APPEAL,CASREF

# U.S. District Court
# Eastern District of Oklahoma (Muskogee)
# CIVIL DOCKET FOR CASE #: <u>6:19–cv–00269–JFH–JAR</u>

Johnson v. Sanders et al

Assigned to: District Judge John F. Heil, III

Referred to: Magistrate Judge Jason A. Robertson

Case in other court:  Circuit Court, 23–07031

Cause: 42:1983 Prisoner Civil Rights

Date Filed: 08/14/2019

Date Terminated: 04/08/2022

Jury Demand: Defendant

Nature of Suit: 550 Prisoner: Civil Rights

Jurisdiction: Federal Question

**Plaintiff**

**Lamone Morlee Johnson**
               represented by  **Lamone Morlee Johnson**
744047
Oklahoma State Penitentiary
PO Box 97
McAlester, OK 74502–0097
405–379–6400
PRO SE

**Plaintiff**

**Marquis LaShaun Porter**
*TERMINATED: 08/16/2019*
               represented by  **Marquis LaShaun Porter**
786756
Davis Correctional Facility
6888 E 133rd Rd
Holdenville, OK 74848
405–379–6400
PRO SE

V.

**Defendant**

**Dr. Sanders**
*Doctor for Davis Correctional Facility*
               represented by  **Darrell L. Moore**
J. Ralph Moore, PC
PO Box 368
Pryor, OK 74362
918–825–0332
Fax: 918–825–7730
Email: <u>darrellmoore@jralphmoorepc.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ray Larimer**
*Correctional Health Services*
*Administrator*
               represented by  **Darrell L. Moore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

1

**Defendant**

| | | |
|---|---|---|
| **Ernesto Martinez** | represented by | **Darrell L. Moore** |
| *Case Manager for Fox Delta Unit, Davis* | | (See above for address) |
| *Correctional Facility* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Shanna Taylor** | represented by | **Darrell L. Moore** |
| *Case Manager for Fox Delta Unit, Davis* | | (See above for address) |
| *Correctional Facility* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Sgt. Morrison** | represented by | **Darrell L. Moore** |
| *Correctional Officer, Davis Correctional* | | (See above for address) |
| *Facility* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

**Sgt Q**
*Sergeant, Davis Correctional Facility*
*TERMINATED: 09/09/2019*

**Defendant**

**Officer Burton**
*Correctional Officer, Davis Correctional*
*Facility*
*TERMINATED: 09/09/2019*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/14/2019 | 1 | COMPLAINT with Jury Demand against All Defendants by Lamone Morlee Johnson, Marquis LaShaun Porter (acg, Deputy Clerk) (Entered: 08/14/2019) |
| 08/14/2019 | 2 | MOTION for Leave to Proceed in Forma Pauperis by Lamone Morlee Johnson Responses due by 8/28/2019(acg, Deputy Clerk) (Main Document 2 replaced on 8/15/2019) (acg, Deputy Clerk). (Main Document 2 replaced on 8/15/2019) (acg, Deputy Clerk). (Entered: 08/14/2019) |
| 08/14/2019 | 3 | DECLARATION (Re: 1 Complaint ) by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 08/14/2019) |
| 08/14/2019 | 4 | DECLARATION (Re: 1 Complaint ) by Marquis LaShaun Porter (acg, Deputy Clerk) (Entered: 08/14/2019) |
| 08/14/2019 | 5 | SECOND DECLARATION (Re: 1 Complaint ) by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 08/14/2019) |
| 08/16/2019 | 6 | OPINION AND ORDER by District Judge James H. Payne: This action is severed such that each plaintiff shall proceed as the sole plaintiff in a separate case. The Court Clerk's Office is directed to open a new case with Plaintiff Porter as the sole plaintiff |

| | | |
|---|---|---|
| | | and with copies of all pleadings, including this Order, filed in the new case. Plaintiffs Johnson and Porter each shall file within twenty−one (21) days an amended complaint setting forth their separate, individual claims in their respective amended complaints. The amended complaints must comply with the instructions set forth in this Order. The Court Clerk shall send each plaintiff a form for filing an amended complaint. Failure to comply with this Order will result in dismissal of the claims by the non−complying plaintiff(s).(acg, Deputy Clerk) (Entered: 08/16/2019) |
| 08/16/2019 | 7 | MINUTE ORDER by District Judge James H. Payne, referring case to Magistrate Judge Steven P. Shreder for all further proceedings in accordance with jurisdiction pursuant to 28 USC § 636. All future filings shall bear the case number CIV−19−269−JHP−SPS. (acg, Deputy Clerk) (Entered: 08/16/2019) |
| 08/16/2019 | 8 | ORDER by District Judge James H. Payne : Granting 2 Motion for Leave to Proceed in Forma Pauperis, initial partial filing fee in the amount of $17.09 is due on 9/5/19. (acg, Deputy Clerk) (Entered: 08/16/2019) |
| 08/26/2019 | | PARTIAL FILING FEES Paid on 8/26/2019 in the amount of $17.09, receipt number 17147 by Lamone Morlee Johnson (pjw, Deputy Clerk) (Entered: 08/26/2019) |
| 08/30/2019 | 9 | MOTION for Appointment of Counsel by Lamone Morlee Johnson Responses due by 9/13/2019(acg, Deputy Clerk) (Entered: 08/30/2019) |
| 08/30/2019 | 10 | MOTION for extension of time to file amended complaint by Lamone Morlee Johnson Responses due by 9/13/2019(acg, Deputy Clerk) (Entered: 08/30/2019) |
| 09/03/2019 | 11 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting 10 plaintiff's Motion for extension of time to file amended complaint. The deadline for filing an amended compliant is extended to September 13, 2019. (acg, Deputy Clerk) (Entered: 09/03/2019) |
| 09/04/2019 | 12 | MINUTE ORDER by Judge Ronald A. White : Denying 9 without prejudice Plaintiff's motion for appointment of counsel. Plaintiff is requesting counsel for himself and his former co−plaintiff. Plaintiff, however, may only present claims or requests for relief on his own behalf. See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990) (The Court will only consider claims "based upon the violation of a plaintiff's personal rights, and not the rights of someone else."). Plaintiff is granted leave to file a proper motion for appointment of counsel for himself, after he has submitted his amended civil rights complaint (acg, Deputy Clerk) (Entered: 09/04/2019) |
| 09/09/2019 | 13 | AMENDED COMPLAINT with Jury Demand against Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Re: 1 Complaint ) by Lamone Morlee Johnson (With attachments)(acg, Deputy Clerk) (Entered: 09/09/2019) |
| | | *Main Document* |
| | | Attachment # 1 *Exhibit 1−10* |
| | | Attachment # 2 *Exhibit 11−17−55* |
| | | Attachment # 3 *Exhibit 17−56* |
| | | Attachment # 4 *Exhibit 21* |
| 09/20/2019 | 14 | LETTER from OKED to Plaintiff RE: 285 forms(acg, Deputy Clerk) (Entered: 09/20/2019) |

| 09/20/2019 | 15 | MOTION for Appointment of Counsel by Lamone Morlee Johnson Responses due by 10/4/2019(acg, Deputy Clerk) (Entered: 09/20/2019) |
|---|---|---|
| 10/02/2019 | 16 | MINUTE ORDER by Magistrate Judge Steven P. Shreder, directing the Clerk of Court to issue Civil Summons for the named defendants and to forward the issued Summons to the U.S. Marshal for service. The plaintiff has been granted In Forma Pauperis status. (Re: 1 Complaint) (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 17 | SUMMONS Issued by Court Clerk as to Ray Larimer (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 18 | SUMMONS Issued by Court Clerk as to Ernesto Martinez (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 19 | SUMMONS Issued by Court Clerk as to Ernesto Martinez (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 20 | SUMMONS Issued by Court Clerk as to Sgt. Morrison (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 21 | SUMMONS Issued by Court Clerk as to Dr. Sanders (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/02/2019 | 22 | SUMMONS Issued by Court Clerk as to Shanna Taylor (acg, Deputy Clerk) (Entered: 10/02/2019) |
| 10/16/2019 | 23 | ATTORNEY APPEARANCE by Darrell L. Moore on behalf of Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 10/16/2019) |
| 10/16/2019 | 24 | MOTION to Stay and for Special Report by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor Responses due by 10/30/2019(Moore, Darrell) (Entered: 10/16/2019) |
| 10/16/2019 | 25 | ORDER by Magistrate Judge Steven P. Shreder :Granting 24 Motion to Stay Proceedings and requiring Special Report. Striking 15 Motion for Appointment of Counsel without prejudice. (acg, Deputy Clerk) (Entered: 10/16/2019) |
| 12/11/2019 | 26 | NOTICE of Change of Address by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 12/11/2019) |
| 12/11/2019 | 27 | MOTION to Extend Deadline(s) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor Responses due by 12/26/2019(Moore, Darrell) (Entered: 12/11/2019) |
| 12/11/2019 | 28 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting 27 Motion to Extend Deadline for defendants to file court ordered Special Report and Answer or Dispositive motions no later than 1/28/2020.(acg, Deputy Clerk) Modified on 12/13/2019, changed date (acg, Deputy Clerk). (Entered: 12/11/2019) |
| 01/27/2020 | 29 | MOTION to Seal Document by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor Responses due by 2/10/2020(Moore, Darrell) (Entered: 01/27/2020) |
| 01/28/2020 | 30 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting 29 Motion to Seal Document for the Special Report.(acg, Deputy Clerk) (Entered: 01/28/2020) |

| 01/28/2020 | 31 | SPECIAL REPORT by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (With attachments)(Moore, Darrell) (Attachment 4 replaced on 2/3/2020) (acg, Deputy Clerk). (Entered: 01/28/2020) |
| --- | --- | --- |
| 01/28/2020 | 32 | ANSWER to Amended Complaint (Re: 13 Amended Complaint) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 01/28/2020) |
| 01/29/2020 | 33 | MINUTE ORDER by Magistrate Judge Steven P. Shreder, Lifting the stay (Re: 25 )(acg, Deputy Clerk) (Entered: 01/29/2020) |
| 01/29/2020 | 34 | SECOND MOTION for Appointment of Counsel by Lamone Morlee Johnson Responses due by 2/12/2020(acg, Deputy Clerk) (Entered: 01/29/2020) |
| 01/29/2020 | 35 | MOTION to Amend/supplemental complaint (Re: 13 Amended Complaint ) (amended complaint not included) by Lamone Morlee Johnson Responses due by 2/12/2020(acg, Deputy Clerk) (Entered: 01/29/2020) |
| 01/29/2020 | 36 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Denying without prejudice Plaintiff's motion to amend 35 for his failure to comply with Local Civil Rule 9.2(c). Plaintiff has failed to clearly set forth the reasons for requesting permission to file an amended complaint, and he has failed to submit a proposed amended complaint with the motion. The Court Clerk is directed to send Plaintiff a copy of Local Civil Rule 9.2(c). (acg, Deputy Clerk) (Entered: 01/29/2020) |
| 02/07/2020 | 37 | OPINION AND ORDER by District Judge James H. Payne: Denying 34 Motion for Appointment of Counsel. (acg, Deputy Clerk) (Entered: 02/07/2020) |
| 02/10/2020 | 38 | MOTION for extension of time to respond/reply to defendants answer and counterclaims. by Lamone Morlee Johnson Responses due by 2/24/2020(acg, Deputy Clerk) (Entered: 02/10/2020) |
| 02/10/2020 | 39 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting 38 plaintiff's Motion for extension of time to respond to the answer and counterclaims, due 3/10/2020.(acg, Deputy Clerk) (Entered: 02/10/2020) |
| 02/24/2020 | 40 | MINUTE ORDER by Court Clerk: At the direction of the Court, this case is hereby reassigned to Judge Ronald A. White. All documents filed in this case in the future shall reflect the new case number CIV–19–269–RAW–SPS (dma, Deputy Clerk) (Entered: 02/24/2020) |
| 03/09/2020 | 41 | SECOND MOTION for extension of time to respond/reply to defendants answer and counterclaims by Lamone Morlee Johnson. Responses due by 3/23/2020(acg, Deputy Clerk) (Entered: 03/09/2020) |
| 03/09/2020 |  | PARTIAL FILING FEES Paid on 3/9/2020 in the amount of $33.62, receipt number 17811 by Lamone Morlee Johnson (pjw, Deputy Clerk) (Entered: 03/09/2020) |
| 03/10/2020 | 42 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting Plaintiff's motion for extension of time until March 17, 2020, to respond to Defendants' answer and counterclaims 41 . Plaintiff's request regarding photocopies is denied. The Court notes that Plaintiff's motion requested two forms of relief––the deadline extension and the request regarding photocopies––in violation of Local Civil Rule 7.1(b), which states that "[e]ach motion, application, or objection filed shall be a separate pleading." Plaintiff is advised that future filings must conform to this local rule. (acg, Deputy Clerk) (Entered: 03/10/2020) |

| 03/11/2020 | 43 | RESPONSE (Re: 31 Special Report, 32 Answer to Amended Complaint ) by Lamone Morlee Johnson (With attachments)(acg, Deputy Clerk) (Entered: 03/11/2020) |
| | | *Main Document* |
| | | Attachment # 1 *Exhibit* |
| 03/18/2020 | 44 | OBJECTION (Re: 42 Ruling on Motion to Extend Deadline and denying photo copies) by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 03/18/2020) |
| 03/18/2020 | 45 | MOTION to order prison officials to allow plaintiff to receive and send affidavit's and written despositions to plaintiff's witness Marquis Porter by Lamone Morlee Johnson Responses due by 4/1/2020(acg, Deputy Clerk) (Entered: 03/18/2020) |
| 04/16/2020 | 46 | NOTICE of Change of Address by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 04/16/2020) |
| 04/16/2020 | 47 | MOTION to order prison officials to allow plaintiff to conduct discovery by Lamone Morlee Johnson Responses due by 4/30/2020(acg, Deputy Clerk) (Entered: 04/16/2020) |
| 04/20/2020 | | PARTIAL FILING FEES Paid on 4/20/2020 in the amount of $2.88, receipt number 17935 by Lamone Morlee Johnson (jcb, Deputy Clerk) (Entered: 04/21/2020) |
| 05/20/2020 | 48 | STIPULATION to allow plaintiff to tape record depositions and type them herself to transcripts. by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 05/20/2020) |
| 06/07/2020 | 49 | MOTION to depose Marquis Porter, inmate titled as "Plaintiffs request for leave of court" by Lamone Morlee Johnson Responses due by 6/22/2020(acg, Deputy Clerk) Modified on 6/10/2020 to edit file date (dma, Deputy Clerk). (Entered: 06/08/2020) |
| 07/08/2020 | 50 | MINUTE ORDER by Court Clerk: At the direction of the Court, this case is hereby reassigned to District Judge John F. Heil, III. All documents filed in this case in the future shall reflect the new case number CIV−19−269−JFH−SPS (dma, Deputy Clerk) (Entered: 07/08/2020) |
| 07/14/2020 | | PARTIAL FILING FEES Paid on 7/14/2020 in the amount of $4.23, receipt number 18225 (jcb, Deputy Clerk) (Entered: 07/16/2020) |
| 07/15/2020 | 51 | MOTION to Compel discovery by Lamone Morlee Johnson Responses due by 7/29/2020(acg, Deputy Clerk) (Entered: 07/15/2020) |
| 07/16/2020 | 52 | MINUTE ORDER by Magistrate Judge Steven P. Shreder : Denying 51 without prejudice Plaintiff's motion to compel discovery. Plaintiff has failed to include a certification that he has in good faith conferred or attempted to confer with the party failing to make disclosure or discovery, as required by Fed. R. Civ. P. 37(a)(1). (acg, Deputy Clerk) (Entered: 07/16/2020) |
| 08/05/2020 | 53 | OBJECTION (Re: 52 Ruling on Motion to Compel, ) by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 08/05/2020) |
| 08/05/2020 | 54 | MOTION to Compel discovery by Lamone Morlee Johnson Responses due by 8/19/2020(acg, Deputy Clerk) (Entered: 08/05/2020) |
| 08/05/2020 | 55 | MOTION requesting a date be set for trial by Lamone Morlee Johnson Responses due by 8/19/2020(acg, Deputy Clerk) (Entered: 08/05/2020) |
| 08/31/2020 | 56 | |

| | | SECOND MOTION to Compel Discovery by Lamone Morlee Johnson Responses due by 9/14/2020(jcb, Deputy Clerk) (Main Document 56 replaced on 8/31/2020) (jcb, Deputy Clerk). (Entered: 08/31/2020) |
|---|---|---|
| 09/02/2020 | 57 | MINUTE ORDER by Magistrate Judge Steven P. Shreder. Plaintiff has filed two motions 45 and 49 , requesting an order to allow him to send and receive affidavits and written depositions for Plaintiff's witness Marquis Porter, or to interview Mr. Porter. Mr. Porter is a prisoner who is incarcerated at Lawton Correctional Facility. Plaintiff is directed to advise the Court within fourteen (14) days of the information Plaintiff is seeking from Mr. Porter. Defendants are directed to reply to Plaintiff's response to this Order within fourteen (14) days of Plaintiff's filing the response. (jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/02/2020 | 58 | MINUTE ORDER by Magistrate Judge Steven P. Shreder denying Plaintiff's motion for an order directing the officials at Joseph Harp Correctional Center to allow Plaintiff access to Plaintiff's legal books, pen, paper, and envelopes in Plaintiff's cell to conduct discovery, and to permit reasonable access to the law library 47 . Plaintiff is requesting relief from non−parties in this action. To pursue a claim against the officials at Plaintiff's current facility, Plaintiff must commence a new civil rights action. Forms for filing a new complaint are available from the Court Clerk's Office. To the extent Plaintiff is requesting copies of any Court decisions from March and April 2020, the Court Clerk is directed to send Plaintiff a copy of the docket sheet for this case. Plaintiff may purchase copies of any document in this action by contacting the Court Clerk's Office and paying fifty (50) cents per page. (jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/02/2020 | 59 | MINUTE ORDER by Magistrate Judge Steven P. Shreder denying without prejudice Plaintiff's motion to compel discovery from Defendant Ernesto Martinez ( 54 Motion to Compel). Plaintiff has failed to attach the referenced copies of interrogatories or to include the certification required by Fed. R. Civ. P. 37(a)(1).(jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/02/2020 | 60 | MINUTE ORDER by Magistrate Judge Steven P. Shreder. Plaintiff has filed a second motion to compel discovery from Defendant Ernesto Martinez ( 56 Motion to Compel). Defendant Ernesto Martinez is directed to respond to Plaintiff's motion within fourteen (14) days by showing cause why the motion should not be granted (jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/02/2020 | 61 | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting scheduling order date(s): Exhibit List due by 12/2/2020, Witness List due by 12/2/2020, Discovery due by 1/2/2021, Dispositive Motions due by 2/2/2021 (jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/02/2020 | 62 | MINUTE ORDER by Magistrate Judge Steven P. Shreder denying without prejudice Plaintiff's Motion to Set Trial Date ( 55 Motion for Hearing). Plaintiff may re−urge the motion after disposition of any dispositive motions. (jcb, Deputy Clerk) (Entered: 09/02/2020) |
| 09/14/2020 | 63 | RESPONSE in Opposition to Motion (Re: 56 MOTION to Compel ) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor ;(Moore, Darrell) (Entered: 09/14/2020) |
| 09/24/2020 | 64 | RESPONSE (Re: 57 Minute Order) titled as "Plaintiff's advisement of information" by Lamone Morlee Johnson (acg, Deputy Clerk) Modified on 1/28/2021 to term motion, edit text and add link (dma, Deputy Clerk). (Entered: 09/24/2020) |

| 09/28/2020 | 65 | REPLY to Response to Motion (Re: 56 MOTION to Compel ) by Lamone Morlee Johnson ;(acg, Deputy Clerk) (Entered: 09/28/2020) |
| 11/02/2020 |  | PARTIAL FILING FEES Paid on 11/2/2020 in the amount of $325.80, receipt number 18562 by Lamone Morlee Johnson (jcb, Deputy Clerk) (Entered: 11/03/2020) |
| 12/02/2020 | 66 | WITNESS LIST by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 12/02/2020) |
| 12/02/2020 | 67 | EXHIBIT LIST by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 12/02/2020) |
| 12/07/2020 | 68 | MOTION for order compelling Discovery by Lamone Morlee Johnson (With attachments) Responses due by 12/21/2020(acg, Deputy Clerk) (Entered: 12/07/2020) |
|  |  | *Main Document* |
|  |  | Attachment # 1 *Exhibit* |
| 12/08/2020 | 69 | EXHIBIT LIST by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 12/08/2020) |
| 12/08/2020 | 70 | WITNESS LIST by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 12/08/2020) |
| 12/15/2020 | 71 | NOTICE of Change of Address by Lamone Morlee Johnson (With attachments)(lal, Deputy Clerk) (Entered: 12/15/2020) |
| 12/30/2020 | 72 | MOTION to Extend Scheduling Order Dates by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor Responses due by 1/13/2021(Moore, Darrell) (Entered: 12/30/2020) |
| 12/30/2020 | 73 | Amended WITNESS LIST by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 12/30/2020) |
| 12/30/2020 | 74 | Amended EXHIBIT LIST by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 12/30/2020) |
| 01/04/2021 | 75 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting Defendants' unopposed motion for extension of deadlines for discovery and for filing dispositive motions 72 . The deadline for discovery is extended to March 2, 2021, and the deadline for filing dispositive motions is extended to April 2, 2021. (acg, Deputy Clerk) (Entered: 01/04/2021) |
| 01/08/2021 | 76 | AMENDED WITNESS LIST by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 01/08/2021) |
| 02/03/2021 | 77 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Directing Defendants to show cause in writing within fourteen (14) days for their failure to respond to Plaintiff's motion to order prison officials to allow Plaintiff to receive and send affidavits and written depositions to Plaintiff's witness Marquis Porter 45 and Plaintiff's motion to depose Marquis Porter 49 . (acg, Deputy Clerk) (Entered: 02/03/2021) |
| 02/18/2021 | 78 |  |

| | | |
|---|---|---|
| | | RESPONSE to Order to Show Cause (Re: 77 Minute Order Directing Party to Show Cause) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 02/18/2021) |
| 03/12/2021 | 79 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Denying without prejudice Plaintiff's motion to allow him to receive and send affidavits and written depositions to his witness Marquis Porter 45 , and Plaintiff's motion to depose his witness Marquis Porter 49 . Plaintiff is granted leave to re−urge the motions, if appropriate, after the defendants file a dispositive motion. (acg, Deputy Clerk) (Entered: 03/12/2021) |
| 03/31/2021 | 80 | Second MOTION for Leave to File Sealed Medical and Mental Health records by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (With attachments) Responses due by 4/14/2021(Moore, Darrell) (Entered: 03/31/2021) |
| 04/02/2021 | 81 | MOTION for Summary Judgment by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (With attachments) Responses due by 4/16/2021(Moore, Darrell) (Entered: 04/02/2021) |
| 04/02/2021 | 82 | MOTION to set trial date by Lamone Morlee Johnson Responses due by 4/16/2021(acg, Deputy Clerk) (Entered: 04/05/2021) |
| 04/05/2021 | 83 | MINUTE ORDER by Magistrate Judge Steven P. Shreder :Granting 80 Motion for Leave to Seal Document. The Court authorizes the electronic filing of documents under seal by counsel. The Clerk shall grant the ability to view sealed documents filed in this case to all attorneys who have entered an appearance in the case and whose appearance has not been terminated. (acg, Deputy Clerk) (Entered: 04/05/2021) |
| 04/06/2021 | 84 | SEALED EXHIBIT 2 (Re: 83 Ruling on Motion to Seal Document(s), 81 MOTION for Summary Judgment) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor (Moore, Darrell) (Entered: 04/06/2021) |
| 04/12/2021 | 85 | MOTION for Extension of Time to Respond to Motion (Re: 81 MOTION for Summary Judgment ) by Lamone Morlee Johnson Responses due by 4/26/2021(acg, Deputy Clerk) (Entered: 04/12/2021) |
| 04/12/2021 | 86 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Granting 85 plaintiff's Motion for Extension of Time to Respond to Motion. Responses due by 5/12/2021 (Re: 81 MOTION for Summary Judgment ) (acg, Deputy Clerk) (Entered: 04/12/2021) |
| 05/12/2021 | 87 | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Directing Defendants to respond within fourteen (14) days to Plaintiff's motion to compel discovery 68 .(acg, Deputy Clerk) (Entered: 05/12/2021) |
| 05/21/2021 | 88 | RESPONSE in Opposition to Motion (Re: 68 MOTION for Discovery ) by Ray Larimer, Ernesto Martinez, Sgt. Morrison, Dr. Sanders, Shanna Taylor ;(Moore, Darrell) (Entered: 05/21/2021) |
| 06/01/2021 | 89 | REPLY to Response to Motion (Re: 56 MOTION to Compel ) by Lamone Morlee Johnson ;(acg, Deputy Clerk) (Entered: 06/01/2021) |
| 06/04/2021 | 90 | MINUTE ORDER by Magistrate Judge Steven P. Shreder : Denying 56 Plaintiff's second motion to compel. Defendants assert they were not served with the discovery requests 63 , and Plaintiff has filed another motion to compel 68 . ( acg, Deputy |

| | | Clerk) (Entered: 06/04/2021) |
|---|---|---|
| 06/04/2021 | 91 | MINUTE ORDER by Magistrate Judge Steven P. Shreder : Denying 68 Plaintiff's motion to compel discovery. Plaintiff has failed to include the certification required by Fed. R. Civ. P. 37(a)(1). (acg, Deputy Clerk) (Entered: 06/04/2021) |
| 06/04/2021 | 92 | MINUTE ORDER by Magistrate Judge Steven P. Shreder : Denying without prejudice Plaintiff's second motion to set trial date 82 . Plaintiff may re−urge the motion after disposition of the pending motion for summary judgment 81 .(acg, Deputy Clerk) (Entered: 06/04/2021) |
| 07/19/2021 | 93 | RESPONSE to Motion (Re: 81 MOTION for Summary Judgment ) by Lamone Morlee Johnson ; (With attachments)(acg, Deputy Clerk) (Entered: 07/19/2021) |
| 10/12/2021 | 94 | MOTION to schedule trial by Lamone Morlee Johnson Responses due by 10/26/2021(acg, Deputy Clerk) (Entered: 10/12/2021) |
| 10/13/2021 | 95 | MINUTE ORDER by Magistrate Judge Steven P. Shreder : Denying without prejudice Plaintiff's third motion to schedule trial 94 . If appropriate, Plaintiff may re−urge the motion after disposition of the pending motion for summary judgment 81 . (acg, Deputy Clerk) (Entered: 10/13/2021) |
| 03/22/2022 | 96 | MINUTE ORDER by Court Clerk referring case to Magistrate Judge Jason A. Robertson for all further proceedings in accordance with jurisdiction pursuant to 28 USC § 636. All future filings shall bear the case number CIV−19−269−JFH−JAR (sms, Deputy Clerk) (Entered: 03/22/2022) |
| 04/01/2022 | 97 | NOTICE of Change of Address by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 04/01/2022) |
| 04/08/2022 | 98 | OPINION AND ORDER by District Judge John F. Heil, III: Granting 81 defendant's Motion for Summary Judgment. (acg, Deputy Clerk) (Entered: 04/08/2022) |
| 04/08/2022 | 99 | JUDGMENT by Court Clerk entering judgment for the defendant and against plaintiff. (terminates case) (acg, Deputy Clerk) (Entered: 04/08/2022) |
| 04/25/2022 | 100 | MOTION to Alter or Amend Judgment (Re: 99 Judgment ) by Lamone Morlee Johnson Responses due by 5/9/2022(acg, Deputy Clerk) (Entered: 04/25/2022) |
| 05/09/2022 | 101 | NOTICE of Change of Address by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 05/09/2022) |
| 05/09/2023 | 102 | OPINION AND ORDER by District Judge John F. Heil, III: Denying 100 Motion to Alter or amend Judgment pursuant to Rule 59(e) (acg, Deputy Clerk) (Entered: 05/09/2023) |
| 05/22/2023 | 103 | NOTICE OF APPEAL to Circuit Court (Re: 102 Ruling on Motion to Alter Order/Judgment, 98 Ruling on Motion for Summary Judgment, 99 Judgment ) by Lamone Morlee Johnson (acg, Deputy Clerk) (Entered: 05/22/2023) |
| 05/22/2023 | 104 | MINUTE ORDER by Magistrate Judge Jason A. Robertson: Upon review of the file in this case, the Court finds that the plaintiff has not submitted a proper motion for leave to proceed in forma pauperis for appeal purposes or paid the $505.00 filing fee. The plaintiff is directed to submit a properly executed motion for leave to proceed in forma pauperis for the appeal, with original signature and have the Trust Fund Officer at his/her facility complete (with an original signature) the Required Certification of Statement of Institutional Accounts and provide a current 6−month |

| | | financial accounting statement and return the completed motion to the Office of the Clerk or pay the filing fee of $505.00 within 20 days or by 6/12/23. The Clerk is directed to provide the plaintiff with a motion for leave to proceed in forma pauperis form and an instruction sheet.(acg, Deputy Clerk) (Entered: 05/22/2023) |
|---|---|---|
| 05/23/2023 | 105 | Transmission of Notice of Appeal and Docket Sheet to U.S. Court of Appeals (Re: 103 Notice of Appeal – Final Judgment) (With attachments). (kdc, Deputy Clerk) (Entered: 05/23/2023) |
| 05/23/2023 | 106 | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 23–7031 (Re: 103 Notice of Appeal – Final Judgment). (kdc, Deputy Clerk) (Entered: 05/24/2023) |
| 06/05/2023 | 107 | MOTION for Leave to Appeal in Forma Pauperis (Re: 103 Notice of Appeal – Final Judgment ) by Lamone Morlee Johnson Responses due by 6/20/2023(acg, Deputy Clerk) (Entered: 06/05/2023) |
| 06/06/2023 | 108 | ORDER by District Judge John F. Heil, III granting 107 Motion for Leave to Appeal in Forma Pauperis. Appeal Filing Fee due by 6/26/2023 in the amount of $23.41. (acg, Deputy Clerk) (Entered: 06/06/2023) |
| 06/22/2023 | | PARTIAL APPEAL FEES Paid on 6/22/2023 in the amount of $23.41, receipt number 21279 (Re: 103 Notice of Appeal – Final Judgment). (jld, Deputy Clerk) (Entered: 06/22/2023) |

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT

for the

Eastern District of Oklahoma

_____ Division

FILED

AUG 1 4 2019

PATRICK KEANEY
Clerk, U.S. District Court

By_____
Deputy Clerk

Case No.   CIV 19 - 269   JHP

*(to be filled in by the Clerk's Office)*

Lamone Montie Johnson, et. al   (See attached)
744 047

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

Dr. Sanders, Ron Lorimer, et. al   (See attached)

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.  Do not include addresses here.)*

Jury Trial
Demanded

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Page 1 of 11

Pg2 \

Plaintiff(s)

2. Marquis Lashawn Porter.
1786756

Defendant(s)

3. E. Martinez
4. Shanna Taylor
5. SGT Q
6. Correctional officer Burton.
7. SGT Morrison

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name                          Lamone Marlee Johnson
All other names by which
you have been known:          Mary'Inmarae' Morleah-Mezelle Green
ID Number                     744047
Current Institution           Davis Correctional Facility - FD-210
Address                       6888 E. 133rd Rd
                              Holdenville         Oklahoma     74848
                                   *City*            *State*     *Zip Code*

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1
Name                          Dr. Sanders
Job or Title *(if known)*     Doctor for Davis Corr. Facility
Shield Number
Employer                      Core CIVIC : Davis Correctional Facility
Address                       6888 E. 133rd Rd
                              Holdenville         Oklahoma   74848
                                   *City*            *State*     *Zip Code*
                              [✓] Individual capacity   [✓] Official capacity

Defendant No. 2
Name                          Ray Larimer
Job or Title *(if known)*     Correctional health services Administrator
Shield Number
Employer                      Core CIVIC : Davis Correctional Facility
Address                       6888 E. 133rd Road
                              Holdenville         Oklahoma   74848
                                   *City*            *State*     *Zip Code*
                              [✓] Individual capacity   [✓] Official capacity

Page 2 of 11

A. The Plaintiff(s)

No. 2 Name: Marquis Lashaun Porter
All other names by which
You have been known: None-Available
ID Number: ~~786756~~ 786756
Current Institution: Davis Correctional Facility
Address: 6888 E. 133rd Rd.
Holdenville, Oklahoma 74848

B. The Defendant(s)

Defendant No. 5
Name: SGT Q
Job or Title: Sergeant
Shield Number: unknown
Employer: Core Civic: Davis Correctional Facility
Address: 6888 E. 133rd Rd. Individual Capacity
Holdenville, OK 74848

Defendant No. 6
Name: Correctional officer Burton
Job or Title: Correctional officer
Shield Number: unknown
Employer: Core Civic: Davis Correctional Facility
Address: 6888 E. 133rd Rd. Individual Capacity
Holdenville, OK 74848

Defendant No. 7
Name: SGT morrison
Job or Title: correctional officer
Shield Number: unknown
Employer: Core Civic: Davis Correctional Facility
Address: 6888 E 133rd Rd. Individual
Holdenville OK 74848 Capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3
Name                                    ~~Felix Martinez~~ Ernesto Martinez
Job or Title *(if known)*               Unit manager Of Fox unit
Shield Number                           Unknown
Employer                                Core Civic's Davis correctional Facility
Address                                 6888 Eo 133rd Rd.

Holdenville                              Oklahoma           74848
_____City_____        _____State_____        ___Zip Code___

[✓] Individual capacity      [✓] Official capacity

Defendant No. 4
Name                                    Shanna Taylor
Job or Title *(if known)*               Case manager for fox delta's unit
Shield Number                           Unknown
Employer                                Core Civic's Davis correctional Facility
Address                                 6888 Eo 133rd Rd.

Holdenville                              Oklahoma           74848
_____City_____        _____State_____        ___Zip Code___

[ ] Individual capacity      [✓] Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

[ ] Federal officials (a *Bivens* claim)

[✓] State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Fourteenth Amendment, eight Amendment of US Constitution, Failure-to-Protect Deprved of Property, Due Process clause, equal Protection, inadequate medical care

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statue, ordinance, regulation, custom, or usage of any state or Territory or the District of columbia." 42 U.S.C. § 1983. If You are suing under Section 1983, explain how each defendant acted under color of State or local law. If You are suing under Bivens, explain how each defendant acted under color of Federal Law.

Answer? Defendant(s) Ray Larimer, Dr. Sanders, Ernesto Martinez, Shanna Taylor, SGT Q , Correctional officer Burton, SGT Morrison, all acted under color of State law because they were all "on the Job" when these incidents took place at Davis Correctional facility. 6888, East 133rd Road, Holdenville, Oklahoma 74848.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Defendant(s) Ray Larimer, Dr. Sanders, ~~Eddie~~ Ernesto Martinez   see attached

## III.   Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- ☐ Pretrial detainee
- ☐ Civilly committed detainee
- ☐ Immigration detainee
- ☑ Convicted and sentenced state prisoner
- ☐ Convicted and sentenced federal prisoner
- ☐ Other *(explain)*  _____

## IV.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   If the events giving rise to your claim arose outside an institution, describe where and when they arose.

Does not apply. N/A

B.   If the events giving rise to your claim arose in an institution, describe where and when they arose.

(see attached)

These events arose at Davis Correctional Facility

Page 4 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

C.   What date and approximate time did the events giving rise to your claim(s) occur?

(See attached)

D.   What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

(See attached)

## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

(See attached)

## VI.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

(See attached)

Page 5 of 11

B. If the events giving rise to Your claim arose in an institution, describe when and where they arose.

Answer?- These events Arose at Davis Correctional Facility, 6888 East 133rd Road, Holdenville OK 74848. The dates are multiple, due to multiple events.

C. What date and approximate time did the events giving rise to Your Claim(s) arose? occur?

Answer? The serious inadequate denial of Medical care began May, 15, 2018. The deprivation of Property Due Process also began May, 15, 2018, the Equal Protection violation begin March 14, 2019 and is till this day Currently Still on going. The Due Process Clause arose on June, 19, 2019. The failure- to- Protect arose on

D. What are the facts underlying Your Claim(s)?

Substantial risk of serious harm at Davis Correctional Facility. Failure-to-Protect, Equal Protection violations, Deprivation of Property, Due Process violations, inadequate Medical Care all occured at Davis Correctional Facility.

## Claim one: Deprivation of Property/Due Process Clause

The Plaintiff Lamone Johnson "monae" is a Pre-operative Transgender (MTF). Whom was born a male but Identify as a female. The Plaintiff "Ms. Johnson" was housed at ~~\_\_\_~~ Joseph Harp Correctional Center (JH.C.C) on November 17, 2017. Plaintiff used a "Request to Staff" which is Oklahoma defartment of corrections Grievance process initial attempt. Plaintiff Ms. Johnson wrote the request to Staff to Warden Carl bear at the Joseph harp correctional Center. The issues raised in the request to Staff (RTS) was that Ms. Johnson a Transgender woman with Gender identity disorder was trying to obtain cosmetics through canteen. Warden Carl Bear granted Plaintiff Ms. Johnson her relief. (See exhibit 1) Plaintiff Purchased 3 cosmetic Items. 1. eye shadow, 2. Foundation, 3. Lip gloss. Plaintiffs

Items Purchased were documented on Plaintiff's Property list (see exhibit 2) Plaintiff was Transferd from J.H.C.C. to Lexington Correctional center, Ms. Johnson was at Lexington correctional center for 2 months. Then Plaintiff was transferd to another facility, Dick Conners correctional center. (D.C.C.C) Plaintiff was there a month and a half, (see exhibit 2) but then yet again Plaintiff was Transferd to Davis correctional Facility. (D.C.F) Plaintiff arrived May, 16, 2016. On that same day Plaintiff was assessed by defendant SGT Morrison; The Property officer SGT Morrison went through the Plaintiff's Ms. Johnson's Personal Property and Found Ms. Johnson's Cosmetic Items. She (defendant Morrison) said " Oh hell no he will not walk around at this Facility with make-up." Ms. Johnson responded that She was a Transgender with Gender Identity disorder that her make-up was Prived by Warden Carl bear at J.H.C.C, Ms. Johnson then informed most respectfully that SGT Morrison refer to her as female Pronouns not male Pronouns. SGT Morrison then told the Plaintiff Ms. Johnson " You are a man's in a man's Prison.", "You will not get Your cosmetics unless approved by medical." SGT Morrison Confiscated and Destroyed Plaintiff's Cosmetic Property. (see exhibit 3) Plaintiff wrote a "Request For Health Services" (Sick Call) to Medical on two occasions. (see exhibit 41, 42) the Correctional Health Services Administrator, defendant, Ray Larimer respond to both sick calls. saying that it was not a medical issue when indeed Plaintiff Ms. Johnson was approet to order cosmetics only because of her Gender identity disorder (see exhibit) So it was a medical issue. As well as asking for a bra which was also confiscated by D.C.F officers. Plaintiff Ms Johnson also wrote an "Inmate request" to Medical the same day as the Sick calls (see exhibit's 41, 42, 5) 5.17-16, again Mr. Larimer responded that this was not a medical issue. So Ms. Johnson filed a RTS and started the Oklahoma Department of Corrections Greivance Process. (see exhibit's 2,1-2-20, for Greivance Process)

Plaintiff Ms. Johnsons Exhaustion of Administrative Remedies were attempted and completed to the best of her knowledge (See exhibits, 61, 61 Backside, 62, 62 Backside, 63, 63 Backside) Ray Larimer knew of the rights that were being violated and he did nothing to stop this situation or grant any relief. So defendants, SGT Morrison and Ray Larimer met the deliberate indifference requirements. Due to multiple requests and attempts to notify.

● Injuries: There was no injuries to claim one only property destroyed without Due Process. of law.

Relief: That SGT Morrison pays Ms. Johnson $7,000 in punitive damages, and $895 in compensatory damages. That an injunction be issued to Ray Larimer to provide Transgender immates with the proper, appropriate medical assistance, care, A jury trial on all issues triable by a jury, a declaration.

<u>Claim two:</u> <u>Denial and inadequate medical care</u>

Plaintiff Lamone Johnson (Ms. Marylin monae Green) is and was always a Preoperative Transgender (see exhibits 71, 72, 73) The Plaintiff Ms. Johnson was sentenced to Ten Years D.O.C. on 8-26-16, The Plaintiff was detained at the Oklahoma County Sheriff's office where she was continued on her Hormone replacement Therapy (HRT) (see exhibits, 81, 82, 82 Backside, 83, 83 Backside, 84, 85.) Ms. Johnson was evaluated at the Oklahoma County Jail (see exhibit 85) for Gender Identity disorder and was confirmed and continued on her Hormones, estradiol (estrogen) and her testerone blocker spironolactone. (See exhibits 81, 82, 82 Backside, 83, 83 Backside, 84, 85) Ms. Johnson was sent to Oklahoma Department of Corrections 9-22-16, She was assessed at LARC

22

Page 1

Case 5:19-cv-00269-JFH-JAR   Document 1   Filed 08/14/19   Page 12 of 33
Appellate Case: 23-7031   Document: 010110881269   Date Filed: 04/20/2023   Page: 23

(Lexington Assessment and Reception Center) where she was assessed and continued on her Hormone replacement therapy. (See Exhibit's 10-1, 10-2, 10-3, 10-4.) Ms. Johnson was sent to North Fork Correctional Center (N.F.C.C) where she signed and agreed to the continuance of her HRT. (See exhibit 91, 91 Backside) from NFCC Plaintiff was transfert to multiple Facilites (See claim one) Ms. Johnson arrived at D.C.C.C (Dick conners Correctional center.) Ms. Johnson was Promised in her Aggrement with Oklahoma deportment of corrections (See exhibit 91, 91 backside) that she would be monitored to see if she was benefiting from the hormones well Ms. Johnson Breast was an A-Cup size However Ms. Johnson's Dysphoria about her body was not being relieved. So Ms. Johnson wrote to a Transgender Law Center where she received Proper (adequate male to female Hormone Guide.) Information from Specialist in Gender identity disorder, (See exhibits 11-1-18) The Plaintiff Submitted a "Oklahoma deportment of corrections request for health services." (See exhibits 12-1, 12-2, 12-3) on 3-26-18, the Mental health services replied "Ms. Johnson You have an order for undergurments." (See exhibit 12-1) on 4-2-018, Plaintiff Ms. Johnson returned from a "Writ" from Oklahoma county Sherrifs office where she obtained a copy of her medical records "Transfer summary" (See exhibit 13) which states the change of dosage of Her Hormonal replacement Therapy medication. Plaintiff Submitted a "Sick Call" (See exhibit 12-2, 12-3) Plaintiff was informed before they could adjust her medication Plaintiff needed to be evaluated for Gender Dysphoria. by Dr. Patrica Jones. Plaintiff informed D.C.C.C Doctor that she was already evaluated at Oklahoma county Sherriff's office. (See exhibit 85) Shewed her medical records (81, 82, 83, 84, 85, 13) but was told she needed to be evaluated by there Doctor Patrica Jones On 5-1-18 Patrica Jones evaluated Ms. Johnson at D.C.C.C medical units. Ms. Johnson shewed Dr. Jolester Piztros (exhibits 71, 72) her medical records (exhibits 81, 82, 83, 84, 98, 13) Ms. Johnson was Transfert to Davis correctional Facility on 5-16-18, Plaintiff was informed by Dr. Shepard and Ray Larimer that Patrica Jones denied Ms. Johnson having Gender Dysphoria. (See exhibits 14-1-9) Stating that Ms. Johnson had a Personality disorder. Ms. Johnson was told by defendant Ray Larimer that he would be discontinuing Ms. Johnson's Hormone Replacement

Therapy (HRT) Ms. Johnson Informed them that she has been on this medication for 3 years that stopping it could mess with her hormonal balance that has been gained over the course of 3 years. Defendant Rail Larimer informed that him and Dr. Sanders would be stopping Plaintiff HRT around August 2018. Plaintiff Seeked Advice from the Transgender Law Center where she received "The Worlds Professional Association for Transgender health" "Standard of care for the Health of Transexuals, Transgenders, Gender Non conforming People (See exhibit's 17-1-113) "(WPATH) is an international, multi disciplinary, Professional association whose mission is to promote evidence-based care, education, research, advocacy Public Policy, and respect for transgender health. (See exhibit 17-1) The Plaintiff Ms. Johnson has experienced "Gender dysphoria and to this day still currently does. (See exhibit 17-3) What is "Gender dysphoria" (See exhibit 17-4) The Plaintiff is and has been distressed about her sex assigned at birth. The Plaintiff Ms. Johnson has felt this way for years. Since she was 6 or 7. Ms. Johnson's family did not approve of supporting Ms. Johnson as a Adolescents transgender (See Exhibit's 17, 10-21) So To better cope with her Gender Identity Ms. Johnson socially changed her name to "marylinmonroe morleah-mezelle Johnson" as well as her daily Appearance (see exhibits 71, 72, 73) (see also Exhibit 17-12 Phenomenology Adolescents) (See also Exhibit 17-16) Patricia Jones was and is inexperienced "Inexperienced clinicians may mistake indications of gender dysphoria for delusions. Phenomenolog ically, there is a qualitative difference between the Presentation of gender dysphoria and the Presentation of delusions or other Psychotic Symptoms" (See exhibit 17-13) "To assess, diagnose and even discuss treatment of gender dysphoria, The QMHP Must meet the exact requirements" (See exhibit 17-21-33) The Plaintiff meets all the criteria for Gender dysphoria. So denying the Plaintiff's HRT is Violating Plaintiff's Serious medical care rights of the eighth Amendment (See exhibits 17-1-113)

Page 14 of 33 filed 08/14/19, on Page 25

On 5-23-18, Plaintiff Ms. Johnson filed a RTS
Pertaining to her Violations Of serious medical
Care to Dr. Patrica Jones (See exhibit 18.5) as
well as (exhibit 18-6) Informing Dr. Jones that
interfering with Plaintiff's prescribe treatment was
Violating Plaintiff's rights. Zn the relief requested
to be "diagnosed with the correct criteria" (See
exhibits 17 1-13) as well as Ms. Johnson's
HRT be reinstated, which was discontinued by
Defendant Ray Larimer, Dr. sanders. (See exhibits
19-1, 19-2, 19-4, 19-5) On 6-6-18 Dr. Patrica Jones
responded "You need to discuss Your diagnosis
with Your Primary QMHP. All medical decisions
are made by medical." The Plaintiff Ms. Johnson
spoke with Ray Larimer and Davis correctional
Facility's QMHP (qualified mental health professional)
Dr. Stepard on 9-17-18 (See exhibit 19.3) Ms. Stepard
said because of Ms. Jones report that the HRT
had to be stopped. Ms. Johnson showed her
medical records (See exhibits 81, 82, 82 Backside
83, 83 Backside, 84, 85) they said Zt don't matter.
Ms. Johnson informed them of how long she has been
undergoing treatment. they still refused to cooperate.
she informed them that this violates her 8th Amendment
to serious medical care. they still stood by their
decision. Ms. Johnson did not like their response
So she appealed with a grievance to defendant
Ray Larimer (.H.S.A (correctional health services
administrator) (See exhibits 18-3, 18-4) On July
5th Ms. Johnson received a response denying her
releif. Alleging 3 things that's incorrect on her

25
→

Greivance 1. "An Answer request to staff form addressed to the correct staff member Must be attached." (See exhibit 18-1) Ms. Johnson attached the correct staff member Patricia Jones (See exhibit's 18-3, 14-4, 18-5, 18-6) 2. "You are on "Grievance restrictions" Proper documentation not included." The Oklahoma department of corrections Greivance Policy OP 090124 is specially clear not to "attach" any thing to the Greivance except the RTS (request to staff) Form. (See exhibit 21-8) 3. That plaintiff did not discuss diagnoses with QMHP, when indeed indeed Plaintiff discussed with QMHP Dr. Shepard who said "the only way we can give you your HRT is if Dr. Jones Confirms you have Gender Dysphoria," 2 would suggest writing her." which the Plaintiff did in her RTS (See exhibit 18-5, 18-6) Ms. Johnson then appealed to the P.I.A.R.A (Personal Identity Administrative Review Authority) (See exhibit 18-7) where she was still denied the releif she was requesting. Plaintiff Ms. Johnson reached the final exhaustion requirement for the Oklahoma Department of corrections. (See exhibit 21-12, 21-13, 21-14) Plaintiff still attempted to rescolve the problem at administrative levels by requesting to speak with defendant Dr. Sanders whom ordered the hormone replacement therapy to be stopped. (See exhibit 19-1, 19-2, 19-4, 19-5, 19-6, 19-7) She Greived the issue again (19-8, 19-9,) was still denied (19-20, 19-21) She appealed and was also still denied again by the medical Administrative review authority (MARA) (See exhibit 19-22) The defendants were informed by Plaintiff's that denying her Estradiol (estrogen

Psychology Disorders, Estrogen Pill, Progesterone Pill (Female Hormonal Pill), (See exhibits 83 backside, 85, 9-1, 10-1, 11-1-18, 13, 17-33-50.) as well as decreasing and denying Ms. Johnson's Testerone blocker Spironolactone (Aldactone), (See exhibits 83 backside, 85, 92, 10-1, 11-1-18, 13, 17-33-50.) Ms. Johnson was not seen by doctor Sanders. Ms. Johnson Informed Dr. Sanders of the physical injuries her body was enduring due to the discontinuation of her HRT, she suffered and still does Suffer from back pain, breast swelling dreadfully dried hair, vomiting, Depression, suicidal thoughts due to her feeling "hated", "hopeless" due to her Body's physical changes of hair growth in a masculine way erections in the morning, deeper voice. Ms. Johnson even found a Oklahoma department of corrections "Management of Gender-Non Conforming Inmates" (see exhibit 70 1-7) Ms. Johnson is a Transgender MTF (Male-to-Female) whom meets the criteria for Gender Dysphoria. (See exhibits 71, 72, 73, 17 1-113) Ms. Johnson still attempted to resolve this administrative issue but still was not seen by defendant Dr. Sanders so that Plaintiff ~~dis~~ could discuss treatment options about her HRT with her medical records prior to incarceration (See exhibits 19-23, 19-24, 19-25, 19-26, 19-27)

Injuries: Chemical-Imbalance, Breast Pain, Chest Pain, back Pain, neck Pain, Depression, Vomiting, Suicidal attempts, dreadfully dried hair, My breast are Sagging and dried. I did receive Indomethacin for the Pain but all other injuries have not been resolved or even been attempted to be resolved by the defendant(s).

Relief: A Preliminary and Permanet Injunction as well as A Temporary restraining order against Defendant(s) Ray Larimer, Dr. Sanders in thier official capacity ordering them to reinstate Plaintiff Lamone (monae') Johnson's HRT (Hormone replacement therapy) estradiol 2 Tab a day (4 MG) (See exhibit B) Spironolactone 2 Tab a day (200 MG) (See exhibit B) To not EVER discontinue Plaintiff HRT again. as well as Punitive, Compensatory, Nominal damages as well as a declaration that the acts and omissions described here in Violated Plaintiff's rights under the Constitution and laws of the united States, A jury trial on all issues triable by a Jury, Punitive damages $9,000, Compensatory $7,000, Plaintiff's Cost in this suit.

## Claim 3: <u>Failure-to-Protect Claim</u>/Equal Protection

On March, 2016 Plaintiff Marquis Lashawn Porter arrived at Davis Correctional Facility. Mr. Porter is not from the State of Oklahoma. He is from The State of Iowa. Mr. Porter was in the state of Oklahoma for 2 weeks visiting his Hunt and was allegely accused of Burganly in the first degree and was Sentenced to Department of corrections In the month of March, 2016, Mr. Porter arrived at Davis Correctional Facility from LARC (Lexington Assessment and Reception Center) Mr. Porter Joined a Gang STG (Security threat group) Rollin' 60's Crip for protection. Due to

Pg. 13, Para. 91,

1. Him not being from Oklahoma he was left alone, his Family is from The State of Iowa. He gets NO Visitation because of the long 12-hour drive. So he Vulnerably Joined a gang for Protection and Survival. Well Plaintiff Ms. Johnson arrived at Davis Correctional Facility May 16, 2018, She Worked in the Kitchen ("Chow-hall") with Mr. Porter. Mr. Porter asks if Ms. Johnson was Transgender. Ms. Johnson Confirms. Mr. Porter told Ms. Johnson that he was a Gay Male in the "freeworld" (Society) that he was from Zolia and that he Joined a STG to be Protected. Ms. Johnson Informed Mr. Porter that she has been incarcerated for 2 1/2 Years and that She has been to 4 other facilitys and that People have tried to Sexually abuse her at every facility except Joseph harp correctional center. That Mr. Porter Needed to embrace himself as who he really is a "Gay male" to not let Inmates Control his life. Mr. Porter agreed and started hanging with Ms. Johnson at work in the Kitchen. Well the STG didn't like Mr. Porter hanging with Ms. Johnson, so they Informed Ms. Johnson that they would "Kill him if we find out he is a Punk." Which "Punk" is a prison terminology for Homosexual. Mr. Porter went to Segregation for Stealing Kitchen food out of the Kitchen. (See exhibit 24-1, 24-2) Ms. Johnson was again approached by the STG Rollinbds and was Informed that they were going to Pay Inmates to Kill Mr. Porter. because he came out to them as Gay. Ms. Johnson being a Transgender and God-friend told the STG that they were "not going to do that. because Mr. Porter has "a right to be whatever he wants to be."

Reply I

and that they were a bunch of "Scary bitches" for trying to kill him all because he was Gay. They told Ms. Johnson she would be next for calling them "Scary bitches". So Ms. Johnson left and refused to house. She went to Segregation housing unit (SoHoHo) She was placed on the same unit as Mr. Porter. She told Mr. Porter why she was down there and that she was never going back to the "Yard" because they were going to kill her for talking up for him. Mr. Porter agreed that the STG was serious he heard stories before. December 11th, 2018, Ms. Johnson and Mr. Porter was placed in the same cell FD-210. where they remained until March, 14, 2019, on March 5th the Plaintiff(s) had a P.M.I (Protective Measures Investigation) by Assistant warden Gentry, Unit manager Berry, Cheif Kevin Brown, Unit manager ~~E~~ Martinez. (the defendant E. Martinez) the Plaintiff(s) both filled a RTS (Request to Staff) to Case Manager

defendant Shanna Taylor explaining in detail what happend and why the PMI and Non-Associations were Necessary (see exhibits 22-1, 23-1) that was on January, 26, 2019, Ms. Taylor (the defendant) responded 2/18/19 saying she has filled out the PMI's for both Plaintiff's (see exhibits 22-1, 23-1) on March 5th, 2019 the PMI was completed and was Granted. meanwhile defendant Shanna Taylor informed Plaintiff(s) that she could not place Non-Associations on Inmates at other Facilitys. even though they are paid to kill the Plaintiff(s). So Plaintiff Ms. Johnson appealed the decision by A

Case 0:19-cv-00269-JFH-JAR Document 1 Filed 08/24/19 Page 20 of 33
Appellate Case 23-7031 Document 010110881285 Date Filed 06/30/2023 Page: 31

Phil 5TN

Grievance. (See exhibit 22-2, 22-2 Backside)
Ms. Johnson releif was granted. (See exhibit 22-3)
Ms. Johnson Still appealed the matter to the
adminastrative review authority because Davis
Correctional Facility is known for going back on
there Greivances and claiming "you should of appealed it
to DoOC, we are a Private Prison." Ms. Johnson
receved the ansur from the Administrative
review authority (See exhibit 22-4) and the
wardens response (See exhibit 22-5) Ms. Johnson
was told to Appeal once again but she already
met the Exhansution requirement to file
her 1963 Civil rights Complaint. Plaintiff Mr. Porter
Also Greived his RTS to his case manager (who
was doing his transfer Packet) Stice and to defendant
Shanna Taylor whom Conducted and referred the
PMI Paper work (See exhibits 23-1, 23-2, 23-12, 23-13,
23-14,) He did not Appeal his Greivance to the Adminis-
trative Review authority (See exhibits 23-16, 23-17)
However Ms. Johnson did include Mr. Porter in her
RTS, Greivance Appeal. So the "Situation" itself was
exhausted. (See exhibits 22-2, 22-2 Backside,) On
3-16-19, The Plaintiff(s) were horse Playing in the
Cell. Ms. Johnson hit her nose on the bunk bed. She
begin bleeding severally. Mr. Porter and Ms. Johnson
Banged on the door to get Immediate help.
C/O Dillenger was working the Pod that day.
Ms. Johnson was asked what happend. She told
them she hit her nose on the bunk. They took
Plaintiff Ms. Johnson to medical where she told them

31

the same. C/O Prince told the Nurse that Ms. Johnson and her celly had a fight. Ms. Johnson informed the Nurse that C/O Prince was just a "escort" to escort her to medical. she had no factual knowledge of the incident. the Nurse typed on the computer and said that was "all she needed." C/O Prince said that we "are both LGBTQ IP family so they're sticking to gutter." Ms. Johnson told C/O prince "we did not fight." Ms. Johnson was talking back to FD-210 (the Plaintiff(s) cell) Ms. Johnson was asked if it was okay to house MR. Porter back in the cell because everybody said they would kill him if he was "put in there cells". Ms. Johnson informed the officers that Her and MR. Porter never fought and that of course MR. Porter could come back into there cell. On March 14, 2019 the Plaintiff(s) received a misconduct report alleging they had a fight. Both Plaintiff(s) assured the hearing officer that there was no fight. the hearing officer "Key" and defendant Ernesto Martinez threated the Plaintiffs that if they did not plead guilty they would not only seperate them but take away the PMI (see exhibits 22-3,22-4) where they would be harmed by inmates that are paid to kill them. Plaintiff Ms. Johnson plead guilty due to her being in fear of her life and being coerced by the defendant Ernesto Martinez and hearing officer "Key." Plaintiff Porter did not plead guilty and was moved from FD-210. Ernesto Martinez was infuritated at Plaintiff Porter and placed a Gang member in his cell FC-107 where inmate Porter was physically assaulted due to Ernesto Martinez deliberate indifference and personal Haterd towards LGBTQIP people.

So Plaintiff Porter filed a RTS (Exhibit 23-5, 23-6)

On the date of the assault, Plaintiff Informed defendant C/o Burton that he had a P.M.I and that he has a hit on him. The plaintiff Mr. Porter begged C/o Burton to remove Inmate Devin Harris from his Cell. But Defendant Correctional officer (C/o) Burton said he had to follow orders that defendant SGT Que said the only way out the cell was if Mr. Porter and Mr. Harris fought it out. So Mr. Harris Assaulted Mr. Porter. Pictures was taking, Medical was Informed and Mr. Porter had knots, bruises on his Head and Face. Due to Mr. Porter being assaulted because of defendant Mr. Ernest martinez deliberate indifference. Plaintiff Mr. Porter Requested to be Placed back in the Cell with Plaintiff Ms. Johnson were he was safe and defendant Ernesto martinez denied him once again. So Plaintiff filed an Grievance to the warden (See exhibits 23-7, 23-8) The warden denied this Greivance and returned it unanswerd because the the Plaintiff Mr. Porter requested Punitive and Nominial Damages. (See exhibits 23-9, 23-10) Plaintiff Mr. Porter Appealed the Decision to the Administrative review authority (See exhibit 23-11-1) where they Informed him that he would receive a amended response from the reviewed authority. (warden) On 6-21-19 Plaintiff received the response from the warden. (See exhibit 23-11-2) Plaintiff Mr. Porter appealed the denied response and awaits the ARA response. Due to Mr. Porter

33

Pg 18, IV, Statement of Facts Cont'd

Informing Officials through the Exhaustion procedure is 100% Fact that the defendant(s), Shanna Taylor, Ernesto martinez, SGT Que, Correctional Officer Burton All knew that both Plaintiff(s) were a substantial risk of safety, that they were both targeted by an STG. This substantial risk of saftey was disregared, and as a result this still continues on, on 6-24-19 a Inmate Rossco craig (a bisexual male) whom notified defendant(s) Ernesto martinez, Shanna Taylor verbally was murdered by the same cell mate he told them he couldn't house with a week prior to his death. Ernesto martinez told Inmate Rossco craig that if he didn't house with Inmate Pryle that he would issue him a misconduct and as a result Rossco craig was murdered. ~~[scribbled out]~~ The Public Interest will not be Disserved by a grant of a Preliminary and Permanet Injunction. As a result of the defendant(s) deliberate indifference Mr. Porter was assaulted and a Inmate was killed, murdred, by a affiliated gang member, whom was ~~both~~ the blame? the defendant Ernesto martinez. LGBTQIP Inmates should ONLY Live with other LGBTQIP Inmates. But as Mr. Ernesto martinez told both Plaintiff(s) "I don't protect bitchs and Fags!"; "This is prison learn how to fuck or fight."; "I'm not your Baby sitter!" "You do the hard crime, you do the hard times!"

Pg 24 - (Statement of claim) Claim 3 contined

Ernesto martinez has retaliated by ordering that the Plaintiff(s) get misconducts for refusing cell mates (see exhibits 23-18, 23-19, 23-20 23-21, 23-22 23-23, (23-24) as well as (exhibit 25-1) This situation is still on going. (See Declarations by both Plaintiff(s))

(See exhibit 23-25, 23-26, 23-27, 23-28 23-29, 23-30, 23-31, 23-32, 23-33)

Injuries: Plaintiff Porter was assaulted and had several Injuries, he had lumps (knots) bruises on his face and head, his dermal Peircing bleed and became infected and smells, he received No Medical attenion for his injuries.

Relief: Enter Preliminary and Permanet Injunctions ordering defendant(s) Ernesto martinez, Shanna Taylor their successors, agents, employees and all Persons acting in concert with them to Protect Plaintiff(s) From hostile gang members and other known enemies; implent an adequate Classification system, Segregating dangerous Inmates from LGBTQIP Inmates; Place Plaintiff(s) at a LGBTQIP Friendly enviroment; Remove Staff initiated seperations from both Plaintiff(s). Due to defendant Ernesto martinez being discriminating to Plaintiff(s) and retaliating to seperate Plaintiff(s) because of lawsuit. Nominal damages, Punitive Damages $11,000 to each defendant, compensatory damages $6,000 to each defendant Ernesto martinez Correctional officer Burton, SGT Q, Jointly severally. Jury trial by all issues triable by a jury. as well as a decluration that the acts and omissions herein above violated Plaintiff(s) rights.

35



under the Constitution and laws of the united States.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII.   Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Davis Correctional Facility

B.   Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C.   Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Medical - Inadequate, Property - Denied, Discrimination - equal
Failure - to - Protect Claim, Denial of Medical,   Protection

Page 6 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.    If you did file a grievance:

1.    Where did you file the grievance?

Davis Correctional Facility

2.    What did you claim in your grievance?

(See attached)

3.    What was the result, if any?

(See attached)

4.    What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

(See attached)

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.  Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B.  If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.  Parties to the previous lawsuit

    Plaintiff(s)    Does not apply. N/A

    Defendant(s)

2.  Court *(if federal court, name the district; if state court, name the county and State)*

3.  Docket or index number

4.  Name of Judge assigned to your case

5.  Approximate date of filing lawsuit

6.  Is the case still pending?

    ☐ Yes

    ☐ No

    If no, give the approximate date of disposition.

7.  What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

    Does not apply. N/A

C.  Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

F.   If you did not file a grievance:

  1.   If there are any reasons why you did not file a grievance, state them here:

Does not apply. N/A

  2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

Does not apply. N/A

G.   Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

(See attached)

These attempts have been made to comply with

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.  Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

Page 8 of 11

Administritive Procedures

G. Please set forth any additional information
that is relevant to the exhaustion
of Your administrative Remedies.

Answer??: These attempts have been fully made
to comply with the Admini stritive
Procedures. returning Greivanees unanswer-
ed is a way of giving "inmates the
run-around" to delay legal action and
to Get a remedy and to "Stall" so that
the Statue of limitations for a "Greivance"
is "Ran out-of-time" which is set forth in
the Greivance procedure for the Oklahoma
department of corrections. as well as
if the inmates receive a Certain amount
of these "unanswerd Greivances" a restriction
shall be "imposed. which the restriction
Contradicts the Greivance Procedure
itself.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

☑ Yes

☐ No

D.   If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s)   Lamone M Johnson,

Defendant(s)   John Whetsel, et, al

2.   Court *(if federal court, name the district; if state court, name the county and State)*

United States District court for the western District Oklahoma

3.   Docket or index number

CIV-17-1312-R

4.   Name of Judge assigned to your case

David L. Russell

5.   Approximate date of filing lawsuit

December 6th, 2017

6.   Is the case still pending?

☐ Yes

☑ No

If no, give the approximate date of disposition   July, 2018

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

Case was dismissed, due to statue of limitations

Page 10 of 11

D.

1. Parties to Previous Lawsuit:
Plaintiff(s): Lamone M. Johnson,
Defendant(s): Deputy warden John Doe #1

2. Court: United States District Court
For the Western District of Oklahoma.

3. Docket or index number: CIV-18-69-M

4. Name of Judge assigned to Your case:
6. GARY M. Purcell

5. Approximate date of filing: Jan, 29, 2018

6. Is this case still Pending? NO, date of disposition:
Feb or March 2018.

7. Failure to Pay Payment of filing Fee
dismissed without Prejudice.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   7-8-2019

Signature of Plaintiff   _Lamore Johnson_

Printed Name of Plaintiff   Lamone M. Johnson

Prison Identification #   744047

Prison Address   DoCoF / FD-210, 6888 Ea 133rd Rd.

Holdenville   OK   74848
City   State   Zip Code

### B.   For Attorneys

Date of signing:   _____

Signature of Attorney   _____

Printed Name of Attorney   _____

Bar Number   _____

Name of Law Firm   _____

Address   _____

_____
City   State   Zip Code

Telephone Number   _____

E-mail Address   _____

Page 11 of 11

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LAMONE MORLEE JOHNSON and** | ) | |
| **MARQUIS LASHAUN PORTER,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | **No. CIV-19-269-JHP-SPS** |
| | ) | |
| **DR. SANDERS, RAY LARIMORE,** | ) | |
| **ENESTO MARTINEZ, SHANNA** | ) | |
| **TAYOR, SGT. Q, CORRECTIONAL** | ) | |
| **OFFICER BURTON, and** | ) | |
| **SGT. MORRISON,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs Lamone Morlee Johnson and Marquis Lashaun Porter, both pro se prisoners in the custody of the Oklahoma Department of Corrections, filed this civil rights action pursuant to 42 U.S.C. § 1983 (Dkt. 1). They seek relief for alleged constitutional violations occurring during their incarceration at Davis Correctional Facility ("DCF"), a private prison in Holdenville, Oklahoma. The defendants are seven DCF employees: Dr. Sanders, Ray Larimore, E. Martinez, Shanna Taylor, Sgt. Q, Correctional Officer Burton, and Sgt. Morrison. As discussed below, Plaintiffs may not proceed as joint plaintiffs in this action, and each plaintiff must file a separate amended civil rights complaint.

**Background**

Plaintiff Johnson is a preoperative transgender (male to female) with gender identity disorder. Johnson complains of the denial of appropriate medical care and personal items

at DCF.  Plaintiff Porter alleges he is a gay male who joined the STG gang for protection when he arrived at DCF.  Porter asserts he received death threats from other gang members after admitting he is gay.  When Johnson defended Porter, Johnson also was threatened. Plaintiffs also claim the defendants have failed to protect them and have retaliated against them.

**Separate Actions**

In *Cremer v. Conover*, No. 09-3200-SAC, 2009 WL 3241583, at *1 (D. Kan. Oct. 1, 2009) (unpublished), the court addressed similar circumstances to those in this case, with two prisoners filing a civil rights action as co-plaintiffs.  The *Cremer* court severed the claims of the co-plaintiffs and opened a new case for the second plaintiff.  *Id.*, slip op. at *1.

This Court has determined it will follow the procedures in *Cremer*, therefore, the claims of Plaintiff Johnson and Plaintiff Porter are hereby severed.  *See Smith v. Corr. Med. Servs.*, No. CV-11-1085, slip op. at *2 (D. N.M. June 21, 2012) (approving the ruling in *Cremer*).  This case shall remain assigned to Plaintiff Johnson, and the Court Clerk is directed to open a separate case for Plaintiff Porter.  Each plaintiff must file a separate amended complaint setting forth their individual claims, in accordance with the instructions below.

**Screening/Dismissal Standards**

Federal courts must engage in a preliminary screening of cases in which prisoners seek redress from a governmental entity or officer or employee of a governmental entity.

28 U.S.C. § 1915A(a).  The Court must identify any cognizable claims and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b); 28 U.S.C. § 1915(e)(2)(B).

The pleading standard for all civil actions was articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  To avoid dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  A court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the plaintiff.  *Id*. at 555-56.  "So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the cause of action should be dismissed.  *Id*. at 558.  The Court applies the same standard of review for dismissals under 28 U.S.C. § 1915(e)(2)(B)(ii) that is employed for Fed. R. Civ. P. 12(b)(6) motions to dismiss for failure to state a claim.  *Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

A pro se plaintiff's complaint must be broadly construed under this standard. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The generous construction to be given to the pro se litigant's allegations, however, "does not

3

relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal

claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Notwithstanding a pro se plaintiff's various mistakes or misunderstandings of legal doctrines

or procedural requirements, "if a court can reasonably read the pleadings to state a valid

claim on which the plaintiff could prevail, it should do so . . . ." *Id.*  A reviewing court need

not accept "mere conclusions characterizing pleaded facts." *Bryson v. City of Edmond*, 905

F.2d 1386, 1390 (10th Cir. 1990).  "While a complaint attacked by a Rule 12(b)(6) motion

to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.

at 555 (quotations and citations omitted).  The court "will not supply additional factual

allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's

behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

**Amended Complaint**

Within twenty-one (21) days of the entry of this Order, Plaintiffs must file separate

amended complaints on the Court's form.  **The amended complaints must set forth the full**

**name of each person being sued under 42 U.S.C. § 1983.**  *See Sutton v. Utah State Sch.*

*for the Deaf & Blind*, 173 F.3d 1226, 1237 (10th Cir. 1999) (holding that "a cause of action

under § 1983 requires a deprivation of a civil right by a 'person' acting under color of state

law").  **Further, the names in the caption of the amended complaint must be identical**

to those contained in the body of the amended complaint, pursuant to **Fed. R. Civ. P. 10(a).** Plaintiffs are responsible for providing sufficient information for service of process. *See Lee v. Armontrout*, 991 F.2d 487, 489 (8th Cir. 1993) (plaintiff proceeding *in forma pauperis* and pro se had responsibility to provide correct names and proper addresses for service of process).

**Each Plaintiff must provide on the amended complaint form a short and plain statement of when and how each named defendant violated the plaintiff's constitutional rights and showing the plaintiff is entitled to relief from each named defendant.** *See* Fed. R. Civ. P. 8(a). Each plaintiff also shall identify a specific constitutional basis for each claim. *See id.* Plaintiffs are admonished that simply alleging that a defendant is an employee or supervisor of a state agency is inadequate to state a claim. A plaintiff must go further and state how the named defendant's personal participation violated the plaintiff's constitutional rights. Furthermore, the Court will only consider claims "based upon the violation of a plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990).

The amended complaint must include all claims and supporting material to be considered by the Court. **It must be complete in itself, including exhibits, and may not reference or attempt to incorporate material from the original complaint or exhibits.** *See* Local Civil Rule 9.2(c). An amended complaint supersedes the original complaint and renders the original complaint of no legal effect. *See Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991); *Gilles v. United States*, 906 F.2d 1386, 1389 (10th Cir. 1990). *See also*

5

Local Civil Rule 9.2(c).  Pursuant to Local Civil Rule 5.2(a), the amended complaint must be clearly legible, and only one side of the paper may be used.

The Court Clerk is directed to send Plaintiffs the proper forms for filing an amended complaint.  Failure to comply with this Order will result in dismissal for failure to state a claim upon which relief may be granted.

**ACCORDINGLY,**

1.	This action is severed such that each plaintiff shall proceed as the sole plaintiff in a separate case.

2.	The Court Clerk's Office is directed to open a new case with Plaintiff  Porter as the sole plaintiff and with copies of all pleadings, including this  Order, filed in the new case.

3.	Plaintiffs Johnson and Porter each shall file within twenty-one (21) days an amended complaint setting forth their separate, individual claims in their respective amended complaints.  The amended complaints must comply with the instructions set forth in this Order.

4.	The Court Clerk shall send each plaintiff a form for filing an amended complaint.

5.	Failure to comply with this Order will result in dismissal of the claims by the non-complying plaintiff(s).

**IT IS SO ORDERED** this 16th day of August 2019.

James H. Payne
United States District Judge
Eastern District of Oklahoma

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**



SEP - 9 2019

**PRO SE PRISONER CIVIL RIGHTS COMPLAINT**

PATRICK KEANEY
Clerk, U.S. District Court

By_____ Deputy Clerk

Morlee
Lamone ~~Creek~~ Johnson

**AMENDED COMPLAINT**

*Plaintiff's full name (Please print)*

**Case No. 19-269-JHP-SPS**

v.

*(To be filled out by Clerk's Office only)*

Dr. Sanders, RN Lortimer, E. Martinez (Ernesto)

*Defendant(s)' full name (Please print)*

+ Shanna Taylor, ~~...~~

~~...~~, SGT Morrison,

Jury Trial Demanded

_____

_____

*For additional names please write "see attached" in the space
above and attach an additional sheet of paper with the full list
of names. **The names listed in the above caption must be
identical to those contained in Section IV, pursuant to Fed.
R. Civ. P. 10(a).***

---

**NOTICE**

*Federal Rule of Civil Procedure 5.2 and Local Civil Rule 5.3 address the privacy and security
concerns resulting from public access to electronic court files. Under these rules, papers filed with
the court should not contain: an individual's full social security number or full birth date; the full
name of a person known to be a minor; or a complete financial account number. A filing may
include only: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.*

***Each claim you raise must be properly exhausted.** If the evidence shows that you did not fully
comply with an available prison grievance process prior to filing this lawsuit, the court may
dismiss the unexhausted claim(s) or grant judgment against you. See 42 U.S.C. 1997e(a).*

***Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.***

## I.   JURISDICTION

*Indicate below the federal legal basis for your claim, if known.*

☑  42 U.S.C. § 1983 (state, county, or municipal defendants)

☐  Action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971)
(federal defendants)

## II.   PLAINTIFF INFORMATION

Lamare Marlee Johnson,          Monae
*Full name*                          *Aliases*

744047
*Prisoner ID #*

Davis Correctional facility
*Place of Detention/Incarnation*

6888 E. 133rd Rd.
*Institutional Address*

Holdenville          Oklahoma          74848
*City*                *State*          *Zip Code*

## III.   PRISONER STATUS

*Indicate whether you are a prisoner or other confined person as follows:*

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☑  Convicted and sentenced state prisoner
☐  Convicted and sentenced federal prisoner

Rev. 07/2019                                              2

## IV.   DEFENDANT(S)' INFORMATION

*List the following information for each defendant. If the correct information is not provided, it could result in the delay or prevention of service. Make sure that the defendant(s) listed below are identical to those contained on the first pate. Attach additional sheets of paper as necessary. Do not write on the backs of any additional sheets. See Local Civil Rule 5.2(a).*

Defendant 1:   Dr Sanders
Full Name

Doctor of DoCoF
Current Job Title

66666 E 133rd Rd
Current Work Address

Holdenville          Oklahoma       74848
City                    State          Zip Code

Defendant 2:   Kall Larymer
Full Name

CottoSoA (Correctional health Service Administrator)
Current Job Title

66666 E 133rd Rd
Current Work Address

Holden Ville       Oklahoma      74848
City                 State          Zip Code

Rev. 07/2019                                                    3

endant 3:   E. Martinez (Ernesto)
*Full Name*

Fot -unit manager
*Current Job Title*

6888 E. 133rd Rd.
*Current Work Address*

Holdenville, Oklahoma 74848
*City*                *State*            *Zip Code*


Defendant 4:   Shanna Taylor
*Full Name*

Fot-delta's Case manager
*Current Job Title*

6888 E. 133rd Rd.
*Current Work Address*

Holdenville, Oklahoma 74848
*City*                *State*            *Zip Code*


Defendant 5:   SGT Morrison
*Full Name*

D.o.C.F-Property/Intake officer
*Current Job Title*

6888 E. 133rd Rd.
*Current Work Address*

Holden Ville Oklahoma 74848
*City*                *State*            *Zip Code*


Rev. 07/2019                              .                              4

## STATEMENT OF CLAIMS

### A. Claim 1

Date(s) of occurrence: May 15, 2018

Place(s) of occurrence: Davis Correctional Facility ("DCF")

*State which of your federal constitutional or federal statutory rights have been violated:*

Due Process clause, Deprivation of Property to the 14th Amendment.

*Briefly state the FACTS that support your case.  Provide **a short and plain statement** of how each named defendant was personally involved in the violation of your constitutional rights and why you are entitled to relief from each named defendant.  See Fed. R. Civ. P. 8(a).  Do not cite case law.*

**FACTS:** SO: SGT Morrison destroyed Plaintiff Johnsons property at arrival from Dick Conners correctional center to Davis correctional center. The items destroyed were cosmetics ordered at a previous facility. Defendant SGT Morrison purposely destroyed Plaintiff's property because of Plaintiff being transgender or as Defendant SGT Morrison says "A man in a man's prison." (See attached)

### B. Claim 2

Date(s) of occurrence: May 15 2018,

Place(s) of occurrence: Davis Correctional facility.

*State which of your federal constitutional or federal statutory rights have been violated:*

Denial and Inadequate to a serious medical need. to the 8th Amendment of the united states constitution.

**FACTS:** Defendant(s) Ray Larimer, Dr. Sanders interfered with Plaintiff's HRT (Hormone replacement therapy) Medication by decreasing and discontinuing (terminating) Plaintiff's estradiol and spironolactone. Plaintiff is a pre-operative MTF (male-to-female) transgender. (See attached)

**A. Claim 1: Deprivation of Property Without Due Process of the 14th Amendment to the U.S. Constitution.**

The Plaintiff Lamone "monie" Johnson is a Pre-operative Transgender (MTF). Whom was born a male but identify as a female. The Plaintiff Ms. Johnson was housed at Joseph Harp Correctional Center (J.H.C.C.) on November 17, 2017. Plaintiff used a "Request to Staff." Which is Oklahoma department of corrections Grievance process initial attempt. Plaintiff Ms. Johnson wrote the request to Staff (RTS) to Warden Carl Bear at the Joseph harp Correctional Center. The issues raised in the request to staff was that Ms Johnson a transgender woman with Gender identity disorder was trying to obtain cosmetics through Canteen. Warden Carl Bear granted Plaintiff Ms. Johnson her relief. (see exhibit 1) Plaintiff Purchased 3 cosmetic Items. 1. eye shadow, 2. Foundation, 3. Lip gloss. Plaintiffs Items Purchased were documented on Plaintiffs Property list (See exhibit 2) Plaintiff was Transferd from J.H.C.C. to Lexington correctional center. Ms. Johnson was at Lexington Correctional center for 2 months. Then Plaintiff was Transferd to Dick Conners correctional center. Plaintiff was there a month and a half. (See exhibit 2) but then let again Plaintiff was transferd to Davis correctional Facility (DCF) Plaintiff arrived may 16, 2018, on that Same day Plaintiff was assessed by defendant SGT morrison. The Property officer SGT morrison went through

the Plaintiff Ms. Johnsons personal property and fund Ms. Johnson's Cosmetics Items. The (defendant SGT morrison) Said "oh hell no, he will not walk around at this facility with make-up." Ms. Johnson responded that She is a Transgender with Gender identity disorder that her make-up was approved by Warden Carl bear at J.H.C.C, Ms. Johnson then Politely informed Ms. SGT morrison to please refer to the Plaintiff with female Pronouns. SGT Morrison then told the Plaintiff "You are a man I'm a man's prison", "You will not get your cosmetics unless approved by medical," SGT morrison confiscated and Destroyed Plaintiff's cosmetics property (See exhibit 3) Plaintiff wrote a "request for health Services" (Sick Call) to medical on two occasions (see exhibit 41, 42) the Correctional Health Services Administrator, defendant Ray Larimer responded to both Sick calls. Denying that the incident was not a "Medical" issue. Plaintiff Ms. Johnson also wrote an "Inmate request" to medical the same day as the Sick calls (See exhibit's 41, 42 5) 5-17-15, as the defendant Ray Larimer responded that it was again not a medical issue so the Plaintiff filed a KTs and started the Oklahoma department of Corrections Grievance Process. (See exhibit's 21-2-20 for Grievance Process) Plaintiff Ms. Johnson Exhausted her administrative remedies to the best of her knowledge and ability (See exhibits 61, 61 Backside, 62, 62 Backside, 63, 63 Backsides) Ray Larimer Knew of the rights that were being violated and he did nothing to stop the situation nor granted any relief. So defendants Ray Larimer, SGT morrison met the deliberate indifference requirement, Due to verbal resolution, and written attempts to correct the situation.

Pg 8 of STATEMENT OF CLAIM

Relief Requested: That SGT Morrison Pays Plaintiff Ms. Johnson $7,000 in Punitive damages, $895 in Compensatory damages, An Injunction be issued to Ray Larimer to Provide Transgender inmates with the Proper, appropriate medical assistance, care, A Jury trial on all issues triable by a Jury, a declaration that the acts and omissions violated Plaintiff's U.S. Constitutional Rights, Plaintiff's cost in this Suit.

B. Claim 2: <u>Denial and Inadequate Medical care to a serious medical need Of the 8th Amendment to the U.S. Constitution</u>

The Plaintiff LaMonie "Monie" Johnson is and has always been a Pre-operative-transgender (MTF) male-to-female (see exhibits 71, 72, 73) The Plaintiff Ms. Johnson was sentenced to 10 Yrs D.O.C on 8-26-16. The Plaintiff was detained at the Oklahoma county sheriff office before being sentenced where she was continued on her HRT (Hormone replacement therapy) (see exhibits 81, 82, 82 Backside, 83, 83 Backside, 84, 85) Ms. Johnson was evaluated at the Oklahoma County Sheriff office (see exhibit 5) for gender identity disorder, which was confirmed and continued on her dosage of HRT, Estrogen (estradiol) and Testorine Blocker (Spironolactone AKA Aldactone) (see exhibits 81, 82, 82 Backside, 83, 83 Backside, 84, 85) Ms. Johnson was sent to O.D.O.C, 9-22-16 she was assessed and Processed through LARC (Lexington Assessment and reception center) where she was assessed and continued on her HRT. (see exhibits 10-1, 10-2, 10-3, 10-4)

Page 86

Case 6:19-cv-00203-JWB-JAR Document 13 Filed 09/09/19 Page 9 of 14
Appellate Case: 23-7034 Document: 0110881265 Date Filed: 06/30/2023 Page: 60

Plaintiff Ms. Johnson was sent to N.F.C.C (North fork Correctional Center) where she signed and agreed to the continuance of her HRTs (See exhibit 91, 91 Backside) from NFCC Plaintiff was transferd to J.C.C. and other Facilities (See claim one) Ms. Johnson arrived at D.C.C.C (Dick Conners correctional center) Ms. Johnson was Promised in her agreement with Oklahoma department of Corrections (See exhibit 91, 91 backside) that she would be monitored to see if she was benefiting from the hormones, Well Ms. Johnson breast tissue was some what an A-cup size. However Ms. Johnson's dysphoria about her body was not being releived. So Ms. Johnson wrote to a "Transgender Law" center where she recepived proper cadequate male-to-female hormone guide) Information from specialist in Gender identity disorders (See exhibits 11-1-16) The plaintiff submitted a "Oklahoma department of Corrections request for health services" (Sick call) (See exhibits 12-1, 12-2, 12-3) On 3-26-18, the Mental health services replied "Ms. Johnson You have an order for undergarments" (See exhibit 12-1) On 4-20-18 Plaintiff Ms. Johnson returned from a "Writ" with the Oklahoma county Sherriff's office where she obtained a copy of her medical reeards. "Transfer Summary" (See exhibit 13) Which states the change of dosage of her Hormonal replacement therapey, Plaintiff Submitted a sick call (See exhibit 12-2, 12-3) Plaintiff was informed before she could receive an adjustment to her HRT medication that she needed to be evaluated for Gender dysphoria. Plaintiff informed D.C.C.C. Doctor that she was already evaluated before entering O.D.O.C. Custody by Oklahoma County Sherriff's office (See exhibit 65) Ms. Johnson showed medical records (See exhibits 81, 82, 83, 84 85, 13) but was still told that their doctor needed to evaluate her. On 5-1-18 Dr. Patricia Jones evaluated Plaintiff Johnson. Ms. Johnson showed Dr. Patricia Jones

her pictures (see exhibits 71, 72) her medical records (exhibits 81, 82, 83, 84, 85, 13) well Ms. Johnson was Transferd to Davis Correctional facility on 5-16-16, Plaintiff was informed by Dr. Jefford and Defendant Ray Larimer that Patrica Jones denied Ms. Johnson having Gender Dysphoria (see exhibits 14-1-9) Stating that Ms. Johnson had a personality disorder, Ms. Johnson was told by defendant Ray Larimer that he would be discontinuing Ms. Johnson's Hormone replacement for Dr. Sanders, Ms. Johnson Informed them that she has been on this medication for 3 years that stopping it would mess with her hormonal balance that has been gained over the course of 3 years. Defendant Ray Larimer Informed Ms. Johnson that him and Dr. Sanders would be completely stopping Plaintiff's Hormone replacement therapy (HRT) by August 2016, Plaintiff seeked advice from the "Transgender Law center" where she recived "the worlds professional Associations for transgenders health" (see exhibits 17-1-113) Plaintiff meets all criteria for gender dysphoria" and "Gender identity disorder" Plaintiff's distressed about sex assigned at birth. Ms. Johnson has felt this way for years before the age of 10 yrs old. Ms. Johnson socially changed her name and daily apperance to better cope with her dysfunctional sex assigned at birth. (see exhibits 71, 72, 73) denying Plaintiff hormone replacement therapy violates Plaintiff's serious medical care rights of the 8th Amendment of the U.S. Constitution. Plaintiff Ms. Johnson also suffers from Physical and mental injuries. the Physical injuries are: back pain, breast-swelling, dreadfully dried hair, breast-dryness, breast-sagging, vomiting, & Chemical-hormonal Imbalance, Neck pain, the mental injuries are: Depression, Gender Identity disorder (increased), Self-hatred, suicidal thoughts and attempts. Plaintiff exhausted Administrative

Pg 11

# STATEMENT OF RELIEF

Remedies.

Relief Requested: A Preliminary and Permanent Injunction as well as a Temporary restraining order against Defendant(s) Ray Larimer, Dr. Sanders in there offical corpacity ordering them to re-instate Plaintiffs Lamone Johnson's HRT (Hormone replacement therapey) estradiol 2 Tab a day (4MG) (see exhibit 13) Spirionolactone 2 Tab a day (200mg) (see exhibit 13) to Not EVER discontinue Plaintiff's HRT again. as well as Punitive, Compensatory, Nominal damages, Punitive $9,000, Compensatory $7,000, as well as a declaration that the acts and omissions described here in violated Plaintiff's rights under the Constitution and laws of the united states, A Jury trial on all issues triable by a Jury. Plaintiff's cost in this suit.



62

**C. Claim 3**

Date(s) of occurrence: ___3-14-19___

Place(s) of occurrence: ___Davis Correctional Facility___

*State which of your federal constitutional or federal statutory rights have been violated:*

Retaliation of the First Amendment of the U.S. constitution

FACTS: Defendant(s) Shanna Taylor, F.Martinez (Ernesto) Retaliated against the Plaintiff for firing grievances by With holding Plaintiff's at Davis correctional Facility Where their are inmates who are Paid to Kill her. As well as writing false-misconducts and placing "Seperations" on Plaintiff and another inmate who was a Plaintiff in this lawsuit.

**D. Claim 4**

Date(s) of occurrence: ___3-14-19___

Place(s) of occurrence: ___Davis Correctional Facility___

*State which of your federal constitutional or federal statutory rights have been violated:*

Equal Protection of the 14th Amendment of the U.S. constitution

FACTS: Defendant F.Martinez (Ernesto) discriminated against Plaintiff for being a part of the "LGBTQIP" Community. by Placing "Seperations" on her and another inmate "Marquis Porter #746756" whom was a Plaintiff in this Lawsuit. because he was a gay Male.

Rev. 07/2019

6

## VI.   RELIEF REQUESTED

*Briefly state what you want the Court to do for you. Do not make legal arguments or cite cases or statutes.*

(Claim 1, Claim2 relief attached) Claim 3
Relief: Defendants remove Seperations Placed
on both inmates for filing Greivances and lawsuits,
Transfer Plaintiff Johnson away from harms way
at Davis correctional Facility, Claim 4: An
Injection ordering removal of Seperations, as well as
a declaration of the acts and omissions here in Violated
Plaintiff's rights under the u.s. constitution.

## VII.   PRISONER'S LITIGATION HISTORY

*The "Three Strikes Rule" bars a prisoner from bringing a civil action or an appeal in forma pauperis in federal court if the prisoner has "on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).*

Have you brought any other lawsuits in federal court while a prisoner?   ☑ Yes   ☐ No

If yes, how many?   _____2_____

Number each different lawsuit below and include the following:

- Name of case (including defendants' names), court, and docket number
- Nature of claim made
- How did it end? (For example, if it was dismissed, appealed, or is still pending, explain below.)
- Did the court assess a "Strike" or find the dismissal a "Prior Occasion" pursuant to 28 U.S.C.1915 (g).

1. Lamone M. Johnson VS. John Whetsel, et. al
Docket# CIV-17-1312-R, Western District of
Oklahoma. • Violations of U.S. constitutional rights
• Dismissed due to Statue of limitations. 2. Lamone M.

Johnson, V.S. Deputy Warden John Doe #1
Docket # CIV-18-89-M, Western District of
Oklahoma. ● Violations of 8th Amendment to the
US Constition● Failure to Payments dismissed
Without Pre Judice

## VIII. PLAINTIFF'S DECLARATIONS:

I declare under penalty of perjury that the foregoing is true and correct.  To the best of my
knowledge, information, and belief, this complaint: (1) is not being presented for an improper
purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
(2) is supported by existing law or by a nonfrivolous argument for extending or modifying
existing law; (3) the factual contentions have evidentiary support or, if specifically so identified,
will likely have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Rule 11 of the
Federal Rules of Civil Procedure.

I agree to provide the Court Clerk's Office with any changes to my address where case-related
papers may be served.  I understand that my failure to keep a current address on file with the
Court Clerk's Office may result in the dismissal of my case.

_____     9-4-19
*Plaintiff's Signature*                        *Date*

I further declare under penalty of perjury that I placed this complaint in the prison's legal mail
system, with the correct postage attached, on the 4th day of September , 2019 .

_____     9-4-19
*Plaintiff's Signature*                        *Date*

Rev. 07/2019                                                                        8

Exhibits for Case No:
CIV-19-269-JHP-SPS

Plaintiff (S) Lamore M Johnson, et.al.,

v.

Defendant(S) DOR Sanders, et.al,

Exhibits here in are titled by
Numbers:
Exhibit 1,2,3, 41,42,5,61,61 Backside,
62, 62 Backside, 63,63 Backside, 64, 71,
72, 73, 81, 81 Backside, 82, 82 Backside, 83
83 Backside, 84, 85, 91, 91 Backside,10-1, 10-2
10-3, 10-4,* 11 1-14* (is Double sided Pages), 12-1, 12-2, 12-3,
13, 14-1-9, 16-1,* 17 1-113* (is Double Sided Pages),

1. He '*' symbol represents all Double sided Pages.

EXHIBIT 1

NOV 17 2017
Received

## Must Be Submitted Through the Law Library or Designee
### Inmate/Offender Grievance Process
### REQUEST TO STAFF

TO: __Warden Carl Bear__   FACILITY/DIST/UNIT: __JHCC__   DATE: __10/17/17__
(NAME AND TITLE OF STAFF MEMBER)   —JHCC 79s-2

I have __X__ have not _____ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: __10/7/17__ facility: __JHCC__ grievance #: __79C8__
I affirm that I do ___ do not __X__ have a grievance pending on this issue.
I affirm that I do ___ do not __X__ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request _____ does __X__ does not relate to a pending misconduct report. If it does, this request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:** State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 10/7/17 I wrote You A "RTS" about As my Facility Head; would You Approve me ordering Cosmetics from an Institution catalog named "Walkenhorst's" You Responded Back "Specify Items I'm Requesting" The Items I'm Requesting

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly should be done and how.

Approve These Listed Cosmetics Items with A Memorandum, so I Can Order them From "Walkenhorst's" (Institution catalog)

NAME: __Lavarne Johnson__ DOC NUMBER: __744047__ UNIT & CELL NUMBER: __C2-107__
(PRINT)
SIGNATURE: __[signature]__ WORK ASSIGNMENT: __Yard Crew-(unit)__

### DO NOT WRITE BELOW THIS LINE

DISPOSITION: _You may order cosmetics through canteen schedule. Thank you!_

__[signature]__   __11-30-17__

STAFF MEMBER          DATE       JHCC        RECEIVED
                                 Law Library  NOV 21 20__

Date response sent to inmate: _____   DEC 01 2017   DOC JHCC
1. Original to file                              Received     WARDEN
2. Copy to inmate/offender

EXHIBIT 1

67

Are 1. Black Radiance Mineral Foundation Kit
2. Black Radiance Soft focus Finishing Powder
3. Black Radiance BB Cream
4. Black Radiance True complexion underelie collector 3, concealer
5. Covergirl Professional Loose Powder
6. Covergirl Tru Blend Minerals Bronzer
7. Covergirl Tru Blend Blush
8. Covergirl eye enhancer eye shadow 4 kit
9. Covergirl clump crusher water proof mascara - Very Black
10. E.L.F Water proof eye Liner Pen
11. Wet N wild color Icon Brow Pencil
12. Wet N wild ultimate minerals Bronzer
13. Wet N wild megaslicks Lipgloss
14. Studio Basics Expert complexion Sponge

Which All of these Items Are "NON-Flammable & NON-Alchol"

**E# Exhibit 2**

# INMATE PROPERTY INVENTORY FORM

Duffel Bag Security Seal Number_____

| | | | |
|---|---|---|---|
| Date 7-44-17 | Johnson | M | |

Inmate's DOC Number | Print Inmate's Name (Last) (First) | (Middle Initial)

**Reason for Inventory**

| | | | | Type |
|---|---|---|---|---|
| Reception | From | Release | | |
| Transfer _____ | To DCCC | Extended Absence | | To _____ |
| Escape | | Segregation | | Number of Boxes |

**Unauthorized/Excess Property To Be mailed or Released To:**

Name _____ Street _____

City/State _____ Zip _____ Phone _____

Description of Unauthorized/Excess Property: _____

Allowable Religious Objects/Symbols (as specified in OP-030112): _____

| QUANTITY | CONDITION | MAKE | MODEL | COLOR | SERIAL NUMBER |
|---|---|---|---|---|---|
| Clock (1) | | | | | |
| Curling Iron, etc. (1) | | | | | |
| Electric Razor or Beard Trimmer (1) | | | | | |
| Fan (1) | Good | westBend | clear | | |
| Hair Dryer (1) | | | | | |
| Hot Pot (1) | | westland | clear | | |
| MP3 Player (1) | fair | MOU | clear | | |
| Radio or Clock Radio (1) | Good | corcom | clear | | |
| Reading Light (1) | | | | | |
| Television (1) | Good | AMPQ | clear | | |
| Watch (1) | good | Three | Brown | | |

**OTHER PROPERTY (LIST QUANTITY OF EACH)**

| | | |
|---|---|---|
| ___ Air Mattress (1) or Mattress w/ integrated pillow (1) | ___ Insulated Underwear Bottom (2) | 2 Spoon (1) |
| ___ Arts/Crafts/Paper | ___ Insulated Underwear Top (2) | ___ State Issue Scrub Pants ( 3-4) |
| ___ Athletic Shoes (1) | ___ Laundry Bag (1) | ___ State Issue Scrub Shirt ( 3-4) |
| ___ Athletic Supporters (1-2) | 1 Legal Material (1 cubic foot) | 2 Sweat Pants (2) |
| ___ Barrettes**(5) | ___ Linens (1 set) | 2 Sweat Shirt (2) |
| ___ Baseball/Stocking Cap (1-2) | 1 Makeup Bag** (1) | ___ T-Shirt, Commemorative (1) |
| ___ Bath Towels (3) | ___ Medicine (KOP) i.e., Nitroglycerin, inhaler | ___ T-Shirt, State Issue (1) |
| ___ Bathrobe* (1) | ___ Necklace (1) | 3 T-Shirt, (5-7 Maximum of 7 T-shirts allowed |
| ___ Bowl with Lid (1) | ___ Nicotine Patches (1 Series) | ___ Toothbrush Cap (1) |
| ___ Bras** (7) | ___ Inmate ID (1) | ___ Tweezers**(1) |
| 3 Briefs/Boxer Shorts*** (7) | ___ Panties** (7) | ___ Wallet (1) (community corrections only) |
| ___ Brush/Comb/Pick (1-2) | 4 Personal hygiene items/cosmetics (base, | 3 Washcloths (3) |
| ___ Can Opener (1) | ___ lipstick, mascara) | **ADDITIONAL PROPERTY:** |
| 1 Coat (1) or (3)**** | 2 Personal Jeans (5) | Shower Shoes |
| 2 Combination Padlocks (2) | ___ Personal Shirts (5) | 2 Folders |
| ___ Denture Cup (1) | ___ Photo Album (1) | 4 Books |
| ___ Disposable Razor (1-5) | ___ Picture Frame (8"x10") (1) | MP3-Canteen |
| ___ Earrings** (2) | ___ Pillow (1) | 2 African Pride hair lotion |
| ___ Electrical Power Bar (1) | ___ Plastic Coffee Cup (1) | TV cable |
| ___ Electronic Game (1) | ___ Plastic Drinking Cup (1) | Remote TV |
| ___ Emery Boards**(2) | ___ Playing Cards (1 Set) | 1-Zinc Wedding Band |
| ___ Fingernail Clippers (1) | 1 Postage Stamps (20) | |
| ___ Footwear (1 [if no athletic shoes] | ___ Ring (1 plain wedding band—no stones) | |
| ___ Gym/Walking Shorts (1-2) | ___ Sewing Kit (1) | |
| ___ Hair Bands (5) | ___ Shower Shoes or Rubber/Plastic Clogs (1) | |
| ___ Hair Clip** (1) | ___ Sleepwear** (2) | |
| 1 Hair Rollers** (20) | ___ Slip** (1) | |
| 1 Headsets (2) | ___ Soap Dish (1) | |
| ___ Ice Bucket | 3 Socks (7) | |

*Females and special needs/geriatric only    **Females only    *** Males Only    ****HWII Only

I understand that unauthorized property listed above must be mailed at my own expense within 30 days from today or that property must be picked up by the person I have indicated within 30 days. If the authorized person does not pick it up, I understand that the property will be donated or destroyed by the Oklahoma Department of Corrections.

I acknowledge that I am responsible for all personal property recorded on my property form to include additions and deletions as well as property issued by the state and that the facility will only accept responsibility for items inventoried and secured by facility staff.

I further understand that the property form, including any additions, is considered to be the complete accounting of the personal property in my possession. other items will be considered contraband and disposed of in accordance with current procedures. OP-040109 entitled "Control of Contraband and Physical Evidence." I am subject to disciplinary action for possession of contraband.

Inmates who are transferred from one prison to another assume the risk of alleged damage to property the inmate packs and/or carries to a transportation vehicle. The department assumes no liability for the welfare of any inmate's property packed by or placed in a transportation vehicle by any person other than facility staff.

I REALIZE THAT I BRING ANY (AUTHORIZED) PERSONAL PROPERTY INTO THE FACILITY AT MY OWN RISK.

Transfer: The undersigned states this inventory includes all personal effects and property, including legal materials, and that he/she has not left any authorized personal property at (Facility) _____ and that all personal effects and property are undamaged and electrical appliances are in working order.

_____ _____ _____ _____
Inmate Signature    Date          Inventory Officer    Date

_____ _____
Witness    Date

Receipt: The undersigned states that the duffel bag and all cardboard boxes were received undamaged and that the security seal was unbroken.

_____ _____ _____ _____
Signature    Date          Inventory Officer    Date

_____ _____
Witness    Date

White – Property Officer's Filed    Yellow – Field File    Pink – Inmate    Blue – Property Desk    DOC 030112

**EXhibit #1** (handwritten vertical)

EXHIBITS

TO: INMATE _Johnson_____   Pod _FC-204_____

NUMBER: _744047_____

Unauthorized items.

FROM: PROPERTY ROOM OFFICER

All make up
items
③

In accordance with CCA Davis Correctional Facility Policy 9-108 and DOC OP-030120,

the following property has been deemed not allowable and you have 30 days to dispose of

these items as follows:  You may  (1) Destroy it

Circle one

(2) Mail it home via the postal service

initial

(3) Donate it to a local charity as available.

You have 30 days from this date: _5·16·18_____ , _____

Thank-you:  Property Room Officer _____

Inmate Signature _refused to sign____  DOC # _744047_____

744047

Exhibit 42

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### REQUEST FOR HEALTH SERVICES

TO BE COMPLETED BY INMATE   Facility: DCcF   Date: 5-17-18

Inmate Name Lamonie (Monae') Johnson DOC # 744047 Unit A South-272

I request the following service(s): (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

Reason for service: In my medical file there is a special clothing order for Bra's 3 Panties. Per OP-140147, I have secondary charestics and i need undergarments Bra 3 Panties order from Mabel bassat. See Konitzer V. Frank 711 F. Supp. 2d 474, 908-11 (F. Dewis, Colo) see also Sonee Yu, 851 F. supp. 2d at 246

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _Lamonie Johnson_   Date: 5-17-18

TO BE COMPLETED BY HEALTH SERVICES

Date Received 5-21-18   Initials C

Comment: You do not meet criteria for this

RN/LPN/Health Care Provider Signature   5-21-18
Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

NOTE: All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within facility.

EXhibit S

**Inmate Request**

72

Issues relating to any of the following areas must be submitted to the Law Library on a "**Request to Staff**" form: Discrimination, Classification, Complaint Against Staff, Condition of Confinement, Disciplinary Process, Legal, Medical, Property, Records/Sentence Administration, and Religion.

This form is not utilized for exhaustion of administrative remedies; you must use the "**Request to Staff**" for those issues.

Facility/Unit: _D.C.F_     Date: _5-17-18_

TO: _Medical_
(Name/Title of Staff Member)

**SUBJECT:** State completely, but briefly, the request on which you desire assistance. This statement must be specific as to the request, dates, place, personnel involved. Only one request or incident per "Inmate Request" is allowed.  The requests addressed on this form are for routine administrative matters such as request for wake-up call, replacement clothing, phone calls, scheduling special/legal visit, hygiene items, etc. Your failure to specifically state your request may result in this Inmate Request being returned denied.

I Arrived at D.C.f on 5-16-18 I was deprived by the property officer of 3 Make-up Items, that I was Approved to order by warden Earl Been at M.C.f. see Montizer V Frank 771 F.supp. 2d 874 908-11 (E.b. Wis.2011) Prison officials denial of Plaintiffs request for make-up women ➔

ODOC # _749047_     Unit & Cell # _A-South #722_

Name: _Lamone Johnson_
(Print)

Signature: _[signature]_     Work Assignment: _____

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION: Take this up with your unit team. Not a medical issue.

_[signature]_     _5-21-18_
Staff Member     Date

ODOC 030101A  (3/17)

Appellate Case: 23-7031     Document: 0101110881265     Date Filed: 06/30/2023     Page: 72

Under garments  and facial hair Remover might give Rise
to an Eighth Amendment Violation): See also Soneeya, 851 F.supp
·2d at 246 (Prison Officals' delay in Providing Female canteen items and
Clothing necessary for Plaintiff's GID treatment Constituted
deliberate indifference.). therefore Taking MY Makeup which was on
MY Property List ALSO violates the U.S. Constitution.

Exhibit 5 (Backside)

222st

Exhibit 61

**Must Be Submitted Through the Law Library or Designee
Inmate/Offender Grievance Process
REQUEST TO STAFF**

TO: Ray Larimer CHSA      FACILITY/DIST/UNIT: D.C.F   DATE: 5-22-18
(NAME AND TITLE OF STAFF MEMBER)

I have ____ have not ____ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do ____ do not ____ have a grievance pending on this issue.
I affirm that I do ____ do not ____ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request _____ does _____ does not relate to a pending misconduct report. If it does, this request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:** State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 5-17-18, I wrote @ 2 sick calls pratining to 1 The property offrcer depriving me of my 3 cosmetics that were approved at another facility due to me having "Gender dysphoria". 2. That I have a special clothing order in my medical files for →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly should be done and how.

Aprrove my underguments and order and I ssue them and Approve my cosmetics and Issue them back to me.

NAME: Cymone Johnson   DOC NUMBER: 744017   UNIT & CELL NUMBER: A Sub T
(PRINT)

SIGNATURE: _____   WORK ASSIGNMENT: _____

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION: You are not approved for this.

_____   6-4-18
STAFF MEMBER   DATE

Date response sent to inmate: _____ JUN 5 ---

1. Original to file
2. Copy to inmate/offender

RECEIVED
JUN 22 20??
GRIEVANCE

DOC 090124D (R 9/16)

74

under garments Due to me having Secondary Charastics
Per OP-140147, and P.R.E.A. 115.42, I need
my Bra & Panties due to without them it
makes me vulnerable for Sexerall Assault
Due to my nipples shaving & my Penis,

Ramore Jenson -744047

Exhibit 61 Backside



GRIEVANCE  JUN 22 2016

Exhibit 62

RECEIVED

JL 22 2018

**INMATE/OFFENDER GRIEVANCE**

GRIEVANCE

Grievance no. _2018-1001-00160 G_

Grievance code: _8_

Response due: _7/11/8_

( Please Return COPY Front & Back )

**DO NOT WRITE ABOVE THIS LINE**

| | |
|---|---|
| Date _6-15-18_ | Facility or District _D.C.F_ |
| Name _Lamone Johnson_ | Facility Housing Unit _AS-222_ |
| ODOC Number _744647_ (Print) | Date "Request to Staff" response received: _June-5th_ |

Have you previously submitted a grievance on this same issue? Yes/No If yes, what date _____, facility _____, grievance # _____. You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1. The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary.

On 5-17-18, I wrote 2 sick calls Pretaining to ① the Property Officer depriving me of my 3 - cosmetics upon arrival, that were approved at another facility (J.H.C.C) due to me having "Gender Dysphoria. ② That I have a special clothing order in my medical →

2. Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.

5-17-18 2 - Request to Health Services
5-22-18 RTS to Ray Larimer C.H.S.A.

3. The action you believe the reviewing authority may lawfully take.

Reimburse my Constricated Items
or the value of currency for those Items.

Grievance report sent to (warden/district supervisor/correctional health services administrator):

| | |
|---|---|
| _Ray Larimer_ | _C.H.S.A._ |
| Name | Title |
| Signature of Grievant | Date Sent to Reviewing Authority _6-15-18_ |

DOC 090124A (R 7/16)

1. Original to file
2. Copy to inmate/offender

(Exhibit)

Files For undergarments Due to me having Secondary charastics Per OP 140147 (Such as Breast) & P.R.E.A 115.42, I need My Bra & Panties due to without them it makes me VULnerable for Sexual Asshault} Due to my nipples showing & male Gentitella on 5-22-18, I wrote a RTS to Ray Lorimer C.B.S.A Pertaining to this Issue. He responded on 6-4-18 " You are not appered for this" How Am I not Appered? If he would've clecked my medical Records. I have an order For my undergarments. So evidontly I Am Approved

RECEIVED

JUN 22 20..

GRIEVANCE

Exhibit 63

# GRIEVANCE RETURNED UNANSWERED

**Received:** _____

_____

**Inmate signature**

_____

**Date**

**DATE:**        June 26, 2018
**TO:**          Johnson, Lamone, #744047
**FROM:**        James Yates, Warden
**Received:**    June 22, 2018
**RE:**          Return of Grievance # 2018-1001-00160-G

YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:

☐    You have not filed your grievance within the specified time frame.  **(CANNOT RESUBMIT)**

   ☐ The "Request to Staff" must be submitted within seven (7) days of the incident.

   ☐The inmate/offender grievance must be submitted by the inmate/offender 15 days from the
      date of the receipt of the response to the "Request to Staff."

☐    An **ANSWERED** Request to Staff form addressed to the correct staff member must be attached.

☐    The Request to Staff issue does not match the issue requested on the Grievance.

☐    Inmate Request forms are not utilized in the Grievance Process.

☐    You have not completed the Grievance form correctly, in its entirety, or on the correct form.

☐    Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil,
      highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making
      comments, in the margins of the pages is permitted.

☐    The Grievance must be specific as to the **complaint, dates, places, personnel involved
      and how the inmate was affected**.

☐    Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐    If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of
      submission, the inmate may file a grievance to the reviewing authority with a copy of the "Request
      to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.) The
      grievance form may only be filed about the lack of response to the "Request to Staff."

☐    You cannot grieve more than one **ISSUE** per grievance form.

☐    You are on **Grievance Restriction**, proper documentation not included.

☐    It has been determined that the grievance is not of an **Emergency or Sensitive** nature, the grievance
      is being returned and you must comply with the standard grievance process.

Exhibit 63 Backside

Page 2 of 2

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
1. Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Offender Disciplinary Procedures."

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
2. Grievances may not be submitted about matters that are in the course of litigation.

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
3. Requests for disciplinary action against staff will not be addressed through the grievance process.

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
4. Grievances shall not be submitted requesting monetary compensation.

☒ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 4 OP-090124 Effective Date: 07/19/2016**
5. Privately contracted facility property issues are not grievable.

☒ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☐ **Section-09 Programs Page: 17 OP-090124 Effective Date: 07/19/2016**
A. Determining Abuse of the Grievance Process
1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
a. Grievances intended to harass another;
b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
d. Grievances about de minimis (small, trifling, no available remedy) issues;
e. Repetitive grievances by multiple inmates/offenders about the same issue;
f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
g. Continued procedural defects, such as submitting additional pages, after having been previously warned. **Because of continued abuse of the grievance process this serves as an official warning.**

☐ You will be afforded the opportunity to properly re-submit the Grievance within **10 days** of receipt of this notice <u>with the noted corrections completed.</u> The failure of such waives/forfeits the right to proceed in the grievance process.

☐ Due to your continued failure to submit a properly filed grievance, you are now <u>**OUT OF TIME**</u>.

☐ Other:

Exhibit 69





JOE M. ALLBAUGH
DIRECTOR

MARY FALLIN
GOVERNOR

STATE OF OKLAHOMA
OKLAHOMA DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE REVIEW AUTHORITY

DCF 18-160

Date:     JULY 24, 2018

To:     JOHNSON, LAMONE #744047

Location:     DCF

From:     Mark Knutson, Director's Designee    *Mark Knutson*

**Your grievance/correspondence was filed improperly for the following reason(s):**

|   |     |                                                                                                                                                                                              |
|---|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|   | 1.  | No facility head response to the grievance.                                                                                                                                                   |
|   | 2.  | No informal action or "Request to Staff" response included.                                                                                                                                   |
|   | 3.  | Out of time from date of alleged incident until filing request to staff.                                                                                                                      |
|   | 4.  | Out of time from date of response to request to staff until filing the grievance with facility head.                                                                                          |
| X | 5.  | Received **out of time** from date of facility head response                                                                                                                                  |
|   | 6.  | You cannot appeal a non-response. See OP-090124 section IV.C.11. or V.C.4.                                                                                                                    |
|   | 7.  | Inmate on grievance restriction and/or proper documentation **not** included.                                                                                                                 |
|   | 8.  | Must be legibly written in blue or black ink. No pencil or other color of ink is allowed. No doodling or writing in margins.                                                                  |
|   | 9.  | Attachments to the grievance/appeal (no additional pages allowed except affidavit if required).                                                                                               |
|   | 10. | Not an issue grievable to Oklahoma Department of Corrections (**Private prison property,** misconduct, litigation pending, not within/under the authority/control of the Department of Corrections, etc.) |
|   | 11. | More than 1 issue - only 1 issue allowed per grievance/Request to Staff                                                                                                                       |
|   | 12. | Not of a sensitive/emergency nature. You must follow the standard grievance process including giving the facility an opportunity to respond.                                                  |
|   | 13. | Requests for disciplinary action against staff will not be addressed in the grievance process.                                                                                               |
|   | 14. | Appeal form not **signed/dated.**                                                                                                                                                             |
|   | 15. | Grievances shall not be submitted requesting monetary compensation.                                                                                                                          |
|   | 16. | The ruling of the Administrative Review Authority or Director's Designee is final.                                                                                                            |
|   | 17. | Facility grievance number not listed on the appeal form.                                                                                                                                      |
|   | 18. | Additional issues submitted in the grievance appeal and not presented in the initial grievance to the facility head for response, will not be addressed by this office.                        |
|   | 19. | You have failed to follow previous instructions from the **reviewing authority** or ARA for filing this **grievance**/appeal and/or properly resubmit. **YOU ARE NOW OUT OF TIME.**           |
|   | 20. | You did not provide the date that you received the reviewing authority's response on the appeal form.                                                                                          |
|   | 21. | This grievance is unanswerable as there are no time frames specified for the alleged action(s) to have occurred                                                                              |
|   | 22. | You failed to identify your grounds for an appeal by checking one, or both boxes on the appeal form.                                                                                          |
|   | 23. | Your appeal must be written on the current Misconduct/Grievance Appeal form (DOC060125V effective **4/17**).                                                                                   |
|   | 24. | You will be afforded **ONE FINAL** opportunity to properly resubmit your corrected grievance/appeal which must be received in ARA within ten (10) days of receipt of this form. **DO NOT RETURN THIS FORM WITH YOUR CORRECTED APPEAL.** |
|   | 25. | Other:                                                                                                                                                                                        |

**THIS OFFICE WILL NOT PROCESS INCOMPLETE/INACCURATE/OUTDATED APPEAL FORMS**
NOTE: Abuse of the grievance process as explained in section IX of OP-090124, will result in restrictions being imposed.

I acknowledge receipt of this response:_____
                                              **Inmate's signature and date**

P.O. BOX 11400, OKLAHOMA CITY, OK. 73136-0400



Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 82

Offender: Lamone Johnson          OK DOC#: 744047          Status: ACTIVE

## Photos



Image Date: 3/14/2017
1234

## Appearance

Gender: Male
Race: Black
Height: 6 ft 3 in
Weight: 161 lbs
Hair Color: Black
Eye Color: Brown

## Alias

Lamone M. Johnson
Monae Johnson

## IDs

OK DOC#: 744047
Birth Date: 8/11/

LAM ONE M JOH

**LAMONE M JOHNSON**

**#130670685**

Segregation, Chronic Care - Pulmonary

Sex: Male
DOB: 08/11/1997 (Age 20)
Height: 6ft 1in
SSN: [redacted]
Agency: DOC
Location: [OUT]
JMS ID: 200353811
Allergies:
NKMA

81

Reports
MAR by Month

# MAR

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✓ | Received |
| 1 | X | Refused |
| 1 | A | Absent |
| 1 | O | Not Given |
| ? | ? | Missing |
| | | Upcoming / Unsaved |
| ~ | ~ | Unscheduled |

| Initials | Name |
|---|---|
| SB | CMA Brown, CMA, Sky |
| YM | ACMA Mattlock, Yvonne |
| CZ | ACMA Zale, Crystal |
| OC | Capehart, CMA, Othello |
| MS | CMA Snyder, CMA, Mary |
| RS | CMA Stafford, Ruby |
| EH | CMA Hadley, Ebony |
| CC | CMA Clark, CMA, Chrystal |
| TL | MAT Lewis, Tashalita |
| KJ | Johnson, Kiara |
| KK | CMA Kellum, CMA, Kiara |
| AM | LPN Mead, Ashlyn |
| WS | CMA Smith, CMA, Whitney |
| EW | CMA Wisby, Ebony |
| AC | CMA Contreras CMA, Alberto |
| AJ | CMA Jonson-Perry, Ayanna |
| NC | CMA Chambers, Natasha |
| DD | MAT Dennis, Darlayna |
| MA | Akomah, CMA, Mary |

## September 2016

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANTACID CALCIUM MINT500MG 2 CHW [PO] By Mouth Q12H - PRN PRN | APRN-CNP Wagner, APRN-CNP, Heather | 89% | 0800 | ~ | ~ | ✓ SB 1 | ~ | ~ | ~ | ~ | ✓ RS 1 | ✓ SB 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 100% |
| | | | 1700 | ~ | ~ | A YM 1 | ✓ CZ 1 | ✓ OC 1 | ✓ OC 1 | ✓ MS 1 | ~ | ✓ EH 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 83% |
| CETIRIZINE HCL10MG 1 TAB [PO] By Mouth QD PM Scheduled | APRN-CNP Wagner, APRN-CNP, Heather | 86% | 1700 | ✓ CC 1 | ✓ AM 1 | A YM 1 | ✓ CZ 1 | ✓ OC 1 | ✓ OC 1 | ✓ MS 1 | A WS 1 | ✓ EH 1 | A KK 1 | ✓ EW 1 | ✓ KK 1 | ✓ TL 1 | ✓ YM 1 | ✓ KK 1 | ✓ KK 1 | ✓ YM 1 | ✓ AC 1 | ✓ WS 1 | ✓ SB 1 | ✓ RS 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 86% |
| DIVALPROEX SODIUM250MG DR 1 TAB [PO] By Mouth BID Scheduled | MD Khan, Ahsan | 82% | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | X SB 1 | ✓ RS 1 | ✓ AJ 1 | ✓ MS 1 | ✓ AC 1 | X NC 1 | ✓ AJ 1 | X NC 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 63% |
| | | | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ TL 1 | ✓ YM 1 | ✓ KK 1 | ✓ KK 1 | ✓ YM 1 | ✓ AC 1 | ✓ WS 1 | ✓ SB 1 | ✓ RS 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 100% |
| ESTRADIOL2MG 1 TAB [PO] By Mouth QD PM Scheduled | D.O Childs, Jr D.O., Jerry | 81% | 1700 | ✓ CC 1 | ✓ AM 1 | A YM 1 | ✓ CZ 1 | ✓ OC 1 | ✓ OC 1 | ✓ MS 1 | A WS 1 | EH 1 | A KK 1 | ✓ EW 1 | ✓ KK 1 | ✓ TL 1 | ✓ YM 1 | ✓ KK 1 | ✓ KK 1 | ✓ YM 1 | ✓ AC 1 | ✓ WS 1 | ✓ SB 1 | ✓ RS 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 81% |
| GUAIFENESIN ER600MG ER 1 TAB [PO] By Mouth BID Scheduled | ARNP-CNP George, Susan | 0% | 0800 | AJ 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | |
| | | | 1700 | CC 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | |
| SERTRALINE HCL50MG 1 TAB [PO] By Mouth QD AM | MD Khan, Ahsan | 57% | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | RS 1 | ✓ AJ 1 | ✓ MS 1 | ✓ AC 1 | X NC 1 | ✓ AJ 1 | X NC 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | |

CorEMR - JOHNSON, LAMONE M :: Diagnostics : v5.4.0 Page 1 of 1

# LAMONE M JOHNSON

☒ LAM ONE M IOH

**#130670685**

Segregation, Chronic Care - Pulmonary

Sex: Male
DOB: 08/11/1997 (Age 20)
Height: 6ft 1in
SSN: ███████
Agency: DOC
Location: [OUT]
JMS ID: 200353811
Allergies:
NKMA

81
Back side

Diagnostics
Labs
# Lab Results

**Instructions:**
1. Click on the lab name to graph all entries for that lab.
2. Click on the column header to view that entire lab result.
3. Click on an individual value to view that specific value. (Double-click for tablet/iPad).

| Test Name | 06/06/2016 1442 IRL | |
|---|---|---|
| Chlamyd Amp DNA | Negative | |
| GC Amplified DNA | Negative | |

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scheduled<br>SPIRONOLACTONE25MG<br>71391793<br>2 TAB [PO] By Mouth QD PM<br>Scheduled | D.O Childs, Jr., D.O., Jerry | 86% | 1700 | ✓ CC 1 | ✓ AM 1 | ^ YM 1 | ✓ CZ 1 | ✓ OC 1 | ✓ OC 1 | ✓ MS 1 | ^ WS 1 | ✓ EH 1 | ^ KK 1 | ✓ EW 1 | ✓ KK 1 | ✓ TL 1 | ✓ YM 1 | ✓ KK 1 | ✓ KK 1 | ✓ YM 1 | ✓ AC 1 | ✓ WS 1 | ✓ SB 1 | ✓ RS 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 86% |
| VENTOLIN HFA<br>18GM90MCG<br>3 AER [IH] By Inhalation<br>Q12H - PRN<br>PRN | APRN-CNP Wagner, APRN-CNP, Heather | 74% | 0800 | ~ | ✓ MS 1 | ✓ SB 1 | ~ | ~ | ~ | ~ | ✓ RS 1 | ✓ SB 1 | X RS 1 | X RS 1 | ~ | ✓ TL 1 | X SB 1 | RS 1 | ~ | ✓ MS 1 | ✓ AC 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 64% |
| | | | 1700 | ✓ CC 1 | ✓ AM 1 | ^ YM 1 | ✓ CZ 1 | ~ | ~ | ✓ MS 1 | ~ | ✓ EH 1 | ~ | ✓ EW 1 | ~ | ~ | X YM 1 | ~ | ~ | ~ | ✓ AC 1 | ✓ WS 1 | ✓ SB 1 | ✓ RS 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 83% |

**Notes** Exhibit 82

| Medication | Date | User | Note |
|---|---|---|---|
| ESTRADIOL<br>2MG 1 TAB [PO] By Mouth QD PM | 09/09/2016 1847 | CMA Hadley, Ebony | medication is not available |
| GUAIFENESIN ER<br>600MG ER 1 TAB [PO] By Mouth BID | 09/01/2016 1641 | CMA Jonson-Perry, Ayanna | exp |
| GUAIFENESIN ER<br>600MG ER 1 TAB [PO] By Mouth BID | 09/01/2016 2349 | CMA Clark, CMA, Chrystal | expired |
| SERTRALINE HCL<br>50MG 1 TAB [PO] By Mouth QD AM | 09/15/2016 1321 | CMA Stafford, Ruby | new not on morning list |
| SPIRONOLACTONE<br>71391793<br>25MG 2 TAB [PO] By Mouth QD PM | 09/04/2016 2222 | ACMA Zale, Crystal | Med in order |
| VENTOLIN HFA 18GM<br>90MCG 3 AER [IH] By Inhalation Q12H - PRN | 09/15/2016 1321 | CMA Stafford, Ruby | not available |

**August 2016** 82 - Exhibit 82

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CETIRIZINE HCL10MG<br>1 TAB [PO] By Mouth QD PM<br>Scheduled | ARNP-CNP George, Susan | 79% | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ CC 1 | ✓ CZ 1 | ✓ TL 1 | ✓ KJ 1 | ✓ OC 1 | ✓ OC 1 | ✓ TL 1 | ✓ SB 1 | ✓ EH 1 | ^ KK 1 | X AM 1 | ✓ CC 1 | ✓ CC 1 | ^ KK 1 | 79% |
| ESTRADIOL2MG<br>71292169<br>1 TAB [PO] By Mouth QD PM<br>Scheduled | D.O Childs, Jr., D.O., Jerry | 35% | 1700 | ✓ OC 1 | X OC 1 | ✓ WS 1 | ✓ TL 1 | ✓ SB 1 | TL 1 | X EH 1 | X TL 1 | ~ | ✓ WS 1 | ✓ SB 1 | ✓ AM 1 | ✓ EH 1 | ✓ EH 1 | ✓ TL 1 | CC 1 | KK 1 | CC 1 | CZ 1 | TL 1 | KJ 1 | OC 1 | X OC 1 | TL 1 | SB 1 | ^ EH 1 | ^ KK 1 | X AM 1 | CC 1 | ✓ CC 1 | ^ KK 1 | 35% |
| GUAIFENESIN ER600MG ER<br>1 TAB [PO] By Mouth BID<br>Scheduled | ARNP-CNP George, Susan | 50% | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ NC 1 | ✓ EW 1 | X DD 1 | ✓ MS 1 | ✓ NC 1 | DD 1 | ✓ DD 1 | ✓ AJ 1 | MS 1 | AC 1 | NC 1 | KK 1 | AJ 1 | AJ 1 | 43% |
| | | | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ CC 1 | ✓ CZ 1 | ✓ TL 1 | ✓ KJ 1 | ✓ OC 1 | ✓ OC 1 | ✓ TL 1 | ✓ SB 1 | EH 1 | AM 1 | AM 1 | CC 1 | CC 1 | ^ KK 1 | 57% |
| NP - CALC. ANTAC<br>ASSORT TAB-30<br>2 CHW By Mouth BID<br>Scheduled | D.O Childs, Jr., D.O., Jerry | 80% | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ AJ 1 | ✓ MA 1 | ✓ AC 1 | ✓ NC 1 | ✓ KK 1 | ~ | ~ | 100% |
| | | | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ SB 1 | ✓ EH 1 | ^ KK 1 | X AM 1 | ✓ CC 1 | ~ | ~ | 60% |
| SPIRONOLACTONE25MG<br>71391793<br>2 TAB [PO] By Mouth QD PM<br>Scheduled | D.O Childs, Jr., D.O., Jerry | 73% | 1700 | ✓ OC 1 | X OC 1 | ✓ WS 1 | ✓ TL 1 | ✓ SB 1 | ✓ TL 1 | X EH 1 | X TL 1 | ~ | ✓ WS 1 | ✓ SB 1 | ✓ AM 1 | ✓ EH 1 | ✓ EH 1 | ✓ TL 1 | ✓ CC 1 | ✓ KK 1 | ✓ CC 1 | ✓ CZ 1 | ✓ TL 1 | ✓ KJ 1 | X OC 1 | X OC 1 | ✓ TL 1 | ✓ SB 1 | ✓ EH 1 | ^ KK 1 | X AM 1 | ✓ CC 1 | ✓ CC 1 | ^ KK 1 | 73% |
| VENTOLIN HFA<br>18GM90MCG<br>3 AER [IH] By Inhalation<br>Q12H - PRN<br>PRN | APRN-CNP Wagner, APRN-CNP, Heather | 86% | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ WS 1 | ✓ SB 1 | ✓ AM 1 | ✓ EH 1 | ✓ EH 1 | ✓ TL 1 | ✓ CC 1 | ~ | ~ | ~ | ✓ TL 1 | ✓ KJ 1 | ~ | ~ | ✓ TL 1 | ✓ SB 1 | ✓ EH 1 | ~ | X AM 1 | ~ | ✓ CC 1 | ~ | 93% |
| | | | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | RS 1 | ✓ RS 1 | ~ | X EH 1 | ~ | ✓ MS 1 | ~ | ~ | ✓ EW 1 | ~ | ✓ MS 1 | ~ | ~ | ~ | ✓ AJ 1 | ~ | ~ | ~ | ~ | ~ | ~ | 71% |

**Notes** Exhibit 82

| Medication | Date | User | Note |
|---|---|---|---|
| ESTRADIOL<br>71292169<br>2MG 1 TAB [PO] By Mouth QD PM | 08/06/2016 2154 | MAT Lewis, Tashalita | med not avail |
| ESTRADIOL<br>71292169<br>2MG 1 TAB [PO] By Mouth QD PM | 08/16/2016 1909 | CMA Clark, CMA, Chrystal | pending |
| ESTRADIOL<br>71292169<br>2MG 1 TAB [PO] By Mouth QD PM | 08/17/2016 1746 | CMA Kellum, CMA, Kiara | exp |

Case 6:19-cv-00269-JFH-JAR Document 13-1 Filed 09/09/19 Page 21 of 33
Appellate Case: 23-7031 Document: 010110881265 Date Filed: 06/30/2023 Page: 86

| | | | |
|---|---|---|---|
| ESTRADIOL 71292169 2MG 1 TAB [PO] By Mouth QD PM | 08/18/2016 1948 | CMA Clark, CMA, Chrystal | expired |
| ESTRADIOL 71292169 2MG 1 TAB [PO] By Mouth QD PM | 08/19/2016 2305 | ACMA Zale, Crystal | exp |
| ESTRADIOL 71292169 2MG 1 TAB [PO] By Mouth QD PM | 08/20/2016 1533 | MAT Lewis, Tashalita | exp |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/20/2016 2240 | MAT Lewis, Tashalita | med not on mar when printed |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/21/2016 1904 | Johnson, Klara | pending |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/22/2016 2233 | Capehart, CMA, Othello | not available |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/24/2016 2121 | MAT Lewis, Tashalita | med not avail |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/25/2016 1710 | CMA Brown, CMA, Sky | not available |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/26/2016 2152 | CMA Hadley, Ebony | this medication was not given it was not available |
| ESTRADIOL 2MG 1 TAB [PO] By Mouth QD PM | 08/29/2016 1834 | CMA Clark, CMA, Chrystal | pending |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/19/2016 2305 | ACMA Zale, Crystal | med in order |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/23/2016 1139 | MAT Dennis, Darlayna | noc |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/26/2016 1537 | CMA Snyder, CMA, Mary | exp |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/26/2016 2152 | CMA Hadley, Ebony | expired |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/27/2016 1429 | CMA Contreras CMA, Alberto | EXPIRED |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/27/2016 1445 | LPN Mead, Ashlyn | expired |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/28/2016 0917 | CMA Chambers, Natasha | exp |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/28/2016 1734 | LPN Mead, Ashlyn | expired |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/29/2016 1311 | CMA Kellum, CMA, Klara | exp |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/29/2016 1834 | CMA Clark, CMA, Chrystal | expired |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/30/2016 1256 | CMA Jonson-Perry, Ayanna | exp |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/30/2016 2041 | CMA Clark, CMA, Chrystal | expired |
| GUAIFENESIN ER 600MG ER 1 TAB [PO] By Mouth BID | 08/31/2016 1457 | CMA Jonson-Perry, Ayanna | exp |
| VENTOLIN HFA 18GM 90MCG 3 AER [IH] By Inhalation Q12H - PRN | 08/11/2016 1422 | CMA Stafford, Ruby | no spacer |

## July 2016

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESTRADIOL2MG 71292169 1 TAB [PO] By Mouth QD PM Scheduled | D.O Childs, Jr., D.O., Jerry | 100% | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ WS 1 | ✓ SB 1 | ✓ WS 1 | ✓ WS 1 | ✓ AC 1 | ✓ AC 1 | ✓ OC 1 | ✓ SB 1 | ✓ SB 1 | ~ | ✓ KK 1 | ✓ KK 1 | ✓ SB 1 | 100% |
| SPIRONOLACTONE25MG 71391793 2 TAB [PO] By Mouth QD PM Scheduled | D.O Childs, Jr., D.O., Jerry | 100% | 1700 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ OC 1 | ✓ SB 1 | ✓ SB 1 | ~ | ✓ KK 1 | ✓ KK 1 | ✓ SB 1 | 100% |

Exhibit 82 Backside.

Case 6:19-cv-00269-JFH-JAR    Document 13-1    Filed 09/09/19    Page 23 of 33
Appellate Case: 23-7031    Document: 010110881265    Date Filed: 06/30/2023    Page: 88

CorEMR - Flow Sheets :: Vital Signs | Vital ...                                    Page 1 of 1

### LAMONE M JOHNSON

☒ LAM
ONE
M
JOH

**#130670685**

Segregation, Chronic Care - Pulmonary

Sex: Male
DOB: 08/11/1997 (Age 20)
Height: 6ft 1in
SSN:
Agency: DOC
Location: [OUT]
JMS ID: 200353811
Allergies:
NKMA



Flow Sheets
Vital Signs

## Vital Signs

Viewing 1-13 of 13 Flow Records

| User | Record Date | Pos | BP Sys | BP Dia | Pulse | Resp. | Temp. | Weight | Height | BMI | $S_pO_2$ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPN Moseley, LPN, Shea | 09/08/2016 2311 | - - - | | | | | | | 6ft 1in | 0.00 | | PT REFUSED VS |
| RN Summers, Eimann | 08/27/2016 1224 | Sitting | 127 | 90 | 78 | 18 | 97.5 ° F | | 6ft 1in | 0.00 | 93.0% | |
| LPN Cargill, LPN, Rebecca | 08/15/2016 1340 | Sitting | 108 | 70 | 79 | 18 | 97.9 ° F | 158 lbs | 6ft 1in | 20.80 | 99.0% | |
| APRN-CNP Wagner, APRN-CNP, Heather | 08/08/2016 1016 | Sitting | 128 | 68 | 70 | 12 | 98.3 ° F | 156 lbs | 6ft 1in | 20.60 | 99.0% | Entered on a sick call created 08-08-2016 1007 |
| LPN Moseley, LPN, Shea | 08/06/2016 1849 | Sitting | 120 | 82 | 74 | 18 | 98.9 ° F | | 6ft 3in | 0.00 | 95.0% | |
| RN Scott, RN, Nicolle | 05/27/2016 2133 | Sitting | 110 | 64 | 76 | 16 | 98.6 ° F | 157 lbs | 6ft 3in | 19.60 | 99.0% | |
| LPN Lee, Kristen R | 05/13/2016 2357 | Sitting | 129 | 92 | 76 | 20 | 97.8 ° F | 161 lbs | 6ft 3in | 20.10 | 98.0% | |
| LPN Lee, Kristen R | 04/16/2016 0158 | Sitting | 144 | 92 | 83 | 20 | 98.9 ° F | 161 lbs | 6ft 3in | 20.10 | 98.0% | |
| R.N. Cantwell, William | 07/17/2015 1200 | - - - | | | | | | | 6ft 3in | 0.00 | | refused |
| RN Cole, RN,, Susie | 05/11/2015 1115 | Sitting | 117 | 68 | 56 | 16 | 95.4 ° F | 157 lbs | 6ft 3in | 19.60 | 99.0% | |
| LPN Young, LPN, Linda | 05/10/2015 0520 | Sitting | 110 | 68 | 78 | 18 | 98.1 ° F | 160 lbs | 6ft 3in | 20.00 | 97.0% | |
| LPN Sampson, LPN, Kysha | 05/05/2015 2037 | Standing | 117 | 71 | 83 | 18 | 97.3 ° F | 158 lbs | | | | 98.0% | INTAKE VITALS |
| LPN Sampson, LPN, Kysha | 05/05/2015 2035 | - - - | | | | | | | 6ft 3in | 0.00 | | |

Viewing 1-13 of 13 Flow Records

Case 6:19-cv-00269-JFH-JAR   Document 13-1   Filed 09/09/19   Page 24 of 33
Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 89
CorEMR - JOHNSON   ...; Medication | v5.4.0   Page 1 of 1

**LAMONE M JOHNSON**

☒ LAM
ONE
M
JOH

**#130670685**

Segregation, Chronic Care - Pulmonary

Sex: Male
DOB: 08/11/1997 (Age 20)
Height: 6ft 1in
SSN:
Agency: DOC
Location: [OUT]
JMS ID: 200353811
Allergies:
NKMA

88
Backside

Medication
Medications

# Inactive Medication

| Medication | Start Date | End Date | Clinician | Status | Dist |
|---|---|---|---|---|---|
| ANTACID CALCIUM MINT500MG<br>2 CHW [PO] By Mouth Q12H - PRN<br>NDC: 00536104815 | 09/03/2016 | 09/09/2016 | APRN-CNP Heather Wagner, APRN-CNP | ✓ Approved<br>09/08/2016 0752<br>Discontinued | PRN |
| CETIRIZINE HCL10MG<br>1 TAB [PO] By Mouth QD PM<br>NDC: 16571040210 | 09/02/2016 | 12/30/2016 | APRN-CNP Heather Wagner, APRN-CNP | ✓ Approved<br>09/08/2016 0752<br>Discontinued | Sched |
| | 08/18/2016 | 09/01/2016 | ARNP-CNP Susan George | ✓ Approved<br>08/17/2016 1505<br>All Taken | Sched |
| DIVALPROEX SODIUM250MG DR<br>1 TAB [PO] By Mouth BID<br>NDC: 29300013905<br>Refills Remaining: 2 | 09/13/2016 | 12/11/2016 | MD Ahsan Khan | ✓ Approved<br>09/14/2016 1334<br>Discontinued | Sched |
| ESTRADIOL2MG<br>1 TAB [PO] By Mouth QD PM<br>NDC: 00591046805 | 08/19/2016 | 12/16/2016 | D.O Jerry Childs, Jr., D.O. | ✓ Approved<br>08/19/2016 1014<br>Discontinued | Sched |
| | 07/18/2016 | 08/18/2016 | D.O Jerry Childs, Jr., D.O. | ✓ Approved<br>07/18/2016 1242<br>All Taken | Sched |
| GUAIFENESIN ER600MG ER<br>1 TAB [PO] By Mouth BID<br>NDC: 45802049878 | 08/18/2016 | 08/25/2016 | ARNP-CNP Susan George | ✓ Approved<br>08/17/2016 1505<br>Discontinued | Sched |
| NP - CALC. ANTAC ASSORT TAB-30<br>2 CHW By Mouth BID<br>NDC: 49349009002 | 08/25/2016 | 08/29/2016 | D.O Jerry Childs, Jr., D.O. | ✓ Approved<br>08/25/2016 1224<br>Discontinued | Sched |
| SERTRALINE HCL50MG<br>1 TAB [PO] By Mouth QD AM<br>NDC: 68180035202<br>Refills Remaining: 2 | 09/13/2016 | 12/11/2016 | MD Ahsan Khan | ✓ Approved<br>09/14/2016 1334<br>Discontinued | Sched |
| SPIRONOLACTONE25MG<br>2 TAB [PO] By Mouth QD PM<br>NDC: 53746051101 | 07/25/2016 | 10/19/2016 | D.O Jerry Childs, Jr., D.O. | Discontinued | Sched |
| VENTOLIN HFA 18GM90MCG<br>3 AER [IH] By Inhalation Q12H - PRN<br>NDC: 00173068220<br>Refills Remaining: 3 | 08/09/2016 | 12/06/2016 | APRN-CNP Heather Wagner, APRN-CNP | ✓ Approved<br>08/16/2016 1508<br>Discontinued | PRN |

**LAMON**

☒ LAM
ONE
M
IOH

**#13067068!**

Segregation, Chronic Care - Pulmonary

Sex: Male
DOB: 08/11/1997 (Age 20)
Height: 6ft 1in
SSN: ▮
Agency: DOC
Location: [OUT]
JMS ID: 200353811
Allergies:
NKMA

84

Summary

## Highlighted Chart Notes

This inmate came to this nurse window at about 13:40 pm. He stated he was on the bench by processing and another inmate hit him. An urgent care document was completed and then a video was viewed. It shows that an inmate almost fell forward on bench touching his leg with his arm. He did not hit him. There was not an altercation with inmate on inmate.     08/15/2016

## Current Problems

| | Problem | Onset Date | Open Date |
|---|---|---|---|
| | Nurse Sick Call | N/A | 08/24/2016 |
| | hormone replacement therpy | 08/08/2016 | 08/08/2016 |
| | PULM - Asthma, mild | 08/08/2016 | 08/08/2016 |
| | PSYCH - Bipolar Disorder | N/A | 04/22/2016 |

## Tasks

Overdue Tasks: 0 View
Today's Tasks: 0 View
Upcoming Tasks: 0 View

## Intake Forms

| Form | Date Saved |
|---|---|
| Mental Health - Intake Screening (MH-014) | 05/13/2016 2351 View |
| Patient - Health Assessment (PT-028) | 05/27/2016 2133 View |
| Patient - Patient Intake Health Screening (PT-051) | 05/13/2016 2357 View |
| Tuberculosis - PPD Reading (PT-024R) | 05/15/2016 0837 View |
| Tuberculosis - Screening and Assesment (PT-024A) | 05/13/2016 2355 View |
| Tuberculosis - Symptom Screening Only Form (PT-024S) - | Begin |
| Zika Virus Disease Screening (PT-092) | 05/13/2016 2356 View |

| Date | Patient Medical History |
|---|---|
| 09/15/2016 | Document Stored: General Patient Chart Inmate Request |
| 09/15/2016 | Document Stored: General Patient Chart Mental Health |
| 09/13/2016 | Completed Form: Mental Health - Outpatient Progress Note (MH-017) by Ahsan Khan |
| 09/13/2016 | Prescription: DIVALPROEX SODIUM 250MG DR BID MD KHAN, AHSAN |
| 09/13/2016 | Prescription: SERTRALINE HCL 50MG QD AM MD KHAN, AHSAN |
| 09/08/2016 | Completed Form: Patient - Urgent Care Assessment (PT-037) by Shea Moseley, LPN |
| 09/07/2016 | Flow: Confinement Log by Mary Snyder, CMA |
| 09/02/2016 | Task: I need my tums back on asap I have acid reflux (Completed) |
| 09/02/2016 | Prescription: ANTACID CALCIUM MINT 500MG Q12H - PRN APRN-CNP Wagner, APRN-CNP, Heather |
| 09/02/2016 | Prescription: CETIRIZINE HCL 10MG QD PM APRN-CNP Wagner, APRN-CNP, Heather |
| 09/01/2016 | Task: Client was seen on SPII. He reported a history of treatment at Red Rock for anx (Completed) |
| 08/30/2016 | Note: 10 David welfare rounds has no medical complaints cell is clean appears to be ta |
| 08/30/2016 | Document Stored: General Patient Chart Inmate Request |

Viewing 1–20 of 132 History Items   « Prev 1 2 3 4 5 6 7 Next »

Case 6:19-cv-00269-JFH-JAR   Document 13-1   Filed 09/09/19   Page 26 of 33
Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 91
CorEMR - L̶e̶m̶o̶n̶e̶̶t̶̶t̶̶e̶ C̶O̶0̶1̶3̶3̶2̶̶R̶#̶1̶3̶0̶6̶7̶0̶6̶8̶t̶:̶1̶6̶̶e̶n̶t̶a̶l̶̶F̶̶i̶l̶e̶d̶̶0̶3̶/̶1̶2̶/̶1̶8̶a̶t̶i̶P̶a̶g̶e̶̶7̶̶3̶̶o̶f̶̶1̶4̶5̶ Page 1 of 4

## ⌂Mental Health - Outpatient Progress Note (MH-017)

| | | | | |
|---|---|---|---|---|
| | JMS ID: | 200353811 | Location: | [OUT] |
| | DOB: | 08/11/1997 | Interviewer: | MD Khan, Ahsan (09/13/2016 16:02) |
| | Age: | 20 | | |
| | Agency: | DOC | | |

**LAMONE M JOHNSON #130670685**

*Exhibit 85*

### Subjective

| | |
|---|---|
| Reason for Encounter / Patient Statement: | SERTRALINE HCL 50MG TAB QD AM; Directions: 1 TAB [PO] By Mouth QD AM ; <br> DIVALPROEX SODIUM 250MG DR TAB BID; Directions: 1 TAB [PO] By Mouth BID ; <br> CETIRIZINE HCL 10MG TAB QD PM; Directions: 1 TAB [PO] By Mouth QD PM ; <br> ESTRADIOL 2MG TAB QD PM; Directions: 1 TAB [PO] By Mouth QD PM ; <br> VENTOLIN HFA 18GM 90MCG AER Q12H - PRN; Directions: 3 AER [IH] By Inhalation Q12H - PRN ; <br> SPIRONOLACTONE 25MG TAB QD PM; Directions: 2 TAB [PO] By Mouth QD PM ; <br><br> I was physically present to evaluate this patient with officer Lisa. Pt was a 19 yrs old AAM who called himself Transgender and would like to be a female. he does not like his body and feels strange in his body. Taking Hormones to develop sec sexual characterstics to him. Working as a strip dancer at a Transgender club. Got arrested 4 months ago for running away from a Juvenile facility. He was sentenced to 10 yrs on 8/27/16 and will go to prison soon. Reported he has issues with his anger, mood swings and how he react towards people. Has been diagnosed with bipolar but he did not fit into the criteria as his sx are ongoing and everyday. Seeing his psychiatrist at Red Rock for the last 2 yrs. <br><br> PPH: Was admitted for bizarre behavior when he was high in 2012 at St. Anthony. <br><br> Social hx: was living by himself before arrested. Was working at a Transgender club as strip dancer. Was sexually abused by his uncle from age 4-12 . Told his mother but no one believed him. Never had sex with females. Has been to JDC many times for behavioral issues. Completed his HS and wants to be a psychiatrist. <br><br> Substance use hx: Started smoking at age 12, smokes one pack/day. Smoked MJ from age 13-15. Drinks occasionally. No DUI. <br><br> Family hx: Aunt is bipolar <br><br> Medical hx: Asthma and scoliosis |

### Objective

| | |
|---|---|
| Appearance: | ☐ Groomed <br> ☑ Disheveled <br> ☐ Red-eyed |
| Orientation: | ☑ Time <br> ☑ Person <br> ☑ Place <br> ☑ Situation <br> ☑ |

Case 6:19-cv-00269-JFH-JAR   Document 13-1   Filed 09/09/19   Page 27 of 33
Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 92
CorEMR - LCASON EMIOLHASSE N #1506/0687 Ment Filedl03/18/Culpatiage074 of 1:45Page 2 of 4

| | | |
|---|---|---|
| Eye Contact: | ☐ Appropriate | |
| | ☐ Downcast | |
| | ☐ Avoidant | |
| Behavior: | ☑ Unremarkable | |
| | ☐ Fidgety | |
| | ☐ Restless | |
| | ☐ Agitated | |
| | ☐ Overly Dramatic | |
| | ☐ Withdrawn | |
| Attitude: | ☐ Cooperative | |
| | ☐ Hostile | |
| | ☐ Guarded | |
| | ☐ Evasive | |
| | ☑ Arrogant | |
| | ☐ Passive-Aggressive | |
| Mood: | ☐ Euthymic | |
| | ☐ Dysphoric | |
| | ☐ Depressed | |
| | ☐ Anxious | |
| | ☐ Angry | |
| | ☐ Labile | |
| | ☑ Irritable | |
| | ☐ Euphoric | |
| Affect: | ☑ Congruent | |
| | ☐ Incongruent | |
| | ☐ Inappropriate | |
| | ☐ Broad | |
| | ☐ Restricted | |
| | ☐ Flat | |
| | ☐ Blunted | |
| Speech: | ☑ Coherent | |
| | ☐ Goal-Directed | |
| | ☐ Incoherent | |
| | ☐ Rapid | |
| | ☐ Loud | |
| | ☐ Soft | |
| | ☐ Pressured | |
| | ☐ Tangential | |
| Thought Content: | ☑ Unremarkable | |
| | ☐ Paranoid | |
| | ☐ Delusional | |
| Suicidal: | ☑ None | |
| | ☐ Ideation | |
| | ☐ Plan | |
| | ☐ Intent (Specify) | |
| Homicidal: | ☑ None | |
| | ☐ Ideation | |



Exhibit 91

Attachment A
OP-140147
Page 1 of 2

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### Male to Female
### Hormonal Therapy Risk and Information Form

Hormone therapy may be all the treatment you need for your gender dysphoria. (While you are being treated with hormones, you will be monitored to determine if the hormone treatment is benefiting you.) Before starting hormone treatment you are encouraged to exercise regularly and stop smoking. Exercise improves the benefits of hormone treatment, while smoking causes increased risk of thromboembolic disease (blood clots) associated with hormone treatment. These blood clots can cause stroke, heart attack, lung damage, and/or death. To reduce the risk of forming blood clots, daily aspirin is often recommended to persons taking estrogen.

Blood tests will be taken to determine your health and suitability to begin hormone therapy. Some people may be unable to take hormones due to other health conditions.

You may be frustrated with how long hormone therapy takes to produce results, and you will need to be realistic about the extent of changes you can expect. For example, hormones cannot change the shape or height of your skeleton.

**Estrogen** can be prescribed for transsexual women with gender dysphoria and is often helpful in making their appearance more feminine.

- Noticeable changes may include:
- your penis and testicles may get smaller
- your body may redistribute body fat into a more female shape
- you may have less muscle
- you may have some breast development

There may be side effects, although some transsexual often report feelings of calm and well-being after starting on hormone treatment.

**Estrogen side effects may include:**

- chest pain or heavy feeling, pain spreading to the arm or shoulder, nausea, sweating, general ill feeling;
- sudden numbness or weakness, especially on one side of the body;
- sudden severe headache, confusion, problems with vision, speech, or balance;
- pain, swelling, warmth, or redness in one or both legs;
- migraine headache;
- pain, swelling, or tenderness in your stomach;
- confusion, problems with memory or concentration;
- jaundice (yellowing of the skin or eyes);
- swelling in your hands, ankles, or feet; or
- a breast lump.

Less serious side effects of estrogen may include:

- mild nausea, vomiting, bloating, stomach cramps;
- breast pain, tenderness, or swelling;
- freckles or darkening of facial skin;
- increased hair growth or loss of scalp hair;
- changes in weight or appetite;
- problems with contact lenses;
- mild headache, nervousness, dizziness, tired feeling or mood swings.

These potential effects and side effects make it important to have regular medical check-ups.



Exhibit 91



Exhibit 91. Backside

Attachment A
OP-140147
Page 2 of 2

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### Male to Female
### Hormonal Therapy Risk and Information Form

Medications known as androgen suppressants help to lessen the effects of your body's own androgens (male sex hormones). Spironolactone is an androgen suppressant and is sometimes used as part of treatment for gender dysphoria.

Spironolactone side effects may include:

- numbness or tingling
- muscle pain or weakness
- slow, fast, or uneven heartbeat
- feeling drowsy, lightheaded, or restless
- urinating less than usual or not at all    *(W/my)*
- shallow breathing
- tremors
- confusion
- nausea
- upper abdominal pain
- itching
- loss of appetite
- dark urine
- clay-colored stools
- yellow skin or eyes
- fever
- sore throat    *(W/my)*
- swelling of face or tongue
- burning eyes
- skin pain
- skin blistering & peeling
- headache
- intestinal gas



I have read the effects and side effects of the medication(s) which are being prescribed to me for gender dysphoria. I accept the potential risks inherent in this treatment. I have been given the opportunity to ask questions and discuss my treatment with my health care provider. By signing below, I acknowledge the risks, verify my understanding of the information provided, and consent to treatment with the medication(s) prescribed to me for gender dysphoria.

Signature: X Lamore Johnson                        Date: 12/8/16

Printed Name: X Lamone Johnson          DOC#: 744047

Witness: _____    Title: _____    Date: 12-8-16

Witness: Mary Church QMH              Title: _____    Date: 12-8-16

(R 4/16)

Exhibit 10-1

# Oklahoma Department of Corrections

Oklahoma Department of Corrections Private and DOC: ODOC Formulary Group
Number:

**JOHNSON, LAMONE**

OK DoC Offender ID **744047**
08/11/1997 (20) M African
American
Joseph Harp Correctional Center

Gender Identity Disorder  302.85 DSM     Suspected 09/23/2016
in Adolescents or Adults     IV

Pt. has been on hormone replacement
therapy for over a year and feels he is a
woman trapped in a man's body.

*Medications:*
Yes

*Medications are placed in sealed envelope for transport:* Yes;

**Medications:**

| Medication | Start Date | End Date |
|---|---|---|
| DermaDaily- lotion topical<br>1 QS Once daily for 151 Days | 07/03/2018 | 11/30/2018 |
| Omeprazole20 mg enteric coated capsule oral<br>1 capsule(s) Once daily for 151 Days | 07/03/2018 | 11/30/2018 |
| Albuterol Sulfate HFACFC free 90 mcg/inh aerosol with adapter inhalation (PRN: short of breath)<br>2 puff(s) Four times daily for 202 Days | 05/13/2018 | 11/30/2018 |
| Aldactone50 mg tablet oral<br>1 tablet(s) Once daily for 273 Days | 03/03/2018 | 11/30/2018 |
| Aspirin325 mg tablet oral<br>1 tablet(s) Once daily for 273 Days | 03/03/2018 | 11/30/2018 |
| Estradiol2 mg tablet oral<br>1 tablet(s) Before bed for 273 Days | 03/03/2018 | 11/30/2018 |
| DermaDaily- lotion topical<br>1 QS Once daily for 180 Days | 01/04/2018 | 07/02/2018 |
| Omeprazole20 mg enteric coated capsule oral<br>1 capsule(s) Once daily for 180 Days | 01/04/2018 | 07/02/2018 |
| Nortriptyline Hydrochloride75 mg capsule oral<br>1 capsule(s) Before bed for 90 Days<br>Notes: dose decrease | 12/13/2017 | 03/12/2018 |
| Vistarilpamoate 25 mg capsule oral<br>1 capsule(s) Before bed for 90 Days<br>Notes: new order | 12/13/2017 | 03/12/2018 |
| Aldactone50 mg tablet oral<br>1 tablet(s) Once daily for 90 Days | 12/03/2017 | 03/02/2018 |
| Albuterol Sulfate HFACFC free 90 mcg/inh aerosol with adapter inhalation (PRN: short of breath)<br>2 puff(s) Four times daily for 180 Days | 11/14/2017 | 05/12/2018 |
| Aspirin325 mg tablet oral<br>1 tablet(s) Once daily for 129 Days | 10/25/2017 | 03/02/2018 |
| Estradiol2 mg tablet oral<br>1 tablet(s) Before bed for 180 Days | 09/04/2017 | 03/02/2018 |

*Orthoses/Prostheses:*
None

*Aides to impairment:*
Glasses

*Impairments:*
Vision

*Pending laboratory/x-rays:*

*The contents of this document are confidential and restricted to authorized personnel of the Oklahoma Department of Corrections.*

Exhibit 16

## Oklahoma Department of Corrections

Oklahoma Department of Corrections Private and DOC: ODOC Formulary Group
Number:

**JOHNSON, LAMONE**

OK DoC Offender ID **744047**
08/11/1997 (20) M African
American
Joseph Harp Correctional Center

No

*Mental health concerns:*
Yes
   *Describe:* GID, PTSD, BIPOLAR DISORDER
*Pending mental health appointment:*
Yes
   *Date:* 01/24/2018

**Vitals:**

| Measurement | 01/04/18 09:21 AM | 12/21/17 04:17 PM | 12/19/17 04:18 PM | 11/03/17 05:30 AM | 04/09/17 10:09 PM |
|---|---|---|---|---|---|
| Height | 75 | | | | |
| Weight (lbs) | 163.2 | | | | |
| Temperature (F) | 99.3 | | | | |
| Pulse (BPM) | 116 H | | | | |
| Respirations (BPM) | 16 | | | | |
| Heart Rate (BPM) | 116 | | | | |
| SBP (sitting) | 135 | | | | |
| DBP (sitting) | 94 | | | | |
| Peak flow | 310,370,340 | | | | |
| MA | | A | | | |
| W | | 1 | | | |
| MH Level: | | | | B | |
| Override | | MHB | | | |
| Vision Acuity OU | | | | | |
| PPD Mfr Lot | | | | | ' |
| Location (RFA or LFA) | | | | | |
| PPD Skin Test Interpretation (Neg/Pos/PP) | | | | | neg |
| Influenza Mfr Lot | | | | | |
| HepBV #1 Mfr Lot | | | | 00444621A | |
| Location Administered: | | | | | |
| Routine PE Completed - Yes (Y) or Refused (R) | | | | right deltoid | |
| HIV Tested (R-reactive or NR - non-reactive) | | | | | |
| DNA Tested (Y/N) | | | | | |

| Measurement | 04/06/17 10:55 PM | 12/02/16 02:35 PM | 12/01/16 03:27 PM | 09/28/16 10:45 AM | 09/22/16 01:29 PM |
|---|---|---|---|---|---|
| Height | | | | | |
| Weight (lbs) | | | | | |
| Temperature (F) | | | | | |

*The contents of this document are confidential and restricted to authorized personnel of the Oklahoma Department of Corrections.*

...://ehr.docsynergy.com/DocSynergy/CentralMR/NotePrint.aspx?PatientUserCode=3432... 1/4/201...

96

## Oklahoma Department of Corrections

Oklahoma Department of Corrections Private and DOC: ODOC Formulary Group
Number:

**JOHNSON, LAMONE**

OK DoC Offender ID **744047**
08/11/1997 (20) M African
American
Joseph Harp Correctional Center

| | | | | | | |
|---|---|---|---|---|---|---|
| Pulse (BPM) | | | | | | |
| Respirations (BPM) | | | | | | |
| Heart Rate (BPM) | | | | | | |
| SBP (sitting) | | | | | | |
| DBP (sitting) | | | | | | |
| Peak flow | | | | | | |
| MA | | | | | | |
| W | | | | | | |
| MH Level: | | | | | | |
| Override | | | | | | |
| Vision Acuity OU | | | | | | |
| PPD Mfr Lot | C5038AA | | | | | |
| Location (RFA or LFA) | LFA | | | | | |
| PPD Skin Test Interpretation (Neg/Pos/PP) | | | | | | |
| Influenza Mfr Lot | | | | | | |
| HepBV #1 Mfr Lot | | completed 1998. | | | | |
| Location Administered: | | | | | | |
| Routine PE Completed - Yes (Y) or Refused (R) | | | | | Y | |
| HIV Tested (R-reactive or NR - non-reactive) | | | | nr | | |
| DNA Tested (Y/N) | | | | | | y |

| Measurement | 09/22/16 01:09 PM |
|---|---|
| Height | |
| Weight (lbs) | |
| Temperature (F) | |
| Pulse (BPM) | |
| Respirations (BPM) | |
| Heart Rate (BPM) | |
| SBP (sitting) | |
| DBP (sitting) | |
| Peak flow | |
| MA | |
| W | |
| MH Level: | |
| Override | |
| Vision Acuity OU | contacts |
| PPD Mfr Lot | |
| Location (RFA or LFA) | |

*The contents of this document are confidential and restricted to authorized personnel of the Oklahoma Department of Corrections.*

Page 5 of 5

# Oklahoma Department of Corrections

Oklahoma Department of Corrections Private and DOC: ODOC Formulary Group
Number:

**JOHNSON, LAMONE**

OK DoC Offender ID **744047**
08/11/1997 (20) M African
American
Joseph Harp Correctional Center

| | |
|---|---|
| PPD Skin Test Interpretation (Neg/Pos/PP) | |
| Influenza Mfr Lot | |
| HepBV #1 Mfr Lot | |
| Location Administered: | |
| Routine PE Completed - Yes (Y) or Refused (R) | |
| HIV Tested (R-reactive or NR - non-reactive) | |
| DNA Tested (Y/N) | |

Suitable for transport:
Without restrictions
Inmate to be transported by: Central Transport Unit (CTU);
Current health summary:
CURRENTLY ON ESTRIDIOL FOR GENDER REASSIGNMENT

Signed Electronically by Bethanie Allie, LPN on 01/04/18 11:45 PM

The contents of this document are confidential and restricted to authorized personnel of the Oklahoma Department of Corrections.



**Trans Care**

# Gender transition

Exhibit 11-1

# Hormones:
# A guide for MTFs

While there are some health risks involved with hormone therapy, it can have positive and important effects on trans people's quality of life. Knowing what you can expect will help you work with your health care providers to maximize the benefits and minimize the risks.

The purpose of this booklet is to:

- explain how hormones work
- describe the changes to expect from MTF[1] hormones, and outline risks and possible side effects
- give you information about how to maximize the benefits and minimize the risks

---

Already sure you want to start hormones? The booklet *Getting Hormones*, available from the Transgender Health Program (see last page), explains the process.

---

1 We use "MTF" as shorthand for a spectrum that includes not just transsexuals, but anyone who was assigned male at birth and who identifies as female, feminine, or a woman some or all of the time. Some non-transsexuals (androgynous people, drag queens, bi-gender and multi-gender people, etc.) may also want hormone therapy, and may not identify or live as women. For this reason we use the term MTF instead of "trans women."

1

This booklet is written specifically for people in the MTF spectrum who are considering taking hormones. It may also be a helpful resource for partners, family, and friends who are wondering how hormones work and what they do. For medical professionals who are involved in prescribing hormones or are looking after the health of someone who is taking hormones, there is a detailed set of guidelines for doctors and nurses available from the Transgender Health Program (see last page).

# How Hormones Work

*Hormones* are chemical messengers produced by one part of the body to tell cells in another part of the body how to function, when to grow, when to divide, and when to die. They regulate many functions, including growth, sex drive, hunger, thirst, digestion, metabolism, fat burning and storage, blood sugar and cholesterol levels, and reproduction.

*Sex hormones* regulate the development of sex characteristics – including the sex organs that develop before we are born (genitals, ovaries/testicles, etc.) and also the secondary sex characteristics that typically develop at puberty (facial/body hair, bone growth, breast growth, voice changes, etc.). The three categories of sex hormones that naturally occur in the body are:

- androgens: testosterone, dehydroepiandrosterone (DHEA), dihydrotestosterone (DHT)
- estrogens: estradiol, estriol, estrone
- progestagens: progesterone

Generally, "males"[2] tend to have higher androgen levels, and "females"[2] tend to have higher levels of estrogens and progestagens.

There are various types of medication that can be taken to change the levels of sex steroids in the body. Changing these levels will affect fat distribution, muscle mass, hair growth, and other features that are associated with sex and gender. For MTFs this can help make the body

---

2 The binary terms "male," "female," "masculine," "feminine," "masculinizing," and "feminizing" don't accurately reflect the diversity of trans people's bodies or identities. But in understanding how hormones work for trans people, it is helpful to understand how testosterone works in "typical" (non-intersex, non-trans) men's bodies, and how estrogen and progesterone works in "typical" women's bodies. We keep these terms in quotes to emphasize that they are artificial and imperfect concepts.

Exhibit 11-2

2

Exhibit 11-3

look and feel less "masculine" and more "feminine" – making your body more closely match your identity.

# What Medications Are Involved for MTFs?

Various kinds of medication can be used to change the levels of sex hormones in your body. Some work on the part of your brain that stimulates sex hormone production, some work on your testicles (which produce testosterone), and some work directly on the cells in your body that respond to sex hormones. Some of these medications are also hormones, and some are another type of chemical.

Typically MTF hormone therapy involves estrogen, medication to block testosterone, or a combination of the two. Sometimes a progestagen is added to the mix.

## 1. Estrogen

Estrogen is the main hormone responsible for promoting "female" physical traits. It works directly on tissues in your body (e.g., makes breasts develop) and also indirectly suppresses your testosterone.

Estrogen can be taken in different ways:
- pill (*oral application*)
- skin patch or gel (*transdermal application*)
- injection (*intramuscular application*)

For reasons that aren't understood, estrogen seems to cause blood clots less when it is taken through the skin rather than by pills or injections. For this reason, transdermal estrogen is usually recommended to anyone who is over age 40, a smoker, or otherwise at risk for blood clots. Transdermal estrogen also tends not to elevate triglycerides (a type of fat in the blood) as much as estrogen taken by pill/injection, so it is recommended if you are at risk of heart disease or stroke.

There are different chemical formulations of estrogen. Usually 17-beta-estradiol (patch = Estradot®, Estraderm®, or Oesclim®; pill form = Estrace®) is used because it has the least health risks. Conjugated estrogens (e.g., Premarin®) and ethinyl estradiol are not recommended because studies of non-trans women have shown them to increase the risk of some types of health problems.

**3**



Exhibit 11-4

## 2. Anti-androgens (also known as androgen blockers or androgen antagonists)

Anti-androgen drugs work by blocking the effect of testosterone. This reduces "male" physical traits and has a mildly "feminizing" effect. For example, they will help slow "male"-pattern baldness, reduce growth of facial hair, and stop spontaneous/morning erections. There are different types of anti-androgens. The ones most typically prescribed to MTFs are spironolactone (Aldactone®) and finasteride (Proscar®). Cyproterone (Androcur®) can be used, but risks include depression and liver enzyme elevation so spironolactone is generally preferred.

Anti-androgen drugs are often prescribed in addition to estrogen, as the two have effects that complement each other. Taking anti-androgens reduces the amount of estrogen you need to get the same effects, which minimizes the health risks associated with high doses of estrogen. Anti-androgen drugs can be prescribed alone for MTFs who want to reduce "masculine" characteristics for a more androgynous appearance, as it's less "feminizing" than estrogen.

## 3. Progestagens

There are mixed opinions about using progestagens (e.g., Prometrium®, Provera®) for MTFs. Most trans health programs around the world don't use progestagens due to the lack of clear evidence that they are important in "feminization," and the known side effects (which include depression, weight gain, and changes to blood fats). Other doctors use progestagens:

- to supplement estrogen if estrogen isn't working even at the maximum dose, or
- as a replacement for estrogen if there are concerns about estrogen's side effects or health risks, or
- because they believe that progestagens help with nipple development

As with estrogen and anti-androgens, balancing possible risks and benefits of progestagens is a decision between you and your health care provider.

Exhibit 11-4

**4**

*Exhibit 11-5*

# What's a Typical Dose?

Clinical protocols for MTF therapy vary greatly. There is no one right hormone combination, type, or dose. Deciding what to take depends on your health (each medication has different risks and side effects), what is available locally, and what you can afford. It also depends on how your body reacts when you start taking hormones – everyone's body is different and sometimes people have a negative reaction to a specific kind of medication.

The right dose or type of medication for you may not be the same as for someone else. It is a good idea to discuss the advantages and disadvantages of different treatment options with a medical professional who has trans health training and experience with hormones. If you have any concerns about being able to take the medications, or about the side effects, costs, or health risks, let them know – it's important that your needs and concerns be taken into account when planning your hormone therapy.

The table on page 6 summarizes the forms of hormone therapy most commonly used by MTFs in BC, and gives the range of starting doses recommended by the Transgender Health Program. Your health provider may start you on a lower dose if you have chronic health problems, are at risk for specific side effects, or have had your testicles removed. If you have been prescribed a dose that is quite a bit higher or lower than the doses outlined in the table below, talk with your health care provider about their reasons for suggesting the dose you have been prescribed (and get a second opinion if you want one).

*Exhibit 11-5*

5

Exhibit 11-6

| Hormone therapy commonly used by MTFs in BC | | | | |
|---|---|---|---|---|
| | **Estrogen** | | **Anti-androgen** | |
| **Chemical** | 17-beta estradiol | | Spironolactone and/or Finasteride | |
| **Brand name** | Estradot®, Estraderm®, Oesclim® | Estrace® | Aldactone® | Proscar® |
| **Taken via** | Skin patch | Pill | Pill | Pill |
| **Typical starting dose** | start with 0.1 mg patch twice per week; gradually increase up to maximum of 0.4 mg patch twice per week | start with 1–2 mg per day; gradually increase up to maximum 8 mg per day | start with 50–100 mg per day; increase by 50–100 mg each month up to maximum 200–300 mg per day | 2.5 mg every other day |
| **Typical cost (as of 2005)** | 0.1 mg twice/ week: ~$25/ month* | 2 mg per day: ~$15/month* | 300 mg per day: ~$22/month* | 2.5 mg every other day: ~$30/month* |

\* Plus the dispensing fee set by each pharmacy and billed each time a prescription is refilled. In BC this averaged $9.25 in 2005. Compounding pharmacies may charge significantly more.

In prescribing a particular medication and dosage, your doctor should consider your health, including any other medications you are taking. Every person is different in terms of how their body absorbs, processes, and responds to sex hormones. Some people have more changes than others; changes happen more quickly for some people than others.

Taking more hormones than the dose you were prescribed is *not* a good way to try to speed up changes. Taking a higher dose can actually slow down the changes you want: extra estrogen in the body can be converted to testosterone by an enzyme called *aromatase*. Taking more than your prescribed dose also greatly increases your health risks. If you think your dose is too low, talk with a health care professional who has trans health training to discuss options. It may be better to try a different type of medication or combination of medications, rather than increasing the dose.

After removal of the testicles (see the booklet *Surgery: A guide for MTFs*) your body is only producing a tiny amount of testosterone, so the dosage of estrogen is usually cut in half and anti-androgens greatly

6

Exhibit 11-6

reduced or stopped. You will need to stay on estrogen or another form of medication for the rest of your life to preserve bone strength (see *Trans people and osteoporosis* booklet). Your doctor may also suggest that you take Calcium and Vitamin D supplements to protect your bones.

# What Changes Can I Expect, and How Soon? (Benefits)

"Feminizing" hormone therapy has important psychological benefits. Bringing the mind and body closer together eases gender dysphoria and can help trans people feel better about their bodies. People who have had gender dysphoria often describe being less anxious, less depressed, calmer, and happier when they start taking hormones. For some people this psychological change happens as soon as they start taking hormones, and for others it happens as physical changes happen.

The degree and rate of change depends on factors that are different for every person, including your age, the number of hormone receptors in your body, and how sensitive your body is to the medication. There is no way of knowing how your body will respond before you start hormones.

## 1. Taking anti-androgens alone (without estrogen)

Taking an anti-androgen without estrogen has relatively mild effects. The changes are caused by the medication blocking the effect of testosterone in your body. Most of the changes are reversible (i.e., they will reverse if you stop taking the medication).

| Typical changes from anti-androgens (vary from person to person) | |
| --- | --- |
| **Average timeline** | **Effect of blocking testosterone** |
| 1–3 months after starting anti-androgens | • decrease in sex drive<br>• fewer instances of waking up with an erection or spontaneously having an erection; some MTFs also have difficulty getting an erection even when they are sexually aroused<br>• decreased ability to make sperm and ejaculatory fluid |
| Gradual changes (usually at least 2 years) | • slower growth of facial and body hair<br>• slowed or stopped "male"-pattern balding<br>• slight breast growth (reversible in some cases, not in others) |
| **Anti-androgens affect the entire body.**<br>**It's not possible to pick some changes and not others.** | |

Exhibit 11-7

7

Exhibit 11-8

## 2. Estrogen

Taking estrogen has stronger physical "feminizing" effects, caused by the estrogen's direct influence on cells of your body that have estrogen receptors and also by an indirect suppression of testosterone production.

| Typical changes from estrogen (vary from person to person) | |
|---|---|
| **Average timeline** | **Effect of estrogen** |
| 1–3 months after starting estrogen | • softening of skin<br>• decrease in muscle mass and increase in body fat<br>• redistribution of body fat to a more "feminine" pattern<br>• decrease in sex drive<br>• fewer instances of waking up with an erection or spontaneously having an erection; some MTFs also find their erections are less firm during sex, or can't get erect at all<br>• decreased ability to make sperm and ejaculatory fluid |
| Gradual changes (maximum change after 1–2 years on estrogen) | • nipple and breast growth<br>• slower growth of facial and body hair<br>• slowed or stopped "male"-pattern balding<br>• decrease in testicular size |
| **Estrogen affects the entire body.**<br>**It's not possible to pick some changes and not others.** | |

Breast and nipple growth starts early but is usually gradual – it can take two years or more for breasts to reach their maximum size. As in non-trans women, there is great variation in how large breasts grow from estrogen. In many MTFs breasts do not grow beyond an A or B cup. If you are not happy with the size of your breasts after 18–24 months on estrogen, you can consider surgical augmentation (see *Surgery: A guide for MTFs* booklet). The implants will look most natural if you wait to get as much growth as you can from hormones.

Most of the effects of hormones happen in the first two years. During this time, the doctor who prescribes your hormones will want to see you one month after starting or changing your dose, then 3–4 times in the next year, then every six months. At appointments in the first two years, your doctor will likely:

Exhibit 11-8

8

Exhibit 11-9

- look at your facial/body hair and ask how fast your hair grows back after you remove it
- measure your breasts, hips, and testicles, and examine your breast/nipple development
- ask about changes to your sex drive, erections, or other sexual changes
- order a blood test to see what your hormone levels are
- ask how you feel about the changes that have happened thus far

After two years have passed, you will likely just be asked if you notice any further changes from the hormones.

## Are These Changes Permanent?

Most of the changes brought on by "feminizing" hormone therapy are not permanent. If you stop taking the medication, most of the changes will reverse themselves. There are two types of changes that may be permanent: breast growth and sterility.

If you are taking anti-androgens without estrogen because you don't want visible changes, you should be aware that you may have some breast growth (although it will happen slowly, so you can stop early on if you need to). Breast growth from anti-androgens is usually minor and reversible, but in some cases the breast tissue has remained even after anti-androgens were stopped.

Estrogen causes permanent nipple development and breast growth. Even if you stop taking estrogen, breast tissue will not go away and your nipples will not shrink.

Both anti-androgens and estrogen affect your production of sperm. The long-term effects on fertility are not fully understood and the ability to make sperm may or may not come back even if you stop taking the medication. We strongly recommend that you talk about options for sperm banking *before* starting hormone therapy. If you have already started hormones, you can work with your doctor to go off them, give sperm samples, and store them if they are viable (then go back on hormones).

Exhibit 11-9

**9**

Exhibit

# What Won't Change?

## 1. Hormone therapy won't solve all body image problems.

The point of hormone therapy is to feel more comfortable with your body by bringing physical characteristics closer to your internal sense of self. This relief can increase self-esteem and make you feel more confident and attractive. However, you will find that there are also attractiveness standards after hormone therapy, and you may not fit them.

It can be hard to separate out gender dysphoria from body image problems. Professional and peer counselling can be helpful to sort out your expectations about your appearance, and to work towards greater self-acceptance.

## 2. Hormone therapy won't make you into somebody else.

Many people experience positive emotional changes with hormone therapy. But you'll likely find, after the excitement wears off and you've incorporated the changes into your day-to-day life, that if you were shy you're still shy, if you didn't like your laugh you still don't, and you're still afraid of spiders. Whatever things you think of as your strengths and weaknesses will still be there. Hopefully, you will be happier, and that is good for anyone. Hormone therapy may help you to be more accepting of yourself. But if you are expecting that all your problems will pass away, and that everything is going to be easy emotionally and socially from here on in, you're probably going to be disappointed.

This extends to mental health concerns as well. Trans people who were depressed because of gender dysphoria may find that taking hormones greatly alleviates their depression. However, if you have depression caused by biological factors, the stresses of transphobia or unresolved personal issues, you may still be depressed after you start hormones. Likewise, if you are having problems with drugs or alcohol, hormones will not necessarily get rid of those problems.

Exhibit 11-10

**10**

Exhibit 11-11

### 3. Hormone therapy won't provide you with a perfect community.

For some trans people, hormone therapy is a ritual affirming that they are who they say they are. Making physical changes is a way to bring who you are to the rest of the world so other people can see it. This process of self-emergence can be very liberating but it does not guarantee that you will find acceptance or understanding.

Some MTFs hope that after they make physical changes they will be validated as "real" women, or feel more accepted by the trans community. But the idea that trans people aren't "real" unless they've changed their bodies is transphobic, and communities or groups that have this belief are not likely to be fully respectful in terms of trans people's identities and bodies.

During the various stages of transition, it's common to dream about finding an ideal community of trans people. When starting hormones there can be a particular drive to find other people who have gone through similar experiences. There are a lot of very cool trans people to talk with about hormones. But having taken hormones doesn't automatically make trans people welcoming, approachable, or sensitive to the needs of others, and despite having some experiences in common you will likely find that no trans person will exactly mirror your personal experiences, identity, and beliefs. Being realistic about the likelihood that you will at times feel lonely and alone after you start taking hormones is part of emotionally preparing for hormone therapy.

### 4. Hormone therapy won't remove all "male"/"masculine" aspects of your body

Some physical characteristics aren't changed by hormone therapy, or are only slightly changed. This includes aspects of your body that develop before birth (penis, sex chromosomes, etc.) and also physical characteristics that developed from the increase in testosterone at puberty.

Hormone therapy may make facial and body hair grow more slowly and be less noticeable, but hair will not go away completely. Electrolysis and/or laser treatments are used by many MTFs for hair removal (electrolysis is permanent; it is not yet clear how long-lasting laser hair removal is).

Exhibit 11-11

11

Exhibit 11-12

While "male"-pattern baldness may slow down or stop, bald areas will not regrow hair. Some MTFs use wigs or hairpieces, while others get hair transplants or other medical treatments.

"Feminizing" hormone therapy does not change voice pitch or speech patterns (see *Changing speech* booklet). Speech therapy can help change pitch and other aspects of speech associated with sex/gender. Some MTFs have surgery on their vocal cords or the surrounding cartilage to try to further raise voice pitch.

Once your bones have stopped growing after puberty, feminizing hormone therapy won't change the size or shape of your bones. Facial feminizing surgery (see MTF surgery booklet) can be used to change the shape of the skull and facial features, and to reduce a prominent Adam's apple. There are no treatments you can take to reduce your height or the size of your hands/feet.

Although anti-androgens and estrogen affect sperm production and can make you permanently sterile, there may still be a chance that you could make someone pregnant even after starting hormone therapy. Depending on how you have sex, you may need to consider birth control options.

Hormone therapy doesn't decrease the risks of HIV and sexually transmitted infections. Depending on how you have sex, you may need to consider condoms, gloves, or other latex barriers. "Feminizing" hormones can make erections less firm, increasing the risk of condom leakage. In this situation your partner can use a special condom that they put inside their anus or vagina (they're called "female condoms" but can be used by people of any gender).

# What are the Possible Side Effects/Risks of "Feminizing" Hormones?

The medical effects and safety of "feminizing" hormones are not fully understood. Most of the studies on the medications used by MTFs as part of hormone therapy involve non-trans people using different doses than MTFs usually use. There may be long-term risks that are not yet known.

Many of the known risks of "feminizing" hormones can be reduced by creating a hormone combination that is tailored to your specific situation. Prevention includes periodic blood tests to keep an eye on potentially

**12**

Exhibit 11-12

Exhibit 11-13

risky conditions, and minimizing other health risks. Stopping smoking is the number one thing you can do to reduce your risk of blood clots and heart disease (and also make it possible to increase the amount of estrogen that can safely be prescribed).

## 1.  General risks

The medications taken in hormone therapy are processed by the liver. There is a possibility that taking hormones over a long period of time can put strain on the liver, possibly leading to liver disease. It is generally recommended that MTFs taking feminizing hormone therapy get their liver enzyme levels checked periodically to monitor liver health. This is especially important if you have Hepatitis B or C, are a heavy drinker, or are otherwise at risk for liver disease.

Being visibly trans in a transphobic society has social risks. While it is possible to stay closeted if you're taking small doses of anti-androgens (as the changes aren't highly visible), estrogen causes changes that can be visible, including breast growth. Some visibly trans people experience violence, harassment, and discrimination, while others have lost support of loved ones. If you are worried or stressed about these possibilities, or unsure of how to tell a loved one that you are thinking about taking or planning to take hormones, peer and/or professional counselling can be useful.

## 2.  Side effects/risks of estrogen

Taking estrogen increases the risk of blood clots. Blood clots can cause death, permanent lung damage (clot in the lungs), permanent brain damage (stroke), heart attack, or chronic problems with the veins in your legs. The risk of blood clots is much higher for smokers, especially those who are age 40 or higher. The danger is so high that some doctors will not prescribe estrogen if you are a smoker; most will only prescribe you a low dose as long as you are still smoking. The risk of blood clots may be reduced by taking estrogen via skin patch, cream, or gel (rather than pill/injection) and also by using a lower dose of estrogen.

Taking estrogen changes the way your body metabolizes and stores fat. Taking estrogen can increase deposits of fat around your internal organs, which is associated with increased risk for diabetes and heart disease. Estrogen also increases the risk of gallstones, which can block your

Exhibit 11-13

Exhibit 11-14

gallbladder. If you have chest or abdominal pain, you should see a medical professional right away.

Estrogen can cause increased blood pressure. This can be counteracted by taking it with spironolactone, which tends to lower blood pressure. If you can't take spironolactone, there are other changes that can be tried, including other types of medication, exercise, and changes to diet.

In some MTFs estrogen causes nausea and vomiting, similar to morning sickness in pregnant women. Estrogen can also cause headaches or migraines. If you are getting frequent headaches/migraines or the pain is unusually bad, or if you are vomiting for more than a couple of days, talk to a health professional.

With breast growth there is often an increase in milky discharge from the nipples (*galactorrhea*). This is caused by the estrogen stimulating the production of the hormone *prolactin*, which in turn stimulates breast ducts to form milk. It is not known whether this increases the risk of non-cancerous tumours of the pituitary gland, which produces prolactin (*prolactinoma*). Although prolactinoma is usually not life-threatening, it can damage vision and cause headaches. For this reason, blood levels of prolactin are usually checked for at least three years when you start taking estrogen, and further tests may be ordered if prolactin levels are very high or if prolactinoma is suspected.

It is not known if estrogen increases the risks of breast cancer (see *Trans people and cancer* booklet). There have been cases of MTFs who have developed breast cancer after starting hormones. Risks of breast cancer are increased if you have a family history of breast cancer, have been taking estrogen and/or progestagens for more than 5 years, are age 50+, or are overweight. Talk with your health care provider about screening tests that can be done to catch early signs of breast cancer.

## 3. Side effects/risks of anti-androgens

Spironolactone affects the balance of water and salts in the kidneys. If the proportion of water and blood salts gets out of balance, you can have problems with low blood pressure or, rarely, high levels of potassium in the blood (this can cause changes to heart rhythm that may be life-threatening). The doctor/nurse who prescribes you hormones should check your potassium levels and kidney function on a regular basis if you:

**14**

Exhibit 11-14

- have a history of kidney problems
- are taking medication that can raise blood potassium (ask your doctor or pharmacist)
- are taking ACE-inhibitors (e.g., Accupril®, Altace®, Capoten®, Coversyl®, Inhibace®, Lotensin®, Mavik®, Monopril®, Prinivil®, Vasotec®, Zestril®) – commonly prescribed for people with high blood pressure or heart problems

Spironolactone can also cause a skin rash. If this happens, see the doctor/nurse who prescribed the hormones.

| Summary of risks and possible side effects of MTF hormone therapy | | |
|---|---|---|
| **General risks** | • increased strain on liver → increased risk of liver disease<br>• harassment, discrimination, violence, and rejection by people who do not support your decision to take hormones | |
| **Estrogen** | **Risks**<br>• increased risk of blood clots (risk of death or permanent damage)<br>• increased risk of diabetes and heart disease<br>• increased risk of gallstones<br>• may be increased risk of non-cancerous tumour of pituitary gland<br>• not known if breast cancer risk is increased | **Possible side effects**<br>• increase in blood pressure<br>• nausea or vomiting<br>• increase in frequency or severity of headaches/migraines<br>• milky discharge from nipples |
| **Spironolactone** | **Risks**<br>• low blood pressure<br>• changes to heart rhythm due to high levels of blood potassium | **Possible side effects**<br>• skin rash |

Exhibit 11-15

15

# Health Checkups While You're Taking Hormones

As long as you are taking hormones (possibly the rest of your life), you need to have regular physical exams and lab tests to monitor your overall health. The first year after starting hormones, the prescribing doctor/nurse will want to see you at least every 3–4 months; after that, you will have appointments at least every 6 months. At each of these appointments, the doctor/nurse will likely:

- ask questions about your overall health
- check your blood pressure and your weight, and listen to your lungs
- look at your arms, legs, hands, and feet to check your overall circulation as well as any signs of swelling, fluid retention, or pain
- check for early warning signs of health problems that can be caused by hormone therapy or made worse by hormone therapy (e.g., blood clots, heart disease, diabetes)
- recommend blood tests to check your blood sugar, blood fats, blood cells, and liver health
- recommend other tests (e.g., bone scan, heart stress function test) as needed, depending on your health history, age, and any signs of possible health problems

It is not known whether hormone therapy increases MTFs' risks for breast cancer. Depending on your age, family history, and other risks for breast cancer, your health care provider may recommend a yearly mammogram. If you are older than 50, your health care provider should check your prostate (via a finger in your rectum) once a year.[3] For more information on cancer screening, see the Transgender Health Program's cancer booklet.

While the Transgender Health Program's training for health care providers emphasizes the need to be creative and consider stopping hormones as a last resort (rather than a first resort), there are some health problems that make it dangerous to take hormones. If your health

---

3 Like the testicles, the *prostate* (an organ that sits around the neck of the bladder) usually shrinks from "feminizing" hormones. However, prostate cancer can still happen. PSA (prostate-specific antigen) tests are sometimes recommended to monitor prostate health. Anti-androgens and estrogen can artificially lower PSA levels, making PSA tests unreliable in MTFs who are taking hormones.

16

Exhibit 11-16

care provider suspects you have one of these conditions, they will try to control it through medical treatment and/or changes to your diet, exercise, or other lifestyle issues. If the condition can't be controlled, you may be switched to another type of hormone, or your dose may be reduced or stopped until your other health problems get under control.

# Maximizing the Benefits, Minimizing the Risks

There are a number of things that you can do to help ensure your hormone therapy is as effective and safe as possible:

- **Be informed**. Understanding how hormones work, what to expect, possible side effects/risks, and guidelines for care gives you the tools to be in charge of your health and to make informed decisions. Do your own research and ask questions. If you're not sure where to look, the Transgender Health Program (see last page) can help you find resources.
- **If you smoke, stop or cut down**. Smoking greatly increases the risks involved with hormone therapy. If you are a smoker, your estrogen level may have to be kept low. If you need help to quit, your health care provider can help you develop a plan and/or direct you to further resources (or contact QuitNow, toll-free at 1-877-455-2233, http://bc.quitnet.com). If you aren't ready to quit, consider cutting down: every little bit helps.
- **Find a health care provider you trust and can be honest with**. To get the most from hormone therapy, you need to be able to talk openly about what you want, concerns you have, and any problems you are experiencing. You also need to be able to talk openly with your health care provider about your health history, smoking, alcohol, street drugs, dietary supplements, herbs, and any other medication you are taking. Hormone therapy can be affected by all of these things, and being honest about them will help create a plan that is right for you.
- **Deal with problems early on**. If caught early enough, most of the problems that can result from taking hormones can be dealt with in a creative way that doesn't involve stopping hormones completely. Waiting can worsen your health to the point where you can't take hormones at all.

Exhibit 11-17

**17**

Exhibit 11-18

- ***Don't change medication on your own.*** Check with your health care provider if you want to start, stop, or change the dose of any of your medication. Taking medication more frequently or at a higher dose than prescribed increases health risks and can slow down the effects you want. Going against the instructions of your health care provider also erodes trust with them. If you want to change your medication, talk with your health provider first.

- ***Take a holistic approach to your health.*** Health involves more than just hormone levels, and taking hormones is only one way for trans people to improve quality of life. Building a circle of care that includes health professionals, friends, partners, and other people who care about you will help support you to deal with other health problems as they come up, and to heal from societal transphobia.

- ***Know where to go for help.*** Staff at the Transgender Health Program can help you find information on trans health and transition issues, and can also help you connect with trans groups and community resources in your region. They can help with referrals if you need assistance finding a trans-experienced medical provider, counsellor, or another type of health professional.

## Questions? Contact the Transgender Health Program:

Office: #301-1290 Hornby Street, Vancouver, BC V6Z 1W2
Phone/TTY/TDD: 604-734-1514 or 1-866-999-1514 (toll-free in BC)
Email: transhealth@vch.ca
Web: http://www.vch.ca/transhealth

The Transgender Health Program is an anonymous and confidential free service for anyone in BC who has a trans health question or concern. Services for trans people and loved ones include:

- information about trans advocacy, medical care, hormones, speech change, and surgery
- help finding health/social services, and help navigating the trans health system
- non-judgmental peer counselling and support
- information about trans community organizations and peer support groups

18

Exhibit 11-18

Exhibit
12-1

## OKLAHOMA DEPARTMENT OF CORRECTIONS
## REQUEST FOR HEALTH SERVICES

TO BE COMPLETED BY INMATE    Facility: _D.C.C.C_    Date: _3/26/18_

Inmate Name _Lonnie Johnson_    DOC #: _294047_  Unit _V2-206_

I request the following service(s): (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal (expired medications only)

Reason for service: _I need a medical evaluation Regarding undergarments Due to me Being Transgender with secondary Characterstics on Hormone therapy Per OP-140147_

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _____    Date: _3/26/18_

TO BE COMPLETED BY HEALTH SERVICES

| Date Received | Initials |
|---|---|
| 3.27.18 | |

Comment: _You have an order in your chart for under garments._

_____    _3.27.18_
RN/LPN/Health Care Provider Signature        Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations v facility.

Exhibit 12-1

C

ibit 12-2

OKLAHOMA DEPARTMENT OF CORRECTIONS
REQUEST FOR HEALTH SE...

4

BE COMPLETED BY INMATE    Facility: D.C.C.    Date: 4-22-18

Inmate Name Lamone Johnson    ODOC # 744007 Unit V-210

I request the following service(s): (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

Reason for service: I need my medication estradiol
3 spironolactone adjusted to estradiol
2 mg to estradiol 4mg and spironolactone 50mg
to 200mg, from oklahoma county sherrifs office

I understand that in accordance with operations memorandum OP-140117 entitled "Access to
Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each
medication(s) dispensed to me, with the exceptions noted in the above-reference operations
memorandum. There is no charge to the inmate for mental health services and/or mental health
medications.

Inmate Signature Lamone Johnson    Date: 4-22-18

TO BE COMPLETED BY HEALTH SERVICES

| Date Received | Initials |
|---|---|
| 4-25-18 | c |

Comment: You have been scheduled to discuss
with the provider 4-26-18

_____    4-25-18
RN/LPN/Health Care Provider Signature    Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to
the inmate after scanning into the inmate's EHR.

NOTE: All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's
health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M).
"Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs
out. "Medication Refill Slips" are readily available and accessible at designated locations within the
facility.

Exhibit 12-2

ODOC 140117A
(R 5/17)

Exhibit 12-3

**OKLAHOMA DEPARTMENT OF CORRECTIONS**
**REQUEST FOR HEALTH SERVICES**

4-22-18

**TO BE COMPLETED BY INMATE**   Facility: D.C.C.C.   Date: 4-22-18

Inmate Name Lamone Johnson   ODOC # 744047 Unit V-20

I request the following service(s): (Check appropriate box(s))

☐ Medical   ☑ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

Reason for service: I need to speak with AJ about My Bra's and Punties,

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

4-22-18

Inmate Signature _____   Date: 4-22-18

**TO BE COMPLETED BY HEALTH SERVICES**

| Date Received | Initials |
|---|---|
| 4-25-18 | |

Comment: you have been scheduled for tomorrow 04-26-2018 @ 1:45pm

Ashton Wilkins, LMSW
**RN/LPN/Health Care Provider Signature**

04-25-2018
**Date**

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

Exhibit 12-3

ODOC 140117A
(R 5/17)

# 🔒Patient - Transfer Summary (PT - 006)

**LAMONE M JOHNSON #130737015**

| | | | |
|---|---|---|---|
| **JMS ID:** | 200353811 | **Location:** | 04D 01 |
| **DOB:** | 08/11/1997 | **Interviewer:** | LPN Hulsey, LPN, Gina L (04/20/2018 03:16) |
| **Age:** | 20 | | |
| **Height:** | 6ft 1in | | |
| **Agency:** | OCSO | | |

*Exhibit 13* (handwritten)

## TRANSFER SUMMARY TO EXTERNAL FACILITY OR PROGRAM

| Transferred From / To: | |
|---|---|
| OKC County Detention Center<br>201 N Shartel Ave<br>Oklahoma City, OK 73102<br>(405)713-7311 | |
| Allergies: | respiradol curved his spine |
| Special Diet: | |
| Current Medical / Psychiatric Problems: | PSYCH - Bipolar Disorder<br>PULM - Asthma, mild<br>hormone replacement therpay<br>Nurse Sick Call, heartburn |
| Current Suicide Precaution: | |
| Current Medication: | SPIRONOLACTONE 100MG TAB QD AM; Directions: 2 TAB [PO] By Mouth QD AM ;<br>DOCUSATE SODIUM 100MG CAP BID; Directions: 1 CAP [PO] By Mouth BID ;<br>ESTRADIOL 2MG TAB QD AM; Directions: 2 TAB [PO] By Mouth QD AM ; |
| Physical Disabilities / Limitations: | |
| Assistive Device / Prosthetics: | |
| Any Other Special Needs? | |
| Test: | |
| Date: | |
| Results: | |
| Test: | |
| Date: | |
| Results: | |
| Test: | |
| Date: | |
| Results: | |
| PPD Results: | |
| CXR: | |
| TETANUS: | |
| OTHER: | |
| Medications sent? | |
| Medication supply ordered? | |
| Form Completed By: Signature and Date: | |

(handwritten: 11    11/97    Exhibit 13 19    17)

JOE M.
ALLBAUGH
DIRECTOR



MARY
FALLIN
GOVERNOR

### STATE OF OKLAHOMA
### OKLAHOMA DEPARTMENT OF
### CORRECTIONS

CONFIDENTIAL
PSYCHOLOGICAL REPORT

**Inmate:** Johnson, Lamone
**Biological Sex:** Male
**DOB:** 8/11/1997
**Marital Status:** Single
**Race and Ethnicity:** African American
**DOC Number:** 744047

**Current Evaluator:** Patricia L. Jones, Psy.D. Staff Psychologist
**Date(s) of Evaluation:** May 1, 2018
**Date of Report:** May 11, 2018

**General Finding(s):** Inmate Johnson does not meet the criteria for Gender Dysphoria.

It is the opinion of the evaluating psychologist that the distress fueled by a documented personality disorder is the primary factor fueling his dysphoric mood.

Recommendations regarding treatment for dysphoric mood and details of the evaluation are available in the comprehensive report placed in the electronic health record. It is advised that Inmate Johnson meet with his primary QMHP to discuss this summary and the general findings.

For additional information, please contact Inmate Johnson's primary QMHP.

*Patricia Jones*

Patricia Jones, Psy.D. Psychologist
Joseph Harp Correctional Center Oklahoma Department of Corrections

Exhibit L4-1

3400 N MARTIN LUTHER KING AVENUE • PO Box 11400 • OKLAHOMA CITY, OKLAHOMA 73136-0400 (405) 425-2505 • FAX (405) 425-2578

121

MARY
FALLIN
GOVERNOR

JOE M.
ALLBAUGH
DIRECTOR



STATE OF OKLAHOMA
OKLAHOMA DEPARTMENT OF
CORRECTIONS

CONFIDENTIAL
PSYCHOLOGICAL REPORT

**Inmate:** Johnson, Lamone          *Exhibit 14-2*
**Biological Sex:** Male
**DOB:** 8/11/1997
**Marital Status:** Single
**Race and Ethnicity:** African American
**DOC Number:** 744047

**Current Evaluator:** Patricia L. Jones, Psy.D. Staff Psychologist
**Date(s) of Evaluation:** May 1, 2018
**Date of Report:** May 11, 2018

**General Finding(s):** Inmate Johnson was documented as having Suspected Gender Dysphoria based on self-report on 09/23/16. Inmate Johnson's current diagnosis is Personality Disorder Not Otherwise Specified. Inmate Johnson's verbalized incongruence between his[1] experienced/expressed gender and anatomical gender may, or may not, be related to the documented personality disorder, however, his dysphoric mood is caused by the underlying personality disorder. That is to say, that while Inmate Johnson may, or may not, be a transgendered individual, his anger, anxiety, reported episodes of depression, substance use, and extreme difficulty in social situations are best explained by Personality Disorder and not Gender Dysphoria.

**Referral and Service Information:** Janna Morgan, Ph.D., Chief Mental Health Officer of the Oklahoma Department of Corrections referred this case in April of 2018. The purpose of the evaluation was to document the presence or absence of the diagnostic criteria for Gender Dysphoria per the DSM-5, as well as any additional information relevant to the question of if it is in the best interest of the inmate's psychological health to provide hormone therapy. Inmate Johnson was apprised of the nature of the evaluation at a brief meeting prior to beginning the evaluation, and was reappraised of the scope and reason for the evaluation by the evaluator during the assessment. In addition, inmate Johnson was apprised that the relevant information collected before, during, and after the evaluation would be shared with the evaluator's clinical coordinator, the Chief Mental Health Officer, and other employees of the Department of Corrections, as deemed appropriate by the Chief Mental Health Officer, for

---

[1] The pronouns he/him/himself/his and the like are used throughout this report for clarity and disambiguation for the reader. The usage of these pronouns is not related to the findings of the evaluator.

3400 N MARTIN LUTHER KING AVENUE • PO Box 11400 • OKLAHOMA CITY, OKLAHOMA 73136-0400 (405) 425-2505 • FAX (405) 425-2578

CONFIDENTIAL PSYCHOLOGICAL REPORT                    Johnson 2 of 8

making decisions regarding the inmate's treatment. Inmate Johnson was further apprised prior to beginning the evaluation that no information shared during the evaluation, nor the results of the evaluation in whole or in part, would be confidential, as the evaluator was acting as an employee of the Department of Corrections, and not as his private therapist. Inmate Johnson verbally stated that he understood the limits of confidentiality, and Inmate Johnson stated that he desired to proceed with the evaluation.

**Sources of Information:** Sources of information considered and reviewed include a review of all electronic medical records available through the Department of Corrections, a field file review, a comprehensive review of Inmate Johnson's Offender Management System records, Social Media files identified by Inmate Johnson as being posted by himself, a comprehensive clinical interview and assessment conducted in person with inmate Johnson, and psychological testing.

**Mental Status Examination:** Inmate Johnson completed a Mini-Mental Status Exam (MMSE) with a score of 30/30. These results are within the normal range and suggest no cognitive impairment.

Inmate Johnson was brought to the medical department of his current facility, where Inmate Johnson met with the evaluating psychologist. Inmate Johnson's primary QMHP was also present. Inmate Johnson appeared somewhat older than his stated age. Inmate Johnson's appearance was remarkable, with very conscientious grooming, hair which was worn pulled back in a 'scarf' made of garment fabric, makeup, and neat Class A inmate apparel, shirt tucked in, and appropriate in presentation. Inmate Johnson has been observed on the yard numerous times by the evaluating psychologist, and his appearance varied from day to day. His dentition was unremarkable. Inmate Johnson stated that he knew the purpose of the evaluation and was looking forward to it. His concentration was good, and as he showed no signs of distraction by external stimuli, such as noises or foot traffic in the adjacent medical unit. Inmate Johnson responded to all questions posed, frequently pausing to consider his answers, and sometimes answering indirectly or evasively. His memory was good, however, his responses were unilaterally shallow. He stated that he had slept well the evening before, and had eaten breakfast. Inmate Johnson did not appear to be lethargic or tired at any point during the evaluation.

Inmate Johnson maintained sporadic eye contact throughout the evaluation, looking away with eye-rolls and hand gestures when describing any situation or response which may have appeared on face-value to discredit a previous statement, or written document. His hands were steady, as observed when writing a sentence. He did not exhibit psychomotor agitation or retardation. He ambulated independently. He was alert, calm of, and cooperative with the evaluation. His speech was remarkable for being loud, somewhat effeminate (a higher tone than usually presented by males), organized, and goal-directed. He did not espouse beliefs that were clearly delusions during the current evaluation. He denied experiencing hallucinations at the present time. Inmate Johnson was focused during the evaluation, and provided clear, though sometimes verbose, answers to questions related to his mental health, which were often shallow and full of psychological jargon rather than specific to symptoms.

Exhibit 14-3

CONFIDENTIAL PSYCHOLOGICAL REPORT                    Johnson 3 of 8

Inmate Johnson exhibited a euthymic (happy and content) mood at the time of the evaluation, with frequent and occasionally inappropriately expressed surprise, laughter, or anger, and no periods of quiet contemplation. His affect was labile (frequently shifting) but was within limits typically seen for Inmate Johnson.

Inmate Johnson exhibited intact abstract reasoning, though frequently sought to over-explain situations, choices, or beliefs, in order to secure the agreement of the evaluator. His logical and social comprehension was intact, evidenced by his ability to participate in the comprehensive clinical interview and respond to inquiries regarding his physical and emotional functioning, history, and future plans with appropriate levels of detail. Although he understood and was able to elucidate on the differences between right and wrong, inmate Johnson was fixated on convincing the evaluating psychologist that he was a victim of circumstance. For example, Inmate Johnson explained that despite his intentional and well-planned escape, including discussions of how to elude notice of law enforcement officials, he had not really been breaking the law. He also romanticized the notion of his escape referring to himself as an "innocent fugitive from justice."

**Relevant Family, Social, and Transgender History:** Inmate Johnson was fully engaged during the clinical interview. When asked to give the assessing psychologist an overview of his childhood, Inmate Johnson gave a very short accounting, hyper focusing on gender related matters and trauma. For clarity, the events and associated history described by Inmate Johnson during the evaluation, and from other sources, are reported here grouped by context rather than a liner history.

**Education and Employment History:** Inmate Johnson reports he attended school through 11th grade, stopping because of an arrest and subsequent incarceration in a group home. Inmate Johnson states that he was a very good student in all classes, except math, earning "A's and B's". He stated he loved to read, and when asked about his favorite book Inmate Johnson stated it was "To Kill a Mocking Bird, (because) it describes how innocent people suffer for someone else's behavior." When asked for clarification, Inmate Johnson suggested that he was the innocent, suffering for the behavior of others.

Inmate Johnson claims to have been enrolled in Job Corp, to have studied Culinary Arts, to have worked at Braums', and to have been a Certified Nursing Assistant, as well as working in the Sex Trade in Georgia, in addition to being a Social Media Celebrity. It should be noted that Inmate Johnson's first alleged crime was at the age of 16.5, he reportedly ran from the group home at age 18, and was incarcerated at age 19.

**Social and Relational History:** Inmate Johnson reported that his father died when he was four years old, in an accident. Inmate Johnson stated that his mother began using drugs after his father died, and Inmate Johnson was sent to live with his uncle from age five to age twelve. Inmate Johnson stressed at this time that he had never had a positive male role model in his lifetime. Then Inmate Johnson stated that his uncle had sexually, emotionally, and physically abused him until at the age of 12, Inmate Johnson's uncle called his mother and told her to

Exhibit 14-4

CONFIDENTIAL PSYCHOLOGICAL REPORT                                    Johnson 4 of 8

"Take him, her, it, back." Inmate Johnson stated that he told his mother what his uncle had done, and his mother began using more drugs than before to cope with the guilt. Inmate Johnson stated that at this time, he met "Diamond," a biologically male friend who identified as transgender. Inmate Johnson stated that "Diamond's" mother was supportive of them being transgender and helped them obtain "androgen suppressants" to take during puberty. Inmate Johnson further described having a "boyfriend" in high school, and this was supported by a tattoo photograph on the social media page of the same boy's name around the approximate date of the reported relationship.

Inmate Johnson described the majority of his relationships as deep and meaningful, but when probed for details, most appear to have been excessively shallow. Inmate Johnson described a Social Media site, where the evaluating psychologist reviewed hundreds of posts dating back to 2016, which were reflective of the same grandiose self-idolization, shallow sense of self, and need to be seen as 'special' by others that are viewed as 'equals', which were noted in Inmate Johnson's in person clinical interview. One of the quotes from the interview with Johnson that helps capture this attitudinal disposition is "people hated on me for being famous."

Inmate Johnson made mention that his mother had been diagnosed with cancer, and this was the purported reason for Inmate Johnson returning from Atlanta, GA to Oklahoma. It was only in the context of his own run-in with the law (wherein he was arrested as an escaped felon during a DUI stop), that he mentioned her illness. Similarly, the driver of the truck involved in the death of his father was working at the time, and there was a financial settlement for wrongful death. The fiscal settlement was brought up repeatedly during the evaluation, the loss of a parent was seemingly insignificant other than to support the story of a traumatized childhood.

**Criminal History:** Inmate Johnson detailed an account of his juvenile charges for molesting an under aged boy as a "set-up" concocted by the youth's mother to get her hands on the money inmate Johnson was to receive from the fiscal settlement over his father's death. He further described his subsequent escape from custody as being the fault of the group home to which he was assigned. Inmate Johnson described his prostitution in Atlanta following his escape as "just making money," and then rationalized his DUI. Inmate Johnson also mentioned to the evaluating psychologist that he has a "new trial" coming up on the original charges in September of 2018, and that the court's failure to take into account his "Gender Dysphoria" during the first trial was going to get him released because he wasn't mentally competent to stand trial.

**Psychiatric and Substance Use History:**

A review of the Department of Corrections Electronic Health Records and provides the following Diagnoses:

- Bipolar I, Most Recent Episode Depressed, Rejected
- Personality Disorder Not Otherwise Specified (PD NOS)

Exhibit 14-5

CONFIDENTIAL PSYCHOLOGICAL REPORT                      Johnson 5 of 8

- Post Traumatic Stress Disorder (PTSD), Rejected
- Gender Identity Disorder (GID), Rejected

The above diagnoses of Bipolar, PTSD, and GID are not considered to be valid primary Diagnoses by the evaluating psychologist. These suspected diagnoses were built on the presence of symptoms better explained by Personality Disorder, based on recorded clinical observations, assessments, record review, and history of observed and documented behaviors across multiple environments.

A review of the social media pages provided multiple posts of Inmate Johnson with alcohol, and claiming to be "high" on illegal substances. A potential substance use disorder should be evaluated.

**Relevant Assessments:** The evaluating QMHP used self-report assessments to quantitatively record Inmate Johnson's level of functioning, for a comprehensive evaluation. These included:

- DSM-5 Self- Rated Level 1 Cross Cutting Symptom Measure - ADULT (CCM): The DSM-5 Level 1 Cross-Cutting Symptom Measure is a self- or informant-rated measure that assesses mental health domains that are important across psychiatric diagnoses. It is intended to help clinicians identify additional areas of inquiry that may have significant impact on the individual's treatment and prognosis.

- The Minnesota Multiphasic Personality Inventory-2 (MMPI-2): The MMPI-2 is a self–report instrument designed to aid in the assessment of a wide range of clinical conditions. The MMPI has 10 clinical scales that are used to indicate different psychological conditions. The combination of these scales and the validity factors provide a useful overview of personality features and emotional functioning.

- Gender Identity/Gender Dysphoria Questionnaire for Adults and Adolescents (GIDYQ- AA) (Male Assigned at Birth): The GIDYQ-AA was developed in 2007 as a dimensional measure of gender dysphoria over a 12 month period (dimensional referring to a concept of gender as a spectrum rather than two opposite poles). Among populations with a diagnosis of gender dysphoria, the questionnaire shows strong evidence for discriminant validity, with lower scores showing increased levels of gender dysphoria.

Using the CCM, Inmate Johnson self-reported severe to moderate levels of depression and anxiety, extreme somatic complaints, as well as rare thoughts of suicide and self-harm. He described no other acute or chronic mental health symptoms. Inmate Johnson's suicidality is not a crisis type of suicidal thought which requires immediate action to provide safety for the inmate. These occasional, sporadic thoughts of suicide with no plan and no intention, are related to the high sense of tension in crisis mode, when Inmate Johnson perceives he is not being taken seriously. Inmate Johnson's chronic need for positive attention, combined with his highly over developed sense of entitlement lend to the strong emotional sense of

Exhibit 14-6

CONFIDENTIAL PSYCHOLOGICAL REPORT                    Johnson 6 of 8

desperation experienced as both anxiety and lack of fulfillment – which is noted as depression. Lack of continuous positive attention causes him anxiety, and intense need, triggering a cry for help which is frequently perceived as acting out.

Using the MMPI-2, Inmate Johnson's responses indicate tendency to exaggerate clinical symptoms, while still providing a valid profile of responses. Inmate Johnson's MMPI-2 Code of 684 shares traits with individuals who suffer from Paranoid Schizophrenia, but also has diagnostic markers of both Histrionic and Narcissistic Personality Disorders. Individuals with this code type tend to be impulsive lack insight show poor judgment, critically blame others for what they perceive to be injustices done to them. These individuals may have a background of severe childhood trauma, and perceive the world as hostile. Frequently, these individuals have delusions of grandeur and difficulty empathizing with the plights of others due to their own self-focused attentions. Their anger tends to be driven by the perception that they need to protect themselves, as they alone are willing and capable of doing so.

The GIDYQ-AA was scored with a raw score of 38 and a scaled score of 1.4. This score is extremely low compared to the mean scores of biological adult males experiencing gender dysphoria $(M = 2.49, SD = .41)$ as opposed to biological male, heterosexual adults not experiencing gender dysphoria $(M = 4.85, SD = .22)$. Of interest is inmate Johnson's almost absolute answers. All answers except one were either Always or Never. Inmate Johnson identified himself as a Woman, with no uncertainty whatsoever, and stated that in the last 12 months he has frequently wished for gender reassignment surgery.

**DSM-V Diagnoses Relevant to the Referral Questions:** *Inclusion of a DSM-V diagnosis in this report does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease or infirmary, mental disorders, insanity, competency and involuntary hospitalization or release.*

The purpose of this evaluation was to document the presence or absence of the diagnostic criteria for Gender Dysphoria per the DSM-5, as well as any additional information relevant to the question of whether or not it is in the best interest of the Inmate's psychological health to pursue and/or continue hormone therapy. Per the DSM-5, the diagnosis of Gender Dysphoria in Adolescents and Adults-302.85 (F64.1) requires two criteria be met.

The first criterion relates to the incongruence between one's experienced/expressed gender and the assigned gender, lasting for at a minimum of six months, and manifested by two of six possible factors. Inmate Johnson does meet some of these six factors at this time.

1. The first factor is a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics. Inmate Johnson verbally expresses this experience. His statements regarding the age at which he began questioning his gender characteristics are inconsistent with the literature, in that his awareness of his own body and feelings developed very early on, prior to puberty. Inmate Johnson

Exhibit 14-7

CONFIDENTIAL PSYCHOLOGICAL REPORT                    Johnson 7 of 8

answers suggested that he was always acutely aware of his desire to live as/be a female, and his urges to behave in non-masculine ways. The evaluating psychologist noted the social media accounts were very clearly demarcated by Inmate Johnson's presenting as a 'female' in dress, making references to 'drag' and self-describing as highly effeminate.

2. The second factor is a strong desire to be rid of one's primary and/or secondary sex characteristics due to the incongruence experienced in factor one. Inmate Johnson has verbally asserted this. He has also stated that it is his desire to someday have gender reassignment surgery. Inmate Johnson has made no threats to harm himself in order to hasten a transition. However he is requesting increased hormones to push his anatomy and presentation towards a more effeminate presentation.

3. The third factor is a strong desire for the primary and/or secondary sex characteristics of the other gender. Inmate Johnson did not discuss the desire for secondary Female sex characteristics such as breasts, during the evaluation, but the presentation on Social Media was remarkable for the focus on presentation of secondary Female sex characteristics.

4. The fourth factor is a desire to be of the other gender. Inmate Johnson has verbalized a desire to be of a female gender.

5. The fifth factor is a strong desire to be treated as the other gender. Inmate Johnson desires to be seen as a woman, but spent no time or detail discussing what it would mean to be treated as a woman.

6. The sixth factor is a strong conviction that one has the typical feelings and reactions of the other gender. Inmate Johnson only expressed interests in specific traditional female roles when describing his employment history. Inmate Johnson had far more focus on his role as an entertainer than as a woman.

The second criterion relates to association of the condition with clinically significant distress in social, occupational, and /or other areas of functioning. Inmate Johnson does not appear to be experiencing clinical levels of anxiety and/or depression related to Gender Dysphoria.

Inmate Johnson appears to be experiencing significant levels of distress due to a diagnostically relevant Personality Disorder.

**Conclusions and Recommendations:** It is the opinion of the evaluating psychologist that the distress fueled by Inmate Johnson's Personality Disorder was expressed by Inmate Johnson through the use of his sexuality via social media, on stage adult entertainment, and prostitution. Inmate Johnson's use of gender and sexuality to attract attention provided ample opportunity for him to receive positive attention, as noted in his comment during the interview that "Facebook is where I found the most support." The current political climate provided, and continues to provide, a socially defensible position for calling out anyone who declines

Exhibit 14-8

CONFIDENTIAL PSYCHOLOGICAL REPORT                          Johnson 8 of 8

to applaud Inmate Johnson's presentations as "haters." This provides Inmate Johnson with attentional support for the symptoms of Histrionic Personality Disorder, as well as a ready supply of the anticipated "unworthy" people needed to continue supporting the features of Narcissistic Personality Disorder.

This evaluating psychologist believes that Inmate Johnson would benefit from mental health programing specifically to address his personality disorders, and the role his attention seeking behaviors play in his chronic social problems, as well as his disciplinary infractions. Dialectical Behavioral Therapeutic informed programing, with self-discovery and trauma informed psychotherapy may provide him with long term benefits.

Inmate Johnson is currently receiving Hormone Treatment for Gender Dysphoria. When medical staff determines if continuation, advancement, or discontinuation of the Hormone Treatment is in the best interest of Inmate Johnson, it is recommended that medical and mental health staff meet to consult on development of a formal behavior plan that will provide appropriate safety precautions in light of Inmate Johnson's history of behaviorally acting out and threatening suicide when he is displeased with negative attention or denial of requests.

For additional information, please contact me at (405) 527-5593 ext. 3204 or via email at patricia.jones@doc.state.ok.us.

*Patricia Jones*

Patricia Jones, Psy.D. Psychologist
Joseph Harp Correctional Center Oklahoma Department of Corrections

Exhibit 14.9

210 DA



**WPATH** WORLD PROFESSIONAL ASSOCIATION for TRANSGENDER HEALTH

Exhibit's 17-1-113

# Standards of Care

## for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professiona Association for Transgender Health

7th Version[1] | www.wpath.org

---

1   This is the seventh version of the Standards of Care. The original SOC were published in 1979. Previous revisions were in 1980, 1981, 1990, 1998, and 2001.

Exhibit's 17 1-113

*Exhibits 17 1-113*

**The Standards of Care**
7TH VERSION

## Table of Contents

I. Purpose and Use of the Standards of Care ........................................1

II. Global Applicability of the Standards of Care ...................................3

III. The Difference between Gender Nonconformity and Gender Dysphoria .............4

IV. Epidemiologic Considerations .................................................6

V. Overview of Therapeutic Approaches for Gender Dysphoria ......................8

VI. Assessment and Treatment of Children and Adolescents with Gender Dysphoria .....10

VII. Mental Health .............................................................21

VIII. Hormone Therapy ..........................................................33

IX. Reproductive Health........................................................50

X. Voice and Communication Therapy............................................52

XI. Surgery..................................................................54

XII. Postoperative Care and Follow-Up...........................................64

XIII. Lifelong Preventive and Primary Care ........................................65

XIV. Applicability of the *Standards of Care* to People Living in Institutional Environments . . .67

XV. Applicability of the *Standards of Care* to People With Disorders of Sex Development . . .69

**References** ................................................................72

**Appendices:**

A. Glossary..................................................................95

B. Overview of Medical Risks of Hormone Therapy ................................97

C. Summary of Criteria for Hormone Therapy and Surgeries........................104

D. Evidence for Clinical Outcomes of Therapeutic Approaches ......................107

E. Development Process for the *Standards of Care, Version 7*........................109

Exhibit 17-1

The Standards of Care
7TH VERSION

# Purpose and Use of the Standards of Care

The World Professional Association for Transgender Health (WPATH)[1] is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health. The vision of WPATH is to bring together diverse professionals dedicated to developing best practices and supportive policies worldwide that promote health, research, education, respect, dignity, and equality for transsexual, transgender, and gender nonconforming people in all cultural settings.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the articulation of *Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People*. The SOC are based on the best available science and expert professional consensus.[2] Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the SOC to other parts of the world are necessary. Suggestions for ways of thinking about cultural relativity and cultural competence are included in this version of the SOC.

The overall goal of the SOC is to provide clinical guidance for health professionals to assist transsexual, transgender, and gender nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment. This assistance may include primary care, gynecologic and urologic care, reproductive options, voice and communication therapy, mental health services (e.g., assessment, counseling, psychotherapy), and hormonal and surgical treatments. While this is primarily a document for health professionals, the SOC may also be used by individuals, their families, and social institutions to understand how they can assist with promoting optimal health for members of this diverse population.

WPATH recognizes that health is dependent upon not only good clinical care but also social and political climates that provide and ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that promote tolerance and equity

---

1   Formerly the Harry Benjamin International Gender Dysphoria Association

2   *Standards of Care (SOC). Version 7* represents a significant departure from previous versions. Changes in this version are based upon significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for transsexual, transgender, and gender nonconforming people beyond hormone therapy and surgery (Coleman, 2009a, b, c, d).

The Standards of Care
7TH VERSION

Exhibit 17-2

for gender and sexual diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these changes in public policies and legal reforms.

## The Standards of Care Are Flexible Clinical Guidelines

The SOC are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender nonconforming people. While flexible, they offer standards for promoting optimal health care and guiding the treatment of people experiencing gender dysphoria – broadly defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

As for all previous versions of the SOC, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care – and the SOC – to evolve.

The SOC articulate standards of care but also acknowledge the role of making informed choices and the value of harm reduction approaches. In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Some patients who present for care will have made significant self-directed progress towards gender role changes, transition, or other resolutions regarding their gender identity or gender dysphoria. Other patients will require more intensive services. Health professionals can use the SOC to help patients consider the full range of health services open to them, in accordance with their clinical needs and goals for gender expression.

2

World Professional Association for Transgender Health

The Standards of Care
7TH VERSION

Exhibit 17-3

# Global Applicability of the Standards of Care

While the *SOC* are intended for worldwide use, WPATH acknowledges that much of the recorded clinical experience and knowledge in this area of health care is derived from North American and Western European sources. From place to place, both across and within nations, there are differences in all of the following: social attitudes towards transsexual, transgender, and gender nonconforming people; constructions of gender roles and identities; language used to describe different gender identities; epidemiology of gender dysphoria; access to and cost of treatment; therapies offered; number and type of professionals who provide care; and legal and policy issues related to this area of health care (Winter, 2009).

It is impossible for the *SOC* to reflect all of these differences. In applying these standards to other cultural contexts, health professionals must be sensitive to these differences and adapt the *SOC* according to local realities. For example, in a number of cultures, gender nonconforming people are found in such numbers and living in such ways as to make them highly socially visible (Peletz, 2006). In settings such as these, it is common for people to initiate a change in their gender expression and physical characteristics while in their teens, or even earlier. Many grow up and live in a social, cultural, and even linguistic context quite unlike that of Western cultures. Yet almost all experience prejudice (Peletz, 2006; Winter, 2009). In many cultures, social stigma towards gender nonconformity is widespread and gender roles are highly prescriptive (Winter et al., 2009). Gender nonconforming people in these settings are forced to be hidden, and therefore may lack opportunities for adequate health care (Winter, 2009).

The *SOC* are not intended to limit efforts to provide the best available care to all individuals. Health professionals throughout the world – even in areas with limited resources and training opportunities – can apply the many core principles that undergird the *SOC*. These principles include the following: Exhibit respect for patients with nonconforming gender identities (do not pathologize differences in gender identity or expression); provide care (or refer to knowledgeable colleagues) that affirms patients' gender identities and reduces the distress of gender dysphoria, when present; become knowledgeable about the health care needs of transsexual, transgender, and gender nonconforming people, including the benefits and risks of treatment options for gender dysphoria; match the treatment approach to the specific needs of patients, particularly their goals for gender expression and need for relief from gender dysphoria; facilitate access to appropriate care; seek patients' informed consent before providing treatment; offer continuity of care; and be prepared to support and advocate for patients within their families and communities (schools, workplaces, and other settings).

The Standards of Care
7TH VERSION

Exhibit 17-4

Terminology is culturally and time-dependent and is rapidly evolving. It is important to use respectful language in different places and times, and among different people. As the *SOC* are translated into other languages, great care must be taken to ensure that the meanings of terms are accurately translated. Terminology in English may not be easily translated into other languages, and vice versa. Some languages do not have equivalent words to describe the various terms within this document; hence, translators should be cognizant of the underlying goals of treatment and articulate culturally applicable guidance for reaching those goals.

‖‖

# The Difference Between Gender Nonconformity and Gender Dysphoria

## Being Transsexual, Transgender, or Gender Nonconforming Is a Matter of Diversity, Not Pathology

WPATH released a statement in May 2010 urging the de-psychopathologization of gender nonconformity worldwide (WPATH Board of Directors, 2010). This statement noted that "the expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally-diverse human phenomenon [that] should not be judged as inherently pathological or negative."

Unfortunately, there is stigma attached to gender nonconformity in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress" (I. H. Meyer, 2003). Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make transsexual, transgender, and gender nonconforming individuals more vulnerable to developing mental health concerns such as anxiety and depression (Institute of Medicine, 2011). In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and neglect in one's relationships with peers and family members, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being transsexual, transgender, or gender nonconforming.

Exhibit 17-5

**The Standards of Care**
7TH VERSION

## Gender Nonconformity Is Not the Same as Gender Dysphoria

*Gender nonconformity* refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011). *Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b). Only *some* gender nonconforming people experience gender dysphoria at *some* point in their lives.

Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them (Bockting & Goldberg, 2006). Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications. Medical treatment options include, for example, feminization or masculinization of the body through hormone therapy and/or surgery, which are effective in alleviating gender dysphoria and are medically necessary for many people. Gender identities and expressions are diverse, and hormones and surgery are just two of many options available to assist people with achieving comfort with self and identity.

Gender dysphoria can in large part be alleviated through treatment (Murad et al., 2010). Hence, while transsexual, transgender, and gender nonconforming people may experience gender dysphoria at some point in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assigned at birth, or from prevailing gender norms and expectations.

## Diagnoses Related to Gender Dysphoria

Some people experience gender dysphoria at such a level that the distress meets criteria for a formal diagnosis that might be classified as a mental disorder. Such a diagnosis is not a license for stigmatization or for the deprivation of civil and human rights. Existing classification systems such as the *Diagnostic Statistical Manual of Mental Disorders (DSM)* (American Psychiatric Association, 2000) and the *International Classification of Diseases (ICD)* (World Health Organization, 2007) define hundreds of mental disorders that vary in onset, duration, pathogenesis, functional disability, and treatability. All of these systems attempt to classify clusters of symptoms and conditions, not the individuals themselves. A disorder is a description of something with which a person might struggle, not a description of the person or the person's identity.

**The Standards of Care**
7TH VERSION

Exhibit 17-6

Thus, transsexual, transgender, and gender nonconforming individuals are not inherently disordered. Rather, the distress of gender dysphoria, when present, is the concern that might be diagnosable and for which various treatment options are available. The existence of a diagnosis for such dysphoria often facilitates access to health care and can guide further research into effective treatments.

Research is leading to new diagnostic nomenclatures, and terms are changing in both the *DSM* (Cohen-Kettenis & Pfäfflin, 2010; Knudson, De Cuypere, & Bockting, 2010b; Meyer-Bahlburg, 2010; Zucker, 2010) and the *ICD*. For this reason, familiar terms are employed in the SOC and definitions are provided for terms that may be emerging. Health professionals should refer to the most current diagnostic criteria and appropriate codes to apply in their practice areas.

# IV

# Epidemiologic Considerations

Formal epidemiologic studies on the incidence[3] and prevalence[4] of transsexualism specifically or transgender and gender nonconforming identities in general have not been conducted, and efforts to achieve realistic estimates are fraught with enormous difficulties (Institute of Medicine, 2011; Zucker & Lawrence, 2009). Even if epidemiologic studies established that a similar proportion of transsexual, transgender, or gender nonconforming people existed all over the world, it is likely that cultural differences from one country to another would alter both the behavioral expressions of different gender identities and the extent to which gender dysphoria – distinct from one's gender identity – is actually occurring in a population. While in most countries, crossing normative gender boundaries generates moral censure rather than compassion, there are examples in certain cultures of gender nonconforming behaviors (e.g., in spiritual leaders) that are less stigmatized and even revered (Besnier, 1994; Bolin, 1988; Chiñas, 1995; Coleman, Colgan, & Gooren, 1992; Costa & Matzner, 2007; Jackson & Sullivan, 1999; Nanda, 1998; Taywaditep, Coleman, & Dumronggittigule, 1997).

For various reasons, researchers who have studied incidence and prevalence have tended to focus on the most easily counted subgroup of gender nonconforming individuals: transsexual individuals who experience gender dysphoria and who present for gender-transition-related care at specialist gender clinics (Zucker & Lawrence, 2009). Most studies have been conducted in European

---

3  **incidence**—the number of new cases arising in a given period (e.g., a year)
4  **prevalence**—the number of individuals having a condition, divided by the number of people in the general population

World Professional Association for Transgender Health

Exhibit 17-7

**The Standards of Care**
7TH VERSION

countries such as Sweden (Wålinder, 1968, 1971), the United Kingdom (Hoenig & Kenna, 1974), the Netherlands (Bakker, Van Kesteren, Gooren, & Bezemer, 1993; Eklund, Gooren, & Bezemer, 1988; van Kesteren, Gooren, & Megens, 1996), Germany (Weitze & Osburg, 1996), and Belgium (De Cuypere et al., 2007). One was conducted in Singapore (Tsoi, 1988).

De Cuypere and colleagues (2007) reviewed such studies, as well as conducted their own. Together, those studies span 39 years. Leaving aside two outlier findings from Pauly in 1968 and Tsoi in 1988, ten studies involving eight countries remain. The prevalence figures reported in these ten studies range from 1:11,900 to 1:45,000 for male-to-female individuals (MtF) and 1:30,400 to 1:200,000 for female-to-male (FtM) individuals. Some scholars have suggested that the prevalence is much higher, depending on the methodology used in the research (for example, Olyslager & Conway, 2007).

Direct comparisons across studies are impossible, as each differed in their data collection methods and in their criteria for documenting a person as transsexual (e.g., whether or not a person had undergone genital reconstruction, versus had initiated hormone therapy, versus had come to the clinic seeking medically-supervised transition services). The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period.

The numbers yielded by studies such as these can be considered minimum estimates at best. The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked.

Other clinical observations (not yet firmly supported by systematic study) support the likelihood of a higher prevalence of gender dysphoria: (i) Previously unrecognized gender dysphoria is occasionally diagnosed when patients are seen with anxiety, depression, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, sexual disorders, and disorders of sex development (Cole, O'Boyle, Emory, & Meyer III, 1997). (ii) Some crossdressers, drag queens/ kings or female/male impersonators, and gay and lesbian individuals may be experiencing gender dysphoria (Bullough & Bullough, 1993). (iii) The intensity of some people's gender dysphoria fluctuates below and above a clinical threshold (Docter, 1988). (iv) Gender nonconformity among FtM individuals tends to be relatively invisible in many cultures, particularly to Western health

**The Standards of Care**
7TH VERSION

Exhibit 17-8

professionals and researchers who have conducted most of the studies on which the current estimates of prevalence and incidence are based (Winter, 2009).

Overall, the existing data should be considered a starting point, and health care would benefit from more rigorous epidemiologic study in different locations worldwide.



# Overview of Therapeutic Approaches for Gender Dysphoria

## Advancements in the Knowledge and Treatment of Gender Dysphoria

In the second half of the 20th century, awareness of the phenomenon of gender dysphoria increased when health professionals began to provide assistance to alleviate gender dysphoria by supporting changes in primary and secondary sex characteristics through hormone therapy and surgery, along with a change in gender role. Although Harry Benjamin already acknowledged a spectrum of gender nonconformity (Benjamin, 1966), the initial clinical approach largely focused on identifying who was an appropriate candidate for sex reassignment to facilitate a physical change from male to female or female to male as completely as possible (e.g., Green & Fleming, 1990; Hastings, 1974). This approach was extensively evaluated and proved to be highly effective. Satisfaction rates across studies ranged from 87% of MtF patients to 97% of FtM patients (Green & Fleming, 1990), and regrets were extremely rare (1-1.5% of MtF patients and <1% of FtM patients; Pfäfflin, 1993). Indeed, hormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither (Bockting & Goldberg, 2006; Bockting, 2008; Lev, 2004). Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate

8

Case 6:19-cv-00269-JFH-JAR   Document 13-2   Filed 09/09/19   Page 42 of 88
Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 140

Exhibit 17-

The Standards of Care
7TH VERSION

gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized.

As a generation of transsexual, transgender, and gender nonconforming individuals has come of age – many of whom have benefitted from different therapeutic approaches – they have become more visible as a community and demonstrated considerable diversity in their gender identities, roles, and expressions. Some individuals describe themselves not as gender nonconforming but as unambiguously cross-sexed (i.e., a member of the other sex; Bockting, 2008). Other individuals affirm their unique gender identity and no longer consider themselves either male or female (Bornstein, 1994; Kimberly, 1997; Stone, 1991; Warren, 1993). Instead, they may describe their gender identity in specific terms such as transgender, bigender, or genderqueer, affirming their unique experience that may transcend a male/female binary understanding of gender (Bockting, 2008; Ekins & King, 2006; Nestle, Wilchins, & Howell, 2002). They may not experience their process of identity affirmation as a "transition," because they never fully embraced the gender role they were assigned at birth or because they actualize their gender identity, role, and expression in a way that does not involve a change from one gender role to another. For example, some youth identifying as genderqueer have always experienced their gender identity and role as such (genderqueer). Greater public visibility and awareness of gender diversity (Feinberg, 1996) has further expanded options for people with gender dysphoria to actualize an identity and find a gender role and expression that is comfortable for them.

Health professionals can assist gender dysphoric individuals with affirming their gender identity, exploring different options for expression of that identity, and making decisions about medical treatment options for alleviating gender dysphoria.

## Options for Psychological and Medical Treatment of Gender Dysphoria

For individuals seeking care for gender dysphoria, a variety of therapeutic options can be considered. The number and type of interventions applied and the order in which these take place may differ from person to person (e.g., Bockting, Knudson, & Goldberg, 2006; Bolin, 1994; Rachlin, 1999; Rachlin, Green, & Lombardi, 2008; Rachlin, Hansbury, & Pardo, 2010). Treatments options include the following:

○ Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

○ Hormone therapy to feminize or masculinize the body;

The Standards of Care
7TH VERSION

Exhibit 17-10

- Surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

## Options for Social Support and Changes in Gender Expression

In addition (or as an alternative) to the psychological and medical treatment options described above, other options can be considered to help alleviate gender dysphoria, for example:

- Offline and online peer support resources, groups, or community organizations that provide avenues for social support and advocacy;

- Offline and online support resources for families and friends;

- Voice and communication therapy to help individuals develop verbal and non-verbal communication skills that facilitate comfort with their gender identity;

- Hair removal through electrolysis, laser treatment, or waxing;

- Breast binding or padding, genital tucking or penile prostheses, padding of hips or buttocks;

- Changes in name and gender marker on identity documents.

# VI

# Assessment and Treatment of Children and Adolescents with Gender Dysphoria

There are a number of differences in the phenomenology, developmental course, and treatment approaches for gender dysphoria in children, adolescents, and adults. In children and adolescents, a rapid and dramatic developmental process (physical, psychological, and sexual) is involved and

Exhibit 12-11

**The Standards of Care**
7TH VERSION

there is greater fluidity and variability in outcomes, particular in prepubertal children. Accordingly, this section of the *SOC* offers specific clinical guidelines for the assessment and treatment of gender dysphoric children and adolescents.

## Differences between Children and Adolescents with Gender Dysphoria

An important difference between gender dysphoric children and adolescents is in the proportion for whom dysphoria persists into adulthood. Gender dysphoria during childhood does not inevitably continue into adulthood.[5] Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6-23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12-27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).

In contrast, the persistence of gender dysphoria into adulthood appears to be much higher for adolescents. No formal prospective studies exist. However, in a follow-up study of 70 adolescents who were diagnosed with gender dysphoria and given puberty suppressing hormones, all continued with the actual sex reassignment, beginning with feminizing/masculinizing hormone therapy (de Vries, Steensma, Doreleijers, & Cohen-Kettenis, 2010).

Another difference between gender dysphoric children and adolescents is in the sex ratios for each age group. In clinically referred, gender dysphoric children under age 12, the male/female ratio ranges from 6:1 to 3:1 (Zucker, 2004). In clinically referred, gender dysphoric adolescents older than age 12, the male/female ratio is close to 1:1 (Cohen-Kettenis & Pfäfflin, 2003).

As discussed in section IV and by Zucker and Lawrence (2009), formal epidemiologic studies on gender dysphoria – in children, adolescents, and adults – are lacking. Additional research is needed to refine estimates of its prevalence and persistence in different populations worldwide.

---

5  Gender nonconforming behaviors in children may continue into adulthood, but such behaviors are not necessarily indicative of gender dysphoria and a need for treatment. As described in section III, gender dysphoria is not synonymous with diversity in gender expression.

The Standards of Care
7TH VERSION

Exhibit 17-12

## Phenomenology in Children

Children as young as age two may show features that could indicate gender dysphoria. They may express a wish to be of the other sex and be unhappy about their physical sex characteristics and functions. In addition, they may prefer clothes, toys, and games that are commonly associated with the other sex and prefer playing with other-sex peers. There appears to be heterogeneity in these features: Some children demonstrate extremely gender nonconforming behavior and wishes, accompanied by persistent and severe discomfort with their primary sex characteristics. In other children, these characteristics are less intense or only partially present (Cohen-Kettenis et al., 2006; Knudson, De Cuypere, & Bockting, 2010a).

It is relatively common for gender dysphoric children to have co-existing internalizing disorders such as anxiety and depression (Cohen-Kettenis, Owen, Kaijser, Bradley, & Zucker, 2003; Wallien, Swaab, & Cohen-Kettenis, 2007; Zucker, Owen, Bradley, & Ameeriar, 2002). The prevalence of autistic spectrum disorders seems to be higher in clinically referred, gender dysphoric children than in the general population (de Vries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers, 2010).

## Phenomenology in Adolescents

In most children, gender dysphoria will disappear before or early in puberty. However, in some children these feelings will intensify and body aversion will develop or increase as they become adolescents and their secondary sex characteristics develop (Cohen-Kettenis, 2001; Cohen-Kettenis & Pfäfflin, 2003; Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008; Zucker & Bradley, 1995). Data from one study suggest that more extreme gender nonconformity in childhood is associated with persistence of gender dysphoria into late adolescence and early adulthood (Wallien & Cohen-Kettenis, 2008). Yet many adolescents and adults presenting with gender dysphoria do not report a history of childhood gender nonconforming behaviors (Docter, 1988; Landén, Wålinder, & Lundström, 1998). Therefore, it may come as a surprise to others (parents, other family members, friends, and community members) when a youth's gender dysphoria first becomes evident in adolescence.

Adolescents who experience their primary and/or secondary sex characteristics and their sex assigned at birth as inconsistent with their gender identity may be intensely distressed about it. Many, but not all, gender dysphoric adolescents have a strong wish for hormones and surgery. Increasing numbers of adolescents have already started living in their desired gender role upon entering high school (Cohen-Kettenis & Pfäfflin, 2003).

Exhibit
M-13

The Standards of Care
7TH VERSION

Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment – starting with GnRH analogues to suppress puberty in the first Tanner stages – differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre-van de Waal & Cohen-Kettenis, 2006; Zucker et al., in press). The percentages of treated adolescents are likely influenced by the organization of health care, insurance aspects, cultural differences, opinions of health professionals, and diagnostic procedures offered in different settings.

Inexperienced clinicians may mistake indications of gender dysphoria for delusions. Phenomenologically, there is a qualitative difference between the presentation of gender dysphoria and the presentation of delusions or other psychotic symptoms. The vast majority of children and adolescents with gender dysphoria are not suffering from underlying severe psychiatric illness such as psychotic disorders (Steensma, Biemond, de Boer, & Cohen-Kettenis, published online ahead of print January 7, 2011).

It is more common for adolescents with gender dysphoria to have co-existing internalizing disorders such as anxiety and depression, and/or externalizing disorders such as oppositional defiant disorder (de Vries et al., 2010). As in children, there seems to be a higher prevalence of autistic spectrum disorders in clinically referred, gender dysphoric adolescents than in the general adolescent population (de Vries et al., 2010).

## Competency of Mental Health Professionals Working with Children or Adolescents with Gender Dysphoria

The following are recommended minimum credentials for mental health professionals who assess, refer, and offer therapy to children and adolescents presenting with gender dysphoria:

1. Meet the competency requirements for mental health professionals working with adults, as outlined in section VII;

2. Trained in childhood and adolescent developmental psychopathology;

3. Competent in diagnosing and treating the ordinary problems of children and adolescents.

**The Standards of Care**
7TH VERSION

Exhibit 17-14

# Roles of Mental Health Professionals Working with Children and Adolescents with Gender Dysphoria

The roles of mental health professionals working with gender dysphoric children and adolescents may include the following:

1. Directly assess gender dysphoria in children and adolescents (see general guidelines for assessment, below).

2. Provide family counseling and supportive psychotherapy to assist children and adolescents with exploring their gender identity, alleviating distress related to their gender dysphoria, and ameliorating any other psychosocial difficulties.

3. Assess and treat any co-existing mental health concerns of children or adolescents (or refer to another mental health professional for treatment). Such concerns should be addressed as part of the overall treatment plan.

4. Refer adolescents for additional physical interventions (such as puberty suppressing hormones) to alleviate gender dysphoria. The referral should include documentation of an assessment of gender dysphoria and mental health, the adolescent's eligibility for physical interventions (outlined below), the mental health professional's relevant expertise, and any other information pertinent to the youth's health and referral for specific treatments.

5. Educate and advocate on behalf of gender dysphoric children, adolescents, and their families in their community (e.g., day care centers, schools, camps, other organizations). This is particularly important in light of evidence that children and adolescents who do not conform to socially prescribed gender norms may experience harassment in school (Grossman, D'Augelli, & Salter, 2006; Grossman, D'Augelli, Howell, & Hubbard, 2006; Sausa, 2005), putting them at risk for social isolation, depression, and other negative sequelae (Nuttbrock et al., 2010).

6. Provide children, youth, and their families with information and referral for peer support, such as support groups for parents of gender nonconforming and transgender children (Gold & MacNish, 2011; Pleak, 1999; Rosenberg, 2002).

Assessment and psychosocial interventions for children and adolescents are often provided within a multi-disciplinary gender identity specialty service. If such a multidisciplinary service is not available, a mental health professional should provide consultation and liaison arrangements with a pediatric endocrinologist for the purpose of assessment, education, and involvement in any decisions about physical interventions.

14                    World Professional Association for Transgender Health

Exhibit
17-15

## Psychological Assessment of Children and Adolescents

When assessing children and adolescents who present with gender dysphoria, mental health professionals should broadly conform to the following guidelines:

1. Mental health professionals should not dismiss or express a negative attitude towards noncon-forming gender identities or indications of gender dysphoria. Rather, they should acknowledge the presenting concerns of children, adolescents, and their families; offer a thorough assess-ment for gender dysphoria and any co-existing mental health concerns; and educate clients and their families about therapeutic options, if needed. Acceptance and removal of secrecy can bring considerable relief to gender dysphoric children/adolescents and their families.

2. Assessment of gender dysphoria and mental health should explore the nature and characteris-tics of a child's or adolescent's gender identity. A psychodiagnostic and psychiatric assessment – covering the areas of emotional functioning, peer and other social relationships, and intel-lectual functioning/school achievement – should be performed. Assessment should include an evaluation of the strengths and weaknesses of family functioning. Emotional and behavioral problems are relatively common, and unresolved issues in a child's or youth's environment may be present (de Vries, Doreleijers, Steensma, & Cohen-Kettenis, 2011; Di Ceglie & Thüm-mel, 2006; Wallien et al., 2007).

3. For adolescents, the assessment phase should also be used to inform youth and their families about the possibilities and limitations of different treatments. This is necessary for informed consent, but also important for assessment. The way that adolescents respond to information about the reality of sex reassignment can be diagnostically informative. Correct information may alter a youth's desire for certain treatment, if the desire was based on unrealistic expecta-tions of its possibilities.

## Psychological and Social Interventions
## for Children and Adolescents

When supporting and treating children and adolescents with gender dysphoria, health professionals should broadly conform to the following guidelines:

1. Mental health professionals should help families to have an accepting and nurturing response to the concerns of their gender dysphoric child or adolescent. Families play an important role in the psychological health and well-being of youth (Brill & Pepper, 2008; Lev, 2004). This also ap-plies to peers and mentors from the community, who can be another source of social support.

World Professional Association for Transgender Health 15

**The Standards of Care**
**7TH VERSION**

Exhibit 17-16

2. Psychotherapy should focus on reducing a child's or adolescent's distress related to the gender dysphoria and on ameliorating any other psychosocial difficulties. For youth pursuing sex reassignment, psychotherapy may focus on supporting them before, during, and after reassignment. Formal evaluations of different psychotherapeutic approaches for this situation have not been published, but several counseling methods have been described (Cohen-Kettenis, 2006; de Vries, Cohen-Kettenis, & Delemarre-van de Waal, 2006; Di Ceglie & Thümmel, 2006; Hill, Menvielle, Sica, & Johnson, 2010; Malpas, in press; Menvielle & Tuerk, 2002; Rosenberg, 2002; Vanderburgh, 2009; Zucker, 2006).

Treatment aimed at trying to change a person's gender identity and expression to become more congruent with sex assigned at birth has been attempted in the past without success (Gelder & Marks, 1969; Greenson, 1964), particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

1. Families should be supported in managing uncertainty and anxiety about their child's or adolescent's psychosexual outcomes and in helping youth to develop a positive self-concept.

2. Mental health professionals should not impose a binary view of gender. They should give ample room for clients to explore different options for gender expression. Hormonal or surgical interventions are appropriate for some adolescents, but not for others.

3. Clients and their families should be supported in making difficult decisions regarding the extent to which clients are allowed to express a gender role that is consistent with their gender identity, as well as the timing of changes in gender role and possible social transition. For example, a client might attend school while undergoing social transition only partly (e.g., by wearing clothing and having a hairstyle that reflects gender identity) or completely (e.g., by also using a name and pronouns congruent with gender identity). Difficult issues include whether and when to inform other people of the client's situation, and how others in their lives should respond.

4. Health professionals should support clients and their families as educators and advocates in their interactions with community members and authorities such as teachers, school boards, and courts.

5. Mental health professionals should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families throughout any subsequent social changes or physical interventions. This ensures that decisions about gender expression and the treatment of gender dysphoria are thoughtfully and recurrently considered. The same reasoning applies if a child or adolescent has already socially changed gender role prior to being seen by a mental health professional.

Exhibit 17-17

The Standards of Care
7TH VERSION

## Social Transition in Early Childhood

Some children state that they want to make a social transition to a different gender role long before puberty. For some children, this may reflect an expression of their gender identity. For others, this could be motivated by other forces. Families vary in the extent to which they allow their young children to make a social transition to another gender role. Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood. Outcomes research with children who completed early social transitions would greatly inform future clinical recommendations.

Mental health professionals can help families to make decisions regarding the timing and process of any gender role changes for their young children. They should provide information and help parents to weigh the potential benefits and challenges of particular choices. Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria (Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008). A change back to the original gender role can be highly distressing and even result in postponement of this second social transition on the child's part (Steensma & Cohen-Kettenis, 2011). For reasons such as these, parents may want to present this role change as an exploration of living in another gender role, rather than an irreversible situation. Mental health professionals can assist parents in identifying potential in-between solutions or compromises (e.g., only when on vacation). It is also important that parents explicitly let the child know that there is a way back.

Regardless of a family's decisions regarding transition (timing, extent), professionals should counsel and support them as they work through the options and implications. If parents do not allow their young child to make a gender role transition, they may need counseling to assist them with meeting their child's needs in a sensitive and nurturing way, ensuring that the child has ample possibilities to explore gender feelings and behavior in a safe environment. If parents do allow their young child to make a gender role transition, they may need counseling to facilitate a positive experience for their child. For example, they may need support in using correct pronouns, maintaining a safe and supportive environment for their transitioning child (e.g., in school, peer group settings), and communicating with other people in their child's life. In either case, as a child nears puberty, further assessment may be needed as options for physical interventions become relevant.

The Standards of Care
7TH VERSION

Exhibit 17-18

# Physical Interventions for Adolescents

Before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken, as outlined above. The duration of this exploration may vary considerably depending on the complexity of the situation.

Physical interventions should be addressed in the context of adolescent development. Some identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility. An adolescent's shift towards gender conformity can occur primarily to please the parents and may not persist or reflect a permanent change in gender dysphoria (Hembree et al., 2009; Steensma et al., published online ahead of print January 7, 2011).

Physical interventions for adolescents fall into three categories or stages (Hembree et al., 2009):

1. *Fully reversible interventions.* These involve the use of GnRH analogues to suppress estrogen or testosterone production and consequently delay the physical changes of puberty. Alternative treatment options include progestins (most commonly medroxyprogesterone) or other medications (such as spironolactone) that decrease the effects of androgens secreted by the testicles of adolescents who are not receiving GnRH analogues. Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses.

2. *Partially reversible interventions.* These include hormone therapy to masculinize or feminize the body. Some hormone-induced changes may need reconstructive surgery to reverse the effect (e.g., gynaecomastia caused by estrogens), while other changes are not reversible (e.g., deepening of the voice caused by testosterone).

3. *Irreversible interventions.* These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one stage to another should not occur until there has been adequate time for adolescents and their parents to assimilate fully the effects of earlier interventions.

## Fully Reversible Interventions

Adolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun. In order for adolescents and their parents to make an informed decision about pubertal delay, it is recommended that adolescents experience the onset of puberty to at least Tanner Stage 2. Some children may arrive at this stage at very young ages (e.g., 9 years of age). Studies

World Professional Association for Transgender Health

Exhibit
12-19

**The Standards of Care**
7TH VERSION

evaluating this approach only included children who were at least 12 years of age (Cohen-Kettenis, Schagen, Steensma, de Vries, & Delemarre-van de Waal, 2011; de Vries, Steensma et al., 2010; Delemarre-van de Waal, van Weissenbruch, & Cohen Kettenis, 2004; Delemarre-van de Waal & Cohen-Kettenis, 2006).

Two goals justify intervention with puberty suppressing hormones: (i) their use gives adolescents more time to explore their gender nonconformity and other developmental issues; and (ii) their use may facilitate transition by preventing the development of sex characteristics that are difficult or impossible to reverse if adolescents continue on to pursue sex reassignment.

Puberty suppression may continue for a few years, at which time a decision is made to either discontinue all hormone therapy or transition to a feminizing/masculinizing hormone regimen. Pubertal suppression does not inevitably lead to social transition or to sex reassignment.

### Criteria for puberty suppressing hormones

In order for adolescents to receive puberty suppressing hormones, the following minimum criteria must be met:

1. The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

2. Gender dysphoria emerged or worsened with the onset of puberty;

3. Any co-existing psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

4. The adolescent has given informed consent and, particularly when the adolescent has not reached the age of medical consent, the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

### Regimens, monitoring, and risks for puberty suppression

For puberty suppression, adolescents with male genitalia should be treated with GnRH analogues, which stop luteinizing hormone secretion and therefore testosterone secretion. Alternatively, they may be treated with progestins (such as medroxyprogesterone) or with other medications that block testosterone secretion and/or neutralize testosterone action. Adolescents with female genitalia should be treated with GnRH analogues, which stop the production of estrogens and

**The Standards of Care**
7TH VERSION



progesterone. Alternatively, they may be treated with progestins (such as medroxyprogesterone). Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses. In both groups of adolescents, use of GnRH analogues is the preferred treatment (Hembree et al., 2009), but their high cost is prohibitive for some patients

During pubertal suppression, an adolescent's physical development should be carefully monitored – preferably by a pediatric endocrinologist – so that any necessary interventions can occur (e.g., to establish an adequate gender appropriate height, to improve iatrogenic low bone marrow density) (Hembree et al., 2009).

Early use of puberty suppressing hormones may avert negative social and emotional consequences of gender dysphoria more effectively than their later use would. Intervention in early adolescence should be managed with pediatric endocrinological advice, when available. Adolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques (alternative techniques, such as the use of a skin graft or colon tissue, are available).

Neither puberty suppression nor allowing puberty to occur is a neutral act. On the one hand, functioning in later life can be compromised by the development of irreversible secondary sex characteristics during puberty and by years spent experiencing intense gender dysphoria. On the other hand, there are concerns about negative physical side effects of GnRH analog use (e.g., on bone development and height). Although the very first results of this approach (as assessed for adolescents followed over 10 years) are promising (Cohen-Kettenis et al., 2011; Delemarre-van de Waal & Cohen-Kettenis, 2006), the long-term effects can only be determined when the earliest treated patients reach the appropriate age.

## Partially Reversible Interventions

Adolescents may be eligible to begin feminizing/masculinizing hormone therapy, preferably with parental consent. In many countries, 16-year-olds are legal adults for medical decision-making and do not require parental consent. Ideally, treatment decisions should be made among the adolescent, the family, and the treatment team.

Regimens for hormone therapy in gender dysphoric adolescents differ substantially from those used in adults (Hembree et al., 2009). The hormone regimens for youth are adapted to account for the somatic, emotional, and mental development that occurs throughout adolescence (Hembree et al., 2009).

**The Standards of Care**
7TH VERSION



## Irreversible Interventions

Genital surgery should not be carried out until (i) patients reach the legal age of majority in a given country, and (ii) patients have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Chest surgery in FtM patients could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment. The intent of this suggested sequence is to give adolescents sufficient opportunity to experience and socially adjust in a more masculine gender role, before undergoing irreversible surgery. However, different approaches may be more suitable, depending on an adolescent's specific clinical situation and goals for gender identity expression.

## Risks of Withholding Medical Treatment for Adolescents

Refusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization. As the level of gender-related abuse is strongly associated with the degree of psychiatric distress during adolescence (Nuttbrock et al., 2010), withholding puberty suppression and subsequent feminizing or masculinizing hormone therapy is not a neutral option for adolescents.

# VII
# Mental Health

Transsexual, transgender, and gender nonconforming people might seek the assistance of a mental health professional for any number of reasons. Regardless of a person's reason for seeking care, mental health professionals should have familiarity with gender nonconformity, act with appropriate cultural competence, and exhibit sensitivity in providing care.

This section of the SOC focuses on the role of mental health professionals in the care of adults seeking help for gender dysphoria and related concerns. Professionals working with gender dysphoric children, adolescents, and their families should consult section VI.

Exhibit M-2

The Standards of Care
7TH VERSION

## Competency of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

The training of mental health professionals competent to work with gender dysphoric adults rests upon basic general clinical competence in the assessment, diagnosis, and treatment of mental health concerns. Clinical training may occur within any discipline that prepares mental health professionals for clinical practice, such as psychology, psychiatry, social work, mental health counseling, marriage and family therapy, nursing, or family medicine with specific training in behavioral health and counseling. The following are recommended minimum credentials for mental health professionals who work with adults presenting with gender dysphoria:

1. A master's degree or its equivalent in a clinical behavioral science field. This degree or a more advanced one should be granted by an institution accredited by the appropriate national or regional accrediting board. The mental health professional should have documented credentials from a relevant licensing board or equivalent for that country.

2. Competence in using the *Diagnostic Statistical Manual of Mental Disorders* and/or the *International Classification of Diseases* for diagnostic purposes.

3. Ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria.

4. Documented supervised training and competence in psychotherapy or counseling.

5. Knowledgeable about gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria.

6. Continuing education in the assessment and treatment of gender dysphoria. This may include attending relevant professional meetings, workshops, or seminars; obtaining supervision from a mental health professional with relevant experience; or participating in research related to gender nonconformity and gender dysphoria.

In addition to the minimum credentials above, it is recommended that mental health professionals develop and maintain cultural competence to facilitate their work with transsexual, transgender, and gender nonconforming clients. This may involve, for example, becoming knowledgeable about current community, advocacy, and public policy issues relevant to these clients and their families. Additionally, knowledge about sexuality, sexual health concerns, and the assessment and treatment of sexual disorders is preferred.

22                                    World Professional Association for Transgender Health

Exhibit 17-23

**The Standards of Care**
7TH VERSION

Mental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria.

## Tasks of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

Mental health professionals may serve transsexual, transgender, and gender nonconforming individuals and their families in many ways, depending on a client's needs. For example, mental health professionals may serve as a psychotherapist, counselor, or family therapist, or as a diagnostician/assessor, advocate, or educator.

Mental health professionals should determine a client's reasons for seeking professional assistance. For example, a client may be presenting for any combination of the following health care services: psychotherapeutic assistance to explore gender identity and expression or to facilitate a coming out process; assessment and referral for feminizing/masculinizing medical interventions; psychological support for family members (partners, children, extended family); or psychotherapy unrelated to gender concerns or other professional services.

Below are general guidelines for common tasks that mental health professionals may fulfill in working with adults who present with gender dysphoria.

## Tasks Related to Assessment and Referral

### 1. Assess gender dysphoria

Mental health professionals assess clients' gender dysphoria in the context of an evaluation of their psychosocial adjustment (Bockting et al., 2006; Lev, 2004, 2009). The evaluation includes, at a minimum, assessment of gender identity and gender dysphoria, history and development of gender dysphoric feelings, the impact of stigma attached to gender nonconformity on mental health, and the availability of support from family, friends, and peers (for example, in person or online contact with other transsexual, transgender, or gender nonconforming individuals or groups). The evaluation may result in no diagnosis, in a formal diagnosis related to gender dysphoria, and/or in other diagnoses that describe aspects of the client's health and psychosocial adjustment. The role

**The Standards of Care**
7TH VERSION

Exhibit
17-24

of mental health professionals includes making reasonably sure that the gender dysphoria is not secondary to or better accounted for by other diagnoses.

Mental health professionals with the competencies described above (hereafter called "a qualified mental health professional") are best prepared to conduct this assessment of gender dysphoria. However, this task may instead be conducted by another type of health professional who has appropriate training in behavioral health and is competent in the assessment of gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy. This professional may be the prescribing hormone therapy provider or a member of that provider's health care team.

**2. Provide information regarding options for gender identity and expression and possible medical interventions**

An important task of mental health professionals is to educate clients regarding the diversity of gender identities and expressions and the various options available to alleviate gender dysphoria. Mental health professionals then may facilitate a process (or refer elsewhere) in which clients explore these various options, with the goals of finding a comfortable gender role and expression and becoming prepared to make a fully informed decision about available medical interventions, if needed. This process may include referral for individual, family, and group therapy and/or to community resources and avenues for peer support. The professional and the client discuss the implications, both short- and long-term, of any changes in gender role and use of medical interventions. These implications can be psychological, social, physical, sexual, occupational, financial, and legal (Bockting et al., 2006; Lev, 2004).

This task is also best conducted by a qualified mental health professional, but may be conducted by another health professional with appropriate training in behavioral health and with sufficient knowledge about gender nonconforming identities and expressions and about possible medical interventions for gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy.

**3. Assess, diagnose, and discuss treatment options for co-existing mental health concerns**

Clients presenting with gender dysphoria may struggle with a range of mental health concerns (Gómez-Gil, Trilla, Salamero, Godás, & Valdés, 2009; Murad et al., 2010) whether related or unrelated to what is often a long history of gender dysphoria and/or chronic minority stress. Possible concerns include anxiety, depression, self-harm, a history of abuse and neglect, compulsivity, substance abuse, sexual concerns, personality disorders, eating disorders, psychotic disorders, and autistic spectrum disorders (Bockting et al., 2006; Nuttbrock et al., 2010; Robinow, 2009). Mental health professionals should screen for these and other mental health concerns and incorporate

Exhibit 17-25

**The Standards of Care**
7TH VERSION

the identified concerns into the overall treatment plan. These concerns can be significant sources of distress and, if left untreated, can complicate the process of gender identity exploration and resolution of gender dysphoria (Bockting et al., 2006; Fraser, 2009a; Lev, 2009). Addressing these concerns can greatly facilitate the resolution of gender dysphoria, possible changes in gender role, the making of informed decisions about medical interventions, and improvements in quality of life.

Some clients may benefit from psychotropic medications to alleviate symptoms or treat co-existing mental health concerns. Mental health professionals are expected to recognize this and either provide pharmacotherapy or refer to a colleague who is qualified to do so. The presence of co-existing mental health concerns does not necessarily preclude possible changes in gender role or access to feminizing/masculinizing hormones or surgery; rather, these concerns need to be optimally managed prior to or concurrent with treatment of gender dysphoria. In addition, clients should be assessed for their ability to provide educated and informed consent for medical treatments.

Qualified mental health professionals are specifically trained to assess, diagnose, and treat (or refer to treatment for) these co-existing mental health concerns. Other health professionals with appropriate training in behavioral health, particularly when functioning as part of a multidisciplinary specialty team providing access to feminizing/masculinizing hormone therapy, may also screen for mental health concerns and, if indicated, provide referral for comprehensive assessment and treatment by a qualified mental health professional.

**4. If applicable, assess eligibility, prepare, and refer for hormone therapy**

The SOC provide criteria to guide decisions regarding feminizing/masculinizing hormone therapy (outlined in section VIII and Appendix C). Mental health professionals can help clients who are considering hormone therapy to be both psychologically prepared (for example, has made a fully informed decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has been evaluated by a physician to rule out or address medical contraindications to hormone use; has considered the psychosocial implications). If clients are of childbearing age, reproductive options (section IX) should be explored before initiating hormone therapy.

It is important for mental health professionals to recognize that decisions about hormones are first and foremost the client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

The Standards of Care
7TH VERSION

Exhibit 17-26

### Referral for feminizing/masculinizing hormone therapy

People may approach a specialized provider in any discipline to pursue feminizing/masculinizing hormone therapy. However, transgender health care is an interdisciplinary field, and coordination of care and referral among a client's overall care team is recommended.

Hormone therapy can be initiated with a referral from a qualified mental health professional. Alternatively, a health professional who is appropriately trained in behavioral health and competent in the assessment of gender dysphoria may assess eligibility, prepare, and refer the patient for hormone therapy, particularly in the absence of significant co-existing mental health concerns and when working in the context of a multidisciplinary specialty team. The referring health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Health professionals who recommend hormone therapy share the ethical and legal responsibility for that decision with the physician who provides the service.

The recommended content of the referral letter for feminizing/masculinizing hormone therapy is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the referring health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for hormone therapy have been met, and a brief description of the clinical rationale for supporting the client's request for hormone therapy;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the referring health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

### 5. If applicable, assess eligibility, prepare, and refer for surgery

The SOC also provide criteria to guide decisions regarding breast/chest surgery and genital surgery (outlined in section XI and Appendix C). Mental health professionals can help clients who are considering surgery to be both psychologically prepared (for example, has made a fully informed

26

Exhibit 12-27

decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has made an informed choice about a surgeon to perform the procedure; has arranged aftercare). If clients are of childbearing age, reproductive options (section IX) should be explored before undergoing genital surgery.

The SOC do not state criteria for other surgical procedures, such as feminizing or masculinizing facial surgery; however, mental health professionals can play an important role in helping their clients to make fully informed decisions about the timing and implications of such procedures in the context of the overall coming out or transition process.

It is important for mental health professionals to recognize that decisions about surgery are first and foremost a client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

### Referral for surgery

Surgical treatments for gender dysphoria can be initiated with a referral (one or two, depending on the type of surgery) from a qualified mental health professional. The mental health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Mental health professionals who recommend surgery share the ethical and legal responsibility for that decision with the surgeon.

- One referral from a qualified mental health professional is needed for breast/chest surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

- Two referrals – from qualified mental health professionals who have independently assessed the patient – are needed for genital surgery (i.e., hysterectomy/salpingo-oophorectomy, orchiectomy, genital reconstructive surgeries). If the first referral is from the patient's psychotherapist, the second referral should be from a person who has only had an evaluative role with the patient. Two separate letters, or one letter signed by both (e.g., if practicing within the same clinic) may be sent. Each referral letter, however, is expected to cover the same topics in the areas outlined below.

The recommended content of the referral letters for surgery is as follows:

1. The client's general identifying characteristics;

The Standards of Care
7TH VERSION



Exhibit
17-24

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the mental health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the mental health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

**Relationship of Mental Health Professionals with Hormone-Prescribing Physicians, Surgeons, and other Health Professionals**

It is ideal for mental health professionals to perform their work and periodically discuss progress and obtain peer consultation from other professionals (both in mental health care and other health disciplines) who are competent in the assessment and treatment of gender dysphoria. The relationship among professionals involved in a client's health care should remain collaborative, with coordination and clinical dialogue taking place as needed. Open and consistent communication may be necessary for consultation, referral, and management of postoperative concerns.

# Tasks Related to Psychotherapy

**1. Psychotherapy is not an absolute requirement for hormone therapy and surgery**

A mental health screening and/or assessment as outlined above is needed for referral to hormonal and surgical treatments for gender dysphoria. In contrast, psychotherapy – although highly recommended – is not a requirement.

The *SOC* do not recommend a minimum number of psychotherapy sessions prior to hormone therapy or surgery. The reasons for this are multifaceted (Lev, 2009). First, a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth. Second, mental health professionals can offer important support to clients throughout all

28     World Professional Association for Transgender Health

Exhibit 17-29

The Standards of Care
7TH VERSION

phases of exploration of gender identity, gender expression, and possible transition – not just prior to any possible medical interventions. Third, clients differ in their abilities to attain similar goals in a specified time period.

## 2. Goals of psychotherapy for adults with gender concerns

The general goal of psychotherapy is to find ways to maximize a person's overall psychological well-being, quality of life, and self-fulfillment. Psychotherapy is not intended to alter a person's gender identity; rather, psychotherapy can help an individual to explore gender concerns and find ways to alleviate gender dysphoria, if present (Bockting et al., 2006; Bockting & Coleman, 2007; Fraser, 2009a; Lev, 2004). Typically, the overarching treatment goal is to help transsexual, transgender, and gender nonconforming individuals achieve long-term comfort in their gender identity expression, with realistic chances for success in their relationships, education, and work. For additional details, see Fraser (Fraser, 2009c).

Therapy may consist of individual, couple, family, or group psychotherapy, the latter being particularly important to foster peer support.

## 3. Psychotherapy for transsexual, transgender, and gender nonconforming clients, including counseling and support for changes.in gender role

Finding a comfortable gender role is, first and foremost, a psychosocial process. Psychotherapy can be invaluable in assisting transsexual, transgender, and gender nonconforming individuals with all of the following: (i) clarifying and exploring gender identity and role, (ii) addressing the impact of stigma and minority stress on one's mental health and human development, and (iii) facilitating a coming out process (Bockting & Coleman, 2007; Devor, 2004; Lev, 2004), which for some individuals may include changes in gender role expression and the use of feminizing/masculinizing medical interventions.

Mental health professionals can provide support and promote interpersonal skills and resilience in individuals and their families as they navigate a world that often is ill prepared to accommodate and respect transgender, transsexual, and gender nonconforming people. Psychotherapy can also aid in alleviating any co-existing mental health concerns (e.g., anxiety, depression) identified during screening and assessment.

For transsexual, transgender, and gender nonconforming individuals who plan to change gender roles permanently and make a social gender role transition, mental health professionals can facilitate the development of an individualized plan with specific goals and timelines. While the experience of changing one's gender role differs from person to person, the social aspects of the experience are usually challenging – often more so than the physical aspects. Because changing

World Professional Association for Transgender Health

29

Case 6:19-cv-00269-JEH-JAR Document 13-2 Filed 09/09/19 Page 63 of 88
Appellate Case: 23-7031 Document: 010110881265 Date Filed: 06/30/2023 Page: 161

72-30

**The Standards of Care**
7TH VERSION

gender role can have profound personal and social consequences, the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.

Many transsexual, transgender, and gender nonconforming people will present for care without ever having been related to or accepted in the gender role that is most congruent with their gender identity. Mental health professionals can help these clients to explore and anticipate the implications of changes in gender role, and to pace the process of implementing these changes. Psychotherapy can provide a space for clients to begin to express themselves in ways that are congruent with their gender identity and, for some clients, overcome fear about changes in gender expression. Calculated risks can be taken outside of therapy to gain experience and build confidence in the new role. Assistance with coming out to family and community (friends, school, workplace) can be provided.

Other transsexual, transgender, and gender nonconforming individuals will present for care already having acquired experience (minimal, moderate, or extensive) living in a gender role that differs from that associated with their birth-assigned sex. Mental health professionals can help these clients to identify and work through potential challenges and foster optimal adjustment as they continue to express changes in their gender role.

### 4. Family therapy or support for family members

Decisions about changes in gender role and medical interventions for gender dysphoria have implications for not only clients, but also their families (Emerson & Rosenfeld, 1996; Fraser, 2009a; Lev, 2004). Mental health professionals can assist clients with making thoughtful decisions about communicating with family members and others about their gender identity and treatment decisions. Family therapy may include work with spouses or partners, as well as with children and other members of a client's extended family.

Clients may also request assistance with their relationships and sexual health. For example, they may want to explore their sexuality and intimacy related concerns.

Family therapy might be offered as part of the client's individual therapy and, if clinically appropriate, by the same provider. Alternatively, referrals can be made to other therapists with relevant expertise to work with family members, or to sources of peer support (e.g., online or offline support networks of partners or families).

Exhibit 17-31

The Standards of Care
7TH VERSION

### 5. Follow-up care throughout life

Mental health professionals may work with clients and their families at many stages of their lives. Psychotherapy may be helpful at different times and for various issues throughout the life cycle.

### 6. Etherapy, online counseling, or distance counseling

Online or etherapy has been shown to be particularly useful for people who have difficulty accessing competent psychotherapeutic treatment and who may experience isolation and stigma (Derrig-Palumbo & Zeine, 2005; Fenichel et al., 2004; Fraser, 2009b). By extrapolation, etherapy may be a useful modality for psychotherapy with transsexual, transgender, and gender nonconforming people. Etherapy offers opportunities for potentially enhanced, expanded, creative, and tailored delivery of services; however, as a developing modality it may also carry unexpected risk. Telemedicine guidelines are clear in some disciplines in some parts of the United States (Fraser, 2009b; Maheu, Pulier, Wilhelm, McMenamin, & Brown-Connolly, 2005) but not all; the international situation is even less defined (Maheu et al., 2005). Until sufficient evidence-based data on this use of etherapy is available, caution in its use is advised.

Mental health professionals engaging in etherapy are advised to stay current with their particular licensing board, professional association, and country's regulations, as well as the most recent literature pertaining to this rapidly evolving medium. A more thorough description of the potential uses, processes, and ethical concerns related to etherapy has been published (Fraser, 2009b).

## Other Tasks of the Mental Health Professional

### 1. Educate and advocate on behalf of clients within their community (schools, workplaces, other organizations) and assist clients with making changes in identity documents

Transsexual, transgender, and gender nonconforming people may face challenges in their professional, educational, and other types of settings as they actualize their gender identity and expression (Lev, 2004, 2009). Mental health professionals can play an important role by educating people in these settings regarding gender nonconformity and by advocating on behalf of their clients (Currah, Juang, & Minter, 2006) (Currah & Minter, 2000). This role may involve consultation with school counselors, teachers, and administrators, human resources staff, personnel managers and employers, and representatives from other organizations and institutions. In addition, health providers may be called upon to support changes in a client's name and/or gender marker on identity documents such as passports, driver's licenses, birth certificates, and diplomas.

The Standards of Care
7TH VERSION

Exhibit
17-32

**2. Provide information and referral for peer support**

For some transsexual, transgender, and gender nonconforming people, an experience in peer support groups may be more instructive regarding options for gender expression than anything individual psychotherapy could offer (Rachlin, 2002). Both experiences are potentially valuable, and all people exploring gender issues should be encouraged to participate in community activities, if possible. Resources for peer support and information should be made available.

## Culture and its Ramifications for Assessment and Psychotherapy

Health professionals work in enormously different environments across the world. Forms of distress that cause people to seek professional assistance in any culture are understood and classified by people in terms that are products of their own cultures (Frank & Frank, 1993). Cultural settings also largely determine how such conditions are understood by mental health professionals. Cultural differences related to gender identity and expression can affect patients, mental health professionals, and accepted psychotherapy practice. WPATH recognizes that the SOC have grown out of a Western tradition and may need to be adapted depending on the cultural context.

## Ethical Guidelines Related to Mental Health Care

Mental health professionals need to be certified or licensed to practice in a given country according to that country's professional regulations (Fraser, 2009b; Pope & Vasquez, 2011). Professionals must adhere to the ethical codes of their professional licensing or certifying organizations in all of their work with transsexual, transgender, and gender nonconforming clients.

Treatment aimed at trying to change a person's gender identity and lived gender expression to become more congruent with sex assigned at birth has been attempted in the past (Gelder & Marks, 1969; Greenson, 1964), yet without success, particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

If mental health professionals are uncomfortable with or inexperienced in working with transsexual, transgender, and gender nonconforming individuals and their families, they should refer clients to a competent provider or, at minimum, consult with an expert peer. If no local practitioners are available, consultation may be done via telehealth methods, assuming local requirements for distance consultation are met.

32

World Professional Association for Transgender Health

Exhibit 17-33 

The Standards of Care
7TH VERSION

## Issues of Access to Care

Qualified mental health professionals are not universally available; thus, access to quality care might be limited. WPATH aims to improve access and provides regular continuing education opportunities to train professionals from various disciplines to provide quality, transgender-specific health care. Providing mental health care from a distance through the use of technology may be one way to improve access (Fraser, 2009b).

In many places around the world, access to health care for transsexual, transgender, and gender nonconforming people is also limited by a lack of health insurance or other means to pay for needed care. WPATH urges health insurance companies and other third-party payers to cover the medically necessary treatment to alleviate gender dysphoria (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

When faced with a client who is unable to access services, referral to available peer support resources (offline and online) is recommended. Finally, harm reduction approaches might be indicated to assist clients with making healthy decisions to improve their lives.

# VIII

# Hormone Therapy

### Medical Necessity of Hormone Therapy

Feminizing/masculinizing hormone therapy – the administration of exogenous endocrine agents to induce feminizing or masculinizing changes – is a medically necessary intervention for many transsexual, transgender, and gender nonconforming individuals with gender dysphoria (Newfield, Hart, Dibble, & Kohler, 2006; Pfäfflin & Junge, 1998). Some people seek maximum feminization/masculinization, while others experience relief with an androgynous presentation resulting from hormonal minimization of existing secondary sex characteristics (Factor & Rothblum, 2008). Evidence for the psychosocial outcomes of hormone therapy is summarized in Appendix D.

Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Hormone therapy can provide significant comfort to patients who do not wish to make a social gender role transition or undergo surgery, or who are unable to do so (Meyer III, 2009).

The Standards of Care
7TH VERSION

Exhibit
17-34

Hormone therapy is a recommended criterion for some, but not all, surgical treatments for gender dysphoria (see section XI and Appendix C).

**Criteria for Hormone Therapy**

Initiation of hormone therapy may be undertaken after a psychosocial assessment has been conducted and informed consent has been obtained by a qualified health professional, as outlined in section VII of the SOC. A referral is required from the mental health professional who performed the assessment, unless the assessment was done by a hormone provider who is also qualified in this area.

The criteria for hormone therapy are as follows:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *Standards of Care* outlined in section VI);

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

As noted in section VII of the *SOC*, the presence of co-existing mental health concerns does not necessarily preclude access to feminizing/masculinizing hormones; rather, these concerns need to be managed prior to or concurrent with treatment of gender dysphoria.

In selected circumstances, it can be acceptable practice to provide hormones to patients who have not fulfilled these criteria. Examples include facilitating the provision of monitored therapy using hormones of known quality as an alternative to illicit or unsupervised hormone use or to patients who have already established themselves in their affirmed gender and who have a history of prior hormone use. It is unethical to deny availability or eligibility for hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis B or C.

In rare cases, hormone therapy may be contraindicated due to serious individual health conditions. Health professionals should assist these patients with accessing non-hormonal interventions for gender dysphoria. A qualified mental health professional familiar with the patient is an excellent resource in these circumstances.

34                                    World Professional Association for Transgender Health

The Standards of Care
7TH VERSION

Exhibit
17-35

**Informed Consent**

Feminizing/masculinizing hormone therapy may lead to irreversible physical changes. Thus, hormone therapy should be provided only to those who are legally able to provide informed consent. This includes people who have been declared by a court to be emancipated minors, incarcerated people, and cognitively impaired people who are considered competent to participate in their medical decisions (see also Bockting et al., 2006). Providers should document in the medical record that comprehensive information has been provided and understood about all relevant aspects of the hormone therapy, including both possible benefits and risks and the impact on reproductive capacity.

**Relationship between the Standards of Care and Informed Consent Model Protocols**

A number of community health centers in the United States have developed protocols for providing hormone therapy based on an approach that has become known as the Informed Consent Model (Callen Lorde Community Health Center, 2000, 2011; Fenway Community Health Transgender Health Program, 2007; Tom Waddell Health Center, 2006). These protocols are consistent with the guidelines presented in the WPATH *Standards of Care, Version 7*. The *SOC* are flexible clinical guidelines; they allow for tailoring of interventions to the needs of the individual receiving services and for tailoring of protocols to the approach and setting in which these services are provided (Ehrbar & Gorton, 2010).

Obtaining informed consent for hormone therapy is an important task of providers to ensure that patients understand the psychological and physical benefits and risks of hormone therapy, as well as its psychosocial implications. Providers prescribing the hormones or health professionals recommending the hormones should have the knowledge and experience to assess gender dysphoria. They should inform individuals of the particular benefits, limitations, and risks of hormones, given the patient's age, previous experience with hormones, and concurrent physical or mental health concerns.

Screening for and addressing acute or current mental health concerns is an important part of the informed consent process. This may be done by a mental health professional or by an appropriately trained prescribing provider (see section VII of the SOC). The same provider or another appropriately trained member of the health care team (e.g., a nurse) can address the psychosocial implications of taking hormones when necessary (e.g., the impact of masculinization/feminization on how one is perceived and its potential impact on relationships with family, friends, and coworkers). If indicated, these providers will make referrals for psychotherapy and for the assessment and treatment of co-existing mental health concerns such as anxiety or depression.

EXhibit
17-36

**The Standards of Care**
*7TH VERSION*

The difference between the Informed Consent Model and *SOC, Version 7* is that the *SOC* puts greater emphasis on the important role that mental health professionals can play in alleviating gender dysphoria and facilitating changes in gender role and psychosocial adjustment. This may include a comprehensive mental health assessment and psychotherapy, when indicated. In the Informed Consent Model, the focus is on obtaining informed consent as the threshold for the initiation of hormone therapy in a multidisciplinary, harm-reduction environment. Less emphasis is placed on the provision of mental health care until the patient requests it, unless significant mental health concerns are identified that would need to be addressed before hormone prescription.

# Physical Effects of Hormone Therapy

Feminizing/masculinizing hormone therapy will induce physical changes that are more congruent with a patient's gender identity.

- In FtM patients, the following physical changes are expected to occur: deepened voice, clitoral enlargement (variable), growth in facial and body hair, cessation of menses, atrophy of breast tissue, increased libido, and decreased percentage of body fat compared to muscle mass.

- In MtF patients, the following physical changes are expected to occur: breast growth (variable), decreased libido and erections, decreased testicular size, and increased percentage of body fact compared to muscle mass.

Most physical changes, whether feminizing or masculinizing, occur over the course of two years. The amount of physical change and the exact timeline of effects can be highly variable. Tables 1a and 1b outline the approximate time course of these physical changes.

World Professional Association for Transgender Health

Exhibit
17-37

The Standards of Care
7TH VERSION

TABLE 1A: EFFECTS AND EXPECTED TIME COURSE OF MASCULINIZING HORMONES [A]

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Skin oiliness/acne | 1-6 months | 1-2 years |
| Facial/body hair growth | 3-6 months | 3-5 years |
| Scalp hair loss | >12 months[C] | variable |
| Increased muscle mass/strength | 6-12 months | 2-5 years[D] |
| Body fat redistribution | 3-6 months | 2-5 years |
| Cessation of menses | 2-6 months | n/a |
| Clitoral enlargement | 3-6 months | 1-2 years |
| Vaginal atrophy | 3-6 months | 1-2 years |
| Deepened voice | 3-12 months | 1-2 years |

[A] Adapted with permission from Hembree et al.(2009). *Copyright 2009, The Endocrine Society.*
[B] Estimates represent published and unpublished clinical observations.
[C] Highly dependent on age and inheritance; may be minimal.
[D] Significantly dependent on amount of exercise.

The Standards of Care
7TH VERSION

Exhibit
17-38

TABLE 1B: EFFECTS AND EXPECTED TIME COURSE OF FEMINIZING HORMONES [A]

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Body fat redistribution | 3-6 months | 2-5 years |
| Decreased muscle mass/strength | 3-6 months | 1-2 years[C] |
| Softening of skin/decreased oiliness | 3-6 months | unknown |
| Decreased libido | 1-3 months | 1-2 years |
| Decreased spontaneous erections | 1-3 months | 3-6 months |
| Male sexual dysfunction | variable | variable |
| Breast growth | 3-6 months | 2-3 years |
| Decreased testicular volume | 3-6 months | 2-3 years |
| Decreased sperm production | variable | variable |
| Thinning and slowed growth of body and facial hair | 6-12 months | > 3 years[D] |
| Male pattern baldness | No regrowth, loss stops 1-3 months | 1-2 years |

[A] Adapted with permission from Hembree et al. (2009). *Copyright 2009, The Endocrine Society.*
[B] Estimates represent published and unpublished clinical observations.
[C] Significantly dependent on amount of exercise.
[D] Complete removal of male facial and body hair requires electrolysis, laser treatment, or both.

The degree and rate of physical effects depends in part on the dose, route of administration, and medications used, which are selected in accordance with a patient's specific medical goals (e.g., changes in gender role expression, plans for sex reassignment) and medical risk profile. There is no current evidence that response to hormone therapy – with the possible exception of voice deepening in FtM persons – can be reliably predicted based on age, body habitus, ethnicity, or family appearance. All other factors being equal, there is no evidence to suggest that any medically approved type or method of administering hormones is more effective than any other in producing the desired physical changes.

Exhibit 17-39

**The Standards of Care**
7TH VERSION

## Risks of Hormone Therapy

All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, co-morbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient.

The risks associated with feminizing/masculinizing hormone therapy for the transsexual, transgender, and gender nonconforming population as a whole are summarized in Table 2. Based on the level of evidence, risks are categorized as follows: (i) likely increased risk with hormone therapy, (ii) possibly increased risk with hormone therapy, or (iii) inconclusive or no increased risk. Items in the last category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Additional detail about these risks can be found in Appendix B, which is based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (Dahl, Feldman, Goldberg, & Jaberi, 2006; Ettner, Monstrey, & Eyler, 2007).

The Standards of Care
7TH VERSION

Exhibit
17-40

TABLE 2:  RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | **Venous thromboembolic disease**[A] Gallstones Elevated liver enzymes Weight gain Hypertriglyceridemia | Polycythemia Weight gain Acne Androgenic alopecia (balding) Sleep apnea |
| Likely increased risk with presence of additional risk factors[B] | **Cardiovascular disease** | |
| Possible increased risk | Hypertension Hyperprolactinemia or prolactinom[A] | Elevated liver enzymes Hyperlipidemia |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[A] | **Destabilization of certain psychiatric disorders**[C] Cardiovascular disease Hypertension Type 2 diabetes |
| No increased risk or inconclusive | **Breast cancer** | Loss of bone density **Breast cancer** Cervical cancer Ovarian cancer Uterine cancer |

[A]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[B]  Additional risk factors include age.
[C]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

World Professional Association for Transgender Health

Exhibit 17-41

**The Standards of Care**
7TH VERSION

## Competency of Hormone-Prescribing Physicians, Relationship with Other Health Professionals

Feminizing/masculinizing hormone therapy is best undertaken in the context of a complete approach to health care that includes comprehensive primary care and a coordinated approach to psychosocial issues (Feldman & Safer, 2009). While psychotherapy or ongoing counseling is not required for the initiation of hormone therapy, if a therapist is involved, then regular communication among health professionals is advised (with the patient's consent) to ensure that the transition process is going well, both physically and psychosocially.

With appropriate training, feminizing/masculinizing hormone therapy can be managed by a variety of providers, including nurse practitioners and primary care physicians (Dahl et al., 2006). Medical visits relating to hormone maintenance provide an opportunity to deliver broader care to a population that is often medically underserved (Clements, Wilkinson, Kitano, & Marx, 1999; Feldman, 2007; Xavier, 2000). Many of the screening tasks and management of co-morbidities associated with long-term hormone use, such as cardiovascular risk factors and cancer screening, fall more uniformly within the scope of primary care rather than specialist care (American Academy of Family Physicians, 2005; Eyler, 2007; World Health Organization, 2008), particularly in locations where dedicated gender teams or specialized physicians are not available.

Given the multidisciplinary needs of transsexual, transgender, and gender nonconforming people seeking hormone therapy, as well as the difficulties associated with fragmentation of care in general (World Health Organization, 2008), WPATH strongly encourages the increased training and involvement of primary care providers in the area of feminizing/masculinizing hormone therapy. If hormones are prescribed by a specialist, there should be close communication with the patient's primary care provider. Conversely, an experienced hormone provider or endocrinologist should be involved if the primary care physician has no experience with this type of hormone therapy, or if the patient has a pre-existing metabolic or endocrine disorder that could be affected by endocrine therapy.

While formal training programs in transgender medicine do not yet exist, hormone providers have a responsibility to obtain appropriate knowledge and experience in this field. Clinicians can increase their experience and comfort in providing feminizing/masculinizing hormone therapy by co-managing care or consulting with a more experienced provider, or by providing more limited types of hormone therapy before progressing to initiation of hormone therapy. Because this field of medicine is evolving, clinicians should become familiar and keep current with the medical literature, and discuss emerging issues with colleagues. Such discussions might occur through networks established by WPATH and other national/local organizations.

172

**The Standards of Care**
**7TH VERSION**

Exhibit
17-42

## Responsibilities of Hormone-Prescribing Physicians

In general, clinicians who prescribe hormone therapy should engage in the following tasks:

1. Perform an initial evaluation that includes discussion of a patient's physical transition goals, health history, physical examination, risk assessment, and relevant laboratory tests.

2. Discuss with patients the expected effects of feminizing/masculinizing medications and the possible adverse health effects. These effects can include a reduction in fertility (Feldman & Safer, 2009; Hembree et al., 2009). Therefore, reproductive options should be discussed with patients before starting hormone therapy (see section IX).

3. Confirm that patients have the capacity to understand the risks and benefits of treatment and are capable of making an informed decision about medical care.

4. Provide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects.

5. Communicate as needed with a patient's primary care provider, mental health professional, and surgeon.

6. If needed, provide patients with a brief written statement indicating that they are under medical supervision and care that includes feminizing/masculinizing hormone therapy. Particularly during the early phases of hormone treatment, a patient may wish to carry this statement at all times to help prevent difficulties with the police and other authorities.

Depending on the clinical situation for providing hormones (see below), some of these responsibilities are less relevant. Thus, the degree of counseling, physical examinations, and laboratory evaluations should be individualized to a patient's needs.

## Clinical Situations for Hormone Therapy

There are circumstances in which clinicians may be called upon to provide hormones without necessarily initiating or maintaining long-term feminizing/masculinizing hormone therapy. By acknowledging these different clinical situations (see below, from least to highest level of complexity), it may be possible to involve clinicians in feminizing/masculinizing hormone therapy who might not otherwise feel able to offer this treatment.

Case 6:19-cv-00269-JFH-JAR  Document 13-2  Filed 09/09/19  Page 76 of 88
Appellate Case: 23-7031  Document: 010110881265  Date Filed: 06/30/2023  Page: 174

The Standards of Care
7TH VERSION

Exhibit
17-43

## 1. Bridging

Whether prescribed by another clinician or obtained through other means (e.g., purchased over the internet), patients may present for care already on hormone therapy. Clinicians can provide a limited (1-6 month) prescription for hormones while helping patients find a provider who can prescribe long-term hormone therapy. Providers should assess a patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated (Dahl et al., 2006; Feldman & Safer, 2009). If hormones were previously prescribed, medical records should be requested (with the patient's permission) to obtain the results of baseline examinations and laboratory tests and any adverse events. Hormone providers should also communicate with any mental health professional who is currently involved in a patient's care. If a patient has never had a psychosocial assessment as recommended by the SOC (see section VII), clinicians should refer the patient to a qualified mental health professional if appropriate and feasible (Feldman & Safer, 2009). Providers who prescribe bridging hormones need to work with patients to establish limits as to the duration of bridging therapy.

## 2. Hormone therapy following gonad removal

Hormone replacement with estrogen or testosterone is usually continued lifelong after an oophorectomy or orchiectomy, unless medical contraindications arise. Because hormone doses are often decreased after these surgeries (Basson, 2001; Levy, Crown, & Reid, 2003; Moore, Wisniewski, & Dobs, 2003) and only adjusted for age and co-morbid health concerns, hormone management in this situation is quite similar to hormone replacement in any hypogonadal patient.

## 3. Hormone maintenance prior to gonad removal

Once patients have achieved maximal feminizing/masculinizing benefits from hormones (typically two or more years), they remain on a maintenance dose. The maintenance dose is then adjusted for changes in health conditions, aging, or other considerations such as lifestyle changes (Dahl et al., 2006). When a patient on maintenance hormones presents for care, the provider should assess the patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated. The patient should continue to be monitored by physical examinations and laboratory testing on a regular basis, as outlined in the literature (Feldman & Safer, 2009; Hembree et al., 2009). The dose and form of hormones should be revisited regularly with any changes in the patient's health status and available evidence on the potential long-term risks of hormones (See Hormone Regimens, below).

The Standards of Care
7TH VERSION

Exhibit 17-44

#### 4. Initiating hormonal feminization/masculinization

This clinical situation requires the greatest commitment in terms of provider time and expertise. Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Although a wide variety of hormone regimens have been published (Dahl et al., 2006; Hembree et al., 2009; Moore et al., 2003), there are no published reports of randomized clinical trials comparing safety and efficacy. Despite this variation, a reasonable framework for initial risk assessment and ongoing monitoring of hormone therapy can be constructed, based on the efficacy and safety evidence presented above.

## Risk Assessment and Modification for Initiating Hormone Therapy

The initial evaluation for hormone therapy assesses a patient's clinical goals and risk factors for hormone-related adverse events. During the risk assessment, the patient and clinician should develop a plan for reducing risks wherever possible, either prior to initiating therapy or as part of ongoing harm reduction.

All assessments should include a thorough physical exam, including weight, height, and blood pressure. The need for breast, genital, and rectal exams, which are sensitive issues for most transsexual, transgender, and gender nonconforming patients, should be based on individual risks and preventive health care needs (Feldman & Goldberg, 2006; Feldman, 2007).

### Preventive care

Hormone providers should address preventive health care with patients, particularly if a patient does not have a primary care provider. Depending on a patient's age and risk profile, there may be appropriate screening tests or exams for conditions affected by hormone therapy. Ideally, these screening tests should be carried out prior to the start of hormone therapy.

### Risk assessment and modification for feminizing hormone therapy (MtF)

There are no absolute contraindications to feminizing therapy *per se*, but absolute contraindications exist for the different feminizing agents, particularly estrogen. These include previous venous thrombotic events related to an underlying hypercoagulable condition, history of estrogen-sensitive neoplasm, and end-stage chronic liver disease (Gharib et al., 2005).

44                                    World Professional Association for Transgender Health

Exhibit 17-45

The Standards of Care
7TH VERSION

Other medical conditions, as noted in Table 2 and Appendix B, can be exacerbated by estrogen or androgen blockade, and therefore should be evaluated and reasonably well controlled prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Clinicians should particularly attend to tobacco use, as it is associated with increased risk of venous thrombosis, which is further increased with estrogen use. Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of feminizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

### Risk assessment and modification for masculinizing hormone therapy (FtM)

Absolute contraindications to testosterone therapy include pregnancy, unstable coronary artery disease, and untreated polycythemia with a hematocrit of 55% or higher (Carnegie, 2004). Because the aromatization of testosterone to estrogen may increase risk in patients with a history of breast or other estrogen dependent cancers (Moore et al., 2003), consultation with an oncologist may be indicated prior to hormone use. Co-morbid conditions likely to be exacerbated by testosterone use should be evaluated and treated, ideally prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

An increased prevalence of polycystic ovarian syndrome (PCOS) has been noted among FtM patients even in the absence of testosterone use (Baba et al., 2007; Balen, Schachter, Montgomery, Reid, & Jacobs, 1993; Bosinski et al., 1997). While there is no evidence that PCOS is related to the development of a transsexual, transgender, or gender nonconforming identity, PCOS is associated with increased risk of diabetes, cardiac disease, high blood pressure, and ovarian and endometrial cancers (Cattrall & Healy, 2004). Signs and symptoms of PCOS should be evaluated prior to initiating testosterone therapy, as testosterone may affect many of these conditions. Testosterone can affect the developing fetus (Physicians' Desk Reference, 2011), and patients at risk of becoming pregnant require highly effective birth control.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of masculinizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

The Standards of Care
7TH VERSION

Exhibit
17-46

# Clinical Monitoring during Hormone Therapy for Efficacy and Adverse Events

The purpose of clinical monitoring during hormone use is to assess the degree of feminization/masculinization and the possible presence of adverse effects of medication. However, as with the monitoring of any long-term medication, monitoring should take place in the context of comprehensive health care. Suggested clinical monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009). Patients with co-morbid medical conditions may need to be monitored more frequently. Healthy patients in geographically remote or resource-poor areas may be able to use alternative strategies, such as telehealth, or cooperation with local providers such as nurses and physician assistants. In the absence of other indications, health professionals may prioritize monitoring for those risks that are either likely to be increased by hormone therapy or possibly increased by hormone therapy but clinically serious in nature.

### Efficacy and risk monitoring during feminizing hormone therapy (MtF)

The best assessment of hormone efficacy is clinical response: Is a patient developing a feminized body while minimizing masculine characteristics, consistent with that patient's gender goals? In order to more rapidly predict the hormone dosages that will achieve clinical response, one can measure testosterone levels for suppression below the upper limit of the normal female range, and estradiol levels within a premenopausal female range but well below supraphysiologic levels (Feldman & Safer, 2009; Hembree et al., 2009).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs of cardiovascular impairment and venous thromboembolism (VTE) through measurement of blood pressure, weight, and pulse; heart and lung exams; and examination of the extremities for peripheral edema, localized swelling, or pain (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

### Efficacy and risk monitoring during masculinizing hormone therapy (FtM)

The best assessment of hormone efficacy is clinical response: Is a patient developing a masculinized body while minimizing feminine characteristics, consistent with that patient's gender goals? Clinicians can achieve a good clinical response with the least likelihood of adverse events by maintaining testosterone levels within the normal male range while avoiding supraphysiological

46                                      World Professional Association for Transgender Health

Exhibit
17-41

The Standards of Care
7TH VERSION

levels (Dahl et al., 2006; Hembree et al., 2009). For patients using intramuscular (IM) testosterone cypionate or enanthate, some clinicians check trough levels while others prefer midcycle levels (Dahl et al., 2006; Hembree et al., 2009; Tangpricha, Turner, Malabanan, & Holick, 2001; Tangpricha, Ducharme, Barber, & Chipkin, 2003).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs and symptoms of excessive weight gain, acne, uterine break-through bleeding, and cardiovascular impairment, as well as psychiatric symptoms in at-risk patients. Physical examinations should include measurement of pressure, weight, pulse, and skin; and heart and lung exams (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

## Hormone Regimens

To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition. As a result, wide variation in doses and types of hormones have been published in the medical literature (Moore et al., 2003; Tangpricha et al., 2003; van Kesteren, Asscheman, Megens, & Gooren, 1997). In addition, access to particular medications may be limited by a patient's geographical location and/ or social or econonomic situations. For these reasons, WPATH does not describe or endorse a particular feminizing/masculinizing hormone regimen. Rather, the medication classes and routes of administration used in most published regimens are broadly reviewed.

As outlined above, there are demonstrated safety differences in individual elements of various regimens. The Endocrine Society Guidelines (Hembree et al., 2009) and Feldman and Safer (2009) provide specific guidance regarding the types of hormones and suggested dosing to maintain levels within physiologic ranges for a patient's desired gender expression (based on goals of full feminization/masculinization). It is strongly recommend that hormone providers regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources.

**The Standards of Care**
7TH VERSION

Exhibit
17-48

### Regimens for feminizing hormone therapy (MtF)

Estrogen

Use of oral estrogen, and specifically ethinyl estradiol, appears to increase the risk of VTE. Because of this safety concern, ethinyl estradiol is not recommended for feminizing hormone therapy. Transdermal estrogen is recommended for those patients with risks factors for VTE. The risk of adverse events increases with higher doses, particular those resulting in supraphysiologic levels (Hembree et al., 2009). Patients with co-morbid conditions that can be affected by estrogen should avoid oral estrogen if possible and be started at lower levels. Some patients may not be able to safely use the levels of estrogen needed to get the desired results. This possibility needs to be discussed with patients well in advance of starting hormone therapy.

Androgen reducing medications ("anti-androgens")

A combination of estrogen and "anti-androgens" is the most commonly studied regimen for feminization. Androgen reducing medications, from a variety of classes of drugs, have the effect of reducing either endogenous testosterone levels or testosterone activity, and thus diminishing masculine characteristics such as body hair. They minimize the dosage of estrogen needed to suppress testosterone, thereby reducing the risks associated with high-dose exogenous estrogen (Prior, Vigna, Watson, Diewold, & Robinow, 1986; Prior, Vigna, & Watson, 1989).

Common anti-androgens include the following:

- Spironolactone, an antihypertensive agent, directly inhibits testosterone secretion and androgen binding to the androgen receptor. Blood pressure and electrolytes need to be monitored because of the potential for hyperkalemia.

- Cyproterone acetate is a progestational compound with anti-androgenic properties. This medication is not approved in the United States because of concerns over potential hepatotoxicity, but it is widely used elsewhere (De Cuypere et al., 2005).

- GnRH agonists (e.g., goserelin, buserelin, triptorelin) are neurohormones that block the gonadtropin releasing hormone receptor, thus blocking the release of follicle stimulating hormone and luteinizing hormone. This leads to highly effective gonadal blockade. However, these medications are expensive and only available as injectables or implants.

- 5-alpha reductase inhibitors (finasteride and dutasteride) block the conversion of testosterone to the more active agent, 5-alpha-dihydrotestosterone. These medications have beneficial effects on scalp hair loss, body hair growth, sebaceous glands, and skin consistency.

Exhibit 17-49

The Standards of Care
7TH VERSION

Cyproterone and spironolactone are the most commonly used anti-androgens and are likely the most cost-effective.

## Progestins

With the exception of cyproterone, the inclusion of progestins in feminizing hormone therapy is controversial (Oriel, 2000). Because progestins play a role in mammary development on a cellular level, some clinicians believe that these agents are necessary for full breast development (Basson & Prior, 1998; Oriel, 2000). However, a clinical comparison of feminization regimens with and without progestins found that the addition of progestins neither enhanced breast growth nor lowered serum levels of free testosterone (Meyer III et al., 1986). There are concerns regarding potential adverse effects of progestins, including depression, weight gain, and lipid changes (Meyer III et al., 1986; Tangpricha et al., 2003). Progestins (especially medroxyprogesterone) are also suspected to increase breast cancer risk and cardiovascular risk in women (Rossouw et al., 2002). Micronized progesterone may be better tolerated and have a more favorable impact on the lipid profile than medroxyprogesterone does (de Lignières, 1999; Fitzpatrick, Pace, & Wiita, 2000).

## Regimens for masculinizing hormone therapy (FtM)

### Testosterone

Testosterone generally can be given orally, transdermally, or parenterally (IM), although buccal and implantable preparations are also available. Oral testosterone undecenoate, available outside the United States, results in lower serum testosterone levels than non-oral preparations and has limited efficacy in suppressing menses (Feldman, 2005, April; Moore et al., 2003). Because intramuscular testosterone cypionate or enanthate are often administered every 2-4 weeks, some patients may notice cyclic variation in effects (e.g., fatigue and irritability at the end of the injection cycle, aggression or expansive mood at the beginning of the injection cycle), as well as more time outside the normal physiologic levels (Jockenhövel, 2004). This may be mitigated by using a lower but more frequent dosage schedule or by using a daily transdermal preparation (Dobs et al., 1999; Jockenhövel, 2004; Nieschlag et al., 2004). Intramuscular testosterone undecenoate (not currently available in the United States) maintains stable, physiologic testosterone levels over approximately 12 weeks and has been effective in both the setting of hypogonadism and in FtM individuals (Mueller, Kiesewetter, Binder, Beckmann, & Dittrich, 2007; Zitzmann, Saad, & Nieschlag, 2006). There is evidence that transdermal and intramuscular testosterone achieve similar masculinizing results, although the timeframe may be somewhat slower with transdermal preparations (Feldman, 2005, April). Especially as patients age, the goal is to use the lowest dose needed to maintain the desired clinical result, with appropriate precautions being made to maintain bone density.

**The Standards of Care**
7TH VERSION

EXhibit

17-50

### Other agents

Progestins, most commonly medroxyprogesterone, can be used for a short period of time to assist with menstrual cessation early in hormone therapy. GnRH agonists can be used similarly, as well as for refractory uterine bleeding in patients without an underlying gynecological abnormality.

### Bioidentical and compounded hormones

As discussion surrounding the use of bioidentical hormones in postmenopausal hormone replacement has heightened, interest has also increased in the use of similar compounds in feminizing/masculinizing hormone therapy. There is no evidence that custom compounded bioidentical hormones are safer or more effective than government agency-approved bioidentical hormones (Sood, Shuster, Smith, Vincent, & Jatoi, 2011). Therefore, it has been advised by the North American Menopause Society (2010) and others to assume that, whether the hormone is from a compounding pharmacy or not, if the active ingredients are similar, it should have a similar side-effect profile. WPATH concurs with this assessment.



# IX

# Reproductive Health

Many transgender, transsexual, and gender nonconforming people will want to have children. Because feminizing/masculinizing hormone therapy limits fertility (Darney, 2008; Zhang, Gu, Wang, Cui, & Bremner, 1999), it is desirable for patients to make decisions concerning fertility before starting hormone therapy or undergoing surgery to remove/alter their reproductive organs. Cases are known of people who received hormone therapy and genital surgery and later regretted their inability to parent genetically related children (De Sutter, Kira, Verschoor, & Hotimsky, 2002).

Health care professionals – including mental health professionals recommending hormone therapy or surgery, hormone-prescribing physicians, and surgeons – should discuss reproductive options with patients prior to initiation of these medical treatments for gender dysphoria. These discussions should occur even if patients are not interested in these issues at the time of treatment, which may be more common for younger patients (De Sutter, 2009). Early discussions are desirable, but not always possible. If an individual has not had complete sex reassignment surgery, it may be possible to stop hormones long enough for natal hormones to recover, allowing the production of mature

Exhibit
17-51

The Standards of Care
7TH VERSION

gametes (Payer, Meyer III, & Walker, 1979; Van den Broecke, Van der Elst, Liu, Hovatta, & Dhont, 2001).

Besides debate and opinion papers, very few research papers have been published on the reproductive health issues of individuals receiving different medical treatments for gender dysphoria. Another group who faces the need to preserve reproductive function in light of loss or damage to their gonads are people with malignances that require removal of reproductive organs or use of damaging radiation or chemotherapy. Lessons learned from that group can be applied to people treated for gender dysphoria.

MtF patients, especially those who have not already reproduced, should be informed about sperm preservation options and encouraged to consider banking their sperm prior to hormone therapy. In a study examining testes that were exposed to high-dose estrogen (Payer et al., 1979), findings suggest that stopping estrogen may allow the testes to recover. In an article reporting on the opinions-of-MtF individuals towards sperm freezing (De Sutter et al., 2002), the vast majority of 121 survey respondents felt that the availability of freezing sperm should be discussed and offered by the medical world. Sperm should be collected before hormone therapy or after stopping the therapy until the sperm count rises again. Cryopreservation should be discussed even if there is poor semen quality. In adults with azoospermia, a testicular biopsy with subsequent cryopreservation of biopsied material for sperm is possible, but may not be successful.

Reproductive options for FtM patients might include oocyte (egg) or embryo freezing. The frozen gametes and embryo could later be used with a surrogate woman to carry to pregnancy. Studies of women with polycystic ovarian disease suggest that the ovary can recover in part from the effects of high testosterone levels (Hunter & Sterrett, 2000). Stopping the testosterone briefly might allow for ovaries to recover enough to make eggs; success likely depends on the patient's age and duration of testosterone treatment. While not systematically studied, some FtM individuals are doing exactly that, and some have been able to become pregnant and deliver children (More, 1998).

Patients should be advised that these techniques are not available everywhere and can be very costly. Transsexual, transgender, and gender nonconforming people should not be refused reproductive options for any reason.

A special group of individuals are prepubertal or pubertal adolescents who will never develop reproductive function in their natal sex due to blockers or cross gender hormones. At this time there is no technique for preserving function from the gonads of these individuals.

**The Standards of Care**
7TH VERSION

Exhibit # 17-52

# Voice and Communication Therapy

Communication, both verbal and nonverbal, is an important aspect of human behavior and gender expression. Transsexual, transgender, and gender nonconforming people might seek the assistance of a voice and communication specialist to develop vocal characteristics (e.g., pitch, intonation, resonance, speech rate, phrasing patterns) and non-verbal communication patterns (e.g., gestures, posture/movement, facial expressions) that facilitate comfort with their gender identity. Voice and communication therapy may help to alleviate gender dysphoria and be a positive and motivating step towards achieving one's goals for gender role expression.

## Competency of Voice and Communication Specialists Working with Transsexual, Transgender, and Gender Nonconforming Clients

Specialists may include speech-language pathologists, speech therapists, and speech-voice clinicians. In most countries the professional association for speech-language pathologists requires specific qualifications and credentials for membership. In some countries the government regulates practice through licensing, certification, or registration processes (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada).

The following are recommended minimum credentials for voice and communication specialists working with transsexual, transgender, and gender nonconforming clients:

1. Specialized training and competence in the assessment and development of communication skills in transsexual, transgender, and gender nonconforming clients.

2. A basic understanding of transgender health, including hormonal and surgical treatments for feminization/masculinization and trans-specific psychosocial issues as outlined in the SOC; and familiarity with basic sensitivity protocols such as the use of preferred gender pronoun and name (Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

52                                        World Professional Association for Transgender Health

Exhibit 17- 53

The Standards of Care
7TH VERSION

3. Continuing education in the assessment and development of communication skills in transsexual, transgender, and gender nonconforming clients. This may include attendance at professional meetings, workshops, or seminars; participation in research related to gender identity issues; independent study; or mentoring from an experienced, certified clinician.

Other professionals such as vocal coaches, theatre professionals, singing teachers, and movement experts may play a valuable adjunct role. Such professionals will ideally have experience working with, or be actively collaborating with, speech-language pathologists.

## Assessment and Treatment Considerations

The overall purpose of voice and communication therapy is to help clients adapt their voice and communication in a way that is both safe and authentic, resulting in communication patterns that clients feel are congruent with their gender identity and that reflect their sense of self (Adler, Hirsch, & Mordaunt, 2006). It is essential that voice and communication specialists be sensitive to individual communication preferences. Communication – style, voice, choice of language, etc. – is personal. Individuals should not be counseled to adopt behaviors with which they are not comfortable or which do not feel authentic. Specialists can best serve their clients by taking the time to understand a person's gender concerns and goals for gender role expression (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

Individuals may choose the communication behaviors that they wish to acquire in accordance with their gender identity. These decisions are also informed and supported by the knowledge of the voice and communication specialist and by the assessment data for a specific client (Hancock, Krissinger, & Owen, 2010). Assessment includes a client's self-evaluation and a specialist's evaluation of voice, resonance, articulation, spoken language, and non-verbal communication (Adler et al., 2006; Hancock et al., 2010).

Voice and communication treatment plans are developed by considering the available research evidence, the clinical knowledge and experience of the specialist, and the client's own goals and values (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada). Targets of treatment typically include pitch, intonation, loudness and stress patterns, voice quality, resonance, articulation, speech rate and phrasing, language, and non-verbal communication (Adler et al., 2006; Davies & Goldberg, 2006; de Bruin, Coerts, & Greven, 2000; Gelfer, 1999; McNeill, 2006; Oates & Dacakis, 1983). Treatment may involve individual and/or group sessions. The frequency and duration of treatment will vary according to a client's needs. Existing protocols for voice and

The Standards of Care
**7TH VERSION**

Exhibit 17-54

communication treatment can be considered in developing an individualized therapy plan (Carew, Dacakis, & Oates, 2007; Dacakis, 2000; Davies & Goldberg, 2006; Gelfer, 1999; McNeill, Wilson, Clark, & Deakin, 2008; Mount & Salmon, 1988).

Feminizing or masculinizing the voice involves non-habitual use of the voice production mechanism. Prevention measures are necessary to avoid the possibility of vocal misuse and long-term vocal damage. All voice and communication therapy services should therefore include a vocal health component (Adler et al., 2006).

## Vocal Health Considerations after Voice Feminization Surgery

As noted in section XI, some transsexual, transgender, and gender nonconforming people will undergo voice feminization surgery. (Voice deepening can be achieved through masculinizing hormone therapy, but feminizing hormones do not have an impact on the adult MtF voice.) There are varying degrees of satisfaction, safety, and long-term improvement in patients who have had such surgery. It is recommended that individuals undergoing voice feminization surgery also consult a voice and communication specialist to maximize the surgical outcome, help protect vocal health, and learn non-pitch related aspects of communication. Voice surgery procedures should include follow-up sessions with a voice and communication specialist who is licensed and/ or credentialed by the board responsible for speech therapists/speech-language pathologists in that country (Kanagalingam et al., 2005; Neumann & Welzel, 2004).

# XI

# Surgery_

## Sex Reassignment Surgery Is Effective and Medically Necessary

Surgery – particularly genital surgery – is often the last and the most considered step in the treatment process for gender dysphoria. While many transsexual, transgender, and gender nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria (Hage

Exhibit
H-55

The Standards of Care
7TH VERSION

& Karim, 2000). For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity. Moreover, surgery can help patients feel more at ease in the presence of sex partners or in venues such as physicians' offices, swimming pools, or health clubs. In some settings, surgery might reduce risk of harm in the event of arrest or search by police or other authorities.

Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Gijs & Brewaeys, 2007; Klein & Gorzalka, 2009; Pfäfflin & Junge, 1998). Additional information on the outcomes of surgical treatments are summarized in Appendix D.

## Ethical Questions Regarding Sex Reassignment Surgery

In ordinary surgical practice, pathological tissues are removed to restore disturbed functions, or alterations are made to body features to improve a patient's self image. Some people, including some health professionals, object on ethical grounds to surgery as a treatment for gender dysphoria, because these conditions are thought not to apply.

It is important that health professionals caring for patients with gender dysphoria feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort and distress of individuals with gender dysphoria, professionals need to listen to these patients discuss their symptoms, dilemmas, and life histories. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having gender dysphoria and the potential for harm caused by denying access to appropriate treatments.

Genital and breast/chest surgical treatments for gender dysphoria are not merely another set of elective procedures. Typical elective procedures involve only a private mutually consenting contract between a patient and a surgeon. Genital and breast/chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals, as outlined in section VII of the SOC. These surgeries may be performed once there is written documentation that this assessment has occurred and that the person has met the criteria for a specific surgical treatment. By following this procedure, mental health professionals, surgeons, and of course patients, share responsibility for the decision to make irreversible changes to the body.

The Standards of Care
**7TH VERSION**

Exhibit -17-56

It is unethical to deny availability or eligibility for sex reassignment surgeries solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis C or B.

# Relationship of Surgeons with Mental Health Professionals, Hormone-Prescribing Physicians (if Applicable), and Patients (Informed Consent)

The role of a surgeon in the treatment of gender dysphoria is not that of a mere technician. Rather, conscientious surgeons will have insight into each patient's history and the rationale that led to the referral for surgery. To that end, surgeons must talk at length with their patients and have close working relationships with other health professionals who have been actively involved in their clinical care.

Consultation is readily accomplished when a surgeon practices as part of an interdisciplinary health care team. In the absence of this, a surgeon must be confident that the referring mental health professional(s), and if applicable the physician who prescribes hormones, are competent in the assessment and treatment of gender dysphoria, because the surgeon is relying heavily on their expertise.

Once a surgeon is satisfied that the criteria for specific surgeries have been met (as outlined below), surgical treatment should be considered and a preoperative surgical consultation should take place. During this consultation, the procedure and postoperative course should be extensively discussed with the patient. Surgeons are responsible for discussing all of the following with patients seeking surgical treatments for gender dysphoria:

- The different surgical techniques available (with referral to colleagues who provide alternative options);

- The advantages and disadvantages of each technique;

- The limitations of a procedure to achieve "ideal" results; surgeons should provide a full range of before-and-after photographs of their own patients, including both successful and unsuccessful outcomes;

- The inherent risks and possible complications of the various techniques; surgeons should inform patients of their own complication rates with each procedure.



<div align="right">

The Standards of Care
**7TH VERSION**

</div>

These discussions are the core of the informed consent process, which is both an ethical and legal requirement for any surgical procedure. Ensuring that patients have a realistic expectation of outcomes is important in achieving a result that will alleviate their gender dysphoria.

All of this information should be provided to patients in writing, in a language in which they are fluent, and in graphic illustrations. Patients should receive the information in advance (possibly via the internet) and given ample time to review it carefully. The elements of informed consent should always be discussed face-to-face prior to the surgical intervention. Questions can then be answered and written informed consent can be provided by the patient. Because these surgeries are irreversibile, care should be taken to ensure that patients have sufficient time to absorb information fully before they are asked to provide informed consent. A minimum of 24 hours is suggested.

Surgeons should provide immediate aftercare and consultation with other physicians serving the patient in the future. Patients should work with their surgeon to develop an adequate aftercare plan for the surgery.

## Overview of Surgical Procedures for the Treatment of Patients with Gender Dysphoria

**For the male-to-female (MtF) patient, surgical procedures may include the following:**

1. Breast/chest surgery: augmentation mammoplasty (implants/lipofilling);

2. Genital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty;

3. Non-genital, non-breast surgical interventions: facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures.

**For the female-to-male (FtM) patient, surgical procedures may include the following:**

1. Breast/chest surgery: subcutaneous mastectomy, creation of a male chest;

2. Genital surgery: hysterectomy/ovariectomy, reconstruction of the fixed part of the urethra, which can be combined with a metoidioplasty or with a phalloplasty (employing a pedicled or free vascularized flap), vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses;

World Professional Association for Transgender Health

57

**The Standards of Care**
7TH VERSION



3. Non-genital, non-breast surgical interventions: voice surgery (rare), liposuction, lipofilling, pectoral implants, and various aesthetic procedures.

## Reconstructive Versus Aesthetic Surgery

The question of whether sex reassignment surgery should be considered "aesthetic" surgery or "reconstructive" surgery is pertinent not only from a philosophical point of view, but also from a financial point of view. Aesthetic or cosmetic surgery is mostly regarded as not medically necessary and therefore is typically paid for entirely by the patient. In contrast, reconstructive procedures are considered medically necessary – with unquestionable therapeutic results – and thus paid for partially or entirely by national health systems or insurance companies.

Unfortunately, in the field of plastic and reconstructive surgery (both in general and specifically for gender-related surgeries), there is no clear distinction between what is purely reconstructive and what is purely cosmetic. Most plastic surgery procedures actually are a mixture of both reconstructive and cosmetic components.

While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive. Although it may be much easier to see a phalloplasty or a vaginoplasty as an intervention to end lifelong suffering, for certain patients an intervention like a reduction rhinoplasty can have a radical and permanent effect on their quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria.

## Criteria for Surgeries

As for all of the *SOC*, the criteria for initiation of surgical treatments for gender dysphoria were developed to promote optimal patient care. While the *SOC* allow for an individualized approach to best meet a patient's health care needs, a criterion for all breast/chest and genital surgeries is documentation of persistent gender dysphoria by a qualified mental health professional. For some surgeries, additional criteria include preparation and treatment consisting of feminizing/masculinizing hormone therapy and one year of continuous living in a gender role that is congruent with one's gender identity.

These criteria are outlined below. Based on the available evidence and expert clinical consensus, different recommendations are made for different surgeries.

World Professional Association for Transgender Health



**The Standards of Care**
**7TH VERSION**

The SOC do not specify an order in which different surgeries should occur. The number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs.

### Criteria for breast/chest surgery (one referral)

Criteria for mastectomy and creation of a male chest in FtM patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the SOC for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a pre-requisite.

Criteria for breast augmentation (implants/lipofilling) in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the SOC for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

**The Standards of Care**
7TH VERSION

Exhibit
17 - 60

# Criteria for genital surgery (two referrals)

The criteria for genital surgery are specific to the type of surgery being requested.

Criteria for hysterectomy and ovariectomy in FtM patients and for orchiectomy in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled.

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before the patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these procedures for medical indications other than gender dysphoria.

Criteria for metoidioplasty or phalloplasty in FtM patients and for vaginoplasty in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

6. 12 continuous months of living in a gender role that is congruent with their gender identity;

60                                          World Professional Association for Transgender Health

Exhibit 17-61

The Standards of Care
7TH VERSION

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

Rationale for a preoperative, 12-month experience of living in an identity-congruent gender role:

The criterion noted above for some types of genital surgeries – i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity – is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery. As noted in section VII, the social aspects of changing one's gender role are usually challenging – often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role. Support from a qualified mental health professional and from peers can be invaluable in ensuring a successful gender role adaptation (Bockting, 2008).

The duration of 12 months allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. This includes coming out to partners, family, friends, and community members (e.g., at school, work, other settings).

Health professionals should clearly document a patient's experience in the gender role in the medical chart, including the start date of living full time for those who are preparing for genital surgery. In some situations, if needed, health professionals may request verification that this criterion has been fulfilled: They may communicate with individuals who have related to the patient in an identity-congruent gender role, or request documentation of a legal name and/or gender marker change, if applicable.

## Surgery for Persons with Psychotic Conditions and Other Serious Mental Illnesses

When patients with gender dysphoria are also diagnosed with severe psychiatric disorders and impaired reality testing (e.g., psychotic episodes, bipolar disorder, dissociative identity disorder, borderline personality disorder), an effort must be made to improve these conditions with psychotropic medications and/or psychotherapy before surgery is contemplated. Reevaluation by a mental health professional qualified to assess and manage psychotic conditions should be

The Standards of Care
7TH VERSION

Exhibit   17-62

conducted prior to surgery, describing the patient's mental status and readiness for surgery. It is preferable that this mental health professional be familiar with the patient. No surgery should be performed while a patient is actively psychotic (De Cuypere & Vercruysse, 2009).

## Competency of Surgeons Performing Breast/Chest or Genital Surgery

Physicians who perform surgical treatments for gender dsyphoria should be urologists, gynecologists, plastic surgeons, or general surgeons, and board-certified as such by the relevant national and/ or regional association. Surgeons should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons must be willing to have their surgical skills reviewed by their peers. An official audit of surgical outcomes and publication of these results would be greatly reassuring to both referring health professionals and patients. Surgeons should regularly attend professional meetings where new techniques are presented. The internet is often effectively used by patients to share information on their experience with surgeons and their teams.

Ideally, surgeons should be knowledgeable about more than one surgical technique for genital reconstruction so that they, in consultation with patients, can choose the ideal technique for each individual. Alternatively, if a surgeon is skilled in a single technique and this procedure is either not suitable for or desired by a patient, the surgeon should inform the patient about other procedures and offer referral to another appropriately skilled surgeon.

## Breast/Chest Surgery Techniques and Complications

Although breast/chest appearance is an important secondary sex characteristic, breast presence or size is not involved in the legal definitions of sex and gender and is not necessary for reproduction. The performance of breast/chest operations for treatment of gender dysphoria should be considered with the same care as beginning hormone therapy, as both produce relatively irreversible changes to the body.

For the MtF patient, a breast augmentation (sometimes called "chest reconstruction") is not different from the procedure in a natal female patient. It is usually performed through implantation of breast prostheses and occasionally with the lipofilling technique. Infections and capsular fibrosis are rare complications of augmentation mammoplasty in MtF patients (Kanhai, Hage, Karim, & Mulder, 1999).

Exhibit
17-63

The Standards of Care
7TH VERSION

For the FtM patient, a mastectomy or "male chest contouring" procedure is available. For many FtM patients, this is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Complications of subcutaneous mastectomy can include nipple necrosis, contour irregularities, and unsightly scarring (Monstrey et al., 2008).

## Genital Surgery Techniques and Complications

Genital surgical procedures for the MtF patient may include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. Techniques include penile skin inversion, pedicled colosigmoid transplant, and free skin grafts to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

Surgical complications of MtF genital surgery may include complete or partial necrosis of the vagina and labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, and vaginas that are either too short or too small for coitus. While the surgical techniques for creating a neovagina are functionally and aesthetically excellent, anorgasmia following the procedure has been reported, and a second stage labiaplasty may be needed for cosmesis (Klein & Gorzalka, 2009; Lawrence, 2006).

Genital surgical procedures for FtM patients may include hysterectomy, ovariectomy (salpingo-oophorectomy), vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. For patients without former abdominal surgery, the laparoscopic technique for hysterectomy and salpingo-oophorectomy is recommended to avoid a lower-abdominal scar. Vaginal access may be difficult as most patients are nulliparous and have often not experienced penetrative intercourse. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations and by a client's financial considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, patients should be clearly informed that there are several separate stages of surgery and frequent technical difficulties, which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one operation. The objective of standing micturition with this technique can not always be ensured (Monstrey et al., 2009).

Complications of phalloplasty in FtMs may include frequent urinary tract stenoses and fistulas, and occasionally necrosis of the neophallus. Metoidioplasty results in a micropenis, without the capacity for standing urination. Phalloplasty, using a pedicled or a free vascularized flap, is a lengthy, multi-stage procedure with significant morbidity that includes frequent urinary complications and

The Standards of Care
**7TH VERSION**



unavoidable donor site scarring. For this reason, many FtM patients never undergo genital surgery other than hysterectomy and salpingo-oophorectomy (Hage & De Graaf, 1993).

Even patients who develop severe surgical complications seldom regret having undergone surgery. The importance of surgery can be appreciated by the repeated finding that quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2006).

## Other Surgeries

Other surgeries for assisting in body feminization include reduction thyroid chondroplasty (reduction of the Adam's apple), voice modification surgery, suction-assisted lipoplasty (contour modeling) of the waist, rhinoplasty (nose correction), facial bone reduction, face-lift, and blepharoplasty (rejuvenation of the eyelid). Other surgeries for assisting in body masculinization include liposuction, lipofilling, and pectoral implants. Voice surgery to obtain a deeper voice is rare but may be recommended in some cases, such as when hormone therapy has been ineffective.

Although these surgeries do not require referral by mental health professionals, such professionals can play an important role in assisting clients in making a fully informed decision about the timing and implications of such procedures in the context of the social transition.

Although most of these procedures are generally labeled "purely aesthetic," these same operations in an individual with severe gender dysphoria can be considered medically necessary, depending on the unique clinical situation of a given patient's condition and life situation. This ambiguity reflects reality in clinical situations, and allows for individual decisions as to the need and desirability of these procedures.

# XII

# Postoperative Care and Follow-up

Long-term postoperative care and follow-up after surgical treatments for gender dysphoria are associated with good surgical and psychosocial outcomes (Monstrey et al., 2009). Follow-up is important to a patient's subsequent physical and mental health and to a surgeon's knowledge about the benefits and limitations of surgery. Surgeons who operate on patients coming from long





**The Standards of Care**
7TH VERSION

distances should include personal follow-up in their care plan and attempt to ensure affordable local long-term aftercare in their patients' geographic region.

Postoperative patients may sometimes exclude themselves from follow-up by specialty providers, including the hormone-prescribing physician (for patients receiving hormones), not recognizing that these providers are often best able to prevent, diagnose, and treat medical conditions that are unique to hormonally and surgically treated patients. The need for follow-up equally extends to mental health professionals, who may have spent a longer period of time with the patient than any other professional and therefore are in an excellent position to assist in any postoperative adjustment difficulties. Health professionals should stress the importance of postoperative follow-up care with their patients and offer continuity of care.

Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. This is discussed more in the next section.

# XIII
# Lifelong Preventive and Primary Care

Transsexual, transgender, and gender nonconforming people need health care throughout their lives. For example, to avoid the negative secondary effects of having a gonadectomy at a relatively young age and/or receiving long-term, high-dose hormone therapy, patients need thorough medical care by providers experienced in primary care and transgender health. If one provider is not able to provide all services, ongoing communication among providers is essential.

Primary care and health maintenance issues should be addressed before, during, and after any possible changes in gender role and medical interventions to alleviate gender dysphoria. While hormone providers and surgeons play important roles in preventive care, every transsexual, transgender, and gender nonconforming person should partner with a primary care provider for overall health care needs (Feldman, 2007).

## General Preventive Health Care

Screening guidelines developed for the general population are appropriate for organ systems that are unlikely to be affected by feminizing/masculinizing hormone therapy. However, in areas such

The Standards of Care
7TH VERSION

Exhibit 17-66

as cardiovascular risk factors, osteoporosis, and some cancers (breast, cervical, ovarian, uterine, and prostate), such general guidelines may either over- or underestimate the cost-effectiveness of screening individuals who are receiving hormone therapy.

Several resources provide detailed protocols for the primary care of patients undergoing feminizing/ masculinizing hormone therapy, including therapy that is provided after sex reassignment surgeries (Center of Excellence for Transgender Health, UCSF, 2011; Feldman & Goldberg, 2006; Feldman, 2007; Gorton, Buth, & Spade, 2005). Clinicians should consult their national evidence-based guidelines and discuss screening with their patients in light of the effects of hormone therapy on their baseline risk.

## Cancer Screening

Cancer screening of organ systems that are associated with sex can present particular medical and psychosocial challenges for transsexual, transgender, and gender nonconforming patients and their health care providers. In the absence of large-scale prospective studies, providers are unlikely to have enough evidence to determine the appropriate type and frequency of cancer screenings for this population. Over-screening results in higher health care costs, high false positive rates, and often unnecessary exposure to radiation and/or diagnostic interventions such as biopsies. Under-screening results in diagnostic delay for potentially treatable cancers. Patients may find cancer screening gender affirming (such as mammograms for MtF patients) or both physically and emotionally painful (such as Pap smears offer continuity of care for FtM patients).

## Urogenital Care

Gynecologic care may be necessary for transsexual, transgender, and gender nonconforming people of both sexes. For FtM patients, such care is needed predominantly for individuals who have not had genital surgery. For MtF patients, such care is needed after genital surgery. While many surgeons counsel patients regarding postoperative urogenital care, primary care clinicians and gynecologists should also be familiar with the special genital concerns of this population.

All MtF patients should receive counseling regarding genital hygiene, sexuality, and prevention of sexually transmitted infections; those who have had genital surgery should also be counseled on the need for regular vaginal dilation or penetrative intercourse in order to maintain vaginal depth and width (van Trotsenburg, 2009). Due to the anatomy of the male pelvis, the axis and the dimensions

The Standards of Care
7TH VERSION

Exhibit 17:67

of the neovagina differ substantially from those of a biologic vagina. This anatomic difference can affect intercourse if not understood by MtF patients and their partners (van Trotsenburg, 2009).

Lower urinary tract infections occur frequently in MtF patients who have had surgery because of the reconstructive requirements of the shortened urethra. In addition, these patients may suffer from functional disorders of the lower urinary tract; such disorders may be caused by damage of the autonomous nerve supply of the bladder floor during dissection between the rectum and the bladder, and by a change of the position of the bladder itself. A dysfunctional bladder (e.g., overactive bladder, stress or urge urinary incontinence) may occur after sex reassignment surgery (Hoebeke et al., 2005; Kuhn, Hiltebrand, & Birkhauser, 2007).

Most FtM patients do not undergo vaginectomy (colpectomy). For patients who take masculinizing hormones, despite considerable conversion of testosterone to estrogens, atrophic changes of the vaginal lining can be observed regularly and may lead to pruritus or burning. Examination can be both physically and emotionally painful, but lack of treatment can seriously aggravate the situation. Gynecologists treating the genital complaints of FtM patients should be aware of the sensitivity that patients with a male gender identity and masculine gender expression might have around having genitals typically associated with the female sex.



# XIV

## Applicability of the Standards of Care to People Living in Institutional Environments

The SOC in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities (Brown, 2009). Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

All elements of assessment and treatment as described in the SOC can be provided to people living in institutions (Brown, 2009). Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess

198

**The Standards of Care**
7TH VERSION

Exhibit 17-64

and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

People with gender dysphoria in institutions may also have co-existing mental health conditions (Cole et al., 1997). These conditions should be evaluated and treated appropriately.

People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the SOC. A "freeze frame" approach is not considered appropriate care in most situations (Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92-12820-MLW, 2002). People with gender dysphoria who are deemed appropriate for hormone therapy (following the SOC) should be started on such therapy. The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality (Brown, 2010).

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the SOC, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. An example of a reasonable accommodation is the use of injectable hormones, if not medically contraindicated, in an environment where diversion of oral preparations is highly likely (Brown, 2009). Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the SOC (Brown, 2010).

Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization (Brown, 2009).

Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.

World Professional Association for Transgender Health

The Standards of Care
7TH VERSION



XV   Exhibit  17.69

# Applicability of the Standards of Care to People With Disorders of Sex Development

## Terminology

The term *disorder of sex development* (DSD) refers to a somatic condition of atypical development of the reproductive tract (Hughes, Houk, Ahmed, Lee, & LWPES1/ESPE2 Consensus Group, 2006). DSDs include the condition that used to be called *intersexuality*. Although the terminology was changed to *DSD* during an international consensus conference in 2005 (Hughes et al., 2006), disagreement about language use remains. Some people object strongly to the "disorder" label, preferring instead to view these congenital conditions as a matter of diversity (Diamond, 2009) and to continue using the terms *intersex* or *intersexuality*. In the *SOC*, WPATH uses the term *DSD* in an objective and value-free manner, with the goal of ensuring that health professionals recognize this medical term and use it to access relevant literature as the field progresses. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

## Rationale for Addition to the SOC

Previously, individuals with a DSD who also met the *DSM-IV-TR*'s behavioral criteria for Gender Identity Disorder (American Psychiatric Association, 2000) were excluded from that general diagnosis. Instead, they were categorized as having a "Gender Identity Disorder - Not Otherwise Specified." They were also excluded from the WPATH *Standards of Care*.

The current proposal for *DSM-5* (www.dsm5.org) is to replace the term *gender identity disorder* with *gender dysphoria*. Moreover, the proposed changes to the *DSM* consider gender dysphoric people with a DSD to have a subtype of gender dysphoria. This proposed categorization – which explicitly differentiates between gender dysphoric individuals with and without a DSD – is justified: In people with a DSD, gender dysphoria differs in its phenomenological presentation, epidemiology, life trajectories, and etiology (Meyer-Bahlburg, 2009).

The Standards of Care
7TH VERSION

Exhibit - 17-70

Adults with a DSD and gender dysphoria have increasingly come to the attention of health professionals. Accordingly, a brief discussion of their care is included in this version of the SOC.

## Health History Considerations

Health professionals assisting patients with both a DSD and gender dysphoria need to be aware that the medical context in which such patients have grown up is typically very different from that of people without a DSD.

Some people are recognized as having a DSD through the observation of gender-atypical genitals at birth. (Increasingly this observation is made during the prenatal period by way of imaging procedures such as ultrasound.) These infants then undergo extensive medical diagnostic procedures. After consultation among the family and health professionals – during which the specific diagnosis, physical and hormonal findings, and feedback from long-term outcome studies (Cohen-Kettenis, 2005; Dessens, Slijper, & Drop, 2005; Jurgensen, Hiort, Holterhus, & Thyen, 2007; Mazur, 2005; Meyer-Bahlburg, 2005; Stikkelbroeck et al., 2003; Wisniewski, Migeon, Malouf, & Gearhart, 2004) are considered – the newborn is assigned a sex, either male or female.

Other individuals with a DSD come to the attention of health professionals around the age of puberty through the observation of atypical development of secondary sex characteristics. This observation also leads to a specific medical evaluation.

The type of DSD and severity of the condition has significant implications for decisions about a patient's initial sex assignment, subsequent genital surgery, and other medical and psychosocial care (Meyer-Bahlburg, 2009). For instance, the degree of prenatal androgen exposure in individuals with a DSD has been correlated with the degree of masculinization of gender-related *behavior* (that is, *gender role and expression*); however, the correlation is only moderate, and considerable behavioral variability remains unaccounted for by prenatal androgen exposure (Jurgensen et al., 2007; Meyer-Bahlburg, Dolezal, Baker, Ehrhardt, & New, 2006). Notably, a similar correlation of prenatal hormone exposure with gender *identity* has not been demonstrated (e.g., Meyer-Bahlburg et al., 2004). This is underlined by the fact that people with the same (core) gender identity can vary widely in the degree of masculinization of their gender-related behavior.

World Professional Association for Transgender Health

Exhibit 17-71

The Standards of Care
7TH VERSION

## Assessment and Treatment of Gender Dysphoria in People with Disorders of Sex Development

Very rarely are individuals with a DSD identified as having gender dysphoria *before* a DSD diagnosis has been made. Even so, a DSD diagnosis is typically apparent with an appropriate history and basic physical exam – both of which are part of a medical evaluation for the appropriateness of hormone therapy or surgical interventions for gender dysphoria. Mental health professionals should ask their clients presenting with gender dysphoria to have a physical exam, particularly if they are not currently seeing a primary care (or other health care) provider.

Most people with a DSD who are born with genital ambiguity do not develop gender dysphoria (e.g., Meyer-Bahlburg et al., 2004; Wisniewski et al., 2004). However, some people with a DSD will develop chronic gender dysphoria and even undergo a change in their birth-assigned sex and/ or their gender role (Meyer-Bahlburg, 2005; Wilson, 1999; Zucker, 1999). If there are persistent and strong indications that gender dysphoria is present, a comprehensive evaluation by clinicians skilled in the assessment and treatment of gender dysphoria is essential, irrespective of the patient's age. Detailed recommendations have been published for conducting such an assessment and for making treatment decisions to address gender dysphoria in the context of a DSD (Meyer-Bahlburg, in press). Only after thorough assessment should steps be taken in the direction of changing a patient's birth-assigned sex or gender role.

Clinicians assisting these patients with treatment options to alleviate gender dysphoria may profit from the insights gained from providing care to patients without a DSD (Cohen-Kettenis, 2010). However, certain criteria for treatment (e.g., age, duration of experience with living in the desired gender role) are usually not routinely applied to people with a DSD; rather, the criteria are interpreted in light of a patient's specific situation (Meyer-Bahlburg, in press). In the context of a DSD, changes in birth-assigned sex and gender role have been made at any age between early elementary-school age and middle adulthood. Even genital surgery may be performed much earlier in these patients than in gender dysphoric individuals without a DSD if the surgery is well justified by the diagnosis, by the evidence-based gender-identity prognosis for the given syndrome and syndrome severity, and by the patient's wishes.

One reason for these treatment differences is that genital surgery in individuals with a DSD is quite common in infancy and adolescence. Infertility may already be present due to either early gonadal failure or to gonadectomy because of a malignancy risk. Even so, it is advisable for patients with a DSD to undergo a full social transition to another gender role only if there is a long-standing history of gender-atypical behavior, and if gender dysphoria and/or the desire to change one's gender role has been strong and persistent for a considerable period of time. Six months is the time period of full symptom expression required for the application of the gender dysphoria diagnosis proposed for *DSM-5* (Meyer-Bahlburg, in press).

**The Standards of Care**
**7TH VERSION**

Exhibit
17 - 72

## Additional Resources

The gender-relevant medical histories of people with a DSD are often complex. Their histories may include a great variety of inborn genetic, endocrine, and somatic atypicalities, as well as various hormonal, surgical, and other medical treatments. For this reason, many additional issues need to be considered in the psychosocial and medical care of such patients, regardless of the presence of gender dysphoria. Consideration of these issues is beyond what can be covered in the *SOC*. The interested reader is referred to existing publications (e.g., Cohen-Kettenis & Pfäfflin, 2003; Meyer-Bahlburg, 2002, 2008). Some families and patients also find it useful to consult or work with community support groups.

There is a very substantial medical literature on the medical management of patients with a DSD. Much of this literature has been produced by high-level specialists in pediatric endocrinology and urology, with input from specialized mental health professionals, especially in the area of gender. Recent international consensus conferences have addressed evidence-based care guidelines (including issues of gender and of genital surgery) for DSD in general (Hughes et al., 2006) and specifically for Congenital Adrenal Hyperplasia (Joint LWPES/ESPE CAH Working Group et al., 2002; Speiser et al., 2010). Others have addressed the research needs for DSD in general (Meyer-Bahlburg & Blizzard, 2004) and for selected syndromes such as 46,XXY (Simpson et al., 2003).

  

# References

Abramowitz, S. I. (1986). Psychosocial outcomes of sex reassignment surgery. *Journal of Consulting and Clinical Psychology, 54*(2), 183-189. doi:10.1037/0022-006X.54.2.183

ACOG Committee of Gynecologic Practice. (2005). Committee opinion #322: Compounded bioidentical hormones. *Obstetrics & Gynecology, 106*(5), 139-140.

Adler, R. K., Hirsch, S., & Mordaunt, M. (2006). *Voice and communication therapy for the transgender/transsexual client: A comprehensive clinical guide.* San Diego, CA: Plural Pub.

American Academy of Family Physicians. (2005). *Definition of family medicine.* Retrieved August 10, 2009, from http://www.aafp.org/online/en/home/policy/policies/f/fammeddef.html

Exhibit 17-73

**The Standards of Care**
7TH VERSION

American Medical Association. (2008). *Resolution 122 (A-08)*. Retrieved from http://www.ama-assn.org/ama1/pub/upload/mm/471/122.doc

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders DSM-IV-TR* (4th ed., text rev.). Washington, DC: Author.

American Speech-Language-Hearing Association. (2011). *Scope of practice*. Retrieved from www.asha.org

Anton, B. S. (2009). Proceedings of the American Psychological Association for the legislative year 2008: Minutes of the annual meeting of the council of representatives, February 22-24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the board of directors. *American Psychologist, 64*, 372-453. doi:10.1037/a0015932

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W., van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *European Journal of Endocrinology, 164*(4), 635-642. doi:10.1530/EJE-10-1038

Baba, T., Endo, T., Honnma, H., Kitajima, Y., Hayashi, T., Ikeda, H., . . . Saito, T. (2007). Association between polycystic ovary syndrome and female-to-male transsexuality. *Human Reproduction, 22*(4), 1011-1016. doi:10.1093/humrep/del474

Bakker, A., Van Kesteren, P. J., Gooren, L. J., & Bezemer, P. D. (1993). The prevalence of transsexualism in the Netherlands. *Acta Psychiatrica Scandinavica, 87*(4), 237-238. doi:10.1111/j.1600-0447.1993.tb03364.x

Balen, A. H., Schachter, M. E., Montgomery, D., Reid, R. W., & Jacobs, H. S. (1993). Polycystic ovaries are a common finding in untreated female to male transsexuals. *Clinical Endocrinology, 38*(3), 325-329. doi:10.1111/j.1365-2265.1993.tb01013.x

Basson, R. (2001). Towards optimal hormonal treatment of male to female gender identity disorder. *Journal of Sexual and Reproductive Medicine, 1*(1), 45-51.

Basson, R., & Prior, J. C. (1998). Hormonal therapy of gender dysphoria: The male-to-female transsexual. In D. Denny (Ed.), *Current concepts in transgender identity* (pp. 277-296). New York: Garland Publishing, Inc.

Benjamin, H. (1966). *The transsexual phenomenon*. New York: Julian Press.

Besnier, N. (1994). Polynesian gender liminality through time and space. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 285-328). New York: Zone Books.

Bockting, W. O. (1999). From construction to context: Gender through the eyes of the transgendered. *Siecus Report, 28*(1), 3-7.

**The Standards of Care**
7TH VERSION

Exhbit
17-74

Bockting, W. O. (2008). Psychotherapy and the real-life experience: From gender dichotomy to gender diversity. *Sexologies, 17*(4), 211-224. doi:10.1016/j.sexol.2008.08.001

Bockting, W. O., & Coleman, E. (2007). Developmental stages of the transgender coming out process: Toward an integrated identity. In R. Ettner, S. Monstrey & A. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 185-208). New York: The Haworth Press.

Bockting, W. O., & Goldberg, J. M. (2006). Guidelines for transgender care (special issue). *International Journal of Transgenderism, 9*(3/4).

Bockting, W. O., Knudson, G., & Goldberg, J. M. (2006). Counseling and mental health care for transgender adults and loved ones. *International Journal of Transgenderism, 9*(3/4), 35-82. doi:10.1300/J485v09n03_03

Bolin, A. (1988). *In search of Eve* (pp. 189-192). New York: Bergin & Garvey.

Bolin, A. (1994). Transcending and transgendering: Male-to-female transsexuals, dichotomy and diversity. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 447-486). New York: Zone Books.

Bornstein, K. (1994). *Gender outlaw: On men, women, and the rest of us*. New York: Routledge.

Bosinski, H. A. G., Peter, M., Bonatz, G., Arndt, R., Heidenreich, M., Sippell, W. G., & Wille, R. (1997). A higher rate of hyperandrogenic disorders in female-to-male transsexuals. *Psychoneuroendocrinology, 22*(5), 361-380. doi:10.1016/S0306-4530(97)00033-4

Brill, S. A., & Pepper, R. (2008). *The transgender child: A handbook for families and professionals*. Berkeley, CA: Cleis Press.

Brown, G. R. (2009). Recommended revisions to The World Professional Association for Transgender Health's Standards of Care section on medical care for incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 11*(2), 133-139. doi:10.1080/15532730903008073

Brown, G. R. (2010). Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 12*(1), 31-39. doi:10.1080/15532731003688970

Bullough, V. L., & Bullough, B. (1993). *Cross dressing, sex, and gender*. Philadelphia, PA: University of Pennsylvania Press.

Callen Lorde Community Health Center. (2000). *Transgender health program protocols*. Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Exhibit 17-75   **The Standards of Care**
7TH VERSION

Callen Lorde Community Health Center. (2011). *Transgender health program protocols.* Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Canadian Association of Speech-Language Pathologists and Audiologists. http://www.caslpa.ca/

Carew, L., Dacakis, G., & Oates, J. (2007). The effectiveness of oral resonance therapy on the perception of femininity of voice in male-to-female transsexuals. *Journal of Voice, 21*(5), 591-603. doi:10.1016/j.jvoice.2006.05.005

Carnegie, C. (2004). Diagnosis of hypogonadism: Clinical assessments and laboratory tests. *Reviews in Urology, 6*(Suppl 6), S3-8.

Cattrall, F. R., & Healy, D. L. (2004). Long-term metabolic, cardiovascular and neoplastic risks with polycystic ovary syndrome. *Best Practice & Research Clinical Obstetrics & Gynaecology, 18*(5), 803-812. doi:10.1016/j.bpobgyn.2004.05.005

Center of Excellence for Transgender Health, UCSF. (2011). *Primary care protocol for transgender health care.* Retrieved from http://transhealth.ucsf.edu/trans?page=protocol-00-00

Chiñas, B. (1995). Isthmus Zapotec attitudes toward sex and gender anomalies. In S. O. Murray (Ed.), *Latin American male homosexualities* (pp. 293-302). Albuquerque, NM: University of New Mexico Press.

Clements, K., Wilkinson, W., Kitano, K., & Marx, R. (1999). HIV prevention and health service needs of the transgender community in San Francisco. *International Journal of Transgenderism, 3*(1), 2-17.

Cohen-Kettenis, P. T. (2001). Gender identity disorder in DSM? *Journal of the American Academy of Child & Adolescent Psychiatry, 40*(4), 391-391. doi:10.1097/00004583-200104000-00006

Cohen-Kettenis, P. T. (2005). Gender change in 46,XY persons with 5D-reductase-2 deficiency and 17D-hydroxysteroid dehydrogenase-3 deficiency. *Archives of Sexual Behavior, 34*(4), 399-410. doi:10.1007/s10508-005-4339-4

Cohen-Kettenis, P. T. (2006). Gender identity disorders. In C. Gillberg, R. Harrington & H. C. Steinhausen (Eds.), *A clinician's handbook of child and adolescent psychiatry* (pp. 695-725). New York: Cambridge University Press.

Cohen-Kettenis, P. T. (2010). Psychosocial and psychosexual aspects of disorders of sex development. *Best Practice & Research Clinical Endocrinology & Metabolism, 24*(2), 325-334. doi:10.1016/j.beem.2009.11.005

Cohen-Kettenis, P. T., & Kuiper, A. J. (1984). Transseksualiteit en psychothérapie. *Tijdschrift Voor Psychotherapie, 10*, 153-166.

**The Standards of Care**
7TH VERSION

Exhibit
17-76

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology, 31*(1), 41-53. doi:10.1023/A:1021769215342

Cohen-Kettenis, P. T., & Pfäfflin, F. (2003). *Transgenderism and intersexuality in childhood and adolescence: Making choices.* Thousand Oaks, CA: Sage Publications, Inc.

Cohen-Kettenis, P. T., & Pfäfflin, F. (2010). The DSM diagnostic criteria for gender identity disorder in adolescents and adults. *Archives of Sexual Behavior, 39*(2), 499-513. doi:10.1007/s10508-009-9562-y

Cohen-Kettenis, P. T., Schagen, S. E. E., Steensma, T. D., de Vries, A. L. C., & Delemarre-van de Waal, H. A. (2011). Puberty suppression in a gender-dysphoric adolescent: A 22-year follow-up. *Archives of Sexual Behavior, 40*(4), 843-847. doi:0.1007/s10508-011-9758-9

Cohen-Kettenis, P. T., Wallien, M., Johnson, L. L., Owen-Anderson, A. F. H., Bradley, S. J., & Zucker, K. J. (2006). A parent-report gender identity questionnaire for children: A cross-national, cross-clinic comparative analysis. *Clinical Child Psychology and Psychiatry, 11*(3), 397-405. doi:10.1177/1359104506059135

Cole, C. M., O'Boyle, M., Emory, L. E., & Meyer III, W. J. (1997). Comorbidity of gender dysphoria and other major psychiatric diagnoses. *Archives of Sexual Behavior, 26*(1), 13-26.

Coleman, E., Colgan, P., & Gooren, L. (1992). Male cross-gender behavior in Myanmar (Burma): A description of the acault. *Archives of Sexual Behavior, 21*(3), 313-321.

Costa, L. M., & Matzner, A. (2007). *Male bodies, women's souls: Personal narratives of Thailand's transgendered youth.* Binghamton, NY: Haworth Press.

Currah, P., Juang, R. M., & Minter, S. (2006). *Transgender rights.* Minneapolis, MN: University of Minnesota Press.

Currah, P., & Minter, S. (2000). Unprincipled exclusions: The struggle to achieve judicial and legislative equality for transgender people. *William and Mary Journal of Women and Law, 7,* 37-60.

Dacakis, G. (2000). Long-term maintenance of fundamental frequency increases in male-to-female transsexuals. *Journal of Voice, 14*(4), 549-556. doi:10.1016/S0892-1997(00)80010-7

Dahl, M., Feldman, J. L., Goldberg, J. M., & Jaberi, A. (2006). Physical aspects of transgender endocrine therapy. *International Journal of Transgenderism, 9*(3), 111-134. doi:10.1300/J485v09n03_06

Exhibit 17-77

**The Standards of Care**
7TH VERSION

Darney, P. D. (2008). Hormonal contraception. In H. M. Kronenberg, S. Melmer, K. S. Polonsky & P. R. Larsen (Eds.), *Williams textbook of endocrinology* (11th ed., pp. 615-644). Philadelphia: Saunders.

Davies, S., & Goldberg, J. M. (2006). Clinical aspects of transgender speech feminization and masculinization. *International Journal of Transgenderism, 9*(3-4), 167-196. doi:10.1300/J485v09n03_08

de Bruin, M. D., Coerts, M. J., & Greven, A. J. (2000). Speech therapy in the management of male-to-female transsexuals. *Folia Phoniatrica Et Logopaedica, 52*(5), 220-227.

De Cuypere, G., T'Sjoen, G., Beerten, R., Selvaggi, G., De Sutter, P., Hoebeke, P., . . . Rubens, R. (2005). Sexual and physical health after sex reassignment surgery. *Archives of Sexual Behavior, 34*(6), 679-690. doi:10.1007/s10508-005-7926-5

De Cuypere, G., Van Hemelrijck, M., Michel, A., Carael, B., Heylens, G., Rubens, R., . . . Monstrey, S. (2007). Prevalence and demography of transsexualism in Belgium. *European Psychiatry, 22*(3), 137-141. doi:10.1016/j.eurpsy.2006.10.002

De Cuypere, G., & Vercruysse, H. (2009). Eligibility and readiness criteria for sex reassignment surgery: Recommendations for revision of the WPATH standards of care. *International Journal of Transgenderism, 11*(3), 194-205. doi:10.1080/15532730903383781

de Lignières, B. (1999). Oral micronized progesterone. *Clinical Therapeutics, 21*(1), 41-60. doi:10.1016/S0149-2918(00)88267-3

De Sutter, P. (2009). Reproductive options for transpeople: Recommendations for revision of the WPATH's standards of care. *International Journal of Transgenderism, 11*(3), 183-185. doi:10.1080/15532730903383765

De Sutter, P., Kira, K., Verschoor, A., & Hotimsky, A. (2002). The desire to have children and the preservation of fertility in transsexual women: A survey. *International Journal of Transgenderism, 6*(3), retrieved from http://www.wpath.org/journal/www.iiav.nl/ezines /web/IJT/97-03/numbers/symposion/ ijtvo06no03_02.htm

de Vries, A. L. C., Cohen-Kettenis, P. T., & Delemarre-van de Waal, H. A. (2006). Clinical management of gender dysphoria in adolescents. *International Journal of Transgenderism, 9*(3-4), 83-94. doi:10.1300/J485v09n03_04

de Vries, A. L. C., Doreleijers, T. A. H., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry.* Advance online publication. doi:10.1111/j.1469-7610.2011.02426.x

**The Standards of Care**
7TH VERSION

Exhibit 17-78

de Vries, A. L. C., Noens, I. L. J., Cohen-Kettenis, P. T., van Berckelaer-Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders, 40*(8), 930-936. doi:10.1007/s10803-010-0935-9

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2010). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine.* Advance online publication. doi:10.1111/j.1743-6109.2010.01943.x

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology, 155*(suppl 1), S131-S137. doi:10.1530/eje.1.02231

Delemarre-van de Waal, H. A., van Weissenbruch, M. M., & Cohen Kettenis, P. T. (2004). Management of puberty in transsexual boys and girls. *Hormone Research in Paediatrics, 62*(suppl 2), 75-75. doi:10.1159/000081145

Derrig-Palumbo, K., & Zeine, F. (2005). *Online therapy: A therapist's guide to expanding your practice.* New York: W.W. Norton & Co.

Dessens, A. B., Slijper, F. M. E., & Drop, S. L. S. (2005). Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 34*(4), 389-397. doi:10.1007/s10508-005-4338-5

Devor, A. H. (2004). Witnessing and mirroring: A fourteen stage model. *Journal of Gay and Lesbian Psychotherapy, 8*(1/2), 41-67.

Di Ceglie, D., & Thümmel, E. C. (2006). An experience of group work with parents of children and adolescents with gender identity disorder. *Clinical Child Psychology and Psychiatry, 11*(3), 387-396. doi:10.1177/1359104506064983

Diamond, M. (2009). Human intersexuality: Difference or disorder? *Archives of Sexual Behavior, 38*(2), 172-172. doi:10.1007/s10508-008-9438-6

Dobs, A. S., Meikle, A. W., Arver, S., Sanders, S. W., Caramelli, K. E., & Mazer, N. A. (1999). Pharmacokinetics, efficacy, and safety of a permeation-enhanced testosterone transdermal system in comparison with bi-weekly injections of testosterone enanthate for the treatment of hypogonadal men. *Journal of Clinical Endocrinology & Metabolism, 84*(10), 3469-3478. doi:10.1210/jc.84.10.3469

Docter, R. F. (1988). *Transvestites and transsexuals: Toward a theory of cross-gender behavior.* New York: Plenum Press.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44*(1), 34-45. doi:10.1037/0012-1649.44.1.34

Exhibit 17-79

**The Standards of Care**
7TH VERSION

Ehrbar, R. D., & Gorton, R. N. (2010). Exploring provider treatment models in interpreting the standards of care. *International Journal of Transgenderism, 12*(4), 198-2010. doi:10.1080/15532739.2010.544235

Ekins, R., & King, D. (2006). *The transgender phenomenon.* Thousand Oaks, CA: SAGE Publications Ltd.

Eklund, P. L., Gooren, L. J., & Bezemer, P. D. (1988). Prevalence of transsexualism in the Netherlands. *British Journal of Psychiatry, 152*(5), 638-640.

Eldh, J., Berg, A., & Gustafsson, M. (1997). Long-term follow up after sex reassignment surgery. *Scandinavian Journal of Plastic and Reconstructive Surgery and Hand Surgery, 31*(1), 39-45.

Emerson, S., & Rosenfeld, C. (1996). Stages of adjustment in family members of transgender individuals. *Journal of Family Psychotherapy, 7*(3), 1-12. doi:10.1300/J085V07N03_01

Emory, L. E., Cole, C. M., Avery, E., Meyer, O., & Meyer III, W. J. (2003). Client's view of gender identity: Life, treatment status and outcome. *18th Biennial Harry Benjamin Symposium,* Gent, Belgium.

Ettner, R., Monstrey, S., & Eyler, A. (Eds.) (2007). *Principles of transgender medicine and surgery.* Binghamton, NY: The Haworth Press.

Eyler, A. E. (2007). Primary medical care of the gender-variant patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 15-32). Binghamton, NY: The Haworth Press.

Factor, R. J., & Rothblum, E. (2008). Exploring gender identity and community among three groups of transgender individuals in the United States: MTFs, FTMs, and genderqueers. *Health Sociology Review, 17*(3), 235-253.

Feinberg, L. (1996). *Transgender warriors: Making history from Joan of Arc to Dennis Rodman.* Boston, MA: Beacon Press.

Feldman, J. (2005, April). *Masculinizing hormone therapy with testosterone 1% topical gel.* Paper presented at the 19th Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, Bologna, Italy.

Feldman, J. (2007). Preventive care of the transgendered patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender surgery and medicine* (pp. 33-72). Binghamton, NY: The Haworth Press.

Feldman, J., & Goldberg, J. (2006). Transgender primary medical care. *International Journal of Transgenderism, 9*(3), 3-34. doi:10.1300/J485v09n03_02

Feldman, J., & Safer, J. (2009). Hormone therapy in adults: Suggested revisions to the sixth version of the standards of care. *International Journal of Transgenderism, 11*(3), 146-182. doi:10.1080/15532730903383757

**The Standards of Care**
7TH VERSION

Exhib Pt
17- 80

Fenichel, M., Suler, J., Barak, A., Zelvin, E., Jones, G., Munro, K., . . . Walker-Schmucker, W. (2004). *Myths and realities of online clinical work, observations on the phenomena of online behavior, experience, and therapeutic relationships. A 3rd-year report from ISMHO's clinical case study group*. Retrieved May 24, 2011, from https://www.ismho.org/myths_n_realities.asp

Fenway Community Health Transgender Health Program. (2007). *Protocol for hormone therapy*. Retrieved from http://www.fenwayhealth.org/site/DocServer/Fenway_Protocols.pdf?docID=2181

Fisk, N. M. (1974). Editorial: Gender dysphoria syndrome--the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. *Western Journal of Medicine, 120*(5), 386-391.

Fitzpatrick, L. A., Pace, C., & Wiita, B. (2000). Comparison of regimens containing oral micronized progesterone or medroxyprogesterone acetate on quality of life in postmenopausal women: A cross-sectional survey. *Journal of Women's Health & Gender-Based Medicine, 9*(4), 381-387.

Frank, J. D., & Frank, J. B. (1993). *Persuasion and healing: A comparative study of psychotherapy* (Third ed.). Baltimore, MD: Johns Hopkins University Press.

Fraser, L. (2009a). Depth psychotherapy with transgender people. *Sexual and Relationship Therapy, 24*(2), 126-142. doi:10.1080/14681990903003878

Fraser, L. (2009b). Etherapy: Ethical and clinical considerations for version 7 of The World Professional Association for Transgender Health's standards of care. *International Journal of Transgenderism, 11*(4), 247-263. doi:10.1080/15532730903439492

Fraser, L. (2009c). Psychotherapy in The World Professional Association for Transgender Health's standards of care: Background and recommendations. *International Journal of Transgenderism, 11*(2), 110-126. doi:10.1080/15532730903008057

Garaffa, G., Christopher, N. A., & Ralph, D. J. (2010). Total phallic reconstruction in female-to-male transsexuals. *European Urology, 57*(4), 715-722. doi:10.1016/j.eururo.2009.05.018

Gelder, M. G., & Marks, I. M. (1969). Aversion treatment in transvestism and transsexualism. In R. Green, & J. Money (Eds.), *Transsexualism and sex reassignment* (pp. 383-413). Baltimore, MD: Johns Hopkins Press.

Gelfer, M. P. (1999). Voice treatment for the male-to-female transgendered client. *American Journal of Speech-Language Pathology, 8*(3), 201-208.

Gharib, S., Bigby, J., Chapin, M., Ginsburg, E., Johnson, P., Manson, J., & Solomon, C. (2005). *Menopause: A guide to management*. Boston, MA: Brigham and Women's Hospital.

Exhibit 17-81

**The Standards of Care**
7TH VERSION

Gijs, L., & Brewaeys, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. *Annual Review of Sex Research, 18,* 178-224.

Gold, M., & MacNish, M. (2011). *Adjustment and resiliency following disclosure of transgender identity in families of adolescents and young adults: Themes and clinical implications.* Washington, DC: American Family Therapy Academy.

Gómez-Gil, E., Trilla, A., Salamero, M., Godás, T., & Valdés, M. (2009). Sociodemographic, clinical, and psychiatric characteristics of transsexuals from Spain. *Archives of Sexual Behavior, 38*(3), 378-392. doi:10.1007/s10508-007-9307-8

Gooren, L. (2005). Hormone treatment of the adult transsexual patient. *Hormone Research in Paediatrics, 64*(Suppl 2), 31-36. doi:10.1159/000087751

Gorton, R. N., Buth, J., & Spade, D. (2005). *Medical therapy and health maintenance for transgender men: A guide for health care providers.* San Francisco, CA: Lyon-Martin Women's Health Services.

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press.

Green, R., & Fleming, D. (1990). Transsexual surgery follow-up: Status in the 1990s. *Annual Review of Sex Research, 1*(1), 163-174.

Greenson, R. R. (1964). On homosexuality and gender identity. *International Journal of Psycho-Analysis, 45,* 217-219.

Grossman, A. H., D'Augelli, A. R., Howell, T. J., & Hubbard, S. (2006). Parent's reactions to transgender youth's gender nonconforming expression and identity. *Journal of Gay & Lesbian Social Services, 18*(1), 3-16. doi:10.1300/J041v18n01_02

Grossman, A. H., D'Augelli, A. R., & Salter, N. P. (2006). Male-to-female transgender youth: Gender expression milestones, gender atypicality, victimization, and parents' responses. *Journal of GLBT Family Studies, 2*(1), 71-92.

Grumbach, M. M., Hughes, I. A., & Conte, F. A. (2003). Disorders of sex differentiation. In P. R. Larsen, H. M. Kronenberg, S. Melmed & K. S. Polonsky (Eds.), *Williams textbook of endocrinology* (10th ed., pp. 842-1002). Philadelphia, PA: Saunders.

Hage, J. J., & De Graaf, F. H. (1993). Addressing the ideal requirements by free flap phalloplasty: Some reflections on refinements of technique. *Microsurgery, 14*(9), 592-598. doi:10.1002/micr.1920140910

Hage, J. J., & Karim, R. B. (2000). Ought GIDNOS get nought? Treatment options for nontranssexual gender dysphoria. *Plastic and Reconstructive Surgery, 105*(3), 1222-1227.

The Standards of Care
7TH VERSION

Exhibit 17-82

Hancock, A. B., Krissinger, J., & Owen, K. (2010). Voice perceptions and quality of life of transgender people. *Journal of Voice*. Advance online publication. doi:10.1016/j.jvoice.2010.07.013

Hastings, D. W. (1974). Postsurgical adjustment of male transsexual patients. *Clinics in Plastic Surgery, 1*(2), 335-344.

Hembree, W. C., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer III, W. J., Spack, N. P., . . . Montori, V. M. (2009). Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 94*(9), 3132-3154. doi:10.1210/jc.2009-0345

Hill, D. B., Menvielle, E., Sica, K. M., & Johnson, A. (2010). An affirmative intervention for families with gender-variant children: Parental ratings of child mental health and gender. *Journal of Sex and Marital Therapy, 36*(1), 6-23. doi:10.1080/00926230903375560

Hoebeke, P., Selvaggi, G., Ceulemans, P., De Cuypere, G. D., T'Sjoen, G., Weyers, S., . . . Monstrey, S. (2005). Impact of sex reassignment surgery on lower urinary tract function. *European Urology, 47*(3), 398-402. doi:10.1016/j.eururo.2004.10.008

Hoenig, J., & Kenna, J. C. (1974). The prevalence of transsexualism in England and Wales. *British Journal of Psychiatry, 124*(579), 181-190. doi:10.1192/bjp.124.2.181

Hughes, I. A., Houk, C. P., Ahmed, S. F., Lee, P. A., & LWPES1/ESPE2 Consensus Group. (2006). Consensus statement on management of intersex disorders. *Archives of Disease in Childhood, 91*(7), 554-563. doi:10.1136/adc.2006.098319

Hunter, M. H., & Sterrett, J. J. (2000). Polycystic ovary syndrome: It's not just infertility. *American Family Physician, 62*(5), 1079-1095.

Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding.* Washington, DC: The National Academies Press.

Jackson, P. A., & Sullivan, G. (Eds.). (1999). *Lady boys, tom boys, rent boys: Male and female homosexualities in contemporary Thailand.* Binghamton, NY: The Haworth Press.

Jockenhövel, F. (2004). Testosterone therapy-what, when and to whom? *The Aging Male, 7*(4), 319-324. doi:10.1080/13685530400016557

Johansson, A., Sundbom, E., Höjerback, T., & Bodlund, O. (2010). A five-year follow-up study of Swedish adults with gender identity disorder. *Archives of Sexual Behavior, 39*(6), 1429-1437. doi:10.1007/s10508-009-9551-1

213

Exhibit 17-83

**The Standards of Care**
7TH VERSION

Joint LWPES/ESPE CAH Working Group, Clayton, P. E., Miller, W. L., Oberfield, S. E., Ritzen, E. M., Sippell, W. G., & Speiser, P. W. (2002). Consensus statement on 21-hydroxylase deficiency from the Lawson Wilkins Pediatric Endocrine Society and the European Society for Pediatric Endocrinology. *Journal of Clinical Endocrinology & Metabolism, 87*(9), 4048-4053. doi:10.1210/jc.2002-020611

Jurgensen, M., Hiort, O., Holterhus, P. M., & Thyen, U. (2007). Gender role behavior in children with XY karyotype and disorders of sex development. *Hormones and Behavior, 51*(3), 443-453. doi:0.1016/j.yhbeh.2007.01.001

Kanagalingam, J., Georgalas, C., Wood, G. R., Ahluwalia, S., Sandhu, G., & Cheesman, A. D. (2005). Cricothyroid approximation and subluxation in 21 male-to-female transsexuals. *The Laryngoscope, 115*(4), 611-618. doi:10.1097/01.mlg.0000161357.12826.33

Kanhai, R. C. J., Hage, J. J., Karim, R. B., & Mulder, J. W. (1999). Exceptional presenting conditions and outcome of augmentation mammaplasty in male-to-female transsexuals. *Annals of Plastic Surgery, 43*(5), 476-483.

Kimberly, S. (1997). I am transsexual - hear me roar. *Minnesota Law & Politics, June,* 21-49.

Klein, C., & Gorzalka, B. B. (2009). Sexual functioning in transsexuals following hormone therapy and genital surgery: A review (CME). *The Journal of Sexual Medicine, 6*(11), 2922-2939. doi:10.1111/j.1743-6109.2009.01370.x

Knudson, G., De Cuypere, G., & Bockting, W. (2010a). Process toward consensus on recommendations for revision of the DSM diagnoses of gender identity disorders by The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 54-59. doi:10.1080/15532739.2010.509213

Knudson, G., De Cuypere, G., & Bockting, W. (2010b). Recommendations for revision of the DSM diagnoses of gender identity disorders: Consensus statement of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 115-118. doi:10.1080/15532739.2010.509215

Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92-12820-MLW (U.S. Federal District Court, Boston, MA, 2002).

Krege, S., Bex, A., Lümmen, G., & Rübben, H. (2001). Male-to-female transsexualism: A technique, results and long-term follow-up in 66 patients. *British Journal of Urology, 88*(4), 396-402. doi:10.1046/j.1464-410X.2001.02323.x

**The Standards of Care**
7TH VERSION

Exhibit 17 - 84

Kuhn, A., Bodmer, C., Stadlmayr, W., Kuhn, P., Mueller, M. D., & Birkhäuser, M. (2009). Quality of life 15 years after sex reassignment surgery for transsexualism. *Fertility and Sterility, 92*(5), 1685-1689. doi:10.1016/j.fertnstert.2008.08.126

Kuhn, A., Hiltebrand, R., & Birkhauser, M. (2007). Do transsexuals have micturition disorders? *European Journal of Obstetrics & Gynecology and Reproductive Biology, 131*(2), 226-230. doi:10.1016/j.ejogrb.2006.03.019

Landén, M., Wålinder, J., & Lundström, B. (1998). Clinical characteristics of a total cohort of female and male applicants for sex reassignment: A descriptive study. *Acta Psychiatrica Scandinavica, 97*(3), 189-194. doi:10.1111/j.1600-0447.1998.tb09986.x

Lawrence, A. A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 32*(4), 299-315. doi:10.1023/A:1024086814364

Lawrence, A. A. (2006). Patient-reported complications and functional outcomes of male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 35*(6), 717-727. doi:10.1007/s10508-006-9104-9

Lev, A. I. (2004). *Transgender emergence: Therapeutic guidelines for working with gender-variant people and their families.* Binghamton, NY: Haworth Clinical Practice Press.

Lev, A. I. (2009). The ten tasks of the mental health provider: Recommendations for revision of The World Professional Association for Transgender Health's standards of care. *International Journal of Transgenderism, 11*(2), 74-99. doi:10.1080/15532730903008032

Levy, A., Crown, A., & Reid, R. (2003). Endocrine intervention for transsexuals. *Clinical Endocrinology, 59*(4), 409-418. doi:10.1046/j.1365-2265.2003.01821.x

MacLaughlin, D. T., & Donahoe, P. K. (2004). Sex determination and differentiation. *New England Journal of Medicine, 350*(4), 367-378.

Maheu, M. M., Pulier, M. L., Wilhelm, F. H., McMenamin, J. P., & Brown-Connolly, N. E. (2005). *The mental health professional and the new technologies: A handbook for practice today.* Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Malpas, J. (in press). Between pink and blue: A multi-dimensional family approach to gender nonconforming chldren and their families. *Family Process.*

Mazur, T. (2005). Gender dysphoria and gender change in androgen insensitivity or micropenis. *Archives of Sexual Behavior, 34*(4), 411-421. doi:10.1007/s10508-005-4341-x

McNeill, E. J. M. (2006). Management of the transgender voice. *The Journal of Laryngology & Otology, 120*(07), 521-523. doi:10.1017/S0022215106001174

Exhibit 17 - 85      **The Standards of Care**
7TH VERSION

McNeill, E. J. M., Wilson, J. A., Clark, S., & Deakin, J. (2008). Perception of voice in the transgender client. *Journal of Voice, 22*(6), 727-733. doi:10.1016/j.jvoice.2006.12.010

Menvielle, E. J., & Tuerk, C. (2002). A support group for parents of gender-nonconforming boys. *Journal of the American Academy of Child & Adolescent Psychiatry, 41*(8), 1010-1013. doi:10.1097/00004583-200208000-00021

Meyer, I. H. (2003). Prejudice as stress: Conceptual and measurement problems. *American Journal of Public Health, 93*(2), 262-265.

Meyer, J. K., & Reter, D. J. (1979). Sex reassignment: Follow-up. *Archives of General Psychiatry, 36*(9), 1010-1015.

Meyer III, W. J. (2009). World Professional Association for Transgender Health's standards of care requirements of hormone therapy for adults with gender identity disorder. *International Journal of Transgenderism, 11*(2), 127-132. doi:10.1080/15532730903008065

Meyer III, W. J., Webb, A., Stuart, C. A., Finkelstein, J. W., Lawrence, B., & Walker, P. A. (1986). Physical and hormonal evaluation of transsexual patients: A longitudinal study. *Archives of Sexual Behavior, 15*(2), 121-138. doi:10.1007/BF01542220

Meyer-Bahlburg, H. F. L. (2002). Gender assignment and reassignment in intersexuality: Controversies, data, and guidelines for research. *Advances in Experimental Medicine and Biology, 511*, 199-223. doi:10.1007/978-1-4615-0621-8_12

Meyer-Bahlburg, H. F. L. (2005). Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. *Archives of Sexual Behavior, 34*(4), 423-438. doi:10.1007/s10508-005-4342-9

Meyer-Bahlburg, H. F. L. (2008). Treatment guidelines for children with disorders of sex development. *Neuropsychiatrie De l'Enfance Et De l'Adolescence, 56*(6), 345-349. doi:10.1016/j.neurenf.2008.06.002

Meyer-Bahlburg, H. F. L. (2009). Variants of gender differentiation in somatic disorders of sex development. *International Journal of Transgenderism, 11*(4), 226-237. doi:10.1080/15532730903439476

Meyer-Bahlburg, H. F. L. (2010). From mental disorder to iatrogenic hypogonadism: Dilemmas in conceptualizing gender identity variants as psychiatric conditions. *Archives of Sexual Behavior, 39*(2), 461-476. doi:10.1007/s10508-009-9532-4

Meyer-Bahlburg, H. F. L. (in press). Gender monitoring and gender reassignment of children and adolescents with a somatic disorder of sex development. *Child & Adolescent Psychiatric Clinics of North America*.

The Standards of Care
7TH VERSION

Exhibit 17-86

Meyer-Bahlburg, H. F. L., & Blizzard, R. M. (2004). Conference proceedings: Research on intersex: Summary of a planning workshop. *The Endocrinologist, 14*(2), 59-69. doi:10.1097/01.ten.0000123701.61007.4e

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Carlson, A. D., Obeid, J. S., & New, M. I. (2004). Prenatal androgenization affects gender-related behavior but not gender identity in 5–12-year-old girls with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 33*(2), 97-104. doi:10.1023/B:ASEB.0000014324.25718.51

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Ehrhardt, A. A., & New, M. I. (2006). Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Archives of Sexual Behavior, 35*(6), 667-684. doi:10.1007/s10508-006-9068-9

Meyer-Bahlburg, H. F. L., Migeon, C. J., Berkovitz, G. D., Gearhart, J. P., Dolezal, C., & Wisniewski, A. B. (2004). Attitudes of adult 46,XY intersex persons to clinical management policies. *The Journal of Urology, 171*(4), 1615-1619. doi:10.1097/01.ju.0000117761.94734.b7

Money, J., & Ehrhardt, A. A. (1972). *Man and woman, boy and girl.* Baltimore, MD: The Johns Hopkins University Press.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*(1), 29-41. doi:10.1093/jpepsy/4.1.29

Monstrey, S., Hoebeke, P., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Blondeel, P., . . . De Cuypere, G. (2009). Penile reconstruction: Is the radial forearm flap really the standard technique? *Plastic and Reconstructive Surgery, 124*(2), 510-518.

Monstrey, S., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Bowman, C., Blondeel, P., . . . De Cuypere, G. (2008). Chest-wall contouring surgery in female-to-male transsexuals: A new algorithm. *Plastic and Reconstructive Surgery, 121*(3), 849-859. doi:10.1097/01.prs.0000299921.15447.b2

Moore, E., Wisniewski, A., & Dobs, A. (2003). Endocrine treatment of transsexual people: A review of treatment regimens, outcomes, and adverse effects. *Journal of Clinical Endocrinology & Metabolism, 88*(8), 3467-3473. doi:10.1210/jc.2002-021967

More, S. D. (1998). The pregnant man-an oxymoron? *Journal of Gender Studies, 7*(3), 319-328. doi:10.1080/09589236.1998.9960725

Mount, K. H., & Salmon, S. J. (1988). Changing the vocal characteristics of a postoperative transsexual patient: A longitudinal study. *Journal of Communication Disorders, 21*(3), 229-238. doi:10.1016/0021-9924(88)90031-7

Exhibit 17-87

The Standards of Care
7TH VERSION

Mueller, A., Kiesewetter, F., Binder, H.,
Beckmann, M. W., & Dittrich, R. (2007).
Long-term administration of testosterone
undecanoate every 3 months for
testosterone supplementation in female-
to-male transsexuals. *Journal of Clinical
Endocrinology & Metabolism, 92*(9), 3470-
3475. doi:10.1210/jc.2007-0746

Murad, M. H., Elamin, M. B., Garcia, M. Z.,
Mullan, R. J., Murad, A., Erwin, P. J., &
Montori, V. M. (2010). Hormonal therapy
and sex reassignment: A systematic
review and meta-analysis of quality of
life and psychosocial outcomes. *Clinical
Endocrinology, 72*(2), 214-231. doi:10.1111/
j.1365-2265.2009.03625.x

Nanda, S. (1998). *Neither man nor woman:
The hijras of India*. Belmont, CA: Wadsworth
Publishing.

Nestle, J., Wilchins, R. A., & Howell, C.
(2002). *Genderqueer: Voices from beyond
the sexual binary*. Los Angeles, CA: Alyson
Publications.

Neumann, K., & Welzel, C. (2004). The
importance of voice in male-to-female
transsexualism. *Journal of Voice, 18*(1), 153-
167.

Newfield, E., Hart, S., Dibble, S., & Kohler, L.
(2006). Female-to-male transgender quality
of life. *Quality of Life Research, 15*(9), 1447-
1457. doi:10.1007/s11136-006-0002-3

Nieschlag, E., Behre, H. M., Bouchard, P.,
Corrales, J. J., Jones, T. H., Stalla, G. K.,
. . . Wu, F. C. W. (2004). Testosterone
replacement therapy: Current trends and
future directions. *Human Reproduction
Update, 10*(5), 409-419. doi:10.1093/
humupd/dmh035

North American Menopause Society.
(2010). Estrogen and progestogen use in
postmenopausal women: 2010 position
statement. *Menopause, 17*(2), 242-255.
doi:10.1097/gme.0b013e3181d0f6b9

Nuttbrock, L., Hwahng, S., Bockting, W.,
Rosenblum, A., Mason, M., Macri, M.,
& Becker, J. (2010). Psychiatric impact of
gender-related abuse across the life course
of male-to-female transgender persons.
*Journal of Sex Research, 47*(1), 12-23.
doi:10.1080/00224490903062258

Oates, J. M., & Dacakis, G. (1983).
Speech pathology considerations in the
management of transsexualism-a review.
*International Journal of Language &
Communication Disorders, 18*(3), 139-151.
doi:10.3109/13682828309012237

Olyslager, F., & Conway, L. (2007). On
the calculation of the prevalence of
transsexualism. Paper presented at
the *World Professional Association for
Transgender Health 20th International
Symposium*, Chicago, Illinois. Retrieved
April 22, 2010 from http://www.
changelingaspects.com/PDF/2007-09-06-
Prevalence_of_Transsexualism.pdf

The Standards of Care
7TH VERSION

Exhibit 17-88

Oriel, K. A. (2000). Clinical update: Medical care of transsexual patients. *Journal of the Gay and Lesbian Medical Association, 4*(4), 185-194. doi:1090-7173/00/1200-0185$18.00/1

Pauly, I. B. (1965). Male psychosexual inversion: Transsexualism: A review of 100 cases. *Archives of General Psychiatry, 13*(2), 172-181.

Payer, A. F., Meyer III, W. J., & Walker, P. A. (1979). The ultrastructural response of human leydig cells to exogenous estrogens. *Andrologia, 11*(6), 423-436. doi:10.1111/j.1439-0272.1979.tb02232.x

Peletz, M. G. (2006). Transgenderism and gender pluralism in southeast asia since early modern times. *Current Anthropology, 47*(2), 309-340. doi:10.1086/498947

Pfäfflin, F. (1993). Regrets after sex reassignment surgery. *Journal of Psychology & Human Sexuality, 5*(4), 69-85.

Pfäfflin, F., & Junge, A. (1998). Sex reassignment. Thirty years of international follow-up studies after sex reassignment surgery: A comprehensive review, 1961-1991. *International Journal of Transgenderism.* Retrieved from http://web.archive.org/web/20070503090247/http://www.symposion.com/ijt/pfaefflin/1000.htm

*Physicians' desk reference.* (61st ed.). (2007). Montvale, NJ: PDR.

*Physicians' desk reference.* (65th ed.). (2010). Montvale, NJ: PDR.

Pleak, R. R. (1999). Ethical issues in diagnosing and treating gender-dysphoric children and adolescents. In M. Rottnek (Ed.), *Sissies and tomboys: Gender noncomformity and homosexual childhood* (pp. 34-51). New York: New York University Press.

Pope, K. S., & Vasquez, M. J. (2011). *Ethics in psychotherapy and counseling: A practical guide* (Fourth ed.). Hoboken, NJ: John Wiley & Sons, Inc.

Prior, J. C., Vigna, Y. M., & Watson, D. (1989). Spironolactone with physiological female steroids for presurgical therapy of male-to-female transsexualism. *Archives of Sexual Behavior, 18*(1), 49-57. doi:10.1007/BF01579291

Prior, J. C., Vigna, Y. M., Watson, D., Diewold, P., & Robinow, O. (1986). Spironolactone in the presurgical therapy of male to female transsexuals: Philosophy and experience of the Vancouver Gender Dysphoria Clinic. *Journal of Sex Information & Education Council of Canada, 1*, 1-7.

Rachlin, K. (1999). Factors which influence individual's decisions when considering female-to-male genital reconstructive surgery. *International Journal of Transgenderism, 3*(3). Retrieved from http://www.WPATH.org

Exhibit 17-89

Rachlin, K. (2002). Transgendered individuals' experiences of psychotherapy. *International Journal of Transgenderism, 6*(1). Retrieved from http://www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97-03/numbers/symposion/ijtvo06no01_03.htm.

Rachlin, K., Green, J., & Lombardi, E. (2008). Utilization of health care among female-to-male transgender individuals in the United States. *Journal of Homosexuality, 54*(3), 243-258. doi:10.1080/00918360801982124

Rachlin, K., Hansbury, G., & Pardo, S. T. (2010). Hysterectomy and oophorectomy experiences of female-to-male transgender individuals. *International Journal of Transgenderism, 12*(3), 155-166. doi:10.1080/15532739.2010.514220

Reed, B., Rhodes, S., Schofield, P. & Wylie, K. (2009). *Gender variance in the UK: Prevalence, incidence, growth and geographic distribution.* Retrieved June 8, 2011, from http://www.gires.org.uk/assets/Medpro-Assets/GenderVarianceUK-report.pdf

Rehman, J., Lazer, S., Benet, A. E., Schaefer, L. C., & Melman, A. (1999). The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. *Archives of Sexual Behavior, 28*(1), 71-89. doi:10.1023/A:1018745706354

Robinow, O. (2009). Paraphilia and transgenderism: A connection with Asperger's disorder? *Sexual and Relationship Therapy, 24*(2), 143-151. doi:10.1080/14681990902951358

Rosenberg, M. (2002). Children with gender identity issues and their parents in individual and group treatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 41*(5), 619-621. doi:10.1097/00004583-200205000-00020

Rossouw, J. E., Anderson, G. L., Prentice, R. L., LaCroix, A. Z., Kooperberg, C., Stefanick, M. L., . . . Johnson, K. C. (2002). Risks and benefits of estrogen plus progestin in healthy postmenopausal women: Principal results from the women's health initiative randomized controlled trial. *JAMA: The Journal of the American Medical Association, 288*(3), 321-333.

Royal College of Speech Therapists, United Kingdom. http://www.rcslt.org/

Ruble, D. N., Martin, C. L., & Berenbaum, S. A. (2006). Gender development. In N. Eisenberg, W. Damon & R. M. Lerner (Eds.), *Handbook of child psychology* (6th ed., pp. 858-932). Hoboken, NJ: John Wiley & Sons, Inc.

Sausa, L. A. (2005). Translating research into practice: Trans youth recommendations for improving school systems. *Journal of Gay & Lesbian Issues in Education, 3*(1), 15-28. doi:10.1300/J367v03n01_04

Simpson, J. L., de la Cruz, F., Swerdloff, R. S., Samango-Sprouse, C., Skakkebaek, N. E., Graham, J. M. J., . . . Willard, H. F. (2003). Klinefelter syndrome: Expanding the phenotype and identifying new research directions. *Genetics in Medicine, 5*(6), 460-468. doi:10.1097/01.GIM.0000095626.54201.D0

The Standards of Care
7TH VERSION

$E \times hibit \ 17-90$

Smith, Y. L. S., Van Goozen, S. H. M., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine, 35*(1), 89-99. doi:10.1017/S0033291704002776

Sood, R., Shuster, L., Smith, R., Vincent, A., & Jatoi, A. (2011). Counseling postmenopausal women about bioidentical hormones: Ten discussion points for practicing physicians. *Journal of the American Board of Family Practice, 24*(2), 202-210. doi:10.3122/jabfm.2011.02.100194

Speech Pathology Australia. http://www.speechpathologyaustralia.org.au/

Speiser, P. W., Azziz, R., Baskin, L. S., Ghizzoni, L., Hensle, T. W., Merke, D. P., . . . Oberfield, S. E. (2010). Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An endocrine society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 95*(9), 4133-4160. doi:10.1210/jc.2009-2631

Steensma, T. D., Biemond, R., de Boer, F., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry.* Advance online publication. doi:10.1177/1359104510378303

Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Gender transitioning before puberty? *Archives of Sexual Behavior, 40*(4), 649-650. doi:10.1007/s10508-011-9752-2

Stikkelbroeck, N. M. M. L., Beerendonk, C., Willemsen, W. N. P., Schreuders-Bais, C. A., Feitz, W. F. J., Rieu, P. N. M. A., . . . Otten, B. J. (2003). The long term outcome of feminizing genital surgery for congenital adrenal hyperplasia: Anatomical, functional and cosmetic outcomes, psychosexual development, and satisfaction in adult female patients. *Journal of Pediatric and Adolescent Gynecology, 16*(5), 289-296. doi:10.1016/S1083-3188(03)00155-4

Stoller, R. J. (1964). A contribution to the study of gender identity. *International Journal of Psychoanalysis, 45*, 220-226.

Stone, S. (1991). The empire strikes back: A posttransexual manifesto. In J. Epstein, & K. Straub (Eds.), *Body guards: The cultural politics of gender ambiguity* (pp. 280-304). London: Routledge.

Tangpricha, V., Ducharme, S. H., Barber, T. W., & Chipkin, S. R. (2003). Endocrinologic treatment of gender identity disorders. *Endocrine Practice, 9*(1), 12-21.

Tangpricha, V., Turner, A., Malabanan, A., & Holick, M. (2001). Effects of testosterone therapy on bone mineral density in the FTM patient. *International Journal of Transgenderism, 5*(4).

Taywaditep, K. J., Coleman, E., & Dumronggittigule, P. (1997). Thailand (muang thai). In R. Francouer (Ed.), *International encyclopedia of sexuality*. New York: Continuum.

Exhibit 17-91

**The Standards of Care**
7TH VERSION

The World Professional Association for Transgender Health, Inc. (2008). *WPATH clarification on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A.* Retrieved from http://www.wpath.org/documents/Med%20Nec%20on%202008%20Letterhead.pdf

Thole, Z., Manso, G., Salgueiro, E., Revuelta, P., & Hidalgo, A. (2004). Hepatotoxicity induced by antiandrogens: A review of the literature. *Urologia Internationalis, 73*(4), 289-295. doi:10.1159/000081585

Tom Waddell Health Center. (2006). *Protocols for hormonal reassignment of gender.* Retrieved from http://www.sfdph.org/dph/comupg/oservices/medSvs/hlthCtrs/TransGendprotocols122006.pdf

Tsoi, W. F. (1988). The prevalence of transsexualism in Singapore. *Acta Psychiatrica Scandinavica, 78*(4), 501-504. doi:10.1111/j.1600-0447.1988.tb06373.x

Van den Broecke, R., Van der Elst, J., Liu, J., Hovatta, O., & Dhont, M. (2001). The female-to-male transsexual patient: A source of human ovarian cortical tissue for experimental use. *Human Reproduction, 16*(1), 145-147. doi:10.1093/humrep/16.1.145

van Kesteren, P. J. M., Asscheman, H., Megens, J. A. J., & Gooren, L. J. G. (1997). Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clinical Endocrinology, 47*(3), 337-343. doi:10.1046/j.1365-2265.1997.2601068.x

van Kesteren, P. J. M., Gooren, L. J., & Megens, J. A. (1996). An epidemiological and demographic study of transsexuals in the Netherlands. *Archives of Sexual Behavior, 25*(6), 589-600. doi:10.1007/BF02437841

van Trotsenburg, M. A. A. (2009). Gynecological aspects of transgender healthcare. *International Journal of Transgenderism, 11*(4), 238-246. doi:10.1080/15532730903439484

Vancouver Coastal Health, Vancouver, British Columbia, Canada. http://www.vch.ca/

Vanderburgh, R. (2009). Appropriate therapeutic care for families with pre-pubescent transgender/gender-dissonant children. *Child and Adolescent Social Work Journal, 26*(2), 135-154. doi:10.1007/s10560-008-0158-5

Vilain, E. (2000). Genetics of sexual development. *Annual Review of Sex Research, 11*, 1-25.

Wålinder, J. (1968). Transsexualism: Definition, prevalence and sex distribution. *Acta Psychiatrica Scandinavica, 43*(S203), 255-257.

Wålinder, J. (1971). Incidence and sex ratio of transsexualism in Sweden. *The British Journal of Psychiatry, 119*(549), 195-196.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*(12), 1413-1423. doi:10.1097/CHI.0b013e31818956b9

**The Standards of Care**
7TH VERSION

Exhibit 17-92

Wallien, M. S. C., Swaab, H., & Cohen-
Kettenis, P. T. (2007). Psychiatric
comorbidity among children with gender
identity disorder. *Journal of the American
Academy of Child & Adolescent Psychiatry,
46*(10), 1307-1314. doi:10.1097/
chi.0b013e3181373848

Warren, B. E. (1993). Transsexuality, identity
and empowerment. A view from the
frontlines. *SIECUS Report, February/March,*
14-16.

Weitze, C., & Osburg, S. (1996).
Transsexualism in Germany: Empirical data
on epidemiology and application of the
German Transsexuals' Act during its first
ten years. *Archives of Sexual Behavior, 25*(4),
409-425.

Wilson, J. D. (1999). The role of androgens
in male gender role behavior. *Endocrine
Reviews, 20*(5), 726-737. doi:10.1210/
er.20.5.726

Winter, S. (2009). Cultural considerations
for The World Professional Association
for Transgender Health's standards of
care: The Asian perspective. *International
Journal of Transgenderism, 11*(1), 19-41.
doi:10.1080/15532730902799938

Winter, S., Chalungsooth, P., Teh, Y. K.,
Rojanalert, N., Maneerat, K., Wong, Y. W.,
. . . Macapagal, R. A. (2009). Transpeople,
transprejudice and pathologization: A seven-
country factor analytic study. *International
Journal of Sexual Health, 21*(2), 96-118.
doi:10.1080/19317610902922537

Wisniewski, A. B., Migeon, C. J., Malouf, M.
A., & Gearhart, J. P. (2004). Psychosexual
outcome in women affected by congenital
adrenal hyperplasia due to 21-hydroxylase
deficiency. *The Journal of Urology, 171*(6,
Part 1), 2497-2501. doi:10.1097/01.
ju.0000125269.91938.f7

World Health Organization. (2007).
*International classification of diseases and
related health problems-10th revision.*
Geneva, Switzerland: World Health
Organization.

World Health Organization. (2008). *The world
health report 2008: Primary health care - now
more than ever.* Geneva, Switzerland: World
Health Organization.

WPATH Board of Directors. (2010). *De-
psychopathologisation statement released
May 26, 2010.* Retrieved from http://
wpath.org/announcements_detail.cfm?pk_
announcement=17

Xavier, J. M. (2000). *The Washington, D.C.
transgender needs assessment survey: Final
report for phase two.* Washington, DC:
Administration for HIV/AIDS of District of
Columbia Government.

Zhang, G., Gu, Y., Wang, X., Cui, Y., &
Bremner, W. J. (1999). A clinical trial of
injectable testosterone undecanoate
as a potential male contraceptive in
normal Chinese men. *Journal of Clinical
Endocrinology & Metabolism, 84*(10), 3642-
3647. doi:10.1210/jc.84.10.3642

Exhibit 17-93

**The Standards of Care**
7TH VERSION

Zitzmann, M., Saad, F., & Nieschlag, E. (2006, April). *Long term experience of more than 8 years with a novel formulation of testosterone undecanoate (nebido) in substitution therapy of hypogonadal men.* Paper presented at European Congress of Endocrinology, Glasgow, UK, April 2006.

Zucker, K. J. (1999). Intersexuality and gender identity differentiation. *Annual Review of Sex Research, 10*(1), 1-69.

Zucker, K. J. (2004). Gender identity development and issues. *Child and Adolescent Psychiatric Clinics of North America, 13*(3), 551-568. doi:10.1016/j.chc.2004.02.006

Zucker, K. J. (2006). 'I'm half-boy, half-girl": Play psychotherapy and parent counseling for gender identity disorder. In R. L. Spitzer, M. B. First, J. B. W. Williams & M. Gibbons (Eds.), *DSM-IV-TR casebook, volume 2* (pp. 321-334). Arlington, VA: American Psychiatric Publishing, Inc.

Zucker, K. J. (2010). The DSM diagnostic criteria for gender identity disorder in children. *Archives of Sexual Behavior, 39*(2), 477-498. doi:10.1007/s10508-009-9540-4

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., & Cantor, J. M. (2008). Is gender identity disorder in adolescents coming out of the closet? *Journal of Sex & Marital Therapy, 34*(4), 287-290. doi:10.1080/00926230802096192

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (in press). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy.*

Zucker, K. J., & Lawrence, A. A. (2009). Epidemiology of gender identity disorder: Recommendations for the standards of care of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 11*(1), 8-18. doi:10.1080/15532730902799946

Zucker, K. J., Owen, A., Bradley, S. J., & Ameeriar, L. (2002). Gender-dysphoric children and adolescents: A comparative analysis of demographic characteristics and behavioral problems. *Clinical Child Psychology and Psychiatry, 7*(3), 398-411.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172*(2), 90-97.

*Exhibit
17-95* (handwritten)

**The Standards of Care**
7TH VERSION

# APPENDIX A
## GLOSSARY

Terminology in the area of health care for transsexual, transgender, and gender nonconforming people is rapidly evolving; new terms are being introduced, and the definitions of existing terms are changing. Thus, there is often misunderstanding, debate, or disagreement about language in this field. Terms that may be unfamiliar or that have specific meanings in the SOC are defined below for the purpose of this document only. Others may adopt these definitions, but WPATH acknowledges that these terms may be defined differently in different cultures, communities, and contexts.

WPATH also acknowledges that many terms used in relation to this population are not ideal. For example, the terms *transsexual* and *transvestite* – and, some would argue, the more recent term *transgender* – have been applied to people in an objectifying fashion. Yet such terms have been more or less adopted by many people who are making their best effort to make themselves understood. By continuing to use these terms, WPATH intends only to ensure that concepts and processes are comprehensible, in order to facilitate the delivery of quality health care to transsexual, transgender, and gender nonconforming people. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

**Bioidentical hormones**: Hormones that are *structurally* identical to those found in the human body (ACOG Committee of Gynecologic Practice, 2005). The hormones used in bioidentical hormone therapy (BHT) are generally derived from plant sources and are structurally similar to endogenous human hormones, but they need to be commercially processed to become bioidentical.

**Bioidentical compounded hormone therapy (BCHT)**: Use of hormones that are prepared, mixed, assembled, packaged, or labeled as a drug by a pharmacist and custom-made for a patient according to a physician's specifications. Government drug agency approval is not possible for each compounded product made for an individual consumer.

**Crossdressing (transvestism)**: Wearing clothing and adopting a gender role presentation that, in a given culture, is more typical of the other sex.

**Disorders of sex development (DSD)**: Congenital conditions in which the development of chromosomal, gonadal, or anatomic sex is atypical. Some people strongly object to the "disorder" label and instead view these conditions as a matter of diversity (Diamond, 2009), preferring the terms *intersex* and *intersexuality*.

**The Standards of Care**
7TH VERSION

Exhibit 17-96

**Female-to-Male (FtM):** Adjective to describe individuals assigned female at birth who are changing or who have changed their body and/or gender role from birth-assigned female to a more masculine body or role.

**Gender dysphoria:** Distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

**Gender identity:** A person's intrinsic sense of being male (a boy or a man), female (a girl or woman), or an alternative gender (e.g., boygirl, girlboy, transgender, genderqueer, eunuch) (Bockting, 1999; Stoller, 1964).

**Gender identity disorder:** Formal diagnosis set forth by the *Diagnostic Statistical Manual of Mental Disorders, 4th Edition, Text Rev (DSM IV-TR)* (American Psychiatric Association, 2000). Gender identity disorder is characterized by a strong and persistent cross-gender identification and a persistent discomfort with one's sex or sense of inappropriateness in the gender role of that sex, causing clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Gender nonconforming:** Adjective to describe individuals whose gender identity, role, or expression differs from what is normative for their assigned sex in a given culture and historical period.

**Gender role or expression:** Characteristics in personality, appearance, and behavior that in a given culture and historical period are designated as masculine or feminine (that is, more typical of the male or female social role) (Ruble, Martin, & Berenbaum, 2006). While most individuals present socially in clearly male or female gender roles, some people present in an alternative gender role such as genderqueer or specifically transgender. All people tend to incorporate both masculine and feminine characteristics in their gender expression in varying ways and to varying degrees (Bockting, 2008).

**Genderqueer:** Identity label that may be used by individuals whose gender identity and/or role does not conform to a binary understanding of gender as limited to the categories of man or woman, male or female (Bockting, 2008).

**Male-to-Female (MtF):** Adjective to describe individuals assigned male at birth who are changing or who have changed their body and/or gender role from birth-assigned male to a more feminine body or role.

**Natural hormones:** Hormones that are derived from natural *sources* such as plants or animals. Natural hormones may or may not be bioidentical.

**Sex:** Sex is assigned at birth as male or female, usually based on the appearance of the external genitalia. When the external genitalia are ambiguous, other components of sex (internal genitalia, chromosomal and hormonal sex) are considered in order to assign sex (Grumbach, Hughes, & Conte,

World Professional Association for Transgender Health

Exhibit 17-97

**The Standards of Care**
7TH VERSION

2003; MacLaughlin & Donahoe, 2004; Money & Ehrhardt, 1972; Vilain, 2000). For most people, gender identity and expression are consistent with their sex assigned at birth; for transsexual, transgender, and gender nonconforming individuals, gender identity or expression differ from their sex assigned at birth.

**Sex reassignment surgery (gender affirmation surgery):** Surgery to change primary and/or secondary sex characteristics to affirm a person's gender identity. Sex reassignment surgery can be an important part of medically necessary treatment to alleviate gender dysphoria.

**Transgender:** Adjective to describe a diverse group of individuals who cross or transcend culturally-defined categories of gender. The gender identity of transgender people differs to varying degrees from the sex they were assigned at birth (Bockting, 1999).

**Transition:** Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role. For many people, this involves learning how to live socially in "the other" gender role; for others this means finding a gender role and expression that is most comfortable for them. Transition may or may not include feminization or masculinization of the body through hormones or other medical procedures. The nature and duration of transition is variable and individualized.

**Transphobia, internalized:** Discomfort with one's own transgender feelings or identity as a result of internalizing society's normative gender expectations.

**Transsexual:** Adjective (often applied by the medical profession) to describe individuals who seek to change or who have changed their primary and/or secondary sex characteristics through femininizing or masculinizing medical interventions (hormones and/or surgery), typically accompanied by a permanent change in gender role.

# APPENDIX B
## OVERVIEW OF MEDICAL RISKS OF HORMONE THERAPY

The risks outlined below are based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (e.g., Dahl et al., 2006; Ettner et al., 2007).

**The Standards of Care**
7TH VERSION

Exhibit   17-98

# Risks of Feminizing Hormone Therapy (MtF)

**Likely increased risk:**

## Venous thromboembolic disease

- Estrogen use increases the risk of venous thromboembolic events (VTE), particularly in patients who are over age 40, smokers, highly sedentary, obese, and who have underlying thrombophilic disorders.

- This risk is increased with the additional use of third generation progestins.

- This risk is decreased with use of the transdermal route of estradiol administration, which is recommended for patients at higher risk of VTE.

## Cardiovascular, cerebrovascular disease

- Estrogen use increases the risk of cardiovascular events in patients over age 50 with underlying cardiovascular risk factors. Additional progestin use may increase this risk.

## Lipids

- Oral estrogen use may markedly increase triglycerides in patients, increasing the risk of pancreatitis and cardiovascular events.

- Different routes of administration will have different metabolic effects on levels of HDL cholesterol, LDL cholesterol and lipoprotein(a).

- In general, clinical evidence suggests that MtF patients with pre-existing lipid disorders may benefit from the use of transdermal rather than oral estrogen.

## Liver/gallbladder

- Estrogen and cyproterone acetate use may be associated with transient liver enzyme elevations and, rarely, clinical hepatotoxicity.

- Estrogen use increases the risk of cholelithiasis (gall stones) and subsequent cholecystectomy.

Exhibit 17-99

**The Standards of Care**
7TH VERSION

**Possible increased risk:**

Type 2 diabetes mellitus

- Feminizing hormone therapy, particularly estrogen, may increase the risk of type 2 diabetes, particularly among patients with a family history of diabetes or other risk factors for this disease.

Hypertension

- Estrogen use may increase blood pressure, but the effect on incidence of overt hypertension is unknown.

- Spironolactone reduces blood pressure and is recommended for at-risk or hypertensive patients desiring feminization.

Prolactinoma

- Estrogen use increases the risk of hyperprolactinemia among MtF patients in the first year of treatment, but this risk unlikely thereafter.

- High-dose estrogen use may promote the clinical appearance of preexisting but clinically unapparent prolactinoma.

**Inconclusive or no increased risk:** Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Breast cancer

- MtF persons who have taken feminizing hormones do experience breast cancer, but it is unknown how their degree of risk compares to that of persons born with female genitalia.

- Longer duration of feminizing hormone exposure (i.e., number of years taking estrogen preparations), family history of breast cancer, obesity (BMI >35), and the use of progestins likely influence the level of risk.

**The Standards of Care**
7TH VERSION

Exhibit 17-100

## Other side effects of feminizing therapy:

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with feminizing hormone therapy.

### Fertility and sexual function

- Feminizing hormone therapy may impair fertility.

- Feminizing hormone therapy may decrease libido.

- Feminizing hormone therapy reduces nocturnal erections, with variable impact on sexually stimulated erections.

## Risks of anti-androgen medications:

Feminizing hormone regimens often include a variety of agents that affect testosterone production or action. These include GnRH agonists, progestins (including cyproterone acetate), spironolactone, and 5-alpha reductase inhibitors. An extensive discussion of the specific risks of these agents is beyond the scope of the *SOC*. However, both spironolactone and cyproterone acetate are widely used and deserve some comment.

Cyproterone acetate is a progestational compound with anti-androgenic properties (Gooren, 2005; Levy et al., 2003). Although widely used in Europe, it is not approved for use in the United States because of concerns about hepatotoxicity (Thole, Manso, Salgueiro, Revuelta, & Hidalgo, 2004). Spironolactone is commonly used as an anti-androgen in feminizing hormone therapy, particularly in regions where cyproterone is not approved for use (Dahl et al., 2006; Moore et al., 2003; Tangpricha et al., 2003). Spironolactone has a long history of use in treating hypertension and congestive heart failure. Its common side effects include hyperkalemia, dizziness, and gastrointestinal symptoms (*Physicians' Desk Reference*, 2007).

Exhibit 17- 101

**The Standards of Care**
7TH VERSION

## Risks of Masculinizing Hormone Therapy (FtM)

**Likely increased risk:**

Polycythemia

- Masculinizing hormone therapy involving testosterone or other androgenic steroids increases the risk of polycythemia (hematocrit > 50%), particularly in patients with other risk factors.

- Transdermal administration and adaptation of dosage may reduce this risk

Weight gain/visceral fat

- Masculinizing hormone therapy can result in modest weight gain, with an increase in visceral fat.

**Possible increased risk:**

Lipids

- Testosterone therapy decreases HDL, but variably affects LDL and triglycerides.

- Supraphysiologic (beyond normal male range) serum levels of testosterone, often found with extended intramuscular dosing, may worsen lipid profiles, whereas transdermal administration appears to be more lipid neutral.

- Patients with underlying polycystic ovarian syndrome or dyslipidemia may be at increased risk of worsening dyslipidemia with testosterone therapy.

Liver

- Transient elevations in liver enzymes may occur with testosterone therapy.

- Hepatic dysfunction and malignancies have been noted with oral methyltestosterone. However, methyltestosterone is no longer available in most countries and should no longer be used.

World Professional Association for Transgender Health

101

**The Standards of Care**
7TH VERSION

Exhibit 17-102

### Psychiatric

Masculinizing therapy involving testosterone or other androgenic steroids may increase the risk of hypomanic, manic, or psychotic symptoms in patients with underlying psychiatric disorders that include such symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone

**Inconclusive or no increased risk:** Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

### Osteoporosis

- Testosterone therapy maintains or increases bone mineral density among FtM patients prior to oophorectomy, at least in the first three years of treatment.

- There is an increased risk of bone density loss after oophorectomy, particularly if testosterone therapy is interrupted or insufficient. This includes patients utilizing solely oral testosterone.

### Cardiovascular

- Masculinizing hormone therapy at normal physiologic doses does not appear to increase the risk of cardiovascular events among healthy patients.

- Masculinizing hormone therapy may increase the risk of cardiovascular disease in patients with underlying risks factors.

### Hypertension

- Masculinizing hormone therapy at normal physiologic doses may increase blood pressure but does not appear to increase the risk of hypertension.

- Patients with risk factors for hypertension, such as weight gain, family history, or polycystic ovarian syndrome, may be at increased risk.

### Type 2 diabetes mellitus

- Testosterone therapy does not appear to increase the risk of type 2 diabetes among FtM patients overall.

Exhibit 17-103 

**The Standards of Care**
7TH VERSION

- Testosterone therapy may further increase the risk of type 2 diabetes in patients with other risk factors, such as significant weight gain, family history, and polycystic ovarian syndrome. There are no data that suggest or show an increase in risk in those with risk factors for dyslipidemia.

### Breast cancer

○ Testosterone therapy in FtM patients does not increase the risk of breast cancer.

### Cervical cancer

○ Testosterone therapy in FtM patients does not increase the risk of cervical cancer, although it may increase the risk of minimally abnormal Pap smears due to atrophic changes.

### Ovarian cancer

○ Analogous to persons born with female genitalia with elevated androgen levels, testosterone therapy in FtM patients may increase the risk of ovarian cancer, although evidence is limited.

### Endometrial (uterine) cancer

○ Testosterone therapy in FtM patients may increase the risk of endometrial cancer, although evidence is limited.

**Other side effects of masculinizing therapy:**

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with masculinization.

### Fertility and sexual function

○ Testosterone therapy in FtM patients reduces fertility, although the degree and reversibility are unknown.

○ Testosterone therapy can induce permanent anatomic changes in the developing embryo or fetus.

○ Testosterone therapy induces clitoral enlargement and increases libido.

**The Standards of Care**
7TH VERSION

Exhibit
17-104

Acne, androgenic alopecia

Acne and varying degrees of male pattern hair loss (androgenic alopecia) are common side effects of masculinizing hormone therapy.

# APPENDIX C
## SUMMARY OF CRITERIA FOR HORMONE THERAPY AND SURGERIES

As for all previous versions of the SOC, the criteria put forth in the SOC for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable to accumulate new data, which can be retrospectively examined to allow for health care – and the SOC – to evolve.

## Criteria for Feminizing/Masculinizing Hormone Therapy (one referral or chart documentation of psychosocial assessment)

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the SOC for children and adolescents);

4. If significant medical or mental concerns are present, they must be reasonably well-controlled.

World Professional Association for Transgender Health

Exhibit 17-165

**The Standards of Care**
7TH VERSION

## Criteria for Breast/Chest Surgery (one referral)

<u>Mastectomy and creation of a male chest in FtM patients:</u>

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a pre-requisite.

<u>Breast augmentation (implants/lipofilling) in MtF patients:</u>

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

## Criteria for genital surgery (two referrals)

<u>Hysterectomy and ovariectomy in FtM patients and orchiectomy in MtF patients:</u>

1. Persistent, well documented gender dysphoria;

**The Standards of Care**
**7TH VERSION**

 Exhibit 17- 166

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before a patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these surgical procedures for medical indications other than gender dysphoria.

Metoidioplasty or phalloplasty in FtM patients and vaginoplasty in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones);

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

The criterion noted above for some types of genital surgeries – i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity – is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery.

E x h i b i t
17-107

The Standards of Care
7TH VERSION

# APPENDIX D
## EVIDENCE FOR CLINICAL OUTCOMES
## OF THERAPEUTIC APPROACHES

One of the real supports for any new therapy is an outcome analysis. Because of the controversial nature of sex reassignment surgery, this type of analysis has been very important. Almost all of the outcome studies in this area have been retrospective.

One of the first studies to examine the post-treatment psychosocial outcomes of transsexual patients was done in 1979 at Johns Hopkins University School of Medicine and Hospital (USA) (J. K. Meyer & Reter, 1979). This study focused on patients' occupational, educational, marital, and domiciliary stability. The results revealed several significant changes with treatment. These changes were not seen as positive; rather, they showed that many individuals who had entered the treatment program were no better off or were worse off in many measures after participation in the program. These findings resulted in closure of the treatment program at that hospital/medical school (Abramowitz, 1986).

Subsequently, a significant number of health professionals called for a standard for eligibility for sex reassignment surgery. This led to the formulation of the original *Standards of Care* of the Harry Benjamin International Gender Dysphoria Association (now WPATH) in 1979.

In 1981, Pauly published results from a large retrospective study of people who underwent sex reassignment surgery. Participants in that study had much better outcomes: Among 83 FtM patients, 80.7% had a satisfactory outcome (i.e., patient self report of "improved social and emotional adjustment"), 6.0% unsatisfactory. Among 283 MtF patients, 71.4% had a satisfactory outcome, 8.1% unsatisfactory. This study included patients who were treated before the publication and use of the *Standards of Care.*

Since the *Standards of Care* have been in place, there has been a steady increase in patient satisfaction and decrease in dissatisfaction with the outcome of sex reassignment surgery. Studies conducted after 1996 focused on patients who were treated according to the *Standards of Care.* The findings of Rehman and colleagues (1999) and Krege and colleagues (2001) are typical of this body of work; none of the patients in these studies regretted having had surgery, and most reported being satisfied with the cosmetic and functional results of the surgery. Even patients who develop severe surgical complications seldom regret having undergone surgery. Quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2003). The vast majority of follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Garaffa, Christopher, & Ralph, 2010; Klein & Gorzalka, 2009), although the specific magnitude of benefit is uncertain from

**The Standards of Care**
7TH VERSION

Exhibit
17-104

the currently available evidence. One study (Emory, Cole, Avery, Meyer, & Meyer III, 2003) even showed improvement in patient income.

One troubling report (Newfield et al., 2006) documented lower scores on quality of life (measured with the SF-36) for FtM patients than for the general population. A weakness of that study is that it recruited its 384 participants by a general email rather than a systematic approach, and the degree and type of treatment was not recorded. Study participants who were taking testosterone had typically being doing so for less than 5 years. Reported quality of life was higher for patients who had undergone breast/chest surgery than for those who had not (p<.001). (A similar analysis was not done for genital surgery). In other work, Kuhn and colleagues (2009) used the King's Health Questionnaire to assess the quality of life of 55 transsexual patients at 15 years after surgery. Scores were compared to those of 20 healthy female control patients who had undergone abdominal/pelvic surgery in the past. Quality of life scores for transsexual patients were the same or better than those of control patients for some subscales (emotions, sleep, incontinence, symptom severity, and role limitation), but worse in other domains (general health, physical limitation, and personal limitation).

It is difficult to determine the effectiveness of hormones alone in the relief of gender dysphoria. Most studies evaluating the effectiveness of masculinizing/feminizing hormone therapy on gender dysphoria have been conducted with patients who have also undergone sex reassignment surgery. Favorable effects of therapies that included both hormones and surgery were reported in a comprehensive review of over 2000 patients in 79 studies (mostly observational) conducted between 1961 and 1991 (Eldh, Berg, & Gustafsson, 1997; Gijs & Brewaeys, 2007; Murad et al., 2010; Pfäfflin & Junge, 1998). Patients operated on after 1986 did better than those before 1986; this reflects significant improvement in surgical complications (Eldh et al., 1997). Most patients have reported improved psychosocial outcomes, ranging between 87% for MtF patients and 97% for FtM patients (Green & Fleming, 1990). Similar improvements were found in a Swedish study in which "almost all patients were satisfied with sex reassignment at 5 years, and 86% were assessed by clinicians at follow-up as stable or improved in global functioning" (Johansson, Sundbom, Höjerback, & Bodlund, 2010). Weaknesses of these earlier studies are their retrospective design and use of different criteria to evaluate outcomes.

A prospective study conducted in the Netherlands evaluated 325 consecutive adult and adolescent subjects seeking sex reassignment (Smith, Van Goozen, Kuiper, & Cohen-Kettenis, 2005). Patients who underwent sex reassignment therapy (both hormonal and surgical intervention) showed improvements in their mean gender dysphoria scores, measured by the Utrecht Gender Dysphoria Scale. Scores for body dissatisfaction and psychological function also improved in most categories. Fewer than 2% of patients expressed regret after therapy. This is the largest prospective study to affirm the results from retrospective studies that a combination of hormone therapy and surgery improves gender dysphoria and other areas of psychosocial functioning. There is a need for further research on the effects of hormone therapy without surgery, and without the goal of maximum physical feminization or masculinization.

World Professional Association for Transgender Health

Exhibit 17-107

**The Standards of Care**
7TH VERSION

Overall, studies have been reporting a steady improvement in outcomes as the field becomes more advanced. Outcome research has mainly focused on the outcome of sex reassignment surgery. In current practice there is a range of identity, role, and physical adaptations that could use additional follow-up or outcome research (Institute of Medicine, 2011).

# APPENDIX E
## DEVELOPMENT PROCESS FOR THE STANDARDS OF CARE, VERSION 7

The process of developing *Standards of Care, Version 7* began when an initial *SOC* "work group" was established in 2006. Members were invited to examine specific sections of *SOC, Version 6*. For each section, they were asked to review the relevant literature, identify where research was lacking and needed, and recommend potential revisions to the *SOC* as warranted by new evidence. Invited papers were submitted by the following authors: Aaron Devor, Walter Bockting, George Brown, Michael Brownstein, Peggy Cohen-Kettenis, Griet DeCuypere, Petra DeSutter, Jamie Feldman, Lin Fraser, Arlene Istar Lev, Stephen Levine, Walter Meyer, Heino Meyer-Bahlburg, Stan Monstrey, Loren Schechter, Mick van Trotsenburg, Sam Winter, and Ken Zucker. Some of these authors chose to add co-authors to assist them in their task.

Initial drafts of these papers were due June 1, 2007. Most were completed by September 2007, with the rest completed by the end of 2007. These manuscripts were then submitted to the *International Journal of Transgenderism (IJT)*. Each underwent the regular *IJT* peer review process. The final papers were published in Volume 11 (1-4) in 2009, making them available for discussion and debate.

After these articles were published, a *Standards of Care* Revision Committee was established by the WPATH Board of Directors in 2010. The Revision Committee was first charged with debating and discussing the *IJT* background papers through a Google website. A subgroup of the Revision Committee was appointed by the Board of Directors to serve as the Writing Group. This group was charged with preparing the first draft of *SOC, Version 7* and continuing to work on revisions for consideration by the broader Revision Committee. The Board also appointed an International Advisory Group of transsexual, transgender, and gender nonconforming individuals to give input on the revision.

A technical writer was hired to (1) review all of the recommendations for revision – both the original recommendations as outlined in the *IJT* articles and additional recommendations that emanated from the online discussion – and (2) create a survey to solicit further input on these potential revisions. From the survey results, the Writing Group was able to discern where these experts stood in terms of areas of agreement and areas in need of more discussion and debate. The technical writer then (3) created a very rough first draft of *SOC, Version 7* for the Writing Group to consider and build on.

**The Standards of Care**
**7TH VERSION**

Exhibit 17 - 110

The Writing Group met on March 4 and 5, 2011 in a face-to-face expert consultation meeting. They reviewed all recommended changes and debated and came to consensus on various controversial areas. Decisions were made based on the best available science and expert consensus. These decisions were incorporated into the draft, and additional sections were written by the Writing Group with the assistance of the technical writer.

The draft that emerged from the consultation meeting was then circulated among the Writing Group and finalized with the help of the technical writer. Once this initial draft was finalized it was circulated among the broader SOC Revision Committee and the International Advisory Group. Discussion was opened up on the Google website and a conference call was held to resolve issues. Feedback from these groups was considered by the Writing Group, who then made further revision. Two additional drafts were created and posted on the Google website for consideration by the broader SOC Revision Committee and the International Advisory Group. Upon completion of these three iteratations of review and revision, the final document was presented to the WPATH Board of Directors for approval. The Board of Directors approved this version on September 14, 2011.

The plans are to disseminate this version of the SOC and invite feedback for further revisions. The WPATH Board of Directors decides the timing of any revision of the SOC.

## Funding

The *Standards of Care* revision process was made possible through a generous grant from the Tawani Foundation and a gift from an anonymous donor. These funds supported the following:

1. Costs of a professional technical writer;

2. Process of soliciting international input on proposed changes from gender identity professionals and the transgender community;

3. Working meeting of the Writing Group;

4. Process of gathering additional feedback and arriving at final expert consensus from the professional and transgender communities, the *Standards of Care, Version 7* Revision Committee, and WPATH Board of Directors;

5. Costs of printing and distributing *Standards of Care, Version 7* and posting a free downloadable copy on the WPATH website;

Exhibit 17-III .

The Standards of Care
7TH VERSION

6. Plenary session to launch the *Standards of Care, Version 7* at the 2011 WPATH Biennial Symposium in Atlanta, Georgia, USA.

## Members of the Standards of Care Revision Committee[1]

Eli Coleman, PhD (USA)✳ - Committee chair
Richard Adler, PhD (USA)
Walter Bockting, PhD (USA)✳
Marsha Botzer, MA (USA)✳
George Brown, MD (USA)
Peggy Cohen-Kettenis, PhD (Netherlands)✳
Griet DeCuypere, MD (Belgium)✳
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)
Randi Ettner, PhD (USA)
Evan Eyler, MD (USA)
Jamie Feldman, MD, PhD (USA)✳
Lin Fraser, EdD (USA)✳
Rob Garofalo, MD, MPH (USA)
Jamison Green, PhD, MFA (USA)✳
Dan Karasic, MD (USA)
Gail Knudson, MD (Canada)✳

Arlene Istar Lev, LCSW (USA)
Gal Mayer, MD (USA)
Walter Meyer, MD (USA)✳
Heino Meyer-Bahlburg, Dr. rer.nat. (USA)
Stan Monstrey, MD, PhD (Belgium)✳
Blaine Paxton Hall, MHS-CL, PA-C (USA)
Friedmann Pfaefflin, MD, PhD (Germany)
Katherine Rachlin, PhD (USA)
Bean Robinson, PhD (USA)
Loren Schechter, MD (USA)
Vin Tangpricha, MD, PhD (USA)
Mick van Trotsenburg, MD (Netherlands)
Anne Vitale, PhD (USA)
Sam Winter, PhD (Hong Kong)
Stephen Whittle, OBE (UK)
Kevan Wylie, MB, MD (UK)
Ken Zucker, PhD (Canada)

## International Advisory Group Selection Committee

Walter Bockting, PhD (USA)
Marsha Botzer, MA (USA)
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)

Evan Eyler, MD (USA)
Jamison Green, PhD, MFA (USA)
Blaine Paxton Hall, MHS-CL, PA-C (USA)

---

1  ✳ Writing Group member
All members of the *Standards of Care, Version 7 Revision Committee* donated their time to work on this revision.

World Professional Association for Transgender Health

111

**The Standards of Care**
7TH VERSION

Exhibit
17 - 162

## International Advisory Group

Tamara Adrian, LGBT Rights Venezuela (Venezuela)
Craig Andrews, FTM Australia (Australia)
Christine Burns, MBE, Plain Sense Ltd (UK)
Naomi Fontanos, Society for Transsexual Women's Rights in the Phillipines (Phillipines)
Tone Marie Hansen, Harry Benjamin Resource Center (Norway)
Rupert Raj, Shelburne Health Center (Canada)
Masae Torai, FTM Japan (Japan)
Kelley Winters, GID Reform Advocates (USA)

## Technical Writer

Anne Marie Weber-Main, PhD (USA)

## Editorial Assistance

Heidi Fall (USA)

112                                          World Professional Association for Transgender Health

Exhibit 17-113



21- 8-20

Inmate/Offender Grievance Process..........................................................................................2
I.   Definition of Terms Used in This Procedure ........................................................................2
   A.   Inmate/Offender Grievance ........................................................................................2
   B.   Request to Staff ..........................................................................................................2
   C.   Inmate/Offender .........................................................................................................2
   D.   Reviewing Authority.....................................................................................................2
   E.   Administrative Review Authority (ARA) .......................................................................2
   F.   Agency Staff ...............................................................................................................2
II.   Grievance Procedure Guidelines.........................................................................................3
   A.   Grievable Issues.........................................................................................................3
   B.   Non-grievable Issues..................................................................................................3
   C.   Failure to Submit Timely Grievance ...........................................................................4
III.   Access to the Grievance Procedure ...................................................................................4
   A.   Availability of Materials/Forms ....................................................................................4
   B.   Explanation of Process ...............................................................................................4
   C.   Training ......................................................................................................................4
   D.   Reprisals ....................................................................................................................4
   E.   Direct Involvement......................................................................................................5
   F.   Inmate/Offender Assistance........................................................................................5
   G.   Submitting on Behalf of Another Person .....................................................................5
   H.   Legible .......................................................................................................................5
IV.   Informal Resolution............................................................................................................6
   A.   Categories for Grievances ..........................................................................................6
   B.   Initial Attempt.............................................................................................................6
   C.   Request to Staff .........................................................................................................6
V.   Submission and Review of Formal Grievances ...................................................................8
   A.   Submitting the Grievance ............................................................................................8
   B.   Where the Grievance is Submitted ..............................................................................9
   C.   Time Frames for the Review of Grievances................................................................10
VI.   Procedures of the Reviewing Authority .............................................................................10
   A.   Tracking Procedures .................................................................................................10
   B.   Answering the Grievance ..........................................................................................11
   C.   Resolution/Action in Response to a Grievance ..........................................................11
VII.   Appeal Process and Procedure (4-4284, 4-4301) .............................................................12
   A.   Grounds for Appeal ..................................................................................................12
   B.   Final Appeal to Administrative Review Authority ........................................................12
   C.   Administrative Review Action ....................................................................................14
   D.   Final Ruling ..............................................................................................................14
VIII.   Emergency or Sensitive Grievances ..............................................................................15
   A.   Process ....................................................................................................................15
   B.   Upon receipt of a grievance marked "emergency" or "sensitive.................................15
   C.   Assistance for Filing a Grievance Regarding Allegations for Sexual Abuse ...............16
   D.   Determination that a Grievance is Not Emergency or Sensitive ..................................16
   E.   Co-Pay .....................................................................................................................16
IX.   Abuse of the Process.......................................................................................................16
   A.   Determining Abuse of the Grievance Process ............................................................17
   B.   Restriction Process ...................................................................................................17
X.   Confidentiality and Use ....................................................................................................18
   A.   File Maintenance and Access ...................................................................................18
   B.   Attachments to Special Reports ................................................................................18
XI.   Monitoring of Inmate/Offender Grievances.......................................................................18
   A.   Grievance Report Log ...............................................................................................19
   B.   Records Keeping ......................................................................................................19
XII.   Submitting a Grievance Out of Time ...............................................................................19
XIII.   References ....................................................................................................................19
XIV.   Action...........................................................................................................................20
   Referenced Forms.........................................................................................................21

| Section-09 Programs | Page: 1 | OP-090124 | Effective Date: 07/19/2016<br>Revision-01 Effective: 09/15/2016<br>Page 7 |
|---|---|---|---|
| Inmate/Offender Grievance Process | | ACA Standards: 2-CO-3C-01, 2-CO-4B-03, 4-4016, 4-4284, 4-4301, 4-4344M, 4-ACRS-4C-01M, 4-ACRS-6B-03, 4-ACRS-7D-09, 4-APPFS-7S-02 |

| Section-09 Programs | Page: 2 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

| | |
|---|---|
| Joe. M. Allbaugh, Director<br>Oklahoma Department of Corrections | Signature on File |

## Inmate/Offender Grievance Process

The grievance process provides a standard method by which an inmate/offender may seek formal administrative decisions or answers to issues or complaints. (2-CO-3C-01, 4-4284, 4-ACRS-4C-01M, 4-ACRS-6B-03, 4-APPFS-2C-02) Inmates/offenders are required to exhaust the grievance process prior to filing a lawsuit (42 U.S.C. § 1997 (e) and 57 O.S. § 564). This procedure will be made available to all inmates/offenders through orientation and library services.

I.  Definition of Terms Used in This Procedure

A.  Inmate/Offender Grievance

The formal complaint by an inmate/offender using the "Inmate/Offender Grievance Report Form" (DOC 090124A, attached).

B.  Request to Staff

A system of written communication between staff and inmates/offenders to resolve complaints/issues informally for issues that can then move forward in the grievance process as necessary. (4-4016)

C.  Inmate/Offender

Any person sentenced or assigned to any form of supervision, custody, or control by the Oklahoma Department of Corrections (ODOC) at any prison facility, in the community, or on probation or parole status.

D.  Reviewing Authority

The facility head or facility correctional health services administrator (CHSA) where the incident occurred and to whom the grievance is first submitted.

E.  Administrative Review Authority (ARA)

The division of the agency serving as the director's designee, or the chief medical officer's designee, to whom the formal grievance is submitted for final appeal.

F.  Agency Staff

Any staff member employed by the Oklahoma Department of Corrections (ODOC). This designation may also include, for the purpose of this procedure, employees of a contract provider or a volunteer for the agency.

G.  Verified

| Section-09 Programs | Page: 3 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

The act of signing a document and having it notarized by a licensed notary.

II.   Grievance Procedure Guidelines

    A.   Grievable Issues

        1.   A grievance will be used to address issues regarding conditions of confinement, actions of staff, and incidents occurring within or under the authority and control of ODOC that have personally affected the inmate/offender making the complaint and for which a remedy may be allowed by the agency or by law.  (2-CO-4B-03, 4-4301)

        2.   Sex Offender Registration Grievances

            Those offenders and persons required to register as sex offenders under Oklahoma law may file a grievance if they believe they are not required to register, or if they believe their registration level is incorrect.

           a.   For those offenders under ODOC supervision on parole or probation, the procedures set forth in this procedure shall be followed by first submitting a "Request to Staff" (DOC 090124D, attached) to their supervising officer, then filing a formal grievance with the district supervisor as the reviewing authority, and an appeal may also be filed to ARA.

           b.   For those persons not under ODOC supervision, a request to staff is not required, but a grievance will be filed with the Sex Offender Registration Unit as the reviewing authority and an appeal may also be filed to the ARA.  The time requirements for filing grievances as set forth in this procedure shall be followed.

    B.   Non-grievable Issues

        1.   Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Offender Disciplinary Procedures."

        2.   Grievances shall not be submitted about matters that are in the course of litigation.

        3.   Grievances shall not be submitted that include requests for disciplinary action against staff.

        4.   Grievances shall not be submitted requesting money compensation.

| Section-09 Programs | Page: 4 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

5.    Privately contracted facility property issues are not grievable.

C.    Failure to Submit Timely Grievance

An inmate/offender will submit a grievance within the time frames in this procedure; if not, the grievance will be ruled as untimely submitted, except as provided for in Section XII. of this procedure.

D.    No Mailbox Rule

There is no mailbox rule regarding submission of requests to staff or grievances and grievance appeals. The document must be received in the appropriate office within the required time frame. All time frames include weekends and holidays. When a time frame ends on a weekend or holiday, it will be extended to the next business day. Deposit in the mail will not be sufficient to meet time frames.

III.    Access to the Grievance Procedure

The written grievance procedure and grievance forms will be readily available to inmate/offenders and staff throughout ODOC and in private prison facilities. (4-4344M) It is the inmate's/offender's responsibility to maintain copies of all relevant grievance documents for his/her record.

A.    Availability of Materials/Forms

Materials and forms will be available through the law libraries, general circulation libraries, facilities, district offices and staff. Staff, or inmate/offender research assistants in the law library, may provide assistance as to the proper procedure for submitting a grievance.

B.    Explanation of Process

Upon initial reception at the assessment and reception center or a district/sub-office and upon transfer to a facility or district/sub-office, the grievance process will be explained to inmate/offenders that will include non-English translation (oral and written) as required. Appropriate assistance for those impaired or disabled will also be provided.

C.    Training

All agency staff, employees of private prisons or community contract facilities and volunteers will receive documented training in the grievance process during orientation. Employees who work at a facility or who have regular daily contact with inmates during the course of their employment will also receive documented grievance process training during in-service training.

faith.

t suffer reprisals for submitting a grievance in good

| Section-09 Programs | Page: 5 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

1.  A reprisal means any action or threat of action against anyone for using the grievance process. Actions taken in accordance with the abuse of process procedure below or discipline for false statements are not reprisals.

2.  A grievance may be submitted if the inmate/offender feels any reprisal has occurred.

3.  The inmate/offender will not receive a misconduct report for submitting a grievance in good faith.

4.  A misconduct report may be issued if an inmate/offender has made a threat in a grievance against staff, visitors, or another inmate/offender, or if an inmate has provided a falsified, forged or fraudulent document as evidence in the complaint.

E.  Direct Involvement

An employee directly involved in the inmate/offender's alleged complaint shall not determine the final resolution of the formal complaint.

1.  If the complaint concerns any direct, personal action by the reviewing authority or facility CHSA, a designee from the facility will be appointed to resolve the complaint.

2.  Direct involvement does not include routine administrative matters such as final review action taken by the facility/district head in the custody assessment process.

F.  Inmate/Offender Assistance

An inmate/offender may assist another inmate/offender at the same facility in preparing a grievance, but the complaining inmate/offender must sign the grievance and submit it to staff.

G.  Submitting on Behalf of Another Person

No person may submit a grievance on behalf of another person or about an issue/complaint not directly affecting the complaining inmate/offender except in the event of an allegation of sexual abuse as outlined in Section VIII. of this procedure. (PREA 115.52 (e)(1)).The facility may require as a condition of processing the grievance that the alleged victim agree to have the grievance filed on his or her behalf, and may also require the alleged victim to personally pursue any subsequent steps in the administrative remedy process. (PREA 115.52 (e)(2))

H.  Legible

Inmate/Offender "Request to Staff" (DOC 090124D) forms and grievances submitted to staff for resolution must be legibly written or typed in blue or

| Section-09 Programs | Page: 6 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

black ink. No pencil, highlighter or other color of ink is allowed. No drawing, decorating, doodling, or making comments in the margins of the pages is permitted.

IV.  Informal Resolution

Informal resolution requires communicating with staff, including submitting a "Request to Staff," if the complaint is not resolved. The informal resolution process precedes submitting a grievance.

A.  Categories for Grievances

This process must relate to one of the following categories:

1.  Discrimination;

2.  Classification;

3.  Complaint Against Staff;

4.  Conditions of Confinement;

5.  Disciplinary Process;

6.  Legal;

7.  Medical;

8.  Property/Trust Fund;

9.  Records/Sentence Administration;

10.  Religion; or

11.  Personal Identity (including, but not limited to, gender variant clothing, hormone treatment, specific mental health treatment, separate showering, etc.).

B.  Initial Attempt

Before submitting a "Request to Staff," the inmate/offender must try to resolve the complaint by talking with the affected staff, supervising employee or other appropriate staff within three (3) days of the incident.

C.  Request to Staff

| Section-09 Programs | Page: 7 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

If not resolved, the inmate/offender must submit a "Request to Staff" through the law library supervisor or the warden's designee, detailing the issue/incident completely but briefly.

1. The submission through the law library supervisor or designee applies to minimum and higher security facilities. At community level facilities, inmate/offenders will submit the form to the appropriate staff member.

2. The form must be specific as to the complaint, dates, places, personnel involved and how the inmate/offender was affected.

3. The "Request to Staff" must be submitted within seven (7) days of the incident, and only one issue or incident is allowed per form. The inmate/offender shall utilize only the front and back of the form. No attachments are allowed.

4. Inmates/offenders will submit the "Request to Staff" form to the law library supervisor or designee. The law library supervisor or designee will stamp the date of receipt on the original submission.

5. Upon request by the inmate/offender, one copy of the original "Request to Staff" that is submitted will be provided. All additional copies are subject to applicable fees as referenced in OP-030115 entitled "Access to Courts/Law Library."

6. The law library supervisor or designee will assign the "Request to Staff" to the appropriate staff member who will attempt to resolve the issue. Multiple "Request to Staff" submitted containing the same issue will be forwarded to the appropriate staff member for one response. The staff member assigned will respond in writing within ten working days of receipt to all "Request to Staff" forms being used to attempt informal resolution. On the "Request to Staff", staff will document any action taken and will cite or quote applicable agency procedures. A "Request to Staff" assigned to an appropriate staff member who is at another facility may be scanned and emailed or faxed to the law library supervisor or designee at the proper facility for response by the appropriate staff member.

7. (Revision-01 09/15/2016) The responding staff member will return the completed "Request to Staff" to the law library supervisor or designee at their facility. If a response is being returned by another facility, the response may be scanned and emailed or faxed to the law library supervisor or designee at the originating facility. The law library supervisor or designee will date stamp the receipt of the response on the "Request to Staff." The law library supervisor or designee will date and send a copy of the completed form to the inmate/offender and retain the original request and response for centralized filing.

Case 6:19-cv-00269-JFH-JAR Document 13-4 Filed 09/09/19 Page 8 of 20
Appellate Case: 23-7031 Document: 010110884265 Date Filed: 06/30/2023 Page: 251

Exhibit 21-8

| Section-09 Programs | Page: 8 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

8. Law library supervisors or designees are required to log each "Request to Staff" in and out on the "Request to Staff Log" located on Share Point if available or, if not available, on the form "Request to Staff Log" (DOC 090124F, attached). If a response is not received in 30 calendar days, the law library supervisor or designee will notate the non-response in the "Disposition Date" column of the "Request to Staff Log."

9. A "Request to Staff" may not be submitted about matters that are in the course of litigation or any categories that are not listed above.

10. A "Request to Staff" by an inmate regarding a pending misconduct against that inmate may only be submitted to the assigned disciplinary coordinator.

11. If there has been no response in 30 days, but no later than 60 days, of submission, the inmate may file a grievance to the reviewing authority with a copy of the "Request to Staff" attached to the grievance form. The grievance may assert only the issue of the lack of response to the "Request to Staff."

12. An Oklahoma inmate held in another state or jurisdiction pursuant to an agreement between ODOC and said jurisdiction shall submit a copy of any "Request to Staff" to the Corrections Compact Unit at the Lexington Assessment and Reception Center (LARC).

V. Submission and Review of Formal Grievances

A. Submitting the Grievance

If a complaint is not resolved informally, the inmate/offender may obtain and complete the "Inmate/Offender Grievance Form" (DOC 090124A) and submit the grievance form, along with the "Request to Staff" used in the informal resolution process with the response, to the appropriate reviewing authority. The "Request to Staff" may be a copy. The submitted documents may contain no alterations whatsoever. Altered documents will cause the grievance to be rejected as improperly filed. No additional attachments are allowed.

1. The inmate/offender grievance must be submitted by the inmate/offender 15 days from the date of the receipt of the response to the "Request to Staff." The "Request to Staff" must have been timely submitted as outlined in this procedure.

2. The reviewing authority may choose to extend the submitting period up to 60 days for good cause.

3. Under no circumstances will the grievance be accepted after 60 days

| Section-09 Programs | Page: 9 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

of the incident or the date of the response to the "Request to Staff" unless ordered by a court, the director, chief medical officer, or their designee.

4.    Only one issue or incident is allowed per grievance.

5.    All medical grievances will be submitted to the facility correctional health services administrator (CHSA) for resolution.

6.    Contract private prison facilities are responsible for responding to grievances on matters occurring during the inmate's/offender's incarceration at their facility. Inmates/offenders will file grievances at private prisons with the facility administrator at the private prison.

7.    If the inmate/offender does not follow instructions as explained in this procedure and on the grievance forms, the grievance may not be answered. If allowed, the inmate/offender must properly re-submit the grievance within 10 days of notice of improper filing. Continued failure to follow instructions may result in restrictions being imposed as outlined in Section IX. of this procedure.

B.    Where the Grievance is Submitted

1.    Inmate/offenders must submit the grievance to the reviewing authority or facility correctional health services administrator (CHSA), whichever is appropriate, where the alleged incident occurred. Grievances concerning custody assessment, sentence administration or records must be submitted to the facility where the field file is located.

2.    If the location of the alleged incident is unknown or uncertain, the inmate/offender will consult with their case manager/designated staff for assistance.

3.    If the grievance involves multiple facilities at different locations, such as transfer of property, the inmate/offender will submit the grievance to one of the involved reviewing authorities who will investigate, respond to the grievance, and then forward the original grievance to the next reviewing authority for further investigation and response.

    a.    The inmate/offender will be informed of where the grievance is being forwarded.

    b.    This process will continue until every involved reviewing authority has reviewed and responded to the grievance.

    c.    The last reviewing authority will return a copy of the originally submitted paperwork to the inmate/offender along with the

Case 6:19-cv-00269-JFH-JAR Document 13-4 Filed 09/09/19 Page 10 of 20
Appellate Case: 23-7031 Document: 0101 1081 865 Date Filed: 06/30/2023 Page: 253

Exhibit 21-16

| Section-09 Programs | Page: 10 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

response.

4.  If the grievance is filed by an Oklahoma inmate/offender held in another state or jurisdiction, the inmate/offender will submit the grievance to the administrator of Classification and Population who will serve as the reviewing authority.

C.  Time Frames for the Review of Grievances

1.  The reviewing authority will respond on the "Grievance Decision from Reviewing Authority" (DOC 090124B, attached), and will forward the answered grievance forms to the inmate/offender within 20 days of receipt of the grievance.

2.  If the grievance involves multiple units at different locations, the period for response will be 20 days from receipt of the grievance by each involved unit.

3.  If the grievance cannot be answered within the 20 day period, the inmate/offender will be notified in writing, and the due date will be extended no more than an additional 20 days.

4.  If there has been no response by the reviewing authority within 30 days, but no later than 60 days, of submission, the inmate/offender may send a grievance to the Administrative Review Authority (ARA) with evidence of submitting the grievance to the proper reviewing authority. The grievance submitted to the ARA will assert only that the inmate's/offender's grievance was not answered by the reviewing authority.

VI.  Procedures of the Reviewing Authority

A.  Tracking Procedures

1.  Upon receipt of every grievance, the reviewing authority will assign a grievance number, category code, and stamp or show date of receipt on the "Inmate/Offender Grievance." This includes grievances returned unanswered for any reason.

2.  The reviewing authority will screen the "Inmate/Offender Grievance" to determine:

a.  Whether the grievance concerns an issue or incident involving the facility where the "Inmate/Offender Grievance" was received;

b.  Whether the issue raised is a grievable issue;

| Section-09 Programs | Page: 11 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

c.  Whether the "Inmate/Offender Grievance" and/or "Request to Staff" were submitted in a timely manner;

d.  Whether the proper procedures for submitting a grievance were followed;

e.  Whether the "Inmate/Offender Grievance" and/or "Request to Staff" contain more than one issue.

B.  Answering the Grievance

1.  On the "Grievance Decision from Reviewing Authority" (DOC 090124B), the reviewing authority may cite and quote the appropriate agency procedures, facility/district/unit procedures or Oklahoma Statute and may state specific findings of fact, conclusions, and actions taken by the reviewing authority to investigate and resolve the complaint.

2.  The facility/district head will receive a copy of the CHSA's medical grievance decision.

3.  A legible copy of the grievance, the decision, and all paperwork submitted will be returned to the inmate/offender. The original of all paperwork will be retained by the reviewing authority. The inmate/offender is responsible for maintaining copies and a record of their grievances.

4.  The reviewing authority or designee will have the inmate/offender sign and date the decision acknowledging receipt.

5.  The reviewing authority will either grant or deny relief in whole or in part, and if granted, will provide the appropriate remedy and due date.

6.  The reviewing authority will return unanswered any "Inmate/Offender Grievance" that contains any errors in the filing process and may allow the inmate/offender to correct the errors within 10 days of receipt of the notice from the reviewing authority. If the inmate/offender fails to correct the errors or properly resubmit, the "Inmate/Offender Grievance" will be returned unanswered and the inmate/offender will have waived/forfeited the opportunity to proceed in the grievance process.

C.  Resolution/Action in Response to a Grievance

1.  Resolution/action may be taken at any reviewing level and may include any appropriate remedy as authorized by Oklahoma law.

2.  Grievances rendered moot by the inmate/offender discharging will not

Exhibit 21-12

| Section-09 Programs | Page: 12 | OP-090124 | Effective Date: 07/19/2016 |

require a response.

VII.   Appeal Process and Procedure (4-4284, 4-4301)

A.   Grounds for Appeal

The inmate/offender may appeal the reviewing authority's response to the grievance on the following grounds only:

1.   Upon newly discovered/available evidence not considered by the reviewing authority, relevant to the issue and necessary for a proper decision. The inmate/offender must state why the evidence was not previously available and how, if considered, it may alter the decision. The inmate/offender must clearly state the newly discovered/available evidence; or

2.   Probable error committed by the reviewing authority in the decision such as would be grounds for reversal.  The inmate/offender must clearly state the error committed by the reviewing authority, including the specific section of procedures or statutes not followed by the reviewing authority.

B.   Final Appeal to Administrative Review Authority

The inmate/offender may make a final appeal to the ARA, personal identity ARA or Medical ARA, whichever is appropriate, within 15 days of receipt of the reviewing authority's decision or any amended decisions.

1.   Submission of the Grievance Appeal

a.   The inmate/offender will submit only the "Misconduct/Grievance Appeal to Administrative Review Authority" (DOC 060125V). Inmates/offenders are to maintain a copy of the appeal and related grievance paperwork for their record. The original paperwork will be retained by the reviewing authority.

b.   No additional attachments, except an affidavit if required, are allowed.  Pages may not be stapled, glued, taped, reduced in size, or otherwise affixed together to count as one page.

c.   The ARA will notify the responding facility when decisions are appealed by the inmate/offender.  The "Request to Staff," "Inmate/Offender Grievance," and "Grievance Decision from Reviewing Authority" will be provided in electronic format to the ARA by designated staff within five (5) days.

d.   Each grievance inmate/offender appeal form must be

EXHIBIT L

| Section-09 Programs | Page: 13 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

submitted in a separate envelope and mailed through the U.S. Postal Service.

Grievance appeals unrelated to medical must be mailed to:.

> Administrative Review Authority
> P.O. Box 11400
> Oklahoma City, OK 73136-0400

Grievance appeals involving medical issues must be mailed to:

> Medical Administrative Review Authority
> 2901 N. Classen Blvd., Suite 200
> Oklahoma City, OK 73106

Grievance appeals involving personal identity issues must be mailed to:

> Personal Identity Administrative Review Authority
> P.O. Box 11400
> Oklahoma City, OK 73136-0400

e. The ARA will notify the inmate/offender when grievances and grievance appeals are submitted improperly. The inmate/offender will be given one opportunity to correct any errors, which must be received by the ARA within 10 days of the time the inmate/offender is notified of improper submission. If the inmate/offender fails to correct the errors or properly resubmit, the grievance or grievance appeal will not be answered and the inmate/offender will have waived/forfeited the opportunity to proceed in the grievance process.

2. Co-Pay

a. Inmates/offenders will be charged $2.00 per grievance appeal submitted to the ARA. Inmates/offenders will not be refused access to the appeal process because of their financial status. If there are not enough funds to cover this cost, the amount will be collected as soon as funds become available.

b. After answering the grievance, the ARA will submit a copy of the "Misconduct/Grievance Appeal to Administrative Review Authority" to the facility trust fund officer at the facility where the inmate is currently housed, for the $2.00 fee to be entered into the system as a "Legal Co-Pay." If a reinvestigation ⌐ amended response to the grievance is ordered, n⌐ be collected.

| Section-09 Programs | Page: 14 | OP-090124 | Effective Date: 07/19/2016 |

3.   The ARA has 30 days from receipt of the appeal to respond. If more time is required, the inmate/offender will receive written notification, and the due date will be extended no more than an additional 30 days.

4.   The ARA will retain one legible paper or digital copy of all grievance paperwork on file. A legible paper or digital copy of the response will be sent to the reviewing authority who will provide a copy of the response to the inmate/offender. Each response will be handled and recorded according to privilege mail procedures.

5.   Grievances and grievance appeals which present more than one issue or which are not submitted in accordance with this procedure will not be answered.

C.   Administrative Review Action

If the ARA determines that the grievance needs further investigation or review by the reviewing authority, the grievance may be returned to the reviewing authority for further investigation and for an amended response to the inmate/offender.

1.   If the grievance is returned to the reviewing authority, the inmate/offender will be notified by the ARA where the grievance has been sent.

2.   The reviewing authority will respond within 20 days of receipt of the returned grievance with an amended response.

3.   The reviewing authority will scan a copy of the amended response to the ARA.

4.   If the inmate/offender has grounds for appealing the reviewing authority's amended response, as provided in Section VII. item A. of this procedure, the inmate/offender may submit a grievance appeal within the guidelines and time frames specified in this procedure.

D.   Final Ruling

1.   The ruling of the ARA is final and will conclude the internal administrative process available to the inmate/offender within the jurisdiction of ODOC. The inmate/offender will have satisfied the exhaustion of internal administrative remedies required by Oklahoma Statute 57 O.S. § 564.

2.   The agency grievance procedure does not satisfy the additional requirements for exhaustion of administrative remedies required by the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq.

| Section-09 Programs | Page: 15 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

Inmates/offenders may also be required to file a tort claim prior to filing a lawsuit.

VIII. <u>Emergency or Sensitive Grievances</u>

A. <u>Process</u>

Grievances may be submitted directly to the reviewing authority without informal resolution process when the complaint is of a sensitive nature or when substantial risk of personal injury, sexual assault or other irreparable harm exists. The inmate/offender must use the "Inmate/Offender Grievance" form (<u>DOC 090124A</u>). (PREA 115.52 (a), 115.52 (b)(3), 115.52 (c), 115.52 (f)(1))

1. Emergency Grievance

A complaint of an emergency nature is one in which the complainant alleges irreparable harm or personal injury will occur and which the grievance process will be unable to address in a timely, preventive manner. The word "emergency" will be written at the top of the grievance before submission

2. Sensitive Grievance

A complaint of a sensitive nature is one in which the complainant alleges misconduct by a staff member who either directly supervises the inmate/offender or is the reviewing authority where the inmate/offender is assigned. The word "sensitive" will be written at the top of the grievance before submission.

There will be no time limit to any portion of a grievance regarding an allegation of sexual abuse. (PREA 115.52 (b)(1)) Grievances of alleged incident of sexual abuse may be filed at any time, regardless of time the incident occurred. (PREA 115.52 (b)(4)). This provision does not restrict the agency's ability to assert as an affirmative defense any applicable statute of limitations in response to an inmate/offender lawsuit. (PREA 115.52 (b)(4))

3. The inmate/offender will describe the reason why they believe the grievance to be of an emergency or sensitive nature that justifies not submitting the grievance through normal procedures and attempting informal resolution. The grievance must include a statement specifying the personal injury or irreparable harm at risk.

4. The inmate/offender will forward the grievance directly to the reviewing authority that can provide immediate resolution. If the complaint involves the reviewing authority and is of a sensitive nature, the grievance may be brought directly to the ARA, whichever is

Exhibit 21-16

| Section-09 Programs | Page: 16 | OP-090124 | Effective Date: 07/19/2016 |

appropriate. (PREA 115.52(c)(2))

B.  Upon receipt of a grievance marked "emergency" or "sensitive," the reviewing authority will have 24 hours to determine if it is in fact an emergency or sensitive grievance.  If so, an expedited review will be conducted and a response provided to the inmate/offender within 48 hours of receipt, excluding weekends and holidays. (PREA 115.52(d)(1)) The inmate/offender may appeal that response as provided for in Section VII. of this procedure. The ARA will provide an expedited response to all verified emergency or sensitive grievances within 72 hours of receipt of the grievance, excluding weekends and holidays. (PREA 115.52(d)(1), 115.52(d) (2)(3)(4))

C.  <u>Assistance for Filing a Grievance Regarding Allegations for Sexual Abuse</u>

1.  Third parties, including fellow inmates/offenders, staff members, family members, attorneys, and outside advocates shall be permitted to assist inmate/offenders in filing requests for administrative remedies relating to allegations of sexual abuse and shall also be permitted to file such requests on behalf of inmates/offenders. (PREA 115.52 (e)(1))

2.  If a third party files such a request on behalf of an inmate/offender, the facility may require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf, and may also require the alleged victim to personally pursue any subsequent steps in the administrative remedy process. (PREA 115.52 (e)(2))

3.  If the inmate/offender declines to have the request processed on his or her behalf, the agency shall document the inmate's/offender's decision. (PREA 115.52 (e)(3))

D.  <u>Determination that a Grievance is Not Emergency or Sensitive</u>

When the appropriate reviewing authority determines that a grievance is not of an emergency or sensitive nature, the inmate/offender will be provided written notification that the grievance is not of an emergency or sensitive nature and that the standard grievance process must be followed. (PREA 115.52 (b)(2), 115.52 (f)(2), 115.52 (g))

E.  <u>Co-Pay</u>

Inmates/offenders will be charged the $2.00 legal co-pay as specified in this procedure for submission of an emergency or sensitive grievance.  If relief is granted, no co-pay will be charged.

IX.  <u>Abuse of the Process</u>

| Section-09 Programs | Page: 17 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

A.  Determining Abuse of the Grievance Process

    1.  The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))

        a.  Grievances intended to harass another;

        b.  The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);

        c.  The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;

        d.  Grievances about de minimis (small, trifling, no available remedy) issues;

        e.  Repetitive grievances by multiple inmates/offenders about the same issue;

        f.  An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;

        g.  Continued procedural defects, such as submitting additional pages, after having been previously warned.

    2.  If abuse of the process is determined, the inmate/offender will be notified in writing, citing the above listed reason or reasons the inmate/offender has been placed on grievance restriction. A copy of the determination will be placed in the inmate's/offender's field file and a copy will also be provided to the reviewing authority and the ARA. If the determination of abuse of the process is taken at the first level of review, the action is appealable to the ARA.

B.  Restriction Process

    1.  The grievance restriction may be imposed for a period not longer than 12 months. Further abuses are grounds for extending the restriction. An extension will not exceed 12 months from the date of notification of restriction extension.

    2.  For all grievances and appeals submitted during the restriction period, the inmate/offender is required to show cause as to why they should be permitted to grieve. Cause will be shown as follows:

| Section-09 Programs | Page: 18 | OP-090124 | Effective Date: 07/19/2016 |

a. The inmate/offender will submit a duly verified affidavit, made under penalty of discipline for lying to staff, attached to the grievance and appeal, stating that all contents of the grievance are true and correct to the best of the inmate's/offender's knowledge. The affidavit will also contain a complete, accurate, and legible list by grievance number, date, description, and disposition at each level, of all grievances previously submitted by the inmate/offender within the last 12 months. Each page of the affidavit must be legible and signed, verified and notarized at the end of the text. Copies of notaries will not be accepted.

b. In each case, before considering the merits of the grievance or appeal, the reviewing authority will determine whether the inmate/offender has complied with the requirements for being permitted to submit a grievance or appeal.

c. If the inmate/offender has not complied with all requirements for submitting a grievance or appeal, the inmate/offender will be provided written notification and the grievance or appeal will not be answered.

d. The grievance or appeal may proceed when the inmate/offender meets the guidelines outlined in this procedure.

X. Confidentiality and Use

A. File Maintenance and Access

1. All inmate/offender grievance records will be treated as restricted and will be maintained in a file separate from the inmate/offender field file and medical record. (4-ACRS-7D-09)

2. Access will be limited to corrections employees who need such information in the performance of their duties, such as staff members preparing responses to grievances and investigations.

B. Attachments to Special Reports

Copies of inmate/offender "Request to Staff," grievances and/or appeals will be made an attachment to all special reports ordered by any court. If no grievance was submitted by an inmate/offender plaintiff, an affidavit attesting to that fact will be made an attachment to the special report.

XI. Monitoring of Inmate/Offender Grievances

| Section-09 Programs | Page: 19 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

A. Grievance Report Log

   1. The reviewing authorities and CHSA's, and/or their designees, will record all submitted inmate/offender grievances and the actions taken at each level using the "Grievance Log" (DOC 090124C, attached). The log will be maintained for statistical purposes at the location of origin. (4-ACRS-6B-03, 4-APPFS-2G-02)

   2. The ARA will maintain electronic records of all submitted inmate/offender grievance appeals and the action taken at each level.

   3. The Medical ARA may maintain electronic or manual records of all submitted inmate/offender grievance appeals and the action taken at each level.

B. Records Keeping

A copy of all grievances submitted and dispositions of those grievances will be maintained for three (3) years at each level the grievance was submitted. At the end of the three (3) year period, the material may be disposed of in accordance with OP-020202 entitled "Management of Office Records."

XII. Submitting a Grievance Out of Time

A. If a grievance has been denied by the reviewing authority and the ARA or Medical ARA due to the grievance not being submitted in a timely manner, the inmate may make a request to submit a grievance out of time by submission of the "Request to Submit a Misconduct/Grievance Appeal Out of Time" (DOC 060125T). The grievance will not be attached to the form.

B. The request may be submitted to the ARA or Medical ARA, whichever is appropriate, and must be received within 15 days of the date of denial of the untimely grievance or appeal by the ARA or Medical ARA.

C. The inmate must prove by substantial evidence that he/she did not submit the grievance or appeal in a timely manner through absolutely no fault of his/her own.

D. If the request to submit an untimely appeal is granted, the inmate will be directed to properly re-submit the appeal with the ARA or Medical ARA within 15 days.

XIII. References

OP-020202 entitled "Management of Office Records"

OP-060125 entitled "Offender Disciplinary Procedures"

| Section-09 Programs | Page: 20 | OP-090124 | Effective Date: 07/19/2016 |
|---|---|---|---|

42 U.S.C. § 1997e

51 O.S. § 151 et seq.

57 O.S. § 564, § 566 et seq.

Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819 (2001)

Jernigan v. Stuchell, 304 F.3d 1030 (10th Cir. 2002)

Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983 (2002)

XIV.   Action

The division manager is responsible for compliance with this procedure.

The General Counsel is responsible for the annual review and revisions.

Any exceptions to this procedure will require prior written approval from the director.

This procedure is effective as indicated.

Replaced:      Operations Memorandum No. OP-090124 entitled "Offender Grievance Process" dated November 20, 2014

Deleted:       OP-090124 Revision-01 dated November 21, 2014

               OP-090124 Revision-02 dated June 15, 2015

Distribution:  Policy and Operations Manual
               Agency Website

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **LAMONE MORLEE JOHNSON,** | |
| **Plaintiff,** | |
| **vs.** | **Case No. CIV-19-269-JHP-SPS** |
| **DR. SANDERS, ET Al.,** | |
| **Defendants.** | |

**DEFENDANTS' APPLICATION FOR ORDER DIRECTING PREPARATION OF
*MARTINEZ* REPORT AND HOLDING IN ABEYANCE/SET DEADLINE FOR
ANSWER AND/OR DISPOSITIVE MOTIONS**

COME NOW Defendants Sanders, Larimer, Martinez, Morrison and Taylor by and through their attorney of record Darrell L. Moore, OBA 6332 of J. Ralph Moore, P.C., hereby making application to the Court for an Order holding in abeyance Defendants' time to Answer, setting an alternate deadline for filing an answer and/or dispositive motions, and, requiring the preparation and submission of a *Special Report*. In support of this application, Defendants state as follows:

1.      Plaintiff's complaint was filed with this Court pursuant to 42 U.S.C. § 1983.  Plaintiff Lamone Johnson, ODOC #744047, is a person in the custody of the Oklahoma Department of Corrections and is presently confined in a penal institution in the State of Oklahoma.  Plaintiff alleges in his complaint that Defendants violated his constitutional rights.

2.      The United States Court of Appeals for the Tenth Circuit, in Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978), held that in an inmate litigation case it was an appropriate step for the District Court to Order prison officials to prepare an

1

administrative record reviewing a plaintiff's allegations so as to enable the Court to decide preliminary issues.  Several years later, in Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir. 1991), the Tenth Circuit Court of Appeals stated: "When the pro se plaintiff is a prisoner, a court-authorized investigation and report by prison officials (referred to as a *Martinez* report) is not only proper, but may be necessary to develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims."

3.     CoreCivic, Inc., owns and operates the Davis Correctional Facility, Holdenville, Oklahoma.  Defendants Sanders, Larimer, Martinez, Morrison and Taylor are employed by CoreCivic at Davis Correctional Facility.  The Oklahoma Department of Corrections and CoreCivic have contracted to house prisoners at the medium security/maximum security prison facility named "Davis Correctional Facility."

4.     Defendants request the Court issue an Order directing officials responsible for the operation of Davis Correctional Facility to prepare an administrative report for submission to the Court, consistent with the Martinez and Hall holdings.  Defendants request authority to obtain and review all pertinent records including, but not limited to, financial, medical and psychiatric records.  Defendants further request the Court issue an Order holding in abeyance further discovery and their time to file an Answer and/or file dispositive motions until such time as a *Special Report* has been prepared and filed with the Court.

WHEREFORE, premises considered, Defendants hereby request the Court enter an Order requiring and authorizing Davis Correctional Facility prison officials to prepare and file a Special Report; and, an Order setting deadlines for the filing of an answer

and/or dispositive motion; and, for any and all further relief to which the Defendants may

be entitled.

Respectfully submitted,
Defendants Sanders, Larimer, Martinez,
Morrison and Taylor

BY:_____

Darrell L. Moore, OBA #6332
J. Ralph Moore, PC
P.O. Box 368
Pryor, OK  74362
Tele: (918) 825-0332
Fax: (918) 825-7730
darrellmoore@jralphmoorepc.com

### Certificate of Service

☐ I hereby certify that on October 16, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants: (insert names)

☑  I hereby certify that on October 16, 2019, I served the attached document by regular US Mail on the following, who are not registered participants of the ECF System:

Lamone Morlee Johnson, DOC# 744047
Davis Correctional Facility
6888 E 133rd Rd
Holdenville, OK 74848

_____
DARRELL L. MOORE

3

Appellate Case: 23-7031     Document: 010110881265     Date Filed: 06/30/2023     Page: 267

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

LAMONE M. JOHNSON,          )
                                  )
                Plaintiff,      )
                                  )
v.                                )     Case No. CIV-19-269-JHP-SPS
                                  )
DR. SANDERS, et al.,           )
                                  )
                Defendants.   )

## ORDER STAYING PROCEEDINGS AND REQUIRING SPECIAL REPORT

The court has determined that an investigation and report would be helpful in determining whether there are any factual or legal bases for Plaintiff's claims. *See Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991); *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978).

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

(1)    Officials responsible for the institution(s) involved in the alleged civil rights violation shall undertake a review of the subject matter of the complaint:

    (a)    to ascertain the facts and circumstances;

    (b)    to consider whether any action can and should be taken by the institution(s) or other appropriate officials to resolve the subject matter of the complaint; and

    (c)    to determine whether other like complaints, whether pending in this court or elsewhere, are related to this complaint and should be taken up and considered together.

(2)    In the conduct of the review, a written report shall be compiled and filed with the court.  Authorization is granted to interview all witnesses including

Plaintiff and appropriate officers of the institution(s).   Wherever appropriate, medical or psychiatric examinations shall be made and included in the written report.   Any rules and regulations pertinent to the subject matter of the complaint shall be included in the written report.

(3)    All pending motions in this case are hereby stricken without prejudice.   No applications, motions, or discovery should be filed or considered until the steps set forth in this Order have been completed, except as the court further orders.

(4)    It is desired that the report made in the course of this investigation be attached to and filed with Defendants' answer or dispositive motion.   **The report and Defendants' answer or dispositive motion, shall be filed no later than sixty days from this date.**

**IT IS SO ORDERED** this 16th day of October, 2019.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

LAMONE JOHNSON,

     **Plaintiff,**

vs.           **Case No. CIV-19-269-JHP-SPS**

DR. SANDERS, et al.,

     **Defendants.**

---

### DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT.

---

COME NOW Defendants Sanders, Larimer, Martinez, Morrison and Taylor by and through their attorney of record, Darrell L. Moore, OBA #6332, submitting their Answer in opposition to Plaintiff's Amended Complaint filed with the Court on August 14, 2019. Defendants' Answer is presented in the same numerical sequence and style as presented by the Plaintiff, as follows:

(Amended Complaint Page 2 of 14)

I. JURISDICTION

Defendants admit that jurisdiction is appropriate under 42 USC § 1983.

II.  PLAINTIFF INFORMATION

Defendants admit that at the time of the Plaintiff's filings he was housed at Davis Correctional Facility.  Plaintiff has since been transferred by Oklahoma DOC to the Oklahoma State Penitentiary.

III.  PRISONER STATUS

Defendants admit that Plaintiff is a convicted and sentenced state prisoner.

(Amended Complaint Page 3 of 14)

IV.  DEFENDANTS' INFORMATION

---

1

Defendant 1.   Defendants admit that Defendant Sanders is a physician at Davis Correctional Facility.

Defendant 2.   Defendants admit that Defendant Larimer is the Health Services Administrator at Davis Correctional Facility.

(Amended Complaint Page 4 of 14)

Defendant 3.   Defendants admit that Defendant Martinez is a Unit Manager at Davis Correctional Facility.

Defendant 4.   Defendants admit that Defendant Taylor is a Case Manager at Davis Correctional Facility.

Defendant 5.   Defendants admit that Defendant Morrison is the Property/Intake Officer at Davis Correctional Facility.

(Amended Complaint Page 5 of 14)

STATEMENT OF CLAIMS

A. Claim 1

Defendants deny Plaintiff's allegations. Plaintiff was not deprived of or denied due process.

B. Claim 2

Defendants deny Plaintiff's allegations. Plaintiff was not deprived of or denied appropriate and adequate medical treatment.

(Amended Complaint Page 6 of 14)

A. Claim 1

Defendants deny Plaintiff's allegations.  Plaintiff was not deprived of or denied due process.   Defendants followed Oklahoma DOC policy.

(Amended Complaint Page 7 of 14)

Defendants deny Plaintiff's allegations.  Plaintiff was not deprived of or denied due process.

(Amended Complaint Page 8 of 14)

Defendants deny that Plaintiff is entitled to any form of relief, monetary or otherwise.

B. Claim 2

Defendants deny Plaintiff's allegations.  Plaintiff was not deprived or denied appropriate and adequate medical treatment.  Defendants followed Oklahoma DOC policy.

(Amended Complaint Page 9 of 14)

Defendants deny Plaintiff's allegations.  Plaintiff was not deprived of or denied adequate medical treatment.  Defendants followed Oklahoma DOC policy.

(Amended Complaint Page 10 of 14)

Defendants deny Plaintiff's allegations.  Plaintiff was not deprived of or denied adequate medical treatment.  Defendants followed Oklahoma DOC policy.

(Amended Complaint Page 11 of 14)

Defendants deny that Plaintiff is entitled to any form of relief, to include injunctive relief.

Defendants deny that Plaintiff is entitled to any form of relief, monetary or otherwise.

(Amended Complaint Page 12 of 14)

C. Claim 3

Defendants deny Plaintiff's allegations.  Plaintiff was not subjected to retaliation for filing grievances.  Defendants deny Plaintiff's allegations that he was in danger.

D. Claim 4

Defendants deny Plaintiff's allegation of discrimination.  Plaintiff was not subjected to discrimination.

## **DEFENDANTS' AFFIRMATIVE DEFENSES**

As separate affirmative defenses to the averments contained in the Plaintiff's Complaint, Defendants state as follows:

1.     As a separate and alternative affirmative defense, Defendants assert Plaintiff has failed to state a claim or claims upon which relief could be granted against these answering Defendants.  To state a claim in federal court, a complaint must explain what a Defendant did to the Plaintiff, when the Defendant did it, how the Defendant's action harmed the Plaintiff, and what specific legal right the Plaintiff believes the Defendant violated. *See* Nasious v. Two Unknown B.I.C.E Agents, 492 F.3d 1158, 1163 (10th Cir. 2007). Plaintiff has failed to plausibly plead that Defendants, by virtue of their own conduct and state of mind, violated the Constitution.  *See* Dodds v. Richardson, 614 F.3d 1185, 1198 (10th Cir. 2010).

2.     As a separate and alternative affirmative defense, Defendants assert that pursuant to 57 O.S. §566.4(B)(1), no policy or internal management procedure issued for the management of a prison or jail shall constitute any contractual relationship or obligation between the prison or any of its officers, members, servants or employees and the prisoner.

3.     As a separate and alternative affirmative defense, Defendants assert that at all times material to Plaintiff's Complaint, Defendants acted in good faith and in a reasonable manner given the information and circumstances existing at the time.

4.     As a separate and alternative affirmative defense, Defendants assert that the constitutional rights of Mr. Johnson were not violated.

5.      As a separate and alternative affirmative defense, CoreCivic's employees were supervised and controlled in a manner that was constitutional, proper, and sufficient under state and federal law.

6.      As a separate and alternative affirmative defense, no policy or custom of Defendant CoreCivic caused or contributed to a violation of any of Mr. Johnson's constitutional rights.

7.      As a separate and alternative affirmative defense, Defendants assert that any state law claims of Plaintiff are barred in that Plaintiff did not first comply with the notice requirements of 57 O.S. §566.4(B)(2).

8.      As a separate and alternative affirmative defense, Defendants state they intend to rely upon other defenses as may become apparent or available during discovery proceedings or which may be raised by separate motion as permitted by the Rules of Civil Procedure.

## **CONCLUSION**

WHEREFORE, Defendants pray the Court enter its order of judgment in favor of Defendants and against the Plaintiff; that the Court dismiss the Plaintiff's allegations as set forth above; that the Plaintiff take nothing by way of her Complaint filed herein; and, that the Defendants be awarded their attorney fees and costs for defense of this action and receive any and all other appropriate relief.

Respectfully submitted,
Defendants Sanders, Larimer, Martinez, Morrison and Taylor

BY:_____
Darrell L. Moore, OBA #6332
J. Ralph Moore, PC
P.O. Box 368
Pryor, OK  74362
Tele: (918) 825-0332

5

273

Fax: (918) 825-7730
darrellmoore@jralphmoorepc.com

### C*ertificate of Service*

☐ I hereby certify that on January 28, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants: (insert names)

☑  I hereby certify that on January 28, 2020, I served the attached document by regular US Mail on the following, who are not registered participants of the ECF System:

Lamone Johnson, DOC# 744047
Oklahoma State Penitentiary
P.O. Box 97
McAlester, OK 74502-0097

_____
DARRELL L. MOORE

IN THE UNITED STATES
DISTRICT FOR THE EASTERN
DISTRICT OF OKLAHOMA

FILED

JAN 29 2020

PATRICK KEANEY
Clerk, U.S. District Court
By_____
Deputy Clerk

Colene M. Johnson,
                    Plaintiff,
          V.
J's Sanders, et al.,
                    Defendants

AMENDED
MOTION LEAVE
TO FILE A
PROPER MOTION
FOR APPOINTMENT
OF COUNSEL
Civil No. CIV-19-269-JHP-SPS

Pursuant to 28 U.S.C. § 1915(e)(1) Plaintiff moves for an order appointing Counsel to represent her in this case. In support of this motion Plaintiff states:

(1) Plaintiff is unable to afford Counsel. She has requested leave to proceed in forma pauperis

(2) Plaintiff's imprisonment will greatly limit her ability to litigate. The issues involved in this case are complex and will require significant research and investigation. Plaintiff is now housed at Oklahoma State Penitentary maximum facility whom legal research center is confusing and hard to comprehend. Plaintiff has limited access to law libary and limited knowledge

of the law.

(3.) A Trial in this case will likely involve conflicting testimony, and counsel would better enable Plaintiff to present evidence and cross examine witnesses and perform depositions and inspections and get an examination by a outside doctor.

(4.) Counsel for Plaintiff could effectively communicate with defendant(s) counsel so that No "New" right violations occur.

(5.) WHEREFORE Plaintiff's request that the Court Order "Appointment of Counsel" to represent her in this Case.

Respectfully Submitted, this
27 day of January 2020

Lamore M. Johnson

O.S.P.
P.O. Box 97
McAlester, OK 74502

Pg 2

Certificate-Of-service

I hereby certify that a copy of the
foregoing Pleading/document was
mailed to Defendants Counsel at
Darrell L. Moore BA 6332
P.O. Box 368
Pryor, OK 74362
on 27th of January
2020

Damoell

PJ 23

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LAMONE MORLEE JOHNSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. CIV 19-269-JHP-SPS** |
| | ) | |
| **DR. SANDERS, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER
### DENYING MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff has filed a motion requesting the Court to appoint counsel (Dkt. 34).   He bears the burden of convincing the Court that his claim has sufficient merit to warrant such appointment. *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985) (citing *United States v. Masters*, 484 F.2d 1251, 1253 (10th Cir. 1973)).   The Court has carefully reviewed the merits of Plaintiff's claims, the nature of factual issues raised in his allegations, and his ability to investigate crucial facts.   *McCarthy*, 753 F.2d at 838 (citing *Maclin v. Freake*, 650 F.2d 885, 887-88 (7th Cir. 1981)).   After considering Plaintiff's ability to present his claims and the complexity of the legal issues raised by the claims, the Court finds that appointment of counsel is not warranted.   *See Williams v. Meese*, 926 F.2d 994, 996 (10th Cir. 1991); *see also Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995).

**ACCORDINGLY,** Plaintiff's motion for appointment of counsel (Dkt. 34) is DENIED.

**IT IS SO ORDERED** this 7th day of February 2020.

James H. Payne
United States District Judge
Eastern District of Oklahoma

FILED

MAR 1 1 2020

PATRICK KEANEY
Clerk, U.S. District Court
Deputy Clerk

Lamone M. Johnson,
    Plaintiff,
    v.
Dr. Sanders et al.
    Defendants,

PLAINTIFF'S
OPPOSITION
TO DEFENDANTS
MOTION TO
DISMISS AND
SPECIAL REPORT
Case No. CIV-19-269-RAW-SPS

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION TO DISMISS AND SPECIAL REPORT.

Comes Now Plaintiff Lamone M. Johnson (Ms. Lamone M. Johnson) in Opposition to Defendants Sanders, Larimer, Martinez, Morrison and Taylor's motion to dismiss and special report.

Claim 1: Defendants denied Plaintiff's Claim 1, alleging that Plaintiff was not deprived of or denied due process

Claim 2: Defendants denied Plaintiff's Claim 2, alleging that Plaintiff was not deprived of or denied appropriate and adequate medical treatment.

Footnote: 1 - It should be noted that the Plaintiff is a male-to-female transgender whom Prefers female pronouns she/her/Ms.
See 28 C.F.R. §115.5

279

Appellate Case: 23-7031    Document: 010110881265    Date Filed: 06/30/2023    Page: 280

Pg. 2

Claim 3: Defendants denied Plaintiffs Claim 3, alleging that Plaintiff was not subjected to retaliation for filing grievances. Defendants deny that Plaintiff was in Danger.

Claim 4: Defendants denied Plaintiff's Claim 4, alleging that Plaintiff was not subjected to discrimination.

## PLAINTIFF'S ARGUMENT AND AUTHORITY

Claim 1: The Due Process Clause of the fourteenth Amendment forbids the State from depriving any Person of "life, liberty, or property, without due Process of law." See U.S. Const. amend. XIV, § 1.; The Clause has been interpreted as containing two seperate types of Protection. "substantive due Process" and "Procedural due Process" Both are being applied in this Claim.

(i) Substantive Due Process. The substantive aspect of the Due Process Clause Prevents the Government from interfering with Your Personal fundamental rights in a way that's not "reasonably related to legitimate Penological

Pg 93

interests." See Turner V. Safley, 482
U.S. 78, 87 (1987); Plaintiff Ms. Johnson
(Monáe) is a Pre-operative Transgender
(MTF) whom was born a male, but
strongly identifys as a female. (See
Compl., A Claim 1, Pg's 5,6.) The Plain-
tiff was approved at Joseph harp Corr.
Center (a med security Facility) to
order cosmetics do to her being a
Transgender Woman in a males Person.
(See COMPL. A. Claim 1, Pg 5,6, Exhibit 1)
He warden carl beer approved this.
Ms. Johnson was transferd to multiple
Facilitys after leaving J.H.C.C. (See
Compl. A Claim 1, pg 5,6,7) Now only
one facility confiscated Ms. Johnson's
Cosmetics. That facility was D.C.F.
That Person was SGT Morrison (Defe-
ndant) whom assessed the Plaintiff
at D.C.F. Intake. The defendant SGT
Morrison searched the Plaintiff's
Property found the cosmetics and frowned
and stated "oh hell no, he will not walk
around at this facility with make-up."
(See COMPL. A. Claim 1, Pg 5, Pg 6, Pg 7)
Defendants allege that Plaintiff failed to
include in her complaint what a defendant
did to the Plaintiff, when the Plaintiff did
it, how the defendants actions harmed the
Plaintiff and what specific legal rights

Pg.4

the Plaintiff believes the defendant violated. This defense is erroneous, more appropriate terms; Irrelevant. It's clear in the Plaintiff's complaint that Plaintiff went beyond the scope of describing the events which took place, when indeed the Fed. R. Civ. P. 8.(a) states provide "a short and plain statement" On these grounds, the defendant's argument has no merit. Now Defendant's cited Nasious V. Two Unknown B.I.C.E. Agents, 492 F.3d 1158, 1163 (10th Cir. 2007), In this case the Plaintiff filed a 42 U.S.C. S 1983 listing "20 individual defendants, as well as scores of John and Jane Doe defendants, in a 42-page complaint that is, through much of the document, often difficult to comprehend" id. Nasious, 492 F.3d 1160 (10th Cir. 2007) In response to this the federal magistrate judge overseeing the case entered an order indicating that Mr. Nasious's pleading did not comply with the requirements of federal rules of civil procedure 8 which instructs "Each averment of a pleading shall be simple, concise, and direct." Fed. R. Civ. P. 8(e) which in this case Plaintiff Ms. Johnson met the pleading requirements. So this case does not apply to Ms. Johnson's complaint. Next

Pg5

Defendants allege that "plaintiff has failed to plausibly plead that Defendants, by virtue of their own conduct and state of mind, violated the Constitution. See Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010) In this case a plaintiff was denied bail due to a County Clerks policy, The plaintiff sued the Sheriff in his individual capacity, the Defendant (sheriff) claimed qualified immunity the court held that (1) fact issue remained as to deprivation of arrestees due process rights"; (2) fact issue remained as to sheriff's personal involvement causing due process violation; (3) fact issue remained as to sheriff's deliberate indifference to arrestees due process right; and (4) fact issue remained as to deprivation of clearly established due process right. id Dodds v. Richardson, 614 F.3d 1185, 1208 (10th Cir. 2010) In plaintiff's case the Defendants all had Personal involvement in violating ms. Johnson's rights ( see exhibit's 4D, 5, 5(Backside,), 61, 62, 41, 18-3, 18-4, 18-5, 18-6, 18-7, 19-1, 19-2, 19-3, 19-4, 19-6, 19-7, 19-8, 19-9, 19-20, 19-21, 19-21 (Backside), 19-22, 19-23, 19-24, 19-25, 19-26, 19-27, 20-1, 20-2, 20-3, 20-4, 20-5, 20-6, 20-7, 22-1, 22-1 (Backside), 22-2, 22-2 (Backside), 22-3, 22-4, 22-5, 23-3, 25-1, 25-2, 25-3, 25-4, 25-5, 25-6, 25-7, 25-8,

Pg.6

25-9, 25-10, 25.11. Decl. La more Johnson,
Decl. Marquis Porter.) In all respects ms.
Johnson (.) wrote Defendants RTs, Sick calls,
Inmate request, Grievances, Appeals which
Put them on "Notice" that they their actions
were Violating Plaintiff's rights so
the Defendants knew of the risks, unconstitutional
Practice and disregard Plaintiff's rights
(see Farmer V. Brennan, 511 U.S. 825,
842 (1995.); Estelle V. Gamble, 429 U.S.
97 (1976); Gutierrez V. Peters, 111 F.3d 1364,
1369 (7th Cir. 1997.) The state of mind was
clearly "motivated by evil motive or intent,"
"reckless... callous indifference to your
rights." See; Smith V. Wade, 461 U.S. 30
(1983) Plaintiff is entitled to all her
requested reliefs. furthermore defendants
allege they "followed policy of O.D.O.C."
The case that defendant cites is exactly a
Perfect example of when A Policy violates
the Plaintiff rights and the Plaintiff informs
You in Grievances that this "Policy" or "custom"
Violates Your right, You (Defendants) can
be held liable when they continue to follow
that Policy (see Document 37, Defen. Answer
to Plaintiff's Amen Comp. Pg 2,3) See;
Dodds V. Richardson, 614 F.3d 1185, 1194,
1195, 1196, 1197, 1208 (10th Cir. 2010.); Ash-
Croft V. Iqbal, 556 U.S. 662, 129
S.Ct. 1937. 173 L.Ed.2d 868 (2009.);

Pg. 7

Monell V. Dept of Social Serv., 436
U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611
(1978); "Personal involvement is not limited
solely to situations where a defendant a
defendant Violates a Plaintiff's rights by
Physically placeing hands on him" Fogarti V.
Gallegos, 523. F.3d 1147, 1162 (10th Cir.
2008) Personal involvement does not require
direct Participation because § 1983 states
"any official who "causes" a citizen to be
deprived of her constitutional rights can
also be held liable" Buck V. City of
Albuqherque, 549 F.3d 1269, 1279 (10th
Cir. 2008) (Quoting) Snell V. Tunnell, 920
F.2d 673 700 (10th Cir. 1990.). This claim
however is substantive Due Process. see
Green V. Post, 574 F.3d 1294, 1301 (10th. Cir.
2009); we ber V. Mefford, 43 F.3d 1340,
1342 (10th Cir. 1994) ([A] government Official
Violates an individual's fourteenth Amendment
rights by injuring his or her life, liberty, or
Property with deliberate or reckless intent")
Which in this case Defendant SGT
Morrison injured Plaintiff's Property by
destroying it when her supervisor
Cheif doolman told her to return Plaintiffs
Cosmetics (see exhibit 25 R) which by
then SGT Morrison Destroyed "my Property
when indeed I requested it be mailed home
via postal mail", ~~~~~~~~~~~~~~~~ It

Pg 8

was not granted. furthermore Exhibit 3 was submitted to this court on my behalf with the yellow carbon copy which stated the true written form. Defendants submitted a falsified document with error, and fraud. (see <s>et</s> Defendants exhibits 1) stating i refused to sign on 5-16-18 and <s>signed</s> on 8-6-18, That is a straight lie. I refused to sign on 5-16-18 then after speaking to the <s>SGT</s> SGT, i was told to just "file a RTS to medical and if they approve it, i can have it back." which i signed after speaking to the SGT on the exact same day 5-16-18 (see exhibit 3) on 6-12-18 chief dorman stated in a RTS my items would be getting returned. I should SGT Morrison (Defendant) whom still refused to release my property (see exhibit 25-12) The defendant SGT Morrison credibility should be dismissed she is not a reliable witness, for this relief Plaintiff does Pray, also that Defendants <s>defenses</s> seperate and alternative affirmative defenses be denied, dismissed, and that Defendants be denied attorney fees and costs for defense of this action, and that the court rules this motion over Defendants motion to dismiss, and any other appropriate relief. The Procedural Due Process is also vice-versa in this case. <s>Defendants</s> No need to elaborate, Plaintiff Consequently Proved both due

Pg.9

Process Clauses with Argument and
Authority earlier established.

Claim 2: The Eighth Amendment to the U.S.
Constitution gives convicted inmates the right
to medical care. (See Barrie V. Grand
County, Utah, 119 F.3d 862, 868-69, (10th Cir.
1997.) ; Estelle V. Gamble, 429 U.S. 97, 103
(1976.). Jail and Prison officals violate the
constitution when they act with deliberate
indifference to an inmates serious medical
needs (1.) Serious medical need?, The 10th Circut
recognized a serious medical need as "has
been Diagnosed by a physician as mandating
treatment or... is so obvious that even a lay
person would easily recognize the necessity
for a doctor's attention." See: Sealock V.
Colorado, 218 F.3d 1205, 1209, (10th Cir. 2000) ;
Prison officals must take care of the inmates serious
medical needs or else they wouldn't taking care
of." [an] Inmate must rely on prison ~~officals~~
Authorities to treat his medical needs: if the
Authorities fail to do so, those needs will
not be met." Estelle V. Gamble, 429 U.S. 97,
103 (1976.) ; Gender Identity disorder is a
Serious medical need. See: Braun V. Zayaras,
63 F.3d 862, 970 [10th Cir. 1995.] "Prison
officals must provide treatment to address
the medical needs of transexuals Prisoners' ] ;
Cuoco V. Moritsugh, 222 F.3d 99, 106 [2d. Cir.
2000 ] ; Meriwether V. faulkner, 821 F.2d 408

Pg 10

[7 th Cir. 1987.] "; Phillips v. Michigan Dept of Corrections, 731 F.supp. 792, 799. [W.D. mich. 1990] "; Plaintiff Ms. Johnson was and has always been and is a Transgender (transexual) woman (sees comp, exhibits 71, 72, 73)    Plaintiff Ms. Johnson was on HRT (Hormone replacement Therapy) Prior to O.D.O.C. Custody (see exhibits 81, 82, 83, 84, 85, 82 Buckside, 83 Buckside, 13) Plaintiff was on hormone replacement therapy while in the O.D.O.C Custody as well. (see exhibits 10-1, 10-2, 10-3, 10-4) Ms. Johnson Serious medical need was known by defendants.

(2.) Officials knowledge of need? Plaintiff Ms. Johnson filled out "Sick Call slips" (see exhibits: 12-2, 12-3, 12-4, 19-1, 19-2, 19-3) "Grievances" (see exhibits: 18-5, 18-6, 19-4, 19-5, 18-3, 18-4, 18-7, 19-6, 19-7, 19-8, 19-9, 19-20, 19-21, 19-22, 19-23, 19-24, 19-25, 19-26) "Appeals" (see exhibits 19-27, 18-7) and put officials on notice that they were violating Plaintiff rights to serious medical care. the officials met the deliberate indifference claim.

(3.) failure to Provide treatment? ": The U.S. Supreme Court wrote that the constitution Prohibits officials from "intentionally denying or delaying access to medical or intentionally interfering with the treatment once Prescribed."

Jail

[ id. Estelle, 429 U.S. at 104-05 ] Plaintiff Ms. Johnson's medical records show she was evaluated before her incarceration for gender dysphoria by the Oklahoma County Sheriffs Office medical and mental health staff. (See exhibits 8 ) the medical offical is responsible for information that he gets during his examinations of an inmate. Green V. Branson, 108 F.3d 1296, 1303 [ 10th Cir. 1997 ]; review of the inmates and letters from other doctors. Greason V. Kemp, 891 F.2d 829, 831-32, [ 11th Cir. 1990 ] (Prior therapist sent letter to Prison officals and Prison doctor describing inmates current mental health status...)

(a.) You are denied medical attention? ; Plaintiff Ms. Johnson was denied having gender dysphoria and/or Gender identity disorder. When indeed the Psycologist is not a gender identity disorder specialist. She is not qualified to diagnose or deny Plaintiff's treatment. Inmates of Allegheny County Jail V. Pierce, 612 F.2d 754, 762-63 (3d. Cir. 1979) (Jail required to provide inmates access to medical personell qualified to diagnose and treat mental disorders) see exhibits 17-1-113, 17-16, 17-13, 17-22-33. )

b. Offilceas interfere with your Prescribed treatment? Plaintiff Ms. Johnson was on estradiol (estrogen) and Spironolactone (Aldactone) these two medications combited are for Hormone replacement therapy.

289

Pg12

Ms. Johnson was prescribed this treatment
before she was incarcerated and was
continued because it was Previously
Prescribed. (See exhibits 81, 82, 83, 84, 85,
B, 10-01, 10-2, 10-3, 10-4) The defendants
Kay Larimer and Dr. Sanders discontinued
Ms. Johnson's HRT Medication. (See
exhibit 19-1, 19-2, 19-3, 19-4, 19-5)" It is
one thing to fail to Provide an intimate with
care that would improve his or her
medical state, such as refusing to Provide
Sex reassignment Surgery or to operate
on a long-endured cyst. Taking measures
which actually reverse the effects of
Years of healing medical treatment...is
measurably worse, making the Cruel
and unusual determination Much easier."
Phillips V. Mich. Dep't. of Corrections,
731 F. Supp. 792 (W.D. Mich. 1996.)
Wolfe V. Horn, 130 F. Supp. 2d 648, 653
(E.D. Pa. 2001) (ruling that where a
Prison doctor discontinued a Patients
hormone treatment that she had
been receiving for almost a Year,
there was "at least a fact Question as
to whether each of the defendants was
deliberately indifferent to treating [The
Plaintiff's gender identity disorder]) white
V. Napoleon, 897 F. 2d 103, 106-10 (3d Cir.
1990.) Steele V. Shah, 87 F. 3d 1266,

Pg. 13

1270 (11th Cir. 1996) (deliberate
indifference for prison doctor to discontinue
psychotropic medications prescribed
for inmate at previous prison on the
basis of one-minute interview and
without reviewing most medical needs.

4.) Causation And Injury? Plaintiff
Ms. Johnson Informed Defendants of the
Pain She was experiencing, the transformation
She was enduring, the mental health issues
She are experiencing, and the suicide
attempts which Plaintiff have done and
will likely continue to do unless She
is issued her HRT. (See exhibits 19-4, 19-27,
19-24.) Plaintiff Johnson is uncomfortable
with her assigned sex at birth and strongly
desires to be a woman. By having breast
A sex change operation (Sex reassignment
Surgery) To have her Identification
and birth certificate say "female." means
everything to Plaintiff. To have people refer
to her as female Pronouns, means
everything to Plaintiff, Hormone,
Therapy meant everything to Plaintiff
but defendants took that away from
her. Now the Plaintiff suffers from breast
pain, Neck pain, Back pain, Breast Sagging,
(Droopy Breast) Dry Damaged hair, cramps
as well as Plaintiff's suffers from

14

severe Gender dysphoria, not wanting to "Get up", move around, or do any daily activites. Farmer V. Moritsugh 163 F.3d 610, 611 (D.C. Cir. 1998) this condition, also called gender dysphoria "is commonly accompanied by a desire to change ones anatomic sexual features to conform physically with one's perception of self. To relieve this gender discomfort, Transexuals may pursue some combination of hormone therapy, surgery and psychological counseling. They may also choose to live in their preferred gender role by dressing, naming, and conducting themselves in conformity with that gender" see also maggert V. Hanks. 131 F.3d 670, 671 (7th cir. 1997) (describing gender dysphoria as "a profound psychiatric disorder.") by stopping the plaintiff's medication it amounted to deliberate indifference to a serious medical need especially when the defendants knew of the Irrepable harm the Plaintiff would face, Greason V. Kemp, 891 F.2d 829, 834 (11th cir. 1990) Waldrop V. Evans, 871 F.2d 1030, 1033-34 (11th cir. 1989) furthermore claim 2 shall not be dismissed because the defendants met the requirements, Defendants affirmative defenses and requested attorneys cost and fees shall be denied. For this relief

Pg. 15

Plaintiff does Pray.

Claim 3: To win a failure-
to. Protect claim, You must Prove
that the Officals whom You are suing
actually knew about a substantial
risk of serious harm and Yet failed
to respond reasonably.

(1.) Substantial risk of serious harm?
In 1994 the U.S. Supreme Court held
that the Constitution gives inmates a right
to be Protected from assualt by other
inmates. Farmer V. Brennan, 511 U.S. 825
(1994); Plaintiff Ms. Johnson was threatened
by the STG "Rolln 60's" because of her
Sexual identity. The Plaintiff was
informed by other inmates that the STG
(Security threat group.) Paid other inmates
to Kill her and another inmate "on Sight." Plaintiff
Ms. Johnson filed a RTS (Start of the Grievance
Process) to her Case manager-Defendant
Shanny Taylor, informing her of the threat.
(See exhibit 22-1) this threat was a
Substantial risk of serious harm. Both
defendants were made aware of this harm.
(See Compl, See declarations of Plaintiff and
inmate Martin's Ryter) The Plaintiff is the minority
group "LGBTQIP" Community. Due to this

Pg.16

another inmate, Plaintiff is only safe around
that other inmate whom has the same
Contract Placed on him, Any other inmate
Could be paid currency to harm Plaintiff,
Plaintiff is currently housed at O.S.P.
(Oklahoma State Penitentary) where 2
of these Inmates whom are paid to
harm her reside alsoo Farmer, 511 uses
at 843 (" [I]t does not matter
whether the risk comes from a single source
or multiple sources, anymore than it matters
whether a prisoner faces an excessive
risk of attack for reasons Personal to him
or because all Prisoners in his situation
face such a risk.") Marsh V. Butler County
268 F.3d 1014, 1029 (11th Cir. 2001)(en
banc)(listing multiple conditions of
confinement that could give rise to
Substantial risk of serious harm to Jail
Inmates); Street. V. Corrections Corp. of
America, 102 F.3d 810, 815 (6th Cir.1996);
Mayoral V. Sheahan, 245 F.3d 934, 939
(7th Cir. 2001); Greene V. Bowles, 361
F.3d 290, 294 (6th Cir.2004)

(2) Officials knowledge of risk? Plaintiff
Informed both Defendant(s) Shanna
Taylor, Ernesto Martinez, in writing of the
threat that was made against her. Names
of some of the inmates that were paid to

Pg; 17

to harm her. (see exhibits 22-1,
22-2, 22-3, 22-4, 22-5.) these request
to Staff's, Grievances Put officals on
notice of the substantial risks of
serious harm. Ernesto martinez was
one of the few staff members who was
Present during the Plaintiff's PMI
(Protective measures Investigations)
which occured march 5th 2019.

(3.) officals failure to respond
reasonably? on 3-12-19, Plaintiff
was falsely accused of a fight with
a inmate whom she was Cellies with,
and whom also had been threatned by
the same STG and was also Paid to
be killed. Defendent Ernesto martinez
wrote this false misconduct 3-12-19
Plaintiff did not Plead guilty because
she did not fight inmate Porter. Mr.
Ernesto martinez did not see a fight,
Nor did he ever ask Plaintiff or the
Inmate marquis Porter was there a fight.
(see Plaintiff's and inmate Porters Dec.)
Plaintiff fell off bunk trying to turn off
the light and hit her nose which led to
her nose bleeding. Prior to falling off
the bunk Plaintiff and her celly inmate
Porter where horse Playing but thats
common in Prison, Just laughing, ~~~~~

B.18

Both Plaintiffs and Inmate Porter was placed back in the cell; Officers concluded there was no fight. (See Plaintiff's and Inmate Porter Decl.) this happend on 3-6-19. Six days later After the P.M.I was completed Defendant Ernesto Martirez written a false misconduct report stating he "concluded a fight had occured" when in FACT, he never talked to Plaintiff or Inmate Porter or CPt.'s, LT's, SGT's, C.O's to determine if a fight had "occured." So how could he conclud a fight had occured? When No Investigation was done. The merriam-Websters's Dictionary AND Thesaurus defires Investigation as follows: "Investigation N. The action or Process of investigating; esp: detailed examination or a search: by inquiry. (Merriam-Webster's, Dictionary AND Thesaurus, 576 (2006).) Mr. Ernesto Martirez did not examine, search inquiringly. So his "conclusion" was not based on merit, facts, but "evil and sadistic purposes." (See Plaintiff's and Inmate declarations) because of his phobic; Homophobic behavior, misconduct was written Plaintiff was threated by the Defendant if her and Inmate Porter did they would be seperated

B318

Both Plaintiff and Inmate Porter was
placed back in the cell; Officers concluded
there was no fight. (See Plaintiff's and
Inmate Porter Decl.) this happend on 3-6-19.
Six days later After the P.M.I was
Completed Defendant Ernesto Martinez
written a false misconduct report stating
he "concluded a fight had occured" when
in FACT, he never talked to Plaintiff
or Inmate Porter or CPt.'s, LT's, SGT's,
C.O's to determine if a fight had
"occured." So how could he conclud a
fight had occured? When No Investigation
was done. The merriam-Websters's
Dictionary AND Thesaurus defines
Investigation as follows: "Investigation N.
The action or Process of investigating; esp:
detailed examination or a search/inquiry.
(Merriam-Webster's, Dictionary AND Thesaurus).
576 (2006.).) Mr. Ernesto Martinez did
not examine, search inquiring/. So
his "Conclusion" was not based on
merit, facts, but "evil and sadistic
motives." (See Plaintiff's and Inmate
Porter's declarations) because of his
transaphobic; Homophobic behavior.
this Misconduct was writteng Plaintiff
Ms. Johnson was therated by the Defendant
Martinez that if her and Inmate Porter did
not "plead guilty." they would be seperated

Pg 14

and their P.M.Z.'s would be removed
and both would be subjected to
assault or killed by the "Paid" inmates.
Plaintiff felt Martinez that is a Due
process violation of the 14th Amendment
to the U.s. Constitution. Plaintiff
Plead Not guilty intially, but after
Ernesto Martinez threats Plaintiff was
afraid of her life so she plead guilty.
Inmate Rider did not Plead guilty and was
moved to a whole nother Podo Ernesto
Martinez stated "I don't Protect bitchs
and fags." "I'm not your baby sitter"
You do the hard crimes, you do the hard
times." By removing Inmate Rider from
the Cell Ernesto Martinez Placed both
in a Serious Risk to be killed Due to
Defendants Martinez not responding
reasonably Plaintiff is Now subjected to
being killed. responding reasonably would've
been investigating this situation throughly,
Not seperating both inmates whom had the
same contract (hit) on there head. Ernesto
Martinez despises the [LGBTQRP Community]
he is trans and homophobic. Why else would
he threat the Plaintiff to plead guilty or suffer
Irreprable harm?, the Statue of limitations
for the misconduct ran out, the misconduct
was written a week later (3-12-19) This
itself is not a "reasonable response." AN Inmate

Pg. 20

Rossco Craig, a bi-sexual male
was murdered on 6-24-19, on FD-
213 (two doors down from Plaintiff) he repeatedly
repeatedly told Ernesto Martinez he did not
feel safe with a celly because his last
celly hogtiled him and beat him up. Defendant
told Mr. Craig that if he didn't take a celly
he would be written up and his level 4
dropped and his "good days" would be
falling and he wouldn't go home in 5+06
months. Rossco Craig took a celly and
was murdered on 6-24-19, Mr. Ernesto
Martinez has a pattern of not responding
reasonably when LGBTQZP Inmates are
Znvolved. He did not take Plaintiff's a
Transgender own safety Veiws into
Serious Consideration. See 28 C.F.R. §
115.42(e) as well as he did not "communciate
effectivelly and Professionally with inmates,
includimg lesbian, gay, bi-sexual, Transgender,
intersex or gender Non-Conforming inmates."
See 28 C.F.R. § 115.31(a),(g) He did not
take Plaintiff's own Perception of assault
or safetly Views into serious consideration.

4.) Causation and injury? Mr. Martinez
stated he didn't "Protect bitches and fags." then
after that he stated that if the Plaintiff did.
not "Plead guilly" to a false Misconduct
report that her P.M.I would be removed and she

Pg 2(

would be subjected to violence, so
to answer the Defendant's denial,
Ms. Johnson is in real danger.

(i) The first Amendment Prohibits Jail and
Prison Officals from retaliating against
inmates who report complaints, file
Grievances, or file lawsuits. See: Penrod
V. Zavaras, 94 F.3d 1399, 1405 Cloth Cir. 1996.)
; Crawford-EL V. Britton, 523 U.S. 574, 588
(1998) (stating that "[T]he reason why ...
retaliation offends the constitution is that
it threatens to inhibit excersice of
the protected right.") "Government
actions, which standing alone do
not Violate the Constitution, may none-
theless be constitutional torts if motivated
in substantial Part by a desire to Punish
an individual for exercise of a constitutional
right." Thaddeus-X V. Blutter, 175 F.3d
378, 386. Cloth Cir. 1999.) (en banc);

To Prove a retaliation claim, You
Must Show three things?

(1) You were doing something You had a
Constitutional right to do? "protected
Conduct?" Plaintiff Ms. Johnson filed
a request to staff (which is the
beginning of the O.D.O.C. Grievance

Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 301

Pg 22

process.) On and to Shanna Taylor on 1-25-19, (see exhibit 22-1) Shanna Taylor (defendant) responded 2-18-19, On 2-21-19, Plaintiff turned the RTS into A Greivance (see exhibit 22-2) Because defendant Shanna Taylor did not do all 11 names Plaintiff listed. On 3-14-19 the "greivance Decision was recieved, concluded (see exhibit 22-3)

(2.) What the Prison offical(s) did to You, which is a "adverse action" was so bad that it would stop an "Average Person" from continuing with their suit? Shanna Taylor surervisor unit manager Ernesto Martinez wrote a false misconduct on Plaintiff and her old cellmate Mershi's Porter (see exhibit 23-3) alleging that there was a fight. In this offense report Defendant Martinez states" on the above date and approximate time unit manager Martinez concluded an investigation which revealed that occured between inmate Lamore mte Porter." How can You "conclude" stigation when came and spoke with iff Johnson and Inmate Porter? nesto Martinez had no direct ement in the "alleged fight." Why ?

Pg.23

because there was never a fight.
Defendant Shanna Taylor and Ernesto
Martirez came to Plaintiff Johnson's
cell and told her and Inmate Porter
that if they did not plead guilty, they
would be moved and their P.M.I. packet
would be removed and that they'd both
would be subjected to violence.
Plaintiff Johnson plead guilty out of
fear. (Plaintiff later filed a RTS on
and to Ernesto Martinez about these
events the RTS somehow disappeared
and was never returned to the Plaintiff.)
Porter (the cellmate) plead not guilty. This
Infuriated Ernesto Martinez and he
Moved Inmate Porter and stated he "don't
protect bitches and fags." This all took
place on 3-14-19. (See's Plaintiff and
Inmates Porters Decl.)

(3). There is a Causal Connection?
On 3-14-19 the Grievance Decision
Was Deeded. On 3-12-19 the false
misconduct was written by ~~Shanna~~ Ernesto
Martinez (Defendant) (Shanna Taylor's
Supervisor.) Prior to the Grievance
Decision Shanna Taylor "Investigated"
the "matter" (See exhibit 22-3) This is
the same exact day that Shanna Taylor
and Ernesto Martinez came to threat

302

pg. 24.

Plaintiff and Inmate Porter to Plead guilty
or be subjected to violence. (See declaration)
Therefore Defendants retaliated against
Plaintiff for filing grievances, If No Grievance
would've been filed? No false misconduct
would've been written. Defendants requested dis
missal should be denied and relief
also denied and Affirmative defenses denied.
This relief Plaintiff does Pray.

Claim 4: To win a equal Protection
Claim You must show that You are
being treated differently than other Prisoners
and that Your treatment is not rationally
related to a legitimate governmental
Purpose.

(1) Different treatment? In 1996 the U.S.
Supreme Court ruled a Colorado state
law unconstitutional, that Prohibited
regulations Protecting gay People from discrimina-
tion See: Romer v. Evans, 517 U.S. 620
(1996) Defendant Ernesto Martinez has
written false misconducts on Plaintiff, Placed
seperation against Plaintiff and Inmate marquis
Porter for filing grievances and being LGBT
Q.I.P Community based Inmates. (See Plaintiff
and Inmate Porter's Decl.) all because
of those two factors Plaintiff's were
treated differently. Defendants Statement alone

Pg.25

"I don't Protect bitchs and fags." Is
Sufficent enough to Prove the discrimination
"diffrent treatment" Part.

(2.) Treatment is not rationally related
to a legitmate governental Purpose.
Defendants Conduct was motivated
by Transaphobic and Homophobic mind
Set. (See decelurations) Not rationally
related to a legitmate governental
Purpose. See: Doe vs Sparks, 73 F.
Supp. 227 (W.D. Pa. 1990.); McClesk-
ey. v. Kemp, 481 U.S. 279, 292, 107 S Ct
1756, 1767 (1987) (noting that a
Successful equal Protection Claim must
Prove that there was Purposeful discrimination.)
Lawrence v. Texas, 539 U.S. 558, 567
(2003) wherefore Defendant's Conduct
was "evil and Sadistic." So he's
motion to dismiss Shall be denied.
and all other relief. This relief Plaintiff
does Pray.


Special Report Fendings Response
From Plaintiff.


(1.) Plaintiff ms. Johnson arrived
From Dr. OL Conners Correctional Center
(O.C.C.C.) to Davis Corr. Facility.
And was allowed to Purchase Cosmetics

Pg°26

While at J.H.C.C (Joseph harp corr.
Center) Which was the second facility
Plaintiff was at, Lexington corr. center (L.C.C.)
the third, Dick conners corr. center (D.C.C.)
the fourth, Davis corr. Facility (D.C.F.)
the fifth. So 2f these "cosmetics
were not allowed" to transgender inmates
they wouldv'e never been (1) approved at O.D.O.C.
Facility by the facility head. (2.) Before
arriving to Davis corr. Facility? the 2
previous O.D.O.C Facility Property officers
would've confiscated these cosmetics, it
should be noted that CCA is a private
owned facility whom is clearly not
familiar with O.D.O.C. Policy! 2f so
they would've never took Plaintiff off
her hormone replacement therapy. (See
Exhibits 84, 83, 83 Backside, 82, 82
Backside, 85, 91, 91 Backside, 10-1, 10-2,
10-3, 10-4, Exhibit 13, 20-5) Plaintiff
objects to Defendants Typo-error on
the Report of Review of fact. Basis of
Claims Asserted in civil rights complaint.
Allegations made by Plaintiff Johnson,
count 1, The head Comptroller in fact is
who made it possible for Plaintiff to order these Products (See exhibit 26-1)
(2.) response to Investigations?
Defendant's clearly state that Plaintiff
Ms. Johnson arrived with 3 cosmetics
on her Property. (See exhibit 2,3) (See defendants

Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 306

Pg.27

Exhibit 1) the Same Policy Defendants State, are not allowed for the Property officer to destroy or take anything unless it is contraband. Contraband is considered as follows: (see Defendant exhibit 1, OP-030120, Inmate Property, Pg.3, E. Possession of Contraband., "Any Item(s) found in the inmates possession, that is 'Not' listed on his/her 'Property form' will be considered Contraband...", Plaintiff Cosmetics were on her Property list see exhibit 2 (Plaintiffs exhibit), Now the second part of the Possession of Contraband is as follows "2. Any Item(s) found listed on the Property form that has distorted or altered markings or that has been substantially (either internally or externally) modified from the manufactures... will be considered Contraband." Plaintiff passed both Contraband test wherefore Plaintiff Cosmetics should have never been Considered Contraband. Defendants considered Plaintiff's Cosmetics "Contraband" because of their "Personal hatred" towards Transexual, Transgendered People. Defendant Morrison statement alone "Oh hell no, he will not walk around at this facility with make-

Pg 28

up." Proves the evil and sadistic motives,
then when Plaintiff showed (exhibit 1) RTs
from Warden Carl bear at J.H.C.C.
that She was approved these items to
Purchase, that they in fact was not
Contraband should've been enough for
Plaintiff to receive her Cosmetics,
but because Plaintiff was a
Transgender woman in a males Prison
the Discrimination occured. It should
also be noted that O.D.O.C. Policy
Contradicts themselves (OP-140147
Management of Gender Non-Conforming
Inmates, IV, Reasonable Accommodations
for Gender NonConforming Inmates, B.
Inmate Property "Inmates will be Provided
Standard O-DOC attire in accordance
with OP-030120 entitled "Inmate Property."
Gender NonConforming inmates may receive
Consideration for "undergarments" or
"Other gender NonConforming Property"...
Any approved Property will be allowed at
Subsequent facilities should the inmate
"transfer" unless the approval has been revoked.")
(See Plaintiff's exhibit 1) I was approved.
(for above Policy Quote see Plaintiff's
exhibit 25-13, 14, 15, 16) ⬛⬛⬛ The Plaintiff
Objects to Defendant's lie stating
that Plaintiff signed the Notice on Apr 6 2018,
Plaintiff signed Notice on 5-16-18, (see

Pg 29

Exhibit 3 Carbon Copy.) Plaintiff
stated she wanted her Property
sent home, if anything (see exhibit 3
Carbon Copy.) Plaintiff was told by
Cheif cormun (see exhibit 25-12)
that Plaintiff won't reeive her items.
Defendant morrison refused to relinquish
the items. The defendants allege that
if Plaintiff was not happy with SGT morrison
decision, that Plaintiff should have submitted
a Property claim to the Property officer
who in fact is SGT morrison (the
defendant) their argument has no
logical sense, with all respect the
Defendant's superior staff Cheif stated
to return these items, why weren't they
returned, Because Defendants had
"Personal feelings" towards Plaintiffs
lifestyle, once Plaintiff filed a Grievance
Plaintiff was told Property issues at
Private contract facility are not
Grievable. See Defendants, Exhibit 8,
Pg 4, checkbox 5.) when a issue
is not "Grievable" It means no "available
remedies" exist. See: Dole Vs Chandler,
438 F.3d 804, 809, 812 (7th Cir. 2006.);
Labounty V. Johnson, 253 F. supp 2d
496, 502-04 (W.D.N.Y. 2003); Hiello
V. Litscher, 104 F. supp. 2d, 1068,
1074 (W.D. Wis. 2000) Plaintiff is a

PJ30

O.D.O.C. Inmate whom was housed at a Private Contracted Facility, O.D.O.C have Policy and Precedures given to Vun upon arrival, Davis Corr. Facility does not. one would assume that Vun Grieve (exhaust) Just like at other Oklahoma Prison Facilitys. But CCA failure to Provide this "Policy" made the remedy un available to the Plaintiff. Westefer V. Snyder, 422 F.3d 570, 580 (7th Cir. 2005); Shaheed-muhammed V. DiPaolo, 393 F. Supp. 2d 80, 97 (D. Mass. 2005) ("Having failed to abide by the strictures of their own regulations, defendants should not be allowed to claim Plaintiffs Non compliance as a bar."); Miller V. Benkebile, No. 5:07-CV-0712-B ECF. 2008 WL 635552, at *7-9 (N.D. Tex. mar. 10, 2008); Gobert V. Lee County, 510 F.3d 1312, 1322-23 (11th Cir. 2007) (holding grievance appeal was not an available remedy where prisoners were not informed of its existence and had no way to find out.) Plaintiff appealed this matter Per O.D.O.C Policy 090121 (see exhibit C4) The ACA ruled ("out of-time") be cause Plaintiff was Plue

B)031

Z.N.S.H.h on July 4th 2018 (see
Affidavit of Plaintiff) And did not
receive her Property until a week
or two later, once Plaintiff received
her Property she immediatly filed the
Appeal, It should be Noted also that
At this Point in time Plaintiff Ms. Johnson
Wishes to supplement her Complaint
Pursuant to Fed. R. Civ. P. 15(a), 15(d)
To Add Terry underwood, and 22
More defendants, 7 of those newly
added Defendants are employed at
CCA (Davis Corr. Facility) After Plaintiff
filed her lawsuit she was subjected
to more retaliation (see Affidavit of
Plaintiff) The EHR record states
that on 3-26-18, I spoke with
a Bethany Wagener telling her that
Patricia Jones evaluated me and did
indicate that Patricia Jones stated
i had Gender dysphoria and that is
why Dr. Moore initiated t strogen. This
is another lie and game that these
Prison officals do at O.D.O.C.. On
3-26-18 I filled out a "sick call"
to be evaluated for undergarments (see
exhibit 12-1) on 3-26-18, the physician
Bethany Wagner stated that she would
Not order my undergarments, I was
made aware by mental health staff →

Pg32

"H.J" he Put a order in my medical chart. The Dr.Wagner Stated that i needed to be evaluated by Patrica Jones. Z should her my medical records were. i was evaluated at Oklahoma County Jail that i was on Hormore replacement Prior to O.D.O.C. that i was already evaluated at Oklahoma County that i was Prescribed Estradiol, & Spironolactone, at Oklahoma County Jail and once arrive at O.D.O.C was continued on them. Z Never said Dr. moore initiated my Hormore replacement Therapy. Z clearly was on them before i even arrived at J.H.C.C. (when Dr. moore words) (see exhibits 81, 82, 82 Backside, 83, 84, 85, 91, 91 Backside 10-1, ) That is evidence that O.D.O.C officials lie on medical records, which is how Plaintiff ms. Johnson's medical rights have beeen violated and still currently are at another facility, this is why Plaintiff wishes to add/supplement her complaint. Because of this EHR system the serious medical needs of Plaintiff will not be met unless this case goes to trial. Please Note that the Policy defendants Cite OP-140147 is the August 27,2018 revised edition, which went in effect Aug, 27,2018, Defendant Sanders

Pg. 33

Ray Larimer came to the conclusion
to discontinue Plaintiff's Hormone replacement
Therapy on 5-23-14, so the Policy
at that time stated, the following"
Hormonal treatment (1) Hormonal treatment
Of inmates with Gender Dysphonia (000 (a) has
been Confirmed by a Qualified mental
health Professional based on the
diagnostic criteria of the Diagnostic
and Statistical manual of mental Disorders.
(b) A female to male Hormonal Therapy
risk and information form 000 is read
and signed by the inmate and scanned into
the inmate's electronic health record. (2)
Once the above steps have been completed,
hormonal treatment may be considered by
the qualified medical provider if the
following (a.) Hormonal treatment was
initiated prior to incarceration 000 "(see exhibit
(1) Figure 20-5 ) this policy was the
one in effect at the time Plaintiff's
rights were Violated. (6-5-17, latest ed.
on 5-28-18 ) (1.) Plaintiff met the 1st
Criteria, she was diagnosed by a Qualified
mental health professional at Oklahoma
County (see exhibit 65) (2.) Plaintiff
signed a male-to-female Hormonal
Therapy risk and Information form at
first facility (N.F.C.C.) North fork
Corr. Center (see exhibit 91, 91

Pg 334

Backside.) And Plaintiff met the
third criteria. (3.) Plaintiff hormones
treatment was initiated prior to incarceration.
(See exhibits 81, 81, 82 Backside, 83, 83 Backside,
84, 84 Backside, 85, 13) However Plaintiff
was on her hormone replacement therapy
for 2 years and 8 months uninterrupted
while in D.O.C. (exhibit 10-1, 10-2, 10-3)
But also note that even though Dr. Patricia
Jones (a unqualified mental health professional
Not entered in Gender dysphoria, see
exhibits 17-21-32, 33-49.) maliciously
lied about Plaintiff's criterium for gender
dysphoria she never concluded her
report to discontinue ~~the~~ Plaintiff's
Hormone replacement Therapy. (see
exhibit 14-9) Defendants did that on
their own accord, why? because of Personal
feelings towards the Plaintiff's lifestyle
as a Transexual woman in a males
prison, Defendants alleged that Unit
Staff did not discriminate or retaliate
against Plaintiff this also a lie.
(See Plaintiff, and Inmate Marquis
Porter Decl.) Plaintiff filed a RTS
(Start of Grievance Process) and
It was never returned and still have
not been returned to Plaintiff. Plaintiff
requested It on multiple occasions
But the RTS is never sent. The Law Library

pg. 35

at D.C.F. and Terry underwood and
mail room (where unit manager martinez
wife works) is all in cahoots together
with Interfering with Plaintiff's mail,
Grievances, The Plaintiff can and will
show this court the games that
the defendants play when it comes to
exhausting administrative remedies.
Grievance No. 2018-160 is exhausted
because If a issue is not "grievable"
then there is "No Available remedy."
Turner V. Burnside, 541 F.3d 1077, 1084
(11th Cir. 2008) "remedies that rational
inmates cannot be expected to use are not
capable of accomplishing their Purposes
and so are not available." Dole
V. Chandler, 438 F.3d 804, 811-12
(7th Cir. 2006); Owens V. Keeting,
461 F.3d 763, 769, (10th Cir. 2006)
Plaintiff Still Appealed though Grievance
was denied. Appeal was also returned
unanswered. Terry underwood has
lied under oath. Terry underwood states
that Plaintiff Johnson Never filed
Grievances based on Discrimination
and retaliation? when indeed Plaintiff
has (See exhibit's 2 & 3-7 see
Terry underwood's Affidavit) Plaintiff
asked that M.S. underwood be Persecuted
for Penalty of Perjury and Affidavit

No. 36

Dismissed as Constructed fraud. Grievance No. 2018-166. Plaintiff was Informed on May 23rd 2018 by Ray Larimer and Dr. Shepard that Patrica Jones Denied her having Gender dysphoria and that Ms. Jones Stated "basically to discontinue" Plaintiff's "hormones." Plaintiff Immediatly filed a RTS to Dr. Patrica Jones (See exhibit 18-5) where Dr. Jones basically Stated "You need to discuss Your diagnosis with Your Primary QMHP. All medicalion decisions are made by medical." Plaintiff's QMHP is Dr. Shepard, the same Dr. Shepard whom with Defendant Ray Larimer Informed the Plaintiff they would be stopping her HRT and which Plaintiff shared medical records (See exhibits 81, 82, 83, 84, 85, 82 Backside, 83, Backside 13), (See also 10-1, 10-2, 10-3, 10-4) which they Stated it was Not Them But Patrica Jones who stated to discontinue Plaintiff's hormone therapy. When in fact Ms. Jones report Stated No Such things (See exhibit 14-9) So Speaking with Dr. Shepard was already done, that is how Plaintiff found out about the denial of her having Gender dysphoria, Plaintiff didn't actually get the report until 5-2-19 (See exhibit 1975) when Plaintiff had money on her account to get the records. That is

Pg 37

When it all came out that Dr. Sanders,
Kay Lariner decided to deny my estradiol,
Spironolactone spironalactone (see exhibit
19-2, 19-4, 19-5, 19-6) Plaintiff did file
a Grievance 2018-166, which was
returned unanswered for the following
reasons. ① "An Answered request to
Staff form addressed to the correct
Staff member must be attached."
- A Answered "RTS" was attached to
and from the correct Staff member
(see exhibit 18-5, 18-1, 18-2) this is
one of the few games these Staff play.
② "You are on Grievance restriction
proper documentation not included."
Plaintiff had No idea You could be
placed on a "Grievance restriction"
(see exhibit 18-1) ③. least, Not least
least the officals have the Power to
return Your grievance back for something
Not even in Policy by checking "Other"
(see exhibit 18-2) Plaintiff appealed
to ARA (O.D.O.C) which is the finale
Stage and her appeal was returned
Un answerd by the ARA, claiming Plaintiffs
appeal was "out of time" (see exhibit
18-7) Plaintiff received response from reviewing
authority (Defendant Kay Lariner) on July 5th
2018 (see exhibit 18-1) ARA responded
July 26 2018 (see exhibit 18-7) When indeed

316

Pg 38

Oklahoma Dept of Corr. Policy states
"The reviewing authority may choose to
Extend the submitting period up to 60 days
for good cause" (see exhibit 21-6, Vol A. 2)
Defendants and official clearly don't follow
their own Policies, all O.P. a C Policys
Contradict one another. Miller V. Norris,
247 F.3d 736, 740 (8th Cir. 2001)" We
believe that a remedy that Prison officials
Prevent a Prisoner from 'utilez[ing] is
not an 'available remedy under § 1997e(a)...");
Labounty V. Johnson, 253 F Supp. 2d 496,
502-04 (W. D. N.Y. 2003) (holding grievance
Supervisors alleged failure to follow Procedures,
Preventing Plaintiff's appeal, barred summary
Judgement for Non-exhaustion.") j Brownell
V. Krom, 446 F.3d 305, 312-13 (2d. Cir 2006)
(Prison officials didn't follow their own rules.)
This applies to All the "allege" Non-exhaustion
requirements. This case has lot's of exhibits,
Paperwork that still have not been copyied
because of the Prison's refuse to copy
exhibits claim it is "not of a legal nature."
So Plaintiff asks this court to allow
discovery to Prove that she exhausted
administrative remides and that Defendants
Policy is inadequate, Non consistent and
that official Play games when it comes
to exhausting administrative remedies
Also Plaintiff asks this court to also

Issue a order so that Plaintiff may obtain Affidavits from Inmate Marquis Porter #786756 whom is located at the Lawton Corr. Facility, 8607 SE Flowermound Rd. Lawton OK 73501, Through legal correspondence since Plaintiff is appearing "Pro Se", under Fed. R. Civ. P. Rule 56(f) the Judge has the power to "issue any other just order." Also to Interview Inmate Porter through telecommunication and any and all Defendents witnesses. Also to Order a outside examination by a outside Doctor-specialized in Gender Dysphoria. Amanda Kleeman, LPC, NCC, MS A specialist in Gender Therapy (918) 779-3754, Kelley Bronnell Blair, LPC, MS, CM III—The diversity center of Oklahoma Inc.—works with LGBTQ communities (405) 622-3191, Christopher D Allen, Psychologist, PHD, LPC, LADC (405) 266-1836, Plaintiff ask the court to issue a order to one of the above specialist to distinguish that the Defendants are making up this lie that Plaintiff is not gender dysphoric. Pursuant to Fed. R. Civ. P. Rule 35. This relief Plaintiff does Pray.

~ Defendant Martinez Affidavit is also a lie under oath, Plaintiff was discriminated against and retaliated against by unit manager Martinez, Terry Underwood and unit manager Martinez keep alleging that they had No "visibility of any Grievances". I never stated he "seen" a grievance, I stated he retaliated and discriminated against me for filing Grievances and being LGBTQ/I. (Transgener) (See Plaintiff's declarations, Inmate Porter's declaration.) No officer of any kind seen me and Inmate Porter "fighting" Nor engaged in "horseplay!" he CPT asked me how I got "scratches". I stated me and my celly were "horse playing". So how can the Defendant issue a Non. association when O.D.O.C. Policy Prohibits staff Non-Associations from being issued on "minor altercations" that the inmate must ⟶

request it, Neither me or my celly requested seperation
on each other, This is how Van Know this is Discrimination
and retaliation, The Defendant Martinez clearlly does not
follow D.O.C. Policy or their own Policy's, So how
can they follow the Supreme law of land???
Please see: Declarations of Plaintiff and Znmate
Porter, Defendant claims he could've never known
about a grievance when indeed he is Defendant,
Shanna Taylors superviser, whom "Znvestigated"
Grievance #2019-00102, which was deecided
on 3-14-19 the Same day Defendant Martinez
AND Shanna Taylor came to FD-216 and threat
Plaintiff And Cellmate, (See Exhibit 22-3, Plaintiff
and Znmate Marquis Porter's Decl.) which in fact
was retaliation And Discrimination, Bluet and
White Dont like (Paperwork, Exhibits,) Not No
frivolous Exhibits, whether ~~Plainti~~ Defendants
followed O.D.O.C. Policy or not they were
made aware through RTS and Grievances
that their actions were violating Plaintiff's
Constitutional rights, which Defendant's
Continued to do, Lastly Plaintiff would like
to Point out that these Defendants and O.D.O.C.
Hide behind this Grievance Policy like it is
Kryptonite to A §1983 Civil rights Complaint.
All they have to do is mark Vonr Grievance as "Ont-
Of-time" "Unanswerd", Point out a million mistakes.
Even a court gives Pro se Znmates leeway →

Pg. 41

To not be held as the same standard as a Attorney licensed in Law. See: Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (Stating that prisoner should be allowed opportunity to offer proof unless it appears beyond doubt that prisoner can prove no facts to support his claim) & Robson v. Wright, 459 F.3d 241, 248 (2d. Cir. 2006) ("We construe complaints filed by pro se litigants liberally and interpret them to raise the strongest arguments that they suggest.") (internal quotations and citations omitted). Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. We believe that this rule means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. At the same time, we do not believe it is the proper function of the district court to assume the role of advocate for the pro se litigant.") So why should the defendants Grievance procedure be any harder, stricter??? A lawyer couldn't even pursue a grievance correctly because the defendant's Grievance allows your grievance to be dismissed by reasons not even in policy by cheating "Other:". Basically the defendents use this Grievance Procedure as a "Get-out-of-lawsuit-free card." which in fact would defeat the purpose of a 42. U.S.C. § 1983 civil rights complaint, which would also defeat and violate the U.S. constitution of the first, fifth and Fourteenth which together makes the "access to courts" right. The question in this case is whether, by enacting the exhaustion requirement in the Prison litigation reform act of 1995 (PLRA) congress intended to authorize state correction officials to impose a complicated

Pg. 42

limitation on Prisoners constitutionally protected right of access to the federal Courts. Congress enacted the following exhaustion requirement in the PLRA:

"No action shall be brought with respect to Prison conditions under section 1983 of this title, or any other federal Law, by a Prisoner confined in any jail, Prison, or other Correctional facility until such administrative remedies as are available are exhausted" 42 U.S.C. § 1997e(a).

This Provision requires Prisoners to exhaust informal remedies before filing a lawsuit under federal laws. They must file an administrative grievance and, if the resolution of that grievance is unsatisfactory to them, they must exhaust available administrative appeals. The Statute, however, says nothing about the reasons why a Grievance may have been denied. It does not distinguish between a denial on the merits and a denial based on Procedural error. It does not attach any significance to a Prison official's decision that a Prisoner has made Procedural misstep in exhausting administrative remedies. In the words of federal Courts Jurisprudence, the text of the P.L.R.A does not impose a sanction of waiver or Procedural default upon those Prisoners who make such Procedural errors. See: Engle v. Issac, 456 U.S. 107, 125 -

Pg243

126 (1982) (explaining that" the Problem of
waiver is separate from the question whether
a State Prisoner has exhausted State remedies.")
the Plain text of the PLRA simply requires
that "such administrative remedies as are
available" be exhausted before the Prisoner can
take the serious step of filing a federal lawsuit
against the officials who hold him in custody.
However the defendants and their successors, employees
concludes that the P.L.R.A. exhaustion requirement
requires Proper exhaustion." The absence of textual
support for that conclusion is a sufficient
reason for rejecting it. Unlike 28 U.S.C. § 2244
(d)(2), a tolling Provision of the Antiterrorism and
Effective Death Penalty Act of 1996, which was signed
into law just two days before the PLRA, 42 U.S.C. § 1997
e(a) lacks any textual requirement of "Proper exhaustion"
See Artuz v. Bennett, 531 U.S. 4, 8, (2000)
(explaining the importance of the textual requirement
that an application be "Properly filed" under 28 U.S.C.
§ 2244 (d)(2).) Instead, just as in the habeas context,
under the PLRA a Prisoner "who has [Procedurally]
defaulted his federal claims in [ a State Prison
Grievance Proceeding] meets the technical requirements
for exhaustion; there are no State remedies any
longer 'available' to him" Coleman v. Thompson, 501
U.S. 722, 732 (1991) Accordingly, under the Plain
text of 42 U.S.C. § 1997 e(a) Plaintiff satisfied her
duty to exhaust available administrative remedies
before filing a federal lawsuit, the defendants dis-

322

Pg. 44

regard of the plain text of the PLRA is especially unjustified in light of the backdrop against which the statue was enacted. We presume, of course, that Congress is familiar with court's precedents and expects its legislation to be interpreted in conformity with those precedents. See Edelman v. Lilnenburg College, 535 U.S. 106, 107, 117 (2002); Porter v. Nussle, 534 U.S. 516, 528 (2002); North Star Steel Co. v. Thomas 515 U.S. 29, 34 (1995). This strong presumption is even more forceful when the underlying precedent is "unusually important." Gebser v. Lago Vista independent school Dist, 524 U.S. 274, 294 (1988) (quoting Cannon v. University of Chicago, 441 U.S. 677, 699 (1979). Consistent with this presumption, if we have already provided a definitive interpretation of the language in one statute, and Congress then uses, nearly identical language in another statute, courts will give the language in the latter statute an identical interpretation, unless there is a clear indication in the text or legislative history that the Court should not do so. See United States v. Wells, 519 U.S. 482, 495 (1997). Under these elementary principles of statutory interpretation, the PLRA's exhaustion requirement does not incorporate a procedural default component. The PLRA's exhaustion provision is essentially identical to that of

Pg. 45

the habeas corpus statute, a provision in the federal habeas statute, first enacted in 1948 as a codification of a previous judge-made rule, (see O'Sullivan v. Boerckel, 526 U.S. 438, 850-853 (1999) (STEVENS, J. joined by GINSBURG and BREYER, JJ., dissenting) (tracing history of exhaustion requirement in habeas law).) bars relief "unless it appears that ... the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The PLRA similarly bars judical relief "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997 e(a). The only noteworthy distinction between the two provisions is that 28 U.S.C. § 2254 b(1)(A) uses the word "unless" whereas 42 U.S.C. § 1997 e(a) uses the word "until". If anything, this distinction suggests that the exhaustion requirement in the PLRA is less amenable to a waiver sanction than the comparable requirement in the habeas statute: The word "until" indicates a temporal condition whereas the word "unless" would have been more appropriate for a procedural bar. Notwithstanding the use of the word "unless" in 28 U.S.C. § 2254(b)(1)(A). The Supreme court has held that State-court remedies are "exhausted" for the purposes of the federal habeas statute so long as "they are no longer available, regardless of the reason for their unavailability." Wainwright v. Sykes, 433 U.S. 72, 97 (1977);

Pg46

Mitchum V. foster, 407 U.S. 225, 242 (1972);
Muhammad V. Close, 540 U.S. 749, 751, (2004);
James V. Kentucky, 466 U.S. 341, 348 (1984), Murray
V. Carrier, 477 U.S. 478 (1986); see Coleman,
501 U.S. at 731; Castille V. People, 489 U.S.
346, 351 (1989); Teague V. Lane, 489 U.S. 288,
298 (1989); Engle, 456 U.S. at 125; Humphrey
V. Cady, 405 U.S. 504, 516 (1972); Fay
V. Noia, 372 U.S. 391, 434-435 (1963) The
Purpose of a 42 U.S.C. § 1983 action such
as that faced by ~~Plaintiff~~ is not to obtain
direct review of an order entered in the grievance
Procedure, but to obtain redress for a alleged
Violation of federal law committed by State
Correctional officials see Mitchum V. foster
407 U.S. 225, 242 (1972) It is undisputed
that the PLRA does nothing to change the nature
of the federal action under § 1983; Prisoner's
who bring such actions after exhausting their
administrative remedies are entitled to de novo Pro-
ceedings in the federal district court without any
deference (on Issues of law or fact) to any ruling
in the administrative grievance proceedings. As expla-
ined by Senator Hatch when he introduced the
legislation on the senate floor, the PLRA was
needed because the quantity of frivolous
suits filed by prisoners was, in senator
Hatch's view, making it difficult for "courts
to consider meritorious claims." 141 Cong.
Rec. 27042 (1995). He continued: "Indeed,

Pg. 47

I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised." Ibid Similarly, as Senator Thurmond, a cosponsor of the bill, stated: "[The PLRA] will allow meritorious claims to be filed, but gives the Judge broader discretion to prevent frivolous and malicious lawsuits filed by prison inmates." id., at 27044. "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." Bill Johnson's Restaurants, Inc. V. NLRB, 461 U.S. 731, 741 (1983) Accordingly, the constitution guarantees that prisoners, like all citizens, have a reasonably adequate opportunity to raise constitutional claims before impartial Judges, See Lewis V. Casey, 518 U.S. 343, 351 (1996) moreover, because access to courts is a fundamental right, see id., at 346, government-drawn classifications that impose substantial burdens on the capacity of a group of citizens to exercise that right require searching judicial examination under the Equal Protection Clause, see Lyng V. Automobile Workers, 485 U.S. 360, 370 (1988) Defendeint's interpretation of PLRA violates the U.S. constitution of Plaintiff's first, fifth and fourteenth amendment rights of access to courts and Equal Protection awarding them Judgement would insult the Supreme law of land and make PLRA unconstitutional. Wherefore Plaintiffs

Pg.48

asks this Court to deny defendants motion
to Dismiss, dismiss SGT morrison, Terry
underwoods and Ernesto martinez credibility
as reliable witnesses, Defendants seperate and
Alternative Defenses be denied, Defendants
Atterney fees and cost of this action be
denied, Terry underwood and Ernesto
Martinez be Perseented for Penalty
of Perjury, To allow discovery so
Plaintiff can Prove exhaustion and
that the defendant's Policy is Inadequate,
NON consistent and that Defendants
(Officials) Play games when it comes to
exhausting administrative remedies, Issue
a order so that Plaintiff may obtain a
Notarized Afficavit from Inmate Marquis
Porter #786756 whom is located at the
Lawton correctional facility, 8607 SE
flowermound Rd. Lawton, OK 73501, Through
Legal Correspondence since Plaintiff appears
Pro se under Fed. R. Civ. P. Rule 56(f),
also to intervein inmate Porter and all
defendants Witnesses via telecommunication.
Also to order a outside examination by
a outside Doctor SPecilized in Gender
dysphoria, Amanda Kleeman, LPC, NCC, MS
(918) 779-3754, to distinguish the
False medical reports Pursuant to Fed.
R. Civ. P. Rule 35, for this relief
Plaintiff does Pray.

Pg. 49.

Respectfully submitted, this 3rd day
of march, 2020.
Lamone M. Johnson
O.S.P. 3 C-4-1
P.O. Box: 97
mcalester, OK 74502

Date: 3-3-20

Certificate Of Service

I hereby certify that a copy of
the foregoing Pleading / documents was
mailed to:

° Clerk, united States District For the
Eastern District Of Oklahoma, P.O. Box:
607, muskogee, OK 74402

° Darrell L. moore, OBA 6332
P.O. Box: 368
pryor, OK 74362
on 3, ___, 2020

DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

Lamone M. Johnson, et al.,
Plaintiff(s),

Vs

Dr. Sanders, et al.,
Defendant(s)

DECLARATION
OF MARQUIS L.
PORTER

Case No. ⬤⬤⬤
(Court Clerk will insert.)
CIV-19-269-RAW-SPS

Marquis L. Porter hereby declares:
I was moved out of Fox delta cell 210. I've been housed At
Davis Correctional Facility Holdenville OK. I've been in that cell since
December 11, 2018 Well we was accused of a fight with me and
my celly Lamone Johnson. We never fought the captin put me back
in cell Fox delta cell 210 because their was no write up on 3-6-19
and their was no were else for me too house because of my sexual
orientation. Im A Gay man im Part of the LGBT inmates. We suffer
harm if living with people who is not LGBT, plus I have a P.M.I. out
because I have a hit on me from people who is with A's to group Neighboorhood 60's
with my celly Lamone Johnson took-up for me because as being LGBT we
stick together. Well on 3-14-19 Eight days later E. Martinez move me
against my will I told him I AM SAFE in the cell with lamone Johnson. That
I cant be house no where else because I will suffer and injure or will be put
At A Substantial risk of harm. Well im from Des moines IOWA im not from
Oklaloma so I have no family or nothing down in oklahoma. Well I joined
a gang. Neighboorhood 60's For protection because I was all by myself and
this is my first time in a correctional facility. Well when my LGBT Friend
arrived in MAY 2018. Lamone Johnson 744047 I seen how nobody messed
with him and I began talking to him and I slowly felt comfortable and
told him I was GAY. Well the neighboorhoods 60's didn't like that so
they told me to quit hanging around Lamone Johnson or go to Court.
Well I left the yard because I got caught stealing food out the kitchen
So I came Segregation were they Face me out which is a program
in segregation that last 9 months. while why I was down here My
Friend Lamone Johnson comes down here too. Well Lamone Johnson
Let me Know what they was saying about me and that he came
to Segregation because he took up for me so they started messing
with him. well we go to rec outside and inmates let me know
and my celly Lamone Johnson that we were going to get Killed

by the parol some people to harm us. So thats when I realized not to trust "No one" but each other and we put in our P.M.I and Non-Associate unit Manager E. Martinez ensure me that I would be safe in A single cell because on 3-14-19 8 days later from 3-6-19 he make A fasly write-up saying me and Lamone Johnson had A fight on 3-6-19 I told him NO we didn't fight NO officer of any kind "Seen" an allegly Fight. He E. Martinez moved me I told him I didn't want to be saind I had too. I ask unit manager E. Martinez why are you doing this to us is this because we are L G B T So after I begged him to to keep me in cell Fox-delta 210 He said No I told him people want to kill and hurt me and my celly Lamone Johnson because of our sexual orientation Well I cuff up and he move me to Fox charlie 107 Well on Saturday 3-16-19 around 5 PM they put me A single cell Well I tell C/O Burton im not posed to move Somebody in my cell. Well I tell They tell me iF I dont take him im getting a wrote have Nobody in my cell. They tell me iF I dont take him im getting wrote up" They kilow up." They tell me iF I dont take him im getting wrote up" They kilow im GAY So I figure he was from the LGBT well he wasn't. So I told them I Need to get out of the cell im GAY he not GAY I have a P.M.I in I Am in Fear of him because I don't Know who he is. IF he's a Gangbanger or anything about him is he From Neighborhood or not Well C/O burton called the Sgt. working Sgt. Q Well Sgt Q Said he don't do moves the only way out was to fight and get spraid by bear mase. I told them I was in FEAR of who they put in my cell Fox charlie 107 We Fight they take Pictures of it on camer but dosn't do A report on it I told them I wanted to report it. Unit Manager E. Martinez dosn't even write it up or try to investigate the Matter Just like he did to me on 3-6-19 he waited till 3-12-19 to write me up and I got served the write up on 3-14-19 the day he Moved me against my will because he Hates the LGBT inmates. Treat me the Same he treat People thats Not GAY don't Just make False documents and lie and say he investagated and never did. Well C/O burton told me he was only saying what his boss told him. They encoraged the attack Sgt Q C/O burton as my witness that Sgt. Q Said something to me indicated he know the attack would occur. "the only way out is to fight" his exact words. Unit Manager E. Martinez put me in harms way by moving me From Fox delta cell 210 With celly lamone Johnson DOC # 744047 To Fox charlie 107

He didn't Cause protect me in a meaningful way. He hates the LGBT he should of protect me I have docments dated 2-19-19 and answel P. ni filled oct 2 I also talk to him about this he told me he dont protect Bitches & Fags I even called P.R.EA and let them know what unit Fox manager E. Martinez is doing to me 3-30-19 I go to medical to report P.Rea again They say Warden Gentry said this is not A P.R.E.A. when indeed it is this is my right to be free from sexually harssment. so they wouldn't let me do my Prea claim on him. I wrote RTS to Contract Monitor J.C. Colbert letting him know what's going on well on 3-29-19 I get wrote up for refused to go to Fox Alpha thats A STG Pod. im not safe in a STG Pod. with somebody I dont know I already got jumped on im staying in single cell onless they place me in cell with my sister from LGBT community or transfer me too A different Facility where I will be safe at. I am being Punished for reporting sexual Misconduct on Fox unit manager E. Martinez. this is Retaliation. I've filled RTS, Griveon to warden, OKC. I will set in here for Exibits well on 4-16-19 I went to outside rec while I was gone I sent my grievnce to warden white unit manager E. Martinez tried to put and inmate in my cell that just beat up one of my LGBT sisters I say he not comming in the cell with me they write me up for that why is he threating my safty he trying to get me killed cuz I culled P.R.E.A and wrote RTS, Grivence to warden, OKC on him. I told them this is retaliation but nobody listen they shoot me down and say im not tellins the trith. well I called P.R.E.A and told them to get somebody from D.O.C to come talk to me Fox unit manager E. Martinez is going to get me killed or serious hurt he is not care about my safty because im GAY. He already got me assalted by inmate he placed "gang banger" in cell with LGBT inmates well D.O.C contrual monitor comrs talk to me. I tell them what Fox unit manager E. Martinez is doing to me but they beleve E. Martinez and NOT ME I say he goin to get me killed or somebody because he dont protect Bitches & Fags. well on 6-24-19 @ 8:45 AM inmate Rossco Craig a bi-sexual male was murdered due to his multiple attempt telling unit manager E. Martinez that he didn't feil safe in cell with his celly and because his last celly "hog tred" and beat him up. This was because inmate "Rossco Craig" was a bi-sexual male well now since NOBODY listen to me whom I called P.R.E.A, talk to DOC contrual monitr. J.C Tolban, wrote RTS, grivnce to warden, OKC this man died becaus E. Martinez Failed to protect us. This Could of bem stop I DECLARE UNDER PEalE AND OF PERSURY THAT THE FOREGOING IS TRUE and Penalty CORRECT.

Holdenville, OK                                    7-8-19
(Executed at City/State)                          (Date)


Marqui Porter                                      786756
(Signature)                                        (DOC#)

IN THE UNITED STATES
DISTRICT COURT FOR
THE EASTERN DISTRICT
OF OKLAHOMA

Lamone M. Johnson, et al.,

    Plaintiff(s),

v.

Dr. Sanders, et al.,

    Defendant(s)

DECLARATION
OF LAMONE M.
JOHNSON

Case NO.

CIV-19-269-RAW-SPS

Lamone M. Johnson hereby declares:

I am a Transgender (MTF), I arrived at Davis Correctional Facility May. 16, 2018, I was on MY HRT Prior to my incarceration. I was evaluated at the Oklahoma county Jail and was diagnosed with Gender Identity disorder. I was started on the lowest dose estradia 2mg and spironolactone 50mg. before that I was ordering hormones and testerone blockers through Amazon.com. before I was incarcerated. when I was at Dick Conner's correctional Center I Put in a "SICK Call" to have my HRT (Hormone replacement Therapy) increased. due to being on the same dosage for a Year and a half. with no results. I was told by a doctor at Dick Conners, that I would have to be evaluated by a doctor Patrica Jones before I received any adjustments to my HRT. I Informed her of the evaluation at the Oklahoma county Jail, she said that I had to be evaluated by her (Doc.o.c) Doctor. I didn't understand why my medical records wasn't sufficient enough to adjust my medication. why I had to be evaluated by "there" doctors. It seemed suspicious to me. Any normal doctor would go off your medical records and get there own evaluation. but would have no Problem adjusting your medication. especially since it's been a Year and a half. on the same dosage. NFCC (Worth fork correctional Center) was my first facility. JHCC (Joseph harp correctional Center) was my second, LCC (Lexington correctional center) was my third. Dick Conner's was my fourth. and Davis correctional Facility was my fifth. Prior to DCDC (Dick Conner's correctional center) I was at those facility so Not one of them required me to be evaluated. but Now all of sudden I have to be evaluated. like I said before something wasn't right. Well I aggred to the evaluation anyways. because I needed the adjustment to make my Breast grow. (Which is the main reason for HRT.) so Patrica Jones..

Transferred to DoC of Davis correctional Facility) where i was deprived my makeup, make up, Foundation, Lipgloss, eye shadow, eye liner, by SGT Morrison. She told me she wasn't "gone let me walk around on her yard with makeup because I am a man in a mans prison, and told me I could either send it home, donate it, or it would be destroyed. Z was afforded these items at Jotoco by the warden carl beers. They also confiscated my Bra i was afforded at Jotocol (which supports Transgender inmates) well after that Lori Lortimer (defendant) told me that Patricia Jones denied me having gender dysphoria at the time. i didn't know the diffrence between "gender dysphenia" and "Gender identity disorder". i never claimed "Gender dysphoria". I was diagnosed with gender identity disorder. well they informed me that that would be stopping my HRT. I told and shared my medical records which again was not enough in these people eyes. Z was told to write Dr. Sanders he wouldn't listen either so i greived the issue and it was returned unanswered. Z appealed to DoCo and it was still denied. well around June 2016, i met Marquis Porter 786756, he told me he use to be a Gay male in the world. well i told him why is he hanging with gang members?" he said for Protection because he is from Zaca and not from oklahoma, that the gang members didn't know that he was gay in the world. he asked me do people harass me and have i been raped in prison because of who i am. Z told him i was sexually assaulted once and it was because i was drugged my drink "got spiked". he asked me if he came out would he have Problems. i told him i didn't have problems really only when people are Transaphobic. So he came out as Gay. well the neighborhood Gp's and Gds didn't like that. he came out in September 2016, well i went to Seg around october 9th because a Transphobic c/o Duncan lied and said i threated him. well i was found not guilty after being down there at least 2 months. Z went back to the "yard" around December 6th 2016, well i didn't know Marquis Porter 786756 was in seg on Fox Charlie 206, (i was on FD-22's, a whole nother unit.) For stealing food out the kitchen. well the neighborhoods told me on BS (bravo-south) that they were going to kill Marquis because they found out he was "gay" and that makes this "set" (gang) look bad. i told them that Marquis is my LGBTQZP sister and she/he has a right to be whatever he want. Stabbing him because he didn't disclose his Personal life with ya'll is Petty. Zf you ask me Yull all sound like some scary bitches trying to stab a gay person, the most harmless person in the Penitentary world! they told me i was heat and they Putting a hit out on me too. so i left the yard. refused housing and went back to seg. Z was placed on Fox charlie where i seen Marquis and told him why i was down there. he said that i heard they did put hits on people and that he to believed they were serious. well we decied to move in the cell together because if there is a hit on us, we want kill each other because we both got the same hit. so we moved in the cell together. they moved us to Fox delta 122, then said they needed that cell so they mered us to Fox delta 120 on December ...

333

Well now during 'n 2019 we have a PoMoI (Protective Measures Investigation)) because around December 11th is when we moved in the cell togather. January 24th we were informed outside at recreation that it was said that 11 inmate are paid to kill us if we were to beat a yard where the 11 inmants where housed. 1. Phillip Mills, 2. Joshua Tyler, 3. Dayjuwn hickman, 4. Lamann blanner, 5. seric wilson, 6. Terrance mereal, 7. R. dial, 8. Joseph berry, 9. Jeremy mcarell, 10. Kevin hill, 11. odell white, we both filled out RTS (Request to staff's) to Sharna Taylter (defendant) Fox-delta's case manger requesting PoMoI against the listed inmates we went to the PoMoI 3-5-19, Kevin brown, Assistant warden Gentry, Unit manager Berry, Unit manager Ernesto Martinez, they came to a conclusion that Non-Associations were necessary, the PoMoI Packets were approved. on march the 6th the next day, we were horse playing and I hit my nose on the bunk it started bleeding real bad. we both banged on the door to get help. (so villenger was working, they asked me what happend I told them. they told me that I was going to medical. I was 'n a fight. to correct him i told C/o prince I was not in a fight. that he don't know what's going on the nurse brought me to medical. Prince then told the nurse that he just brought me to medical. prince then told the nurse that we "Are both LGBTQIP Family that we are sticking togather," I was talking back Z told the nurse again that I did not fight. I was talking back so I D2W. 2 or 3 hours later they brought marquis back and asked me was it okay if he came back 'n the cell. Z told them of course that nothing happend i just hit my nose on the bunk they said good because people were saying if they put him in there cell they was gone kill him. On march 14, 2019 we both received misconducts for a fight by Unit manager Ernesto Martinez (defendant) we both told discipilinary officer Key we did not fight. Key went and got defendant martinez and told Key if we did not plead guilty are PoMoZ and Non-Associations could be removed and denied and that they would move us and put people 'n our cells that are paid to kill us. so i was scared p plead guilty my celly marquis did not so they moved him. marquis begged them not to move him but defendant Ernesto martinez wasn't hearing he said he "don't Protect bitches and Fags," that he need to "learn how to fight or learn how to fuck," that if we do the "Hard crimes we do the hard time" "I'm not your baby sitter" well Porter was

Appellate Case: 23-7031 Document: 010110881265 Date Filed: 08/30/2023 Page: 335

a guy-member Devin harris, in the cell with Marquis Porter and was assaulted by Devin harris. Word spread Fast of what happend to Marquis. Martinez still Refused to move him backinto the cell with me where he was safe, because Mr. Ernesto martinez is Homo and Transaphobic. He hates the LGBT QTP. He even Placed a seperation on me and Inmate Porter because we told him through RTS that he was violating our rights and that we would be Persuing a 1983 civil rights Complaints He even is responsible for the death of inmate Rossco craig who died and was Murdered by his Cell Mate a Affiliated Gang member. He Previously had a Celly who "hog tied" him and beat him up, He told martinez he didn't want another Celly because he was in fear of his life, and that he went home in 4 months. Martinez told him if he didn't take a cell he would Issue him a misconduct and take away his "good credits" so he wouldn't go home. So Rossco craig took a celly, and was a result was Murdered on 6-29-19 @ 8:45 Inmate Rossco craig was murder found dead on Fox delta, Cell#213, Mr. Marquis Porter was in cell #211, ~~I~~ I was in cell#210. that could've been us dead if we hadn't stood up for ourselves. the staff here does not take our own safety veiws into Consideration. well on 7-11-19 Marquis Porter 786756 was Transferd to another Facility, but before he left he wrote a declaration, submitted his RTS, Greivances, Misconducts, Appeals and all Information to Claim 3 to me, he is a Plaintiff in this lawsuit. He filed and motion to leave to proceed" but left before he could get it back for mail call. I asked for it and was denied (See exhibit 253, 25-2)

I declare under Penalty of Perjury that the Fore going is True and Correct.

<u>Holdenville Oklahoma</u>
(Executed at city (state)

<u>Simore Seuss</u>
(signature)

<u>7-12-19</u>
(date)

<u>749047</u>
(Doc#

Pg24

## AFFIDAVIT

STATE OF OKLAHOMA )
                  ) SS:
COUNTY OF PITTSBURG )

I, _Lamone Johnson_____, the Affiant, do solemnly swear on my oath that I give this sworn statement of my own free will, and I, being of sound mind and competent to testify in this matter, am over the age of eighteen (18), do state, to wit:

" I have been retaliated against for filing a 1983 civil rights complaint form against D.O.C. Staff. Dr. Sanders, Ray Larimer, Ernesto Martinez, Shanna Taylor, SGT Morrison, I was told by mental health staff Ms. Garvin I was approved to go to J.H.C.C. (Josephharp Correctional Center) to be evaluated for gender dysphoria, that Ms Garvin talked to Janna Morgan of D.O.C. that Dr. Morgan approved it. I was also told by Ms. Garvin mental health staff that a mental (see back →)

Anything further, Affiant saveth not."

_____
Affiant's Signature

## NOTARY'S STATEMENT

STATE OF OKLAHOMA )
                  ) SS:
COUNTY OF PITTSBURG )

This instrument was acknowledged, signed, and sworn to before me on this __15th__ day of __Jan_____ 20_20_ by _Lamone Johnson_____

_____
NOTARY PUBLIC

My commission expires: __3-12-22__

SHERRY DAY
NOTARY
# 18002542
EXP. 03/12/22
PUBLIC
STATE OF OKLAHOMA

Health Packet was to be Placed on me to Transfer to J.H.C.C.; I was over-ruded to a maxium security level, when in deed I was medium security level by defendants Shanna Taylors reccomendation to ~~J.H.C.C. that~~ D.D.O.C. that I be Placed in max security. Now that in fact is retaluation against me for filing a 1983 civil rights complaint for moZ am now at O.S.P. (Oklahoma State Penintentary) a max security Prison, where the mental health staff MR. Long spoke with me on 12-27-19 and (which i was on constant suicide watch,) he told me that his boss spoke with Dr. Shields, who does the gender dysphoria evaluation and she said i am not on her list nor was i ever supposed to be going to Joseph harp corr. center, So this Proves the Transfer security override Packet was retaliation. Z Now wish to amend and supplement my complaint to add new claims as well as new defendants. My same rights are being violated at O.S.P. Due to D.C.of. already Putting incorrect and false information into my "inmate files" (medical, mental health, classifications, Disciplinary) This case can never be moot Because this has been entered into a database that will be looked at by every facility in the state of Oklahoma. when determing housing, medical, mental health,

Exhibit 41

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### REQUEST FOR HEALTH SERVICES

**TO BE COMPLETED BY INMATE**   Facility: D.C.F   Date: 5-17-18

Inmate Name _LaMone Johnson_   DOC # 744047 Unit A-South 222

I request the following service(s): (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

Reason for service: I Arrived at D.C.F on 5-16-18, I was deprived by the property officer of 3-make up Items so that I was approved to order by Warden Carl Bear at J.H.C.C See Kattzer V. Frank, 711 F. supp.2d 874, 908-11 (ED wis 2010) See also Schuelu, 851 F. supp.2d at 246.

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _LaMone Johnson_   Date: 5-17-18

---

**TO BE COMPLETED BY HEALTH SERVICES**

| Date Received | Initials |
|---|---|
| 5-21-18 | C |

Comment: This is not a medical issue

_____   5-21-18
RN/LPN/Health Care Provider Signature   Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

DOC 140117A
(P. 5/17)

Exhibit 72



Exhibit 72

Appellate Case: 23-7048   Document: 010110972558   Date Filed: 06/28/2022   Page: 340



OKLAHOMA DEPARTMENT OF CORRECTIONS
REQUEST FOR HEALTH SERVICES

Exhibit 16-1

| TO BE COMPLETED BY INMATE |  Facility: O.C.F  Date: 5-23-18 |

Inmate Name Lamone Johnson  DOC # 744417  Unit A south #222

I request the following service(s): (Check appropriate box(s))

☑ Medical  ☐ Mental Health  ☐ Dental  ☐ Optometry (eye)  ☐ Medication Renewal
(expired medications only)

Reason for service: I would like a copy of Dr. Patrica
Jones summary Denying me Treatment of
Gender dysPhoria

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _Lamone Johnson_  Date: 5-23-18

| TO BE COMPLETED BY HEALTH SERVICES | RECEIVED Date Received MAY 24 2018  Initials |

Comment: _Referred to medical records_  BY: ...............

_____  5.24.18
RN/LPN/Health Care Provider Signature  Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

NOTE: All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

Exhibit 16-1

DOC 140117A
(R 341)

## GRIEVANCE RETURNED UNANSWERED

Exhibit
18-1

**Received:**

_____

**Inmate signature**

_____

**Date**

| | |
|---|---|
| **DATE:** | July 5, 2018 |
| **TO:** | Johnson, Lamore, #744047 |
| **FROM:** | Ray Larimer, Health Services Administrator |
| **Received:** | July 5, 2018 |
| **RE:** | Return of Grievance # 2018-1001-**00166**-G |

### YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:

☐ You have not filed your grievance within the specified time frame.   **(CANNOT RESUBMIT)**

   ☐ The "Request to Staff" must be submitted within seven (7) days of the incident.

   ☐ The inmate/offender grievance must be submitted by the inmate/offender 15 days from the date of the receipt of the response to the "Request to Staff."

☒ An **ANSWERED** Request to Staff form addressed to the correct staff member must be attached.

☐ The Request to Staff issue does not match the issue requested on the Grievance.

☐ Inmate Request forms are not utilized in the Grievance Process.

☐ You have not completed the Grievance form correctly, in its entirety, or on the correct form.

☐ Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil, highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making comments, in the margins of the pages is permitted.

☐ The Grievance must be specific as to the **complaint, dates, places, personnel involved and how the inmate was affected**.

☐ Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐ If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of submission, the inmate may file a grievance to the reviewing authority with a copy of the "Request to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.) The grievance form may only be filed about the lack of response to the "Request to Staff."

☐ You cannot grieve more than one **ISSUE** per grievance form.

☒ You are on **Grievance Restriction**, proper documentation not included.

☐ It has been determined that the grievance is not of an **Emergency or Sensitive** nature, the grievance is being returned and you must comply with the standard grievance process.

Exhibit 18-2

Page 2 of 2

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
**1.** Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Offender Disciplinary Procedures."

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
**2.** Grievances may not be submitted about matters that are in the course of litigation.

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
**3.** Requests for disciplinary action against staff will not be addressed through the grievance process.

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 3 OP-090124 Effective Date: 07/19/2016**
**4.** Grievances shall not be submitted requesting monetary compensation.

☐ **NOT A GRIEVABLE ISSUE. Section-09 Programs Page: 4 OP-090124 Effective Date: 07/19/2016**
**5.** Privately contracted facility property issues are not grievable.

☐ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☐ **Section-09 Programs Page: 17 OP-090124 Effective Date: 07/19/2016**
A. Determining Abuse of the Grievance Process
1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
a. Grievances intended to harass another;
b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
d. Grievances about de minimis (small, trifling, no available remedy) issues;
e. Repetitive grievances by multiple inmates/offenders about the same issue;
f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
g. Continued procedural defects, such as submitting additional pages, after having been previously warned. **Because of continued abuse of the grievance process this serves as an official warning.**

☒ You will be afforded the opportunity to properly re-submit the Grievance within **10 days** of receipt of this notice <u>with the noted corrections completed.</u> The failure of such waives/forfeits the right to proceed in the grievance process.

☐ Due to your continued failure to submit a properly filed grievance, you are now <u>**OUT OF TIME**</u>.

☒ Other:  **Dr. Jones told you that you needed to discuss your diagnosis with your primary QMHP. You have not done this. You need to address this to medical at this facility.**

Exhibit 18-5

JHCC
Law Library

**Must Be Submitted Through the Law Library or Designee**
**Inmate/Offender Grievance Process**
**REQUEST TO STAFF**

JUN 05 2018

Received

TO: Dr. Patrila Jones   FACILITY/DIST/UNIT: Emd. D.C. DATE: 5-28-18
(NAME AND TITLE OF STAFF MEMBER)   JHCC 9151   To: Jail H.C.C.   Jones

I have ☐ have not ☑ already submitted a "Request to Staff or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____ MAY 30 2018
I affirm that I do ___ do not ☑ have a grievance pending on this issue.
I affirm that I do ___ do not ___ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____   LAW LIBRARY
This request ___ does ___ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

SUBJECT: State completely, but briefly, the problem on which you desire assistance. This statement
must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One
issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this
being returned unanswered.

On 5-1-18 @ Dick Conners Corr. Center, You Assessed
me for "Gender dysphoria". The Conclusion of Your
"Assesment" was that I did not have "Gender dysphoria"
and to stop MY current Hormone therapy that I was →
(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

ACTION REQUESTED: State exactly how you believe your request may be handled; that is, what exactly
should be done and how.
Diagnose me with the correct criteria of Gender dysphoria
and Re instate MY Hormone therapy, which has been
Discontinued.

NAME: LaMone Johnson   DOC NUMBER: 944647 UNIT & CELL NUMBER: A5-222
(PRINT)
SIGNATURE: M-S(Mone) Lamone Johnson WORK ASSIGNMENT: # TransPride

DO NOT WRITE BELOW THIS LINE

DISPOSITION:
You need to discuss your diagnosis with
your primary GMHP. all medication
decisions are made by medical.

RECEIVED
JUN 06 2018
JHCC
MHU-UNIT

Dr. Jones   6/6/18

STAFF MEMBER   DATE

JUN 25 —

Date response sent to inmate: _____
1. Original to file
2. Copy to inmate/offender

RECEIVED
JUL 0 DOC 090124D (R 0/16)

GRIEVANCE

Exhibit 18-6

and has been Receiving since / or Before my
Incarceration which violates the Eight Amendment
of the U.S Constitution See; Estelle V. Gamble
424 U.S at 104-05, See also; White V. napoleon
897 F.2d. 103, 106-10 (3d cir. 1990) "Prison
Doctor Ignored instructions of inmates Prior Physician
Regarding treatment of Chronic ear Infection." In
my case, my "Hormone Replacement Therapy" See;
Steele V. Shah, 87 F.3d 1266,1270 (11th cir.1996) €
"deliberate indifference for Prison doctor to "discontinue"
Psychotropic medications Prescribed for inmate at
previous prison on the basis of one minute Interveiw
and without reviewing most medical records.) Werefore
Interfering, Discontinuing my Hormone therapy, which i been on
for over 2 years would cause me significant Harm
Vomitting, Abdominal Pain, Breast swelling, Cancer,
Depression and could Possibly lead up to cutting, self-
harm, self-castaration, which i Attempted 3 Times in my
Adolescent Years Due to the strong discomfort of my
Genetelia, See; Estate of Cole V. Fromm, 94 F.3d
254 259, (7th cir. 1996) "Prison officials may be liable
for an inmates suicide if they were deliberately
indifferent to a substantial suicide risk; Farmer V. Montsayu
163 F.3d 610,611 (D.C. cir. 1998) "this condition, also called
Gender dysphoria" "is commonly accompanied by a desire to
change one's anatomic sexual features to conform physically
with one's perception of self, to relieve this gender discomfort
Trans sexuals, may pursue some combination of hormone therapy
Surgery and psychological counseling                they may also choose
to live in their preferred gender role by dressing, naming, and
conducting themselves in conformity with that gender."
See also; maggert V. Hanks, 131.F.3d 670, 671 (7th cir 1997.)
Fields V. smith, 712 F.supp.2d 830, 867-69 (E.D wis.2010)
see; Delonta, 330 F.3d at 634-35; Wolfe V. Horn,

Exhibit 18-3

**INMATE/OFFENDER GRIEVANCE**

RECEIVED

JUL 05 2018

GRIEVANCE

Grievance no. 2018-1001-00166 G

Grievance code: 11

Response due: 7/24/18

---

**DO NOT WRITE ABOVE THIS LINE**

Date 7-1-18

Name Lamone Johnson
(Print)

ODOC Number 744017

Facility or District D.C.F

Facility Housing Unit AS-222

Date "Request to Staff" response received: June 25 2018

Have you previously submitted a grievance on this same issue? Yes If yes, what date 5-23-18, facility D.C.F, grievance # mara-1640 You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1.  The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. On 5-1-18, I was at O.C.C.C, I was Assesed by Dr. Patrica Jones for "Gender dysphoria" on 5-23-18, I was Informed by D.C.F-CHt.S.A. Ray Larimer that Dr. Patrica Jones sent him a summary order of My

2.  Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance. RTS to Dr. Patrica Jones (5-23-18 Emergency Grievance to P.I.A.R.A (5-23-18)

3.  The action you believe the reviewing authority may lawfully take. Diagnose me with the correct criteria of Gender dysphoria and Reinstate my Hormone therapy which has been discontinued and altered, Instead with Refer me to outside Gender dysphoria specialist.

Grievance report sent to (warden/district supervisor/correctional health services administrator): Ray Larimer   C.H.S.A

Name _____   Title _____

Signature of Grievant   Date Sent to Reviewing Authority 7-1-18

DOC 090124A (R 7/16)

1. Original to file
2. Copy to inmate/offender

Exhibit

(D)
6

"Gender dysphoria" Evaluation. Denying me the the criteria of Gender dysphoria, Removing my Hormone Therapey that was prescribed by an diffrent Physician. See: Estelle v. Gamble 429, u.s at 104-05, See also: white v. Napoleon 897 F.2d. 103, 106-10 (3d cir. 1990) "Prison Doctor Ignored instructions of inmates prior physican Regarding treatment of Chronic ear infection"

In my case Hormone therapey. See: Steele v. shah, 87. F.3d. 1266, 1270 (11th cir, 1996) "deliberate indiffrence for prison doctor to "discontinue" pschotropic medications prescribed for inmate at preview prison on the basis of one minute Interview and without reviewing most medical records.) Wherefore Interfering, Discontinuing, my Hormone therapey which i been on for over 2 Years would cause me significant harm Vomiting, Abdominal Pain, Breast Dysfunction, Cancer, Depression and could possibly lead up to Cutting, self-harm, self Castration, which i Attempted 3 Times In my Adolescent Years, Due to the Strong discomfort of my Genetila, See: Estate of cole v. fromm, 94. F.3d 254, 259 (7th cir. 1996) "Prison officals may be liable for an inmates suicide if they were deliberatedly indiffrent to a substantial suicide Risk. Farmer v. montsugu, 163. F.3d 610,611 (D.C. cir 1998.) "this condition also called "Gender dysphoria" is commonly accomplished by a desire to change ones anatomic sexual features to conform physically with one's perception of self. to relieve this gender discomfort. Transsexuals may persue some combination of hormone therapey, surgery and psychological counseling to live in their preferred gender rove by dressing naming and conducting themselves in conformity with that gender. See: also: meriwot v. hanks, 131. F.3d 610,611 (7th cir. 1997.) fields v. smith, 712. F. supp.2d 830, 861,64 (E.D wis. 2010)
See: Delonta 1330 F.3d at 634-35; Wolf___ ___ on 5-23-18
I wrote a RTS to Dr. Patricia Jones addressing these issues on 6-6-18
She responded "You need to discuss your diagnosis with your primary QMHP. all medication decisions are made by medical.





JOE M. ALLBAUGH
DIRECTOR



MARY FALLIN
GOVERNOR

**STATE OF OKLAHOMA**
**OKLAHOMA DEPARTMENT OF CORRECTIONS**
**ADMINISTRATIVE REVIEW AUTHORITY**

DCF 18-166

Date:       JULY 24, 2018

To:         JOHNSON, LAMONE #744047

Location:   DCF

From:       Mark Knutson, Director's Designee   *Mark Knutson*

**Your grievance/correspondence was filed improperly for the following reason(s):**

| | | |
|---|---|---|
| | 1. | No facility head response to the grievance. |
| | 2. | No informal action or "Request to Staff" response included. |
| | 3. | Out of time from date of alleged incident until filing request to staff. |
| | 4. | Out of time from date of response to request to staff until filing the grievance with facility head. |
| | 5. | Received out of time from date of facility head response |
| | 6. | You cannot appeal a non-response.  See OP-090124 section IV.C.11. or V.C.4. |
| X | 7. | Inmate on grievance restriction and/or proper documentation not included. |
| | 8. | Must be legibly written in blue or black ink.  No pencil or other color of ink is allowed.  No doodling or writing in margins. |
| | 9. | Attachments to the grievance/appeal (no additional pages allowed except affidavit if required). |
| | 10. | Not an issue grievable to Oklahoma Department of Corrections (Private prison property, misconduct, litigation pending, not within/under the authority/control of the Department of Corrections, etc.) |
| | 11. | More than 1 issue - only 1 issue allowed per grievance/Request to Staff |
| | 12. | Not of a sensitive/emergency nature.  You must follow the standard grievance process including giving the facility an opportunity to respond. |
| | 13. | Requests for disciplinary action against staff will not be addressed in the grievance process. |
| | 14. | Appeal form not signed/dated. |
| | 15. | Grievances shall not be submitted requesting monetary compensation. |
| | 16. | The ruling of the Administrative Review Authority or Director's Designee is final. |
| | 17. | Facility grievance number not listed on the appeal form. |
| | 18. | Additional issues submitted in the grievance appeal and not presented in the initial grievance to the facility head for response, will not be addressed by this office. |
| X | 19. | You have failed to follow previous instructions from the reviewing authority or ARA for filing this grievance/appeal and/or properly resubmit.  **YOU ARE NOW OUT OF TIME.** |
| | 20. | You did not provide the date that you received the reviewing authority's response on the appeal form. |
| | 21. | This grievance is unanswerable as there are no time frames specified for the alleged action(s) to have occurred |
| | 22. | You failed to identify your grounds for an appeal by checking one, or both boxes on the appeal form. |
| | 23. | Your appeal must be written on the current Misconduct/Grievance Appeal form (DOC060125V effective _4/17_). |
| | 24. | You will be afforded **ONE FINAL** opportunity to properly resubmit your corrected grievance/appeal which must be received in ARA within ten (10) days of receipt of this form. **DO NOT RETURN THIS FORM WITH YOUR CORRECTED APPEAL.** |
| X | 25. | Other:  AFFIDAVIT NOT SUBMITTED TO THE REVIEWING AUTHORITY AND ARA. |

**THIS OFFICE WILL NOT PROCESS INCOMPLETE/INACCURATE/OUTDATED APPEAL FORMS**
**NOTE:** Abuse of the grievance process as explained in section IX of OP-090124, will result in restrictions being imposed.

I acknowledge receipt of this response:_____
                                        **Inmate's signature and date**

P.O. BOX 11400, OKLAHOMA CITY, OK. 73136-0400

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### REQUEST FOR HEALTH SERVICES

Exhibit 19-1

| TO BE COMPLETED BY INMATE | Facility: O.C.F. Date: 7-6-18

Inmate Name Camere Johnson   ODOC # 744047 Unit F3-212

I request the following service(s): (Check appropriate box)

☐ Medical   ☑ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

Reason for service: I need to speak with Dr. Sanders pertaining to my Hormone therapy Issues

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _____ Date: 7-6-18

| TO BE COMPLETED BY HEALTH SERVICES

| Date Received | Initials |
| 07/07/18 | |

Comment: referred to provider

_____ 07/07/18
RN/LPN/Health Care Provider Signature   Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

ODOC 140117A
(R 5/17)

OKLAHOMA DEPARTMENT OF CORRECTIONS
**REQUEST FOR HEALTH SERVICES**

Exhibit 19-2

**TO BE COMPLETED BY INMATE**   Facility: OCF   Date: 8-26-18

Inmate Name Lamone Johnson   DOC # 744647   Unit CU-121

**I request the following service(s):** (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☑ Medication Renewal
(expired medications only)

Reason for service: My estradiol & spironolactone has
expired I need a renewal.

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _____   Date: 8-26-18

**TO BE COMPLETED BY HEALTH SERVICES**

RECEIVED AUG 28 2018

Comment: Spironolactone renewed; will expire 11.25.18. Estradiol denied per Dr. Sanders.   BY: _____

_____   8.28.18
RN/LPN/Health Care Provider Signature   Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to health services unit or to the medical host facility, using the "Medication Refill Slip" (D "Medication Refill Slips" must be submitted within ten days of the date the medication out. "Medication Refill Slips" are readily available and accessible at designated loc facility.

## OKLAHOMA DEPARTMENT OF CORRECTIONS
## REQUEST FOR HEALTH SERVICES

*Exhibit 19-3*

**TO BE COMPLETED BY INMATE**   Facility: _DCF_   Date: _9-16-18_

Inmate Name _Lamone Johnson_   DOC # _749047_ Unit _DN-128_

I request the following service(s): (Check appropriate box)

☐ Medical   ☑ Mental Health   ☐ Dental   ☐ Otometry (eye)   ☐ **Medication Renewal**
(expired medications only)

Reason for service: _I need to speak with Dr Shepard._

I understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for <u>each</u> medical service <u>I request</u> and a charge of $4 for <u>each</u> medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is <u>no charge</u> to the inmate for mental health services and/or mental health medications.

Inmate Signature _____   Date: _9-16-18_

**TO BE COMPLETED BY HEALTH SERVICES**

| Date Received | Initials |
|---|---|
| 9-17-18 | G |

Comment: _Seen on this date-_

_Shepherd MEd LPC LADC_   _9-17-18_
RN/LPN/Health Care Provider Signature   Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

<u>NOTE:</u>  All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out.  "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

DOC 140117A
(R 5/17)

EXHIBIT 1-P
FD228

**Must Be Submitted Through the Law Library or Designee**
**Inmate/Offender Grievance Process**
**REQUEST TO STAFF**

TO: Dr. Sanders                     FACILITY/DIST/UNIT: D.C.F   DATE: 10-6-18
(NAME AND TITLE OF STAFF MEMBER)

RECEIVED
OCT 9 - 2018
LAW LIBRARY

I have ____ have not ✓ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do ____ do not ✓ have a grievance pending on this issue.
I affirm that I do ____ do not ✓ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request ____ does ____ does not ✓ relate to a pending misconduct report. If it does, this request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:** State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 8-31-18, I was Informed per sick call that you discontinued my HRT (Hormone Replacement therapy) which violates my 8th Amendment Rights to medical care. I have been experiencing Pain and swelling in my Breast as well as →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)
**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly should be done and how.

Re-instate, Renew, my HRT to estradiol 2mg, Aldactone 50mg

NAME: Lamore (Monie') Johnson   DOC NUMBER: 744047   UNIT & CELL NUMBER: DN-178
(PRINT)
SIGNATURE: Lamore Johnson   WORK ASSIGNMENT: _____

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:
Offender Notification per Dr. Sanders mailed answering the listed concern.
You are currently on a Tapering dose of Aldactone-
Offender request mailed 7/10/18 & 10/15/18
J. Sifah   10-15-18
If you have medical issues that need evaluated Submit a Request for Health Services

STAFF MEMBER   DATE
Date response sent to inmate: _____
1. Original to file
2. Copy to inmate/offender            DOC 090124D (R 9/16)

OCT 17

352

my Back, I was on Hormone Replacement Therapy Prior to my Incarceration, which was Prescribed by A Diffrent doctor. Not dealing with D.O.C. you also Interfered with my Dosages you switched my estradiol 2mg to 1mg, my Aldactone 50mg to 25mg. which also Violates my 8th Amendment Rights to Serious medical care. my Facial hair, Acne, Testicals are experiencing Puberty you are Interfering with my body's chemical Balance of Hormones which also Violates my 8th Amendment.

RECEIVED

Must Be Submitted Through the Law Library or Designee

JUN 1 8 2019

Inmate/Offender Grievance Process

REQUEST TO STAFF

BY: _____

TO: Dr. Sanders _____ FACILITY/UNIT: DoCoF DATE: 6-13-19

(NAME AND TITLE OF STAFF MEMBER)

I have _____ have not ✓ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do _____ do not ✓ have a grievance pending on this issue.
I affirm that I do _____ do not ✓ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request _____ does _____ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

SUBJECT: State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 6-6-19 I filed a request to health services, requesting
that I meet with you pertaining to you stopping my HRT
(Hormone replacement therapy) estradiol 2mg and spironolactone 50
mg. I have been on HRT for 4 years prior to my incarceration
see back →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

ACTION REQUESTED: State exactly how you believe your request may be handled; that is, what exactly should be done and how.

reinstate my HRT estradiol 2mg and spironolactone 50mg
I have my medical records from Oklahoma County Jail.

NAME: Lamone (Monie) Johnson DOC NUMBER: 744047 UNIT & CELL NUMBER: FD-210
(PRINT)

SIGNATURE: Lamone Johnson WORK ASSIGNMENT: _____

DO NOT WRITE BELOW THIS LINE

DISPOSITION:
During your psychologist evaluation you did not
meet the criteria for therapy. Offender
Notification was sent 07/10/18 per Dr. Sanders

_____ STAFF MEMBER

06/20/19 DATE

RECEIVED
JUL 0 8 2019
GRIEVANCE

JUL 0 2 ANS'D

Date response sent to inmate/offender: _____
1. Original to file
2. Copy to inmate/offender

DOC 090124D (R 4/19)

354

See OP 140147, Pg. 5, IV. C, 2. a. "Once the above steps
have been completed, hormonal treatment may be
considered by the qualified medical Provider
if the following: a. Hormonal treatment was
initiated Prior to incarceration." I was on
HRT from the Oklahoma county jail and from
the "free world". I was Prescribed estradiol, and spirono before
before I was incarcerated. See: Steele v. shah, 87 F3d
1266, 1270 (11th Cir. 1996.) See also: miller v. schoenen, 75
F3d 1305, 1311 (8th Cir. 1996.) See: De'Lonta v. Angelone, 708 F3d
at 522-25, DeLonta, 330 F3d at 634-35; wolfe v. Horn,
130 F. supp. 2d 648, 653 [E. D. Pa. 2001) Phillips, 731 F. supp.
at 800 ["Taking measures which actually reverse the effects
of years of healing medical treatment... is measurably
worse[ than failing to provide such treatment in the first
place"]. I would like to meet face to face & have
my medical records.

Exhibit 19-7

2019-2736


RECEIVED
JUL 0 8 2019
GRIEVANCE

EXHIBIT 1

## INMATE/OFFENDER GRIEVANCE

**RECEIVED**
JUL 0 8 2019
GRIEVANCE

Grievance no. _2019-1001-00273-6_

Grievance code: _7_

Response due: _7/29/19_

DO NOT WRITE ABOVE THIS LINE

Date _7-3-19_                    Facility or Unit _DoCoF_

Name _Lamone (monae) Johnson_   Facility Housing Unit _FD-210_
(Print)

DOC Number _744047_             Date "Request to Staff" response received: _7-7-19_

Have you previously submitted a grievance on this same issue? _N/A_ If yes, what date _N/A_, facility _N/A_, grievance # _N/A_. You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1. The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. _On 6-6-19, I filled out a request to health servies requesting that I meet with Dr. Sanders pertaining to him stopping my HRT (Hormone replacement therapy) estradiol 2mg, spironolactone 50mg, I have been on_

2. Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.

   _RTS to Dr. Sanders 6-13-19_
   _Sick Call (Request for health servies) 6-6-19_

3. The action you believe the reviewing authority may lawfully take.
   _Reinstate my estradiol 2mg and spironolactone 50mg, re-diagnose me with correct criteria_

Grievance report sent to (warden/facility head/deputy director/correctional health services administrator):
Name _Rick Lanimer_                Title _CHosA_
Signature of Grievant _Lamone Mae_ Date Sent to Reviewing Authority _7-3-19_

DOC 090124A (R 4/19)

1. Original to file
2. Copy to inmate/offender

HRT for 4 years prior to my incarceration.
See OP-140147, P.5, IV. C, 2.a. "Once the
above steps have been completed, hormonal treat
ment may be considered by the Qualified Medical
Provider if the following: a. Hormonal treatment
was initiated prior to incarceration." i was on
HRT from the Oklahoma County jail and from the
"freeworld". I was Prescribed estradiol and
spironolactore before my incarceration. See: Steele
V. Shah, 87 F.3d 1266, 1270 (11th cir. 1996); see
also: Miller V. Schoenen, 75 F.3d 1305, 1311 (8th cir.
1996); See: De'Lonta V. Angelore 330 F.3d at
634-35, Phillips, 731 F.supp. at 800" "Taking
measures which actually reverse the effects
of years of reality medical treatment ooo is
measurably worse < than failing to provide
such treatment in the first place." I I
have my medical records. Ms. Jones did
not say discontinue my HRT. She did
incorrectly diagnose me.



RECEIVED
JUL 0 8 2019
GRIEVANCE

## Grievance Decision from Reviewing Authority

| Inmate/Offender Name: | Johnson, Lamone | | DOC Number | 744047 |
|---|---|---|---|---|
| Receipt Date: | 07/08/19 | Grievance Category Code: 7 | Grievance Number: | 2019-1001-00273-G |

| 1. Discrimination | 3. Complaint against staff | 5.Disciplinary process | 7.Medical | 9. Records/Sentence Admin. |
|---|---|---|---|---|
| 2. Classification | 4. Condition of confinement | 6.Legal | 8. Property/Trust Fund | 10.Religion 11.Personal Identity |

Decision:

On 6/6/19 Inmate Johnson sent a request to health services requesting to meet with Dr. Sanders regarding why his HRT (hormone replacement therapy) was stopped.

After further review of the matter, Ray Larimer, Health Services Administrator replied that Inmate Johnson was evaluated by a psychologist and he did not meet the criteria for therapy. Notification was sent to the inmate on 07/10/2018 per Dr. Sanders.

Inmate Johnson's **RELIEF IS DENIED.**

X _____   X  7-16-19
Reviewing Authority – Facility Health Services Admin (medical issues)   Date

X _____   X  7/16/19
Review Authority – Facility/Unit Head   Date

I have received the copy of the response of the reviewing authority.

_____   _____
Signature of Grievant   Date

_____   _____
Signature of Staff Witness and Printed Name of Witness   Date

You may appeal to the Administrative Review Authority or Personal Identity ARA at Department of Corrections, P.O Box 11400, Oklahoma City, OK  73136-0400 or Medical ARA at 2901 N. Classen Blvd, Suite 200, Oklahoma City, OH 73106, within 15 days of the receipt of response using only DOC Form 060125V entitled "Misconduct/Grievance Appea to Administrative Review Authority." Do not send this decision to the Administrative Review Authority or Medical ARA
1. Original to file
2. Copy to inmate/offender

DOC 090124B (R 4/19)

Exhibit 19-21

## Misconduct/Grievance Appeal To Administrative Review Authority

Inmate Name: _Lamone Johnson_   DOC Number: _744047_

Department of Corrections
Medical Services Administration

Facility Where Offense/Grievance Occurred:
_Davis Correctional Facility_

Offense Code: _____

AUG 0 5 2019

Date of misconduct violation: _____

Received

☐ Facility Misconduct Appeal Number
_____

☑ Facility Grievance Appeal Number
_2019-1001-00273 - G_

I received the response of the reviewing authority at the facility on: _7-31-19_

Fill out this form in blue or black ink. Writing must be legible. I wish to appeal the reviewing authority's response to the misconduct/grievance on the following ground(s) only. DO NOT ATTACH ANY OTHER PAGES. (Use ONLY the back side of this page, if necessary). Your appeal will be returned to you unanswered if any other pages are submitted.

☑   Newly discovered/available evidence not considered by the reviewing authority, relevant to the issue, necessary for a proper decision, and why the evidence was not previously available which if considered may alter the decision (you must clearly state the newly discovered/available evidence); or

☐   Probable error committed by the reviewing authority in the decision such as would be grounds for reversal (you must clearly state the error committed by the reviewing authority, including citing the part of procedures or statutes not followed by the reviewing authority).

**Response:**
_Available evidence: On 6-6-19, I filed a "request to health services" to "meet" with Dr. Sanders for stopping my HRT (Harmone replacement therapy) because of a "inexperienced" psychologist's report that i only meet the first required criteria for "gender dysphoria." The purpose of this meeting was a attempt to show my previous medical records and results→_

I understand that in accordance with OP-060125/OP-090124, I will be charged $2 to appeal a misconduct/grievance to the Administrative Review Authority or Chief Medical Officer, and that this form is also a request for disbursement of funds from my trust fund draw account. If I do not have enough funds to cover this cost, the amount will be collected as soon as funds become available.

_Lamone Johnson_   _7-31-19_
Signature of Inmate        Date

DOC 060125V (R 4/17)

Exhibit 14-21 (Cont's'de)

Of another evaluation (Prior to my incarceration) and to show Documentation written by "experienced Professional" within Gender Dysphoria, to show one 1. I do meet the Criteria for Gender dysphoria, 2. That "inexperienced Psychologist's" often misdiagnose Gender dysphoria for a "Psychiatric disorder" and the Proper and Professional way to distinguish the Two. I was on Hormone replacement Therapy Prior to my incarceration, when i was assesed at LARC, i was continued on my HRT until i arrived at Davis Correctional Facility, Where i was informed Dr. Patrica Jones denied me having "Gender dysphoria" and said i had a "Personality disorder", however Ms. Jones report never stated to Stop my HRT. That was a decision that Dr. Sanders, Ray Larimer made. Which is Denying my eight amendment rights to my "Serious medical need". i have wrote Dr. Patrica Jones a RTS. She said that "all medications decisions are made by Medical." So saying in other words "I didn't do it." which is what Davis Medical and mently health is saying "Ms. Jones told us to discontine it." I am experiencing mental and Physical Pain due to this errors my body is making a transformation, from years of healing my Gender dysphoria to Now Stopping it? is worse than denying it in the first Place. See Phill v. Micho. Dept. of Corr., 731 F. Supp. 792 (W.D. Micho 1990.) I have filled out "sick Calls" about the Pain i am experincing but there is more Pain than what meets the eye. I am severally depressed without my HRT. It makes me feel less of a woman. Please reinstute my HRT. Thank-you.

Department of Corrections
Medical Services Administration

AUG 05 2019

Received

Exhibit 19-22

| | |
|---|---|
| Grievance Number: | 2019-1001-00273-G |
| Inmate Name and ODOC Number: | Lamone Johnson (#744047) |
| Facility Location: | Davis Correctional Facility |

Your grievance appeal, dated July 31, 2019, was received on August 5, 2019. All of your correspondence was thoroughly reviewed. The actions you believe the Administrative Review Authority may lawfully take, and my response, are provided below.

**Request:**

"Please reinstate my HRT."

**Response:**

According to your record, a Qualified Mental Health Professional (QMPH) completed a Gender Dysphoria Forensic Mental Health Assessment report on May 11, 2018 and concluded you do not have a current diagnosis of Gender Dysphoria. Therefore, your request to reinstate your hormone replacement therapy (HRT) is denied.

If you need further assistance with any medical or mental health concerns/treatments, you must submit a "Request for Health Services" form (attached) to the medical unit at your facility, via the sick call process.

Disposition: (3) – Relief denied.

*OP-090124 entitled "Inmate/Offender Grievance Process," Section VII.D states, "The ruling of the administrative review authority or chief medical officer is final and will conclude the administrative remedy available to the inmate/offender within the jurisdiction of the Oklahoma Department of Corrections. The inmate/offender will have satisfied the exhaustion of administrative remedies required by 57 O.S., Section 564. The grievance procedure, however, does not satisfy the additional requirements for exhaustion of administrative remedies required by the Governmental Tort Claims Act, 51 O.S., Section 151 et seq."*

Cheri Atkinson
Medical Services Manager

9/4/19
Date

CA/cr

CC    Ray Larimer
      James Yates (Terry Underwood)
      Julie Rose
      James Rudek (Kim Wells)
      Janna Morgan, Ph.D. (Liz Janway)
      File

OKLAHOMA DEPARTMENT OF CORRECTIONS    Exhibit
REQUEST FOR HEALTH SERVICES

19-23

**BE COMPLETED BY INMATE**    Facility: DoCoF    Date: 2-24-19

Inmate Name _Lamone (monie) Johnson_    DOC # 744047    Unit FD-216

Request the following service(s): (Check appropriate box(s))

☐ Medical  ☑ Mental Health  ☐ Dental  ☐ Optometry (eye)  ☐ Medication Renewal (expired medications only)

Reason for service: _I would like to be re evaluated_
_for "Gender dysphoria" by Dr. Patrica Jones_

Understand that in accordance with operations memorandum OP-140117 entitled "Access to Health Care", I will be charged $4 for each medical service I request and a charge of $4 for each medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is no charge to the inmate for mental health services and/or mental health medications.

Inmate Signature _Lamone Johnson_    Date: 2-24-19

**BE COMPLETED BY HEALTH SERVICES**    III    Date Received 2·24·19    Initials LH

Comment: _Referred to ema MH_    HSA will look into this

_J Garvin MS LPC_    2/26/2019
RN/LPN/Health Care Provider Signature    Date

...rn the "Request for Health Services" with the disposition of the Inmate's request in the comment section to
...nate after scanning into the inmate's EHR.

...:  All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's
... services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M).
...cation Refill Slips" must be submitted within ten days of the date the medication expires or runs
...'Medication Refill Slips" are readily available and accessible at designated locations within the

DOC 140117A
(R 5/17)

362

OKLAHOMA DEPARTMENT OF CORRECTIONS
REQUEST FOR HEALTH SERVICES

Exhibit
19-74

**TO BE COMPLETED BY INMATE**      Facility: _Davis Corr. Facility_ Date: _3-31-19_

mate Name _Lamore Johnson_ · DOC # _744017_ Unit _FD-210_

request the following service(s): (Check appropriate box(s))

✓ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ Medication Renewal
(expired medications only)

eason for service: _I am in Pain, my back, breast, neck_
_Is hurting._

understand that in accordance with operations memorandum OP-140117 entitled "Access to
alth Care", I will be charged $4 for each medical service I request and a charge of $4 for each
edication(s) dispensed to me, with the exceptions noted in the above-reference operations
emorandum. There is no charge to the inmate for mental health services and/or mental health
edications.

nate Signature _Lamore Johnson_      Date: _3-31-19_

**TO BE COMPLETED BY HEALTH SERVICES**

| | Date Received | Initials |
|---|---|---|
| | 4/2/19 | IU |

mment: _Referred to Provider, Pain Protocol_
_done, refused Naproxen + Tylenol_

_____      4/2/19
RN/LPN/Health Care Provider Signature      Date

urn the "Request for Health Services" with the disposition of the inmate's request in the comment section to
nmate after scanning into the inmate's EHR.

E: All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's
th services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M).
lication Refill Slips" must be submitted within ten days of the date the medication expires or runs
"Medication Refill Slips" are readily available and accessible at designated locations within the
ty.

DOC 140117A
(R 5/17)

OKLAHOMA DEPARTMENT OF CORRECTIONS   Exhibit
REQUEST FOR HEALTH SERVICES

19-25

| TO BE COMPLETED BY INMATE |   Facility: _DoCoF_   Date: _5-2-19_

Inmate Name _Lamore, Johnson_   DOC # _744047_   Unit _FD-21o_

I request the following service(s): (Check appropriate box(s))

☑ Medical   ☐ Mental Health   ☐ Dental   ☐ Optometry (eye)   ☐ **Medication Renewal**
(expired medications only)

Reason for service: _I am requesting medical records_
_of Patricia Jones Gender dysphoria summary_
_evaluations_

I understand that in accordance with operations memorandum OP-140117 entitled, "Access to Health Care", I will be charged $ 4 for **each** medical service **I request** and a charge of $ 4 for **each** medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is **no charge** to the offender for mental health services and/or mental health medications.

Inmate Signature _Lamore Johnson_   Date: _5-2-19_

| TO BE COMPLETED BY HEALTH SERVICES |   III   | Date Received _5-2-19_ | Initials _G_ |

Comment: _Referred to HH Medical Records_

RN/LPN/Health Care Provider Signature     _5-2-19_   Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

DOC 140117A
(R 5/17)

**OKLAHOMA DEPARTMENT OF CORRECTIONS** EXHIBIT
**REQUEST FOR HEALTH SERVICES** 19-26

| TO BE COMPLETED BY INMATE | Facility: DoCoF | Date: 5-2-19 |

Inmate Name Lemore Johnson _____ DOC # 744047 Unit FD-210

**I request the following service(s):** (Check appropriate box(s))

☐ Medical    ☑ Mental Health    ☐ Dental    ☐ Optometry (eye) ·    ☐ **Medication Renewal**
(expired medications only)

Reason for service: I am requesting to Speak With the QmHP (Qualified Mental Health Professional) about my Gender dysphoria diagnosis.

I understand that in accordance with operations memorandum OP-140117 entitled, "Access to Health Care", I will be charged $ 4 for **each** medical service **I request** and a charge of $ 4 for **each** medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is **no charge** to the offender for mental health services and/or mental health medications.

Inmate Signature _Lemore Owen_    Date: 5-2-19

| TO BE COMPLETED BY HEALTH SERVICES | III | Date Received 5-2-19 | Initials G |

Comment: Referred to MH

_____ RN/LPN/Health Care Provider Signature    5-2-19 Date

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

<u>NOTE:</u>  All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out.  "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

DOC 140117A
(R 5/17)

## OKLAHOMA DEPARTMENT OF CORRECTIONS
### REQUEST FOR HEALTH SERVICES

*Exhibit 19-27*

**TO BE COMPLETED BY INMATE**  Facility: DoCoF  Date: 6-6-19

Inmate Name: Lamore Johnson  DOC # 744047  Unit: FD-216

**I request the following service(s):** (Check appropriate box(s))

☒ Medical  ☐ Mental Health  ☐ Dental  ☐ Optometry (eye)  ☐ **Medication Renewal**
(expired medications only)

Reason for service: I am requesting to "meet" with Dr. sanders to discuss treatment options about my HRT that was stopped. I recieved Dr. Jukes report He did not say discontinue my HRT. I need to speak with Dr. sanders.

I understand that in accordance with operations memorandum OP-140117 entitled, "Access to Health Care", I will be charged $ 4 for **each** medical service **I request** and a charge of $ 4 for **each** medication(s) dispensed to me, with the exceptions noted in the above-reference operations memorandum. There is **no charge** to the offender for mental health services and/or mental health medications.

Inmate Signature: Lamore Dee  Date: 6-6-19

**TO BE COMPLETED BY HEALTH SERVICES**

Date Received: 6/7/19  Initials: CS

Comment: providers notified

R Shirley, RN  6/7/19
**RN/LPN/Health Care Provider Signature**  **Date**

"Return the "Request for Health Services" with the disposition of the inmate's request in the comment section to the inmate after scanning into the inmate's EHR.

**NOTE:** All "Keep on Person" (KOP's) medication refill requests must be submitted to the facility's health services unit or to the medical host facility, using the "Medication Refill Slip" (DOC 140130M). "Medication Refill Slips" must be submitted within ten days of the date the medication expires or runs out. "Medication Refill Slips" are readily available and accessible at designated locations within the facility.

DOC 140117A
(R 5/17)

Exhibit 10.1

Management of Gender Nonconforming Inmates ................................................................ 1
I.    Definitions ................................................................................................................... 1
      A.    Inmate .............................................................................................................. 1
      B.    Gender Nonconforming ................................................................................... 2
      C.    Transgender ..................................................................................................... 2
      D.    Intersex ............................................................................................................ 2
      E.    Lesbian ............................................................................................................ 2
      F.    Gay ................................................................................................................... 2
      G.    Bisexual ........................................................................................................... 2
      H.    Gender Dysphoria (GD) .................................................................................. 2
      I.    Sex ................................................................................................................... 2
      J.    The Prison Rape Elimination Act (PREA) ....................................................... 2
      K.    Personal Identity Administrative Review Authority (PIARA) ............................ 3
II.   Determining Gender Nonconformity ............................................................................ 3
      A.    Self-identification as Gender Nonconforming ................................................. 3
      B.    Medical or Legal Documentation of Gender Nonconformance ....................... 3
III.  Initiating Review by PIARA ......................................................................................... 4
IV.   Reasonable Accommodations for Gender Nonconforming Inmates ........................... 4
      A.    Housing ............................................................................................................ 4
      B.    Clothing ............................................................................................................ 4
      C.    Hormonal Treatment ....................................................................................... 5
      D.    Surgical Sex Reassignment ............................................................................ 5
V.    References .................................................................................................................. 5
VI.   Action .......................................................................................................................... 6
Referenced Forms ............................................................................................................... 7
Attachments ......................................................................................................................... 7

| Section-14 Health Services | OP-140147 | Page: 1 | Effective Date: 06/05/2017 |
|---|---|---|---|
| Management of Gender Nonconforming Inmates | ACA Standards: None | | |
| Joe M. Allbaugh, Director<br>Oklahoma Department of Corrections | | Signature on File | |

## Management of Gender Nonconforming Inmates

The purpose of this procedure is to establish processes for the appropriate management of gender nonconforming inmates in the Oklahoma Department of Corrections (ODOC).

It is the policy of ODOC to receive, evaluate, house, and provide secure, safe, and humane custody of all persons, including gender nonconforming inmates. ODOC does not place gender nonconforming inmates, which includes lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status. (PREA 115.42/115.242)

I.    Definitions

      A.    Inmate

| Section-14 Health Services | OP-140147 | Page: 2 | Effective Date: 06/05/2017 |

For the purposes of this procedure, the term "inmate" applies to anyone under the custody or care of a prison or community-based facility operated by or contracted with the ODOC.

B.   **Gender Nonconforming**

The term used when behavior or gender expression by an individual is different from societal expectations related to gender.

C.   **Transgender**

A person whose gender identity differs from their birth sex.

D.   **Intersex**

A condition in which a person is born with external genitalia, internal reproductive organs, chromosome patterns, and /or an endocrine system that does not fit typical definitions of male or female.

E.   **Lesbian**

Commonly refers to women typically sexually attracted to other women.

F.   **Gay**

Commonly refers to men typically sexually attracted to other men.

G.   **Bisexual**

A person who is romantically or sexually attracted to more than one gender or sexual category.

H.   **Gender Dysphoria (GD)**

A condition where there is clinically significant discontent or distress with one's sex assigned at birth and/or the gender roles associated with that sex.

I.   **Sex**

The sex of individuals assigned at birth based on observed genitalia.

J.   **The Prison Rape Elimination Act (PREA)**

The Prison Rape Elimination Act of 2003, which was signed into law with the goal of preventing, detecting and responding to sexual abuse occurring in confinement facilities.

EXHIBIT C-3

| Section-14 Health Services | OP-140147 | Page: 3 | Effective Date: 06/05/2017 |
|---|---|---|---|

K.   **Personal Identity Administrative Review Authority (PIARA)**

For the purpose of ensuring adherence to PREA standards for the management and care of gender nonconforming inmates, the director will appoint a designee/designees to serve as the Personal Identity Administrative Review Authority (PIARA). PIARA may consist of any or all of the following:

1.   Chief mental health officer;

2.   Chief medical officer;

3.   Agency PREA coordinator;

4.   Director, Health Services;

5.   Inmate's facility head or designee; and/or

6.   Medical and mental health provider at facility level.

II.   **Determining Gender Nonconformity**

When determining whether inmates are gender nonconforming, the following will be taken into consideration:

A.   **Self-identification as Gender Nonconforming**

During intake and upon any intra-system transfer, classification staff will ensure a "Self Report Form" (OP-030102, Attachment B) is completed privately by the inmate, to include whether or not he or she identifies as lesbian, gay, transgender, bisexual, intersex, or gender nonconforming. (PREA 115.41/115.241)

B.   **Medical or Legal Documentation of Gender Nonconformance**

Diagnosis of Gender Dysphoria has been confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders.*

C.   Inmate's appearance and/or behavior does not match the gender identity on his or her documents. These inmates will be evaluated by health services to clarify gender nonconformity cases, unless waived by the inmate. This assessment will include review of the "Self Report Form." Medical examinations will not be performed solely for the determination of genitalia characteristics, unless requested by the inmate for verification. Examination of the genitalia may be incorporated into a more general routine physical examination, or for other medical purposes such as cancer screening or subjective complaints pertaining to the genitals. (PREA 115.15/ 115.215)

Exhibit 10-4

| Section-14 Health Services | OP-140147 | Page: 4 | Effective Date: 06/05/2017 |
|---|---|---|---|

III.   Initiating Review by PIARA

Inmates who are, or perceived to be, gender nonconforming may have their housing, clothing, and health care needs specific to their gender nonconformity assessed by PIARA.  This committee will consider each gender nonconforming inmate on a case-by-case basis to ensure fair, safe, and appropriate management of their gender associated requests. (PREA 115.42/115.242)

A.   Consideration by PIARA of an inmate's request will be initiated by the inmate through the grievance process established in OP-090124 entitled "Inmate/Offender Grievance Process."

B.   PIARA consideration may be requested by health services staff, a facility's PREA compliance manager, or a facility/unit head, if an exception to policy is needed or to determine consistency of agency practice. The referring staff member will complete a "Referral For Gender Associated Requests" (DOC 140147A, attached).   The completed form will be scanned and emailed to PIARA@doc.ok.gov

C.   Upon receipt of a PIARA review request, the PIARA will convene to review the request within 30 days

IV.   Reasonable Accommodations for Gender Nonconforming Inmates

A.   Housing

Health services staff will not determine housing assignments for gender nonconforming inmates, unless the determination is for medical or mental health reasons. If a gender nonconforming inmate is placed in a single cell until proper housing can be determined, the health services staff may make housing recommendations to the facility head, after any necessary medical and/or mental health assessments have been completed. Cases requiring more extensive review will be submitted to the PIARA. Self-inflicted genital mutilation will not constitute surgical reassignment therapy and will not qualify an inmate for placement in a facility for inmates of the opposite sex from the inmate's birth sex.

B.   Clothing

Inmates will be provided standard ODOC attire in accordance with OP-030120 entitled "Inmate Property." Gender nonconforming inmates with secondary sexual characteristics such as breasts will receive consideration for undergarments.  A "Request for Health Services" form may be submitted for medical evaluation regarding these clothing requests.  Medical staff will forward their recommendations to the facility head for approval or denial. If denied, a grievance may be filed in accordance with OP-090124 entitled "Inmate/Offender Grievance Process." Appeal of the grievance will be made to PIARA who will make

| Section-14 Health Services | OP-140147 | Page: 5 | Effective Date: 06/05/2017 |
|---|---|---|---|

the final determination regarding clothing requests. If approved, the clothing will be issued by the facility where the inmate is housed and noted on the "Inmate Property Inventory Form" (DOC 030120A). Any authorized undergarments may be worn if they are not visible when the inmate is out of their cell. At no time will authorized undergarments be worn in a manner that is disruptive or provocative.

C.   Hormonal Treatment

    1.   Hormonal treatment of inmates with Gender Dysphoria may be undertaken only after all the following occurs;

        a.   Diagnosis of Gender Dysphoria has been confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders*.

        b.   A "Female to Male Hormonal Therapy Risk and Information Form" (Attachment B, attached) or "Male to Female Hormonal Therapy Risk and Information Form" (Attachment A, attached) is read, signed by the inmate and scanned into the inmate's electronic health record.

    2.   Once the above steps have been completed, hormonal treatment may be considered by the qualified medical provider if the following:

        a.   Hormonal treatment was initiated prior to incarceration; or

        b.   Surgical castration has occurred, verified by examination and/or medical records; or

        c.   The facility medical provider determines hormone treatment is medically necessary and approval from the Chief Medical Officer is obtained.

D.   Surgical Sex Reassignment

    Surgical procedures for the initiation, advancement, or maintenance of sex reassignment will not be performed, except in extraordinary circumstances, requiring recommendation from PIARA, as well as authorization of both the chief medical officer and the director.

V.   References

    OP-030102 entitled "Inmate Housing"

    OP-030120 entitled "Inmate Property"

    OP-030601 entitled "Oklahoma Prison Rape Elimination Act"

| Section-14 Health Services | OP-140147 | Page: 6 | Effective Date: 06/05/2017 |
|---|---|---|---|

OP-090124 entitled "Inmate/Offender Grievance Process"

Prison Rape Elimination Act of 2003, 42 U.S.C.A. §15601

"Diagnostic and Statistical Manual of Mental Disorders"

PREA 115.15/115.215

PREA 115.41/115.241

PREA 115.42/115.242

VI.   Action

The chief medical officer is responsible for compliance with this procedure.

The director of Health Services is responsible for the annual review and revisions.

Any exceptions to this procedure will require prior written approval from the agency director.

This procedure is effective as indicated.

Replaced:     Operations Memorandum No. OP-140147 entitled "Management of Gender Nonconforming Offender" dated April 28, 2016

Distribution:   Policy and Operations Manual
                Agency Website

Exhibit CUC7

| Section-14 Health Services | OP-140147 | Page: 7 | Effective Date: 06/05/2017 |
|---|---|---|---|

| Referenced Forms | Title | Location |
|---|---|---|
| DOC 030120A | "Inmate Property Inventory Form" | OP-030120 |
| DOC 140147A | "Referral for Gender Associated Requests" | Attached |

| Attachments | Title | Location |
|---|---|---|
| Attachment B | "Inmate Housing" | OP-030102 |
| Attachment A | "Male to Female Hormonal Therapy Risk and Information Form" | Attached |
| Attachment B | "Female to Male Hormonal Therapy Risk and Information Form" | Attached |

Must Be Submitted Through the Law Library or Designee
Inmate/Offender Grievance Process

### REQUEST TO STAFF

TO: __Ms. Taylor CM-Fox-D__ FACILITY/DIST/UNIT: __DCCF__ DATE: __1-25-19__
   (NAME AND TITLE OF STAFF MEMBER)

I have ____ have not __✓__ already submitted a "Request to Staff" or grievance on this same issue.

If yes, what date: _____ facility: _____ grievance # _____

I affirm that I do ____ do not __✓__ have a grievance pending on this issue.

I affirm that I do ____ do not __✓__ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____

This request ____ does ____ does not relate to a pending misconduct report. If it does, this request may only be answered by the disciplinary coordinator assigned to the misconduct.

SUBJECT: State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 1-23-19, I was Informed by Inmates that i was going to get Killed by Neighbor hoods. 60's, 90's. I would like NoN-association placed on the following Inmates. 1. Phillip Mills 2. Terrance McNeal, 3. Sedric Wilson, 4. RD Dial, 5. Lamonn Blonner →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

ACTION REQUESTED: State exactly how you believe your request may be handled; that is, what exactly should be done and how.

Place NoN-association's on the above listed Inmates I Fear that i will suffer "Irrepable harm". If not done.

NAME: __Lamone Johnson (Monroe)__ DOC NUMBER: __744417__ UNIT & CELL NUMBER: __FD-210__
   (PRINT)

SIGNATURE: __Lamone Johnson (Monroe)__ WORK ASSIGNMENT: _____

### DO NOT WRITE BELOW THIS LINE

DISPOSITION: PMI has been filled out.

RECEIVED
FEB 26 2019
GRIEVANCE

STAFF MEMBER _____    DATE __02/18/19__

FEB 19 ANS'D

Date response sent to inmate: _____
Original to file
Copy to inmate/offender

DCC 090124D (R 9/16)

6. DaVjawn Hickman, 7. Joseph Berry, 8. Kevin Hill
9. Ode White, 10. Jeremy mColloughen, 11. Joshua Tyler
These are People whom the neighbor hoods has paid
to kill me and my celly Marquis Fenten. I took up for
him, because he came out as "gay". As a "Transgender"
all Gays, Bisexual's, Transgenders, Intersex, Queer, Pansexuals,
Lesibians. stick together. my celly, Marquis) use to
be from Neighbor hood but no longer is. Please
Place us in a Safe, enviorment for "LGBTQIP"
Inmates. Thank-You.

Exhibit 22-1. Backside



RECEIVED
FEB 26 2023
GRIEVANCE

Exhibit 22-2

INMATE/OFFENDER GRIEVANCE

**RECEIVED**

FEB 26 2019

**GRIEVANCE**

Grievance no. 2018-1001-00102-G

Grievance code: 4

Response due: 3/18/19

**DO NOT WRITE ABOVE THIS LINE**

Date 2-21-19

Name Lamone Johnson
(Print)

ODOC Number 744047

Facility or District Davis Corr Facility

Facility Housing Unit FOX delta-210

Date "Request to Staff" response received: 2-21-19

Have you previously submitted a grievance on this same issue? NO If yes, what date N/A, facility N/A, grievance # N/A. You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1. The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. On 1-23-19, I was informed by inmates that i was going to get killed by neighbor hoods o Gd's, 90's. I would like Non-association is on the inmates that threated me, on 1-25-19, I wrote a Request to staff (RTS) to My Case Manager Ms. Taylor, about placing the Non associations on all the (sectback) →

2. Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.

   RTS to Ms. Taylor 1-25-19
   Verbal Conversation 2-14-19
   Protective Measures Investigation (PMI) w Ms. Taylor

3. The action you believe the reviewing authority may lawfully take.

   Place Non-associations on all "11" inmates listed.

Grievance report sent to (warden)/district supervisor/correctional health services administrator):

Name James Yates

Signature of Grievant

Title Warden - Facility head

Date Sent to Reviewing Authority 2-22-19

DOC 090124A (R 7/16)

1. Original to file
2. Copy to inmate/offender

Inmates that was Paid to Kill me and my celly
Marquis Porter because my celly came out as gay
He was from neighborhood 60's & 90's they told him
they was gone kill him if he stayed on the facility
or if he went anywhere else where neighborhoods were.
I us a Transgender belonging to the "LGBTQIP"
Community, (Acronym for Lesbian, Gay, Bi-Sexual, Transgender,
Queer, Intersex, Pan-Sexual.) Stood up for him because
as "Gay's and Transgentr's" We Stick Together. So the same
People who they Paid to harm him? is also Paid to harm
Me. Ms. Tayllor, filled out Our PMI (Protective measures
Investigation on 2-18-19, On 2-19-19, she Informed
us verbally that she can only Place Non-Associations
on Inmates at Davis correctional facility, which is
invalid. If I am sent anywhere where the People
Col Phillp mills, 2. Terrance mcneal, 3. Sedrick wilson
4. RD Dial, 5. Lamonn Blohner, 6. DayJohn Hickman
7. Joseph Barry, 8. Kelvin hill, 9. ode White, 10. Jeremy
mcollaghen, 11. Joshua Tyler,) are being housed (detained)
i am being Put in harms way. which violates my
4.5 Constitutional rights of the Eigth Amendmant.
(See Farmer V. Brennan, 511 U.S. 825 (1994).), (See also
Johnson V. Johnson, 385 F.3d 503 (5th Cir. 2004)
If Officals deny us Protection because of our sexual
orientation and/or Gender identity. It violates our
Equal Protection neghts (Id. Johnson V. Johnson
385 F.3d 503, 532 (5th Cir. 2004.) Wherefore
Ms. Tayllor has met the deliberate indifference
requirement.

RECEIVED
FEB 26 2019
GRIEVANCE

Exhibit 22-3

FD 210 

## Grievance Decision from Reviewing Authority

| Inmate/Offender Name: | Johnson, Lamone | | DOC Number | 744047 |
|---|---|---|---|---|
| Receipt Date: | 02/26/2019   Grievance Category Code:   4 | | Grievance Number: | 2019-1001-00102-G |

| 1. Discrimination | 3. Complaint against staff | 5.Disciplinary process | 7.Medical | 9. Records/Sentence Admin. |
|---|---|---|---|---|
| 2. Classification | 4. Condition of confinement | 6.Legal | 8. Property/Trust Fund | 10.Religion 11.Personal Identity |

Decision:

Inmate Johnson requested that all 11 inmates he listed on his PMI have non-associations placed on them.

After an investigation of the matter by Shanna Taylor, Case Manager, she will place non-associations on all the inmates he listed on his PMI.

Inmate Johnson's **RELIEF IS GRANTED.**

Reviewing Authority – Facility Health Services Admin (medical issues)         Date

X _____                              X _3/14/17_

Review Authority – Facility/District/Unit Head                              Date

I have received the copy of the response of the reviewing authority.

_____                              3-18-19

Signature of Grievant                                          Date

_____                              _____

Signature of Staff Witness and Printed Name of Witness            Date

You may appeal to the Administrative Review Authority or Personal Identity ARA at Department of Corrections, P.O Box 11400, Oklahoma City, OK  73136-0400 or Medical ARA at 2901 N. Classen Blvd, Oklahoma City, OK 73106, within 15 days of the receipt of response using only DOC Form 060125V entitled "Misconduct/Grievance Appeal to Administrative Review Authority." Do not send this decision to the Administrative Review Authority or Medical ARA

1. Original to file
2. Copy to inmate/offender                                    DOC 090124B (R 07/16 )

Still Appeal (just in
Case they don't do it)



Exhibit 22-4

JOE M. ALLBAUGH
DIRECTOR

J. KEVIN STITT
GOVERNOR



STATE OF OKLAHOMA
OKLAHOMA DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE REVIEW AUTHORITY

April 18, 2019

JOHNSON, LAMONE #744047
DCF 19-102

Mr. Johnson,

Your grievance is being reviewed. Based on the information provided to this office, I have forwarded your grievance to the Warden at DCF for further review and investigation. An amended response will be provided by the reviewing authority within twenty (20) days of receipt of this request.

If, after receiving and reviewing the amended response, you believe that you have grounds for an appeal as specified on OP-090124 entitled "Inmate/Offender Grievance Process" section VII.A., you may do so within the guidelines stipulated in policy.

Sincerely,

*Mark Knutson*

Mark Knutson, Director's Designee

The inmate/offender received a copy of this response_____
                                                          Signature and date

Exhibit 22-5

FD 210

## Grievance Decision from Reviewing Authority

| Inmate/Offender Name: | Johnson, Lamone | | DOC Number | 744047 |
|---|---|---|---|---|
| Receipt Date: | 02/26/2019 | Grievance Category Code: 4 | Grievance Number: | 2019-1001-00102-G |

| 1. Discrimination | 3. Complaint against staff | 5.Disciplinary process | 7.Medical   9. Records/Sentence Admin. |
|---|---|---|---|
| 2. Classification | 4. Condition of confinement | 6.Legal | 8. Property/Trust Fund   10.Religion 11.Personal Identity |

Decision: *AMENDED RESPONSE*

Inmate Johnson requested that all 11 inmates he listed on his PMI have non-associations placed on them.

After further investigation of the matter by Shanna Taylor, Case Manager it was determined that non-associations have been completed on ten of the inmates listed. Inmate Kevin Hill will require further investigation. Inmate Johnson will have to provide additional information for a non-association to be filed on I/M Kevin Hill.

Inmate Johnson's **RELIEF IS PARTIALLY GRANTED.**

| | |
|---|---|
| Reviewing Authority – Facility Health Services Admin (medical issues) | Date |
| X | X  6/12/19 |
| Review Authority – Facility/District/Unit Head | Date |

I have received the copy of the response of the reviewing authority.

| | |
|---|---|
| Signature of Grievant | Date |
| Signature of Staff Witness and Printed Name of Witness | Date |

You may appeal to the Administrative Review Authority or Personal Identity ARA at Department of Corrections, P.C Box 11400, Oklahoma City, OK  73136-0400 or Medical ARA at 2901 N. Classen Blvd, Suite 200, Oklahoma City, Ol 73106, within 15 <u>days</u> of the receipt of response using only DOC Form 060125V entitled "Misconduct/Grievance Appea to Administrative Review Authority." Do not send this decision to the Administrative Review Authority or Medical ARA
1. Original to file
2. Copy to inmate/offender

DOC 090124B (R 07/16 )

## DEPARTMENT OF CORRECTIONS OFFENSE REPORT

**Section I**

| | |
|---|---|
| Name of Facility: OLF | Facility Computer Code: 7E |

Inmate Name: Lamone, Johnson   DOC#: 744047   Date of Offense: 3/12/19   Time: 1636

Place of Offense: PD219   Housing Assignment: PD219

Offense: (4-4233, b# 1, 2)  Fighting   Offense Computer Code:

Class of Offense: A   A-2

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)
On the above date and approximate time, Unit Manager Matthew
concluded an investigation which revealed that a fight occurred
between inmate Lamone and inmate Porter.

Staff or Inmate Witness (if any) (4-4233, b#4) _N/A_____

Disposition of Physical Evidence (if any) (4-4233, b#5) _N/A_____

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6) _N/A_____

Printed Name and Title of Reporting Employee (4-4233, b#7)   Signature of Reporting Employee

Name _E. Matthew_____

Title _UM_____   Date 3/12/19   Time 1636

**Section II**

> To be referred within 24 hours from the time the violation is reported.
>
> _____ Informal Resolution
> _____ Dismissed
> __✓__ Referred for investigation
> Name _____
> Title _____
> Date 3/12/19   Time: 1640

**Section III Inmate should initial appropriate response**

_____ I have received a copy of the written charge against me. I realize that I have a right to remain silent.
_____ I plead guilty and waive my right to an appeal.
_____ I plead not guilty.
_____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____ DOC # _____ Date ___/___/___ Time _____

_____ Inmate chose not to sign for a copy of the Offense Report at this time.

Offense Report Delivered to above inmate by (Print and Sign)   Date Delivered   Time Delivered
(4-4236, 4-4238)

ORIGINAL:   Commitment Document Folder
FIRST COPY:   Field File
SECOND COPY: Inmate

DOC 060125A (R 4/17)

## DEPARTMENT OF CORRECTIONS OFFENSE REPORT

DCF                                                                 7E
Name of Facility                                                   Facility Computer Code

### Section I

| Inmate Name: | DOC#: | Date of Offense: | Time: |
|---|---|---|---|
| Johnson, Lamone | 744047 | 6·17·19 | 1230 |

Place of Offense:                                                 Housing Assignment:
FD 210                                                            FD 210
Offense: (4-4233, b# 1, 2)                                        Offense Computer Code:

Class of Offense: Refusing cellmate                              A·22

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)
Inmate Johnson 744047 refused to accept a cell mate.
_____
_____
_____
_____
_____

Staff or Inmate Witness (if any) (4-4233, b#4) NA _____

Disposition of Physical Evidence (if any) (4-4233, b#5) NA _____

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6) Verbal orders;
Written report
Printed Name and Title of Reporting Employee (4-4233, b#7)     Signature of Reporting Employee
Name Runyan                                                    Runyan
Title Correctional Counselor          Date 6 / 17 / 19   Time 1500 hrs.

### Section II

> To be referred within 24 hours from the time the violation is reported.
> _____ Informal Resolution
> _____ Dismissed
> ___✓__ Referred for investigation
> Name _____
> Title _____
> Date 6 / 17 / 19   Time 1540

### Section III  Inmate should initial appropriate response

_____ I have received a copy of the written charge against me. I realize that I have a right to remain silent.
_____ I plead guilty and waive my right to an appeal.
_____ I plead not guilty.
_____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____ DOC # _____ Date ___ / ___ / ___   Time _____

_____ Inmate chose not to sign for a copy of the Offense Report at this time.

_____        _____        _____
Offense Report Delivered to above inmate by (Print and Sign)    Date Delivered              Time Delivered
(4-4236, 4-4238)

ORIGINAL:  Commitment Document Folder
FIRST COPY:   Field File
SECOND COPY: Inmate

DOC 060125A (R 4/17)

## DEPARTMENT OF CORRECTIONS OFFENSE REPORT

| Name of Facility Davis Correctional Facility | Facility Computer Code |
|---|---|

### Section I

| Inmate Name: Johnson, Lamone | DOC#: 744047 | Date of Offense: 09/11/19 | Time: 1515 |
|---|---|---|---|

| Place of Offense: Fox Delta | Housing Assignment: Cell 210 |
|---|---|

| Offense: (4-4233, b# 1, 2) | Offense Computer Code: |
|---|---|

| Class of Offense: A | A-7 |
|---|---|

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)

On above date and approximate time, Inmate Johnson, Lamone DOC # 744047 stated repeatedly that he will "file PREA on me and I need to lawyer up". This was after I informed him he will remain level one due to continued poor behavior.

Staff or Inmate Witness (if any) (4-4233, b#4)  N/A

Disposition of Physical Evidence (if any) (4-4233, b#5)  N/A

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6)  misconduct written

| Printed Name and Title of Reporting Employee (4-4233, b#7) | Signature of Reporting Employee |
|---|---|
| Name  S. Taylor | |
| Title  Case Manager   Date 9/12/19  Time 0840 | |

### Section II

To be referred within 24 hours from the time the violation is reported.

_____ Informal Resolution
_____ Dismissed
_____ Referred for investigation

Name _____
Title _____
Date 9/12/19   Time: 0845

### Section III Inmate should initial appropriate response

_____ I have received a copy of the written charge against me. I realize that I have a right to remain silent.

_____ I plead guilty and waive my right to an appeal.

_____ I plead not guilty.

_____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____ DOC # _____ Date ___/___/___ Time _____

_____ Inmate chose not to sign for a copy of the Offense Report at this time.

| Offense Report Delivered to above inmate by (Print and Sign) (4-4236, 4-4238) | Date Delivered | Time Delivered |
|---|---|---|

ORIGINAL:  Commitment Document Folder
FIRST COPY:   Field File
SECOND COPY: Inmate

–DOC 060125A (R 4/17)

Exhibit 23-3

## GRIEVANCE RETURNED UNANSWERED

Received: _____

FD 210

_____
Inmate signature

_____
Date

DATE:        August 28, 2019
TO:          Johnson, Lamone, #744047
FROM:        James Yates, Warden
Received:    August 19, 2019
RE:          Return of Grievance # 2019-1001-00292-G

*YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:*

☐   You have not filed your grievance within the specified time frame.  *(CANNOT RESUBMIT)*

    ☐ The "Request to Staff" must be submitted **within seven (7) days of the incident.**

    ☐The inmate/offender grievance must be submitted by the inmate/offender 15 days from the
    **date of the receipt of the response to the "Request to Staff."**

☐   An **ANSWERED** Request to Staff form addressed to the **correct staff member** must be attached.

☒   The **Request to Staff** issue is not consistent with the issue requested on the **Grievance.**

☐   **Inmate Request forms are not utilized in the Grievance Process.**

☐   You have not completed the **Grievance form correctly, in its entirety, or on the correct form.**

☐   Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil,
    highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making
    comments, in the margins of the pages is permitted.

☐   The **Grievance and Request to staff** must be specific as to the **Complaint, Dates, Places,
    Personnel Involved and How the Inmate was Affected**.

☐   Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐   If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of
    submission, the inmate may file a grievance to the reviewing authority with **a copy of the "Request
    to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.)
    The grievance form may only be filed about the lack of response to the "Request to Staff."**

☐   Only **ONE ISSUE OR INCIDENT** is allowed per **Grievance** and **Request to Staff.**

☐   You are on **Grievance Restriction**, proper documentation was not included.

☐   It has been determined that the grievance is not of an **Emergency or Sensitive** nature. The grievance
    is being returned and you must comply with the standard grievance process.

copy

9/9

Case 6:19-cv-00269-JFH-JAR   Document 43-1   Filed 03/11/20   Page 57 of 79
Appellate Case: 23-7031   Document: 010110881265   Date Filed: 06/30/2023   Page: 385

Exhibit 73-9

Page 2 of 2

☐ **Section-09 Programs Page: 4 OP-090124 Effective Date: 04/11/2019**
**B. Non-grievable Issues**
1. Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Inmate/Offender Disciplinary Procedures."

☐ 2. Grievances shall not be submitted:

☐ (a) about matters that are in the course of litigation;

☐ (b) about matters that include requests for disciplinary action against staff;

☐ (c) requesting monetary compensation; or

☐ (d) For property issues at privately contracted facilities. These are to be resolved by the privately contracted facility and are not grievable or appealable to ARA.

☐ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☒ **Section-09 Programs Page: 18 OP-090124 Effective Date: 04/11/2019**
A. Determining Abuse of the Grievance Process
1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
☐ a. Grievances intended to harass another;
☐ b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
☐ c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
☐ d. Grievances about de minimis (small, trifling, no available remedy) issues;
☐ e. Repetitive grievances by multiple inmates/offenders about the same issue;
☐ f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
☒ g. Continued procedural defects, such as submitting additional pages, after having been previously warned.
☒ **Because of continued abuse of the grievance process this serves as an official warning.**

☐ You will be afforded the opportunity to properly re-submit a grievance form within **10 days** of receipt of this notice **WITH THE NOTED CORRECTIONS COMPLETED.** The grievance form must be proper, complete, and submitted to the proper reviewing authority. The failure of such waives/forfeits the right to proceed in the grievance process.

☒ Due to your continued failure to submit a properly filed grievance, you are now **OUT OF TIME**.

☐ Other: _____

Exhibit 25-5

## INMATE/OFFENDER GRIEVANCE

RECEIVED

AUG 19 2019

GRIEVANCE

Grievance no. 2019-1001-00292-6

Grievance code: 4

Response due: 9/9/19

**DO NOT WRITE ABOVE THIS LINE**

Date 6-14-19                    Facility or Unit _____

Name Lamore Johnson             Facility Housing Unit _____
         (Print)

DOC Number 744017               Date "Request to Staff" response received: _____

GN# 2019-1001-00292-G

Have you previously submitted a grievance on this same issue? Yes  If yes, what date 7-19-19, facility DoCF, grievance #2019-1001-00292-G You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff." The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1.   The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. On 6-24-19 @ 8:45 PM, Inmate Rossco Craig was Murdered 3 doors down from me. Because of E. Martinez and Shanna Taylor's deliberate-indifference to mole him closed (Craig), a bisexual male) or his gang affiliated celly.

2.   Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.

     RTS to Warden 6-25-19

     Grievance #2019-1001-00292-G

3.   The action you believe the reviewing authority may lawfully take.

     Listen to LGBTQIP Inmates own Safety Views and take into serious consideration. Screen all Inmates for LGBTQIP Status, create a Questionare for LGBTQIP Inmates.

Grievance report sent to (warden/facility head/deputy director//correctional health services administrator):

James Yates                          Warden
Name                                 Title  8-14-19
_Lamore_____                         _____
Signature of Grievant                Date Sent to Reviewing Authority

1. Original to file                  DOC 090124A (R 4/19)
2. Copy to inmate/offender

## GRIEVANCE RETURNED UNANSWERED

Received: _____

_____
**Inmate signature**

_____
**Date**

| | |
|---|---|
| **DATE:** | July 31, 2019 |
| **TO:** | Johnson, Lamone, #744047 |
| **FROM:** | James Yates, Warden |
| **Received:** | July 23, 2019 |
| **RE:** | Return of Grievance # 2019-1001-00292-G |

### *YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:*

☐   You have not filed your grievance within the specified time frame.  *(CANNOT RESUBMIT)*

   ☐ The "Request to Staff" must be submitted **within seven (7) days of the incident.**

   ☐The inmate/offender grievance must be submitted by the inmate/offender 15 days from the **date of the receipt of the response to the "Request to Staff."**

☐   An **ANSWERED** Request to Staff form addressed to the **correct staff member** must be attached.

☒   The **Request to Staff** issue is not consistent with the issue requested on the **Grievance.**

☐   **Inmate Request forms are not utilized in the Grievance Process.**

☐   You have not completed the **Grievance form correctly, in its entirety, or on the correct form.**

☒   Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil, highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making comments, in the margins of the pages is permitted.

☐   The **Grievance and Request to staff** must be specific as to the **Complaint, Dates, Places, Personnel Involved and How the Inmate was Affected**.

☐   Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐   If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of submission, the inmate may file a grievance to the reviewing authority with **a copy of the "Request to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.) The grievance form may only be filed about the lack of response to the "Request to Staff."**

☒   Only **ONE ISSUE OR INCIDENT** is allowed per **Grievance** and **Request to Staff.**

☐   You are on **Grievance Restriction**, proper documentation was not included.

☐   It has been determined that the grievance is not of an **Emergency or Sensitive** nature. The grievance is being returned and you must comply with the standard grievance process.

387

*Exhibit 257*

Page 2 of 2

☐ **Section-09 Programs Page: 4 OP-090124 Effective Date: 04/11/2019**
**B. Non-grievable Issues**
1. Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Inmate/Offender Disciplinary Procedures."

☐ 2. Grievances shall not be submitted:

  ☐ (a) about matters that are in the course of litigation;

  ☐ (b) about matters that include requests for disciplinary action against staff;

  ☐ (c) requesting monetary compensation; or

  ☐ (d) For property issues at privately contracted facilities. These are to be resolved by the privately contracted facility and are not grievable or appealable to ARA.

☐ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☐ **Section-09 Programs Page: 18 OP-090124 Effective Date: 04/11/2019**
A. Determining Abuse of the Grievance Process
1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
☐ a. Grievances intended to harass another;
☐ b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
☐ c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
☐ d. Grievances about de minimis (small, trifling, no available remedy) issues;
☐ e. Repetitive grievances by multiple inmates/offenders about the same issue;
☐ f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
☐ g. Continued procedural defects, such as submitting additional pages, after having been previously warned.
☐ **Because of continued abuse of the grievance process this serves as an official warning.**

☒ You will be afforded the opportunity to properly re-submit a grievance form within **10 days** of receipt of this notice **WITH THE NOTED CORRECTIONS COMPLETED.** The grievance form must be proper, complete, and submitted to the proper reviewing authority. The failure of such waives/forfeits the right to proceed in the grievance process.

☐ Due to your continued failure to submit a properly filed grievance, you are now **OUT OF TIME**.

☒ Other: *__Too many issues on RTS and Grievance.__*

*Exhibit 25-8*

## INMATE/OFFENDER GRIEVANCE

Grievance no. _2019-1001-00292-6_

Grievance code: _4_

Response due: _8/12/19_

RECEIVED
JUL 23 2013
GRIEVANCE

### DO NOT WRITE ABOVE THIS LINE

Date _7-19-19_                    Facility or Unit _D.C.C.F_

Name _Lamone Johnson_            Facility Housing Unit _FD-210_
(Print)

DOC Number _744047_              Date "Request to Staff" response received: _7-11-19_

Have you previously submitted a grievance on this same issue? _NO_ If yes, what date _N/A_, facility _N/A_, grievance # _N/A_. You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1. The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. On 6-24-19 @ 8:45 AM, Inmate Rossco Craig was Pronounced Dead from Murder by an Inmate that is gang affiliated, that was his Cell Mate. Because of Staff's deliberate indifference to his attempt of his →

2. Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.
RTS to Warden 6-25-19

3. The action you believe the reviewing authority may lawfully take.
Listen to LGBTQIP Inmate own safety Views and take into Serious Consideration. Screen all Inmates for LGBTQIP Status, Create a Questionare for LGBTQIP Inmates.

Grievance report sent to (warden/facility head/deputy director//correctional health services administrator):
_James Yates_                    _Warden_
Name                             Title

_[signature]_                    _7-19-19_
Signature of Grievant            Date Sent to Reviewing Authority

DOC 090124A (R 4/19)

1. Original to file
2. Copy to inmate/offender

389

Safety concerns, I have also attempted and have
notified staff members of my unit team. That I can
only live with Inmate marquis Porter #866756 Ernesto
martinez and shanna Taylor are saying me and Mr. Porter
had a fight. When we were cellys, we were only horse-playing.
They refused to place my LGBTQIP sister (Porter) back
into the cell with me. They also constantly issue us
both misconducts for refusing cellys when we both have
a hit on our head, by the same individuals. I Am a Trans-
gender (MTF), Mr. Porter is a gay male. we are both vulnerable
for attacks, on 3-16-19 Mr. Porter was attacked because Mr.
Ernesto martinez placed an affiliated gang member in his
cell. when Mr. Porter was inded safe in the cell with me.
we are compatiable cellys. Mr. martinez refused to mov-
e us for our safety. He says he don't do "Happy mores"
and that he "don't protect bitches and fags" that "this
is prison". we need to "learn how to fight", Placing anyone
in our cells is putting us at risk for mepublic harm.
Just like Rossco craig we may not survive. Rossco was also
from the LGBTQIP community (as well as me and Porter)
we cell together because we stick together. we don't
kill each other, we protect each other. It's the gang mem-
bers and hetrosexual inmates that kill LGBTQIP inmates
we can prevent this by bringing awarness, being cautious, start
screening for LGBTQIP statuses. start a questionaire for
LGBTQIP inmates. Rossco craig was a Bi-sexual male
Don't let his death be a waste, let it be honored and a lesson
to all staff and inmates. lets save the next Lesbian, gay,
bisexual, Transgender, Queer, Intersex, Pan Sexual inmate.
I speak on behalf of the LGBTQIP friends and family "Hear our
cries, save us". Listen to our safety. Mattw's. (See § 28 CoF§R § 115.42
(e).) See also, OP. 080601, VII. Screening Assessment, B. b. (d)

R.I.P Rossco Craig ♂+♂
#Rosscocraig movement

Exhibit 25

FWD to Facility Investigator        **RECEIVED**

**Must Be Submitted Through the Law Library or Designee**        JUL 01 2019
**Inmate/Offender Grievance Process**
**REQUEST TO STAFF**        BY: _____

TO: __Warden__        FACILITY/UNIT: __DoCoF__        DATE: __6-25-19__
(NAME AND TITLE OF STAFF MEMBER)

I have ____ have not __✓__ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____   facility: _____   grievance #: _____
I affirm that I do ____ do not __✓__ have a grievance pending on this issue.
I affirm that I do ____ do not __✓__ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request ____ does __✓__ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:**   State completely, but briefly, the problem on which you desire assistance. This statement
must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One
issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this
being returned unanswered.

On 6-24-19 @ 4:45 Am, Inmate Rossco Craig was Pronounced
Dead from Murder by an Gang-affiliated inmate as his cell
mate, because of Staff's deliberate-indifference to his warning
attempts of his safety concerns. I have also attempted and have notified →
(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly
should be done and how.
Prevent Irrepable harm from the LGBTQIP Family and Community. Listen
to our own Safety Views. take into serious consideration. Place us
only in cells with other LGBTQIP Family. Place Marquis Porter 786756
In my cell where were both safe. or order Staff to Quit issuing us misconducts for any refusals.

NAME: __Lamorel(morie) Johnson__   DOC NUMBER: __744047__   UNIT & CELL NUMBER: __FD216__
(PRINT)

SIGNATURE: __Lamorel Johnson__   WORK ASSIGNMENT: __#RossCoCraigWWentWent__

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:
The incident is being Investigated

Horseplay is not allowed

__Gannon__                                        __7/9/19__   **RECEIVED**
STAFF MEMBER                                        DATE        JUL 23 20__
                                                    JUL 11 ANS'D   **GRIEVANCE**

Date response sent to inmate/offender: _____          DOC 090124E (R 4/19)
1. Original to file
2. Copy to inmate/offender

EXHIBIT 28-18

Staff members of my unit team, That I only feel safe around Inmate Marquis Porter #786756, Ernesto Martinez, Shanna Taylor are saying me and Mr. Porter had a fight when we were cellys. When indeed we were only horse-playing. They refuse to place my LGBTQIP Sister (Porter) back into the cell with me. They also constantly issue us both misconducts for refusing cellys when we both have a hit out on us by the same Individual. So I am a Transgender (MTF), Mr. Porter is a Gay Male. we are both vulnearble for attacks. On 3-16-19 Mr. Porter was attacked because they (Ernesto Martinez) placed an affiliated gang member into his cell when he was safe in the cell with me. We are compatible cellys. Mr. E. Martinez refuses to move us for our safety. he says he don't do "happy moves" and that he "don't protect bitches and fags." That "this is prison" and we "need to learn how to fight." Placing anyone else in our cell is putting us in irreplable harm Just like Rossco Craig we may not survive. Rossco was also from the LGBTQIP community (as well as me and Mr. Porter's) we cell together because we stick together. We do not kill one another. It is the Gang members and hetrosexual Inmates. We cannot bring Rossco back, but we can save other LGBTQIP Inmates. Starting with me and Marquis Porter by placing us in the cell together, we can avenge Rossco's death by preventing, bringing awareness, being cautious, Screening for LGBTQIP Statuses. Rossco Craig was a bi-sexual male which is the "B" in LGBTQIP. we are apart of the same community. Don't let his death be a waste. let it be a honorable lesson all staff and inmates in the future to come. Save the next Lesbian, Gay, Bi-sexual, Transgender, Queer, Intersed, Pansexual Inmate! Look at what happens to our community out in the world. Our clubs get shot up, Bloody massacres thensands dead, thousands of LGBTQIP family dead. I speak on behalf of all LGBTQIP Inmates and family and Friends. "Help us, Save us, hear our cries, Listen to our own Safty Versus (See 29 C.F.R. § 115.42 (e)) See al30 § 0803060l, VII. Screening Assesment pg 19-21, B.1(d). Please Start with yourself then you can save us. "Start with the man in the mirror" -Michael Jackson R.I.P Rossco Craig  #RosscoCraigMovement

JUL 23 2[...]   GRIEVANCE

SCOTT CROW
INTERIM DIRECTOR



J. KEVIN STITT
GOVERNOR



STATE OF OKLAHOMA
OKLAHOMA DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE REVIEW AUTHORITY

DCF 19-292

Date:          SEPTEMBER 26, 2019

To:            JOHNSON, LAMONE #744047

Location:      DCF

From:          Mark Knutson, Director's Designee   *Mark Knutson*

**Your grievance/correspondence was filed improperly for the following reason(s):**

|   |     | |
|---|-----|-|
|   | 1.  | No reviewing authority response to the grievance. |
|   | 2.  | No informal action, Request to Staff response included. |
|   | 3.  | Out of time from date of alleged incident until filing Request to Staff. |
|   | 4.  | Out of time from date of response to Request to Staff until filing the grievance with the reviewing authority. |
|   | 5.  | Received **out of time** from date of the reviewing authority's response. |
|   | 6.  | You cannot appeal a non-response.  See OP-090124 section V.B.1.b.(8) (Request to Staff) or VI.C.4. (grievance). |
|   | 7.  | Inmate on grievance restriction and/or proper documentation **not** included.  See OP-090124, section X.B.2.a. |
|   | 8.  | Must be legibly written in blue or black ink.  No pencil or other color of ink is allowed. No doodling or writing in margins. |
|   | 9.  | Attachments to the grievance/appeal (no additional pages allowed except affidavit if required). |
|   | 10. | Not an issue grievable to Oklahoma Department of Corrections (Private prison property, misconduct, litigation pending, not within/under the authority/control of the Department of Corrections) |
| X | 11. | More than one issue or the complaint and relief requested are not consistent on the Request to Staff and grievance. |
|   | 12. | Not of a sensitive/emergency nature.  You must follow the standard grievance process including giving the reviewing authority an opportunity to respond. |
|   | 13. | Requests for disciplinary action against staff or monetary compensation will not be addressed in the grievance process. |
|   | 14. | Appeal form not **signed/dated.** |
|   | 15. | The ruling of the Administrative Review Authority or Director's Designee is final. |
|   | 16. | Facility grievance number not listed on the appeal form. |
|   | 17. | Additional issues submitted in the grievance appeal and not presented in the initial grievance to the reviewing authority for response will not be addressed by this office. |
| X | 18. | You have failed to follow previous instructions from the reviewing authority or ARA for filing this grievance/appeal and/or properly resubmit.  **YOU ARE NOW OUT OF TIME.** |
|   | 19. | You did not provide the date that you received the reviewing authority's response on the appeal form. |
|   | 20. | This grievance is unanswerable as there are no time frames specified for the alleged action(s) to have occurred |
|   | 21. | You failed to identify your grounds for an appeal by checking one, or both boxes on the appeal form. |
|   | 22. | Your appeal must be written on the Misconduct/Grievance Appeal form (DOC060125Veffective **4/19**) |
|   | 23. | You will be afforded ONE FINAL opportunity to properly resubmit your corrected grievance appeal which must be received in ARA within ten (10) days of receipt of this form. **DO NOT RETURN THIS FORM WITH YOUR CORRECTED APPEAL.** |
|   | 24. | Other: |

**THIS OFFICE WILL NOT PROCESS INCOMPLETE/INACCURATE/OUTDATED APPEAL FORMS**
NOTE: Abuse of the grievance process as explained in section IX of OP-090124, will result in restrictions being imposed.

I acknowledge receipt of this response:_____
                                    **Inmate's signature and date**

P.O. BOX 11400
OKLAHOMA CITY, OK.  73136-0400

**Must Be Submitted Through the Law Library or Designee**
**Inmate/Offender Grievance Process**

Exhibit 25-12

**REQUEST TO STAFF**

TO: _Warden_____ FACILITY/DIST/UNIT: _D.C.F._ DATE: _6-5-18_
(NAME AND TITLE OF STAFF MEMBER)

I have ____ have not __✓__ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do ____ do not __✓__ have a grievance pending on this issue. JUN 11 2018
I affirm that I do ____ do not. __✓__ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court:
This request _____ does _____ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

LAW LIBRARY

**SUBJECT:** State completely, but briefly, the problem on which you desire assistance. This statement
must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One
issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this
being returned unanswered.

On 5-31-18 @ 9:30-10:00Am, Cell 222 Bailey Davis, Kanuel
took my undergarments, that approved at Joseph harp
corr. Center Per OP-140147 and mocked me saying "Your
a man in a man's prison", "our facility don't Follow D.O.C"

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly
should be done and how.

Re-issue my Bra's & make-up From Property Teach
Staff the P.R.E.A Training Per OP-030601, V, F, III. B,
I.K, P., as well as OP-140147 IV. B

NAME: _Lamore, Johnson_ DOC NUMBER: _744047_ UNIT & CELL NUMBER: _AS 222_
(PRINT)

SIGNATURE: _LaMore Johnson_ WORK ASSIGNMENT: _____

_____
**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:
Bra's & Make-up are not on the allowed DOC property
matrix. You will be getting them returned.

_____   _6-12-18_
STAFF MEMBER                                      DATE

Date response sent to inmate: _JUN 13___
1. Original to file
2. Copy to inmate/offender

DOC 090124D (R 9/16)

Searched me Naked, ~~●●●●●~~ See: 42 U.S.C. 15609(5)
[defining "prison" for purposes of PREA to include ~~and~~ "any ~~●~~
confinement facility of a federal state or local government, whether admini-
stered by such government or by a private organization on behalf of such
government"]; 28 C.F.R. § 115.501 (b) ["The Governor's Certification shall
apply to all facilities in the state under ~~the~~ the operational control of the
states executive branch, including facilities operated by private
entities on behalf of the states executive branch."

See: Rosborough v. Mgmt. & Training Corp., 350 F.3d 459, 461 (5th
Cir. 2003) [Private prison management company and its employees may
be sued for violating the constitution] wherefore, Taking my
Bra which is a part of my GDC (Gender dysphoria) a mental disorder
Is violating my 8 Amendments Rights of "cruel & unusual Punishments"
and "Serious Medical Care."

## INTEROFFICE MEMORANDUM
### Finance & Accounting

**DATE:** April 26, 2017   *Exhibit 26-1*

**TO:** Lamone Johnson, ODOC# 744047
Joseph Harp Correctional Center

**FROM:** Leon Wilson, OBS Comptroller

**SUBJECT:** Response to Inmate Request

I received a copy of your inmate request where you report that you are a transgender woman living in a men's prison. You request that you be able to order from Mabel Basset Correctional Center's canteen.

Since you wrote me about canteen issues, I am going to respond about canteen issues. From an operational stance, there is nothing that the MBCC canteen can order today that the JHCC canteen cannot order. Both canteens order from our contracted supplier using the same ordering system. Anything available to one canteen is available to all canteens. Ordering from MBCC will just have you paying expensive shipping fees from MBCC to JHCC.

You specifically ask for that I could identify:

| Keefe Item# | Description | Aprox Price (Pre Tax) |
|---|---|---|
| 22965 | Dark & Lovely Relaxer System Plus | $8.95 |
| 8091401099 | Conair Curling Iron | $19.78 |
| 5084001099 | Conair hair Dryer 1600 Watt | $19.49 |

I could not identify:

- Sports Bra: no size given. Most cost under $4
- Make up: several are offered but could not identify the specific kind
- Hair Rollers: although these are still allowed, these are no longer sold. Women have gone to curling irons in the last couple of decades. We do not have a source to get hair rollers from.

It seems to me that you have a property, security, or facility issue that I cannot help you with. I have made all of the products available to JHCC. I do not work at your facility so I do not know what is allowed and what is not at your facility. Any item available to the canteen may be denied by the facility for security reasons. I would suggest writing your local canteen or Warden with these issues for resolution.

1 | P a g e

Tracking #: 19-2476D    *Exhibit 26-2*    FD210

## ~~DISCIPLINARY DISPOSITION REPORT~~
### (CLASS A & B OFFENSES AND CLASS X GUILTY PLEAS)

I.   Name of Facility **DCF**                    Facility Code **7E**   Date of Violation **9/11/19**
     Name of Inmate **Johnson**          **Lamone**
                        Last Name              First Name              M.I.
     Violation **Coerce Staff**                Violation Code **7**   Class of Offense **A**
     Disposition Date **9/16/19**   DOC # **744047**   Time **1353**   Place **FD 210**

---

II.  I understand that I waive the opportunity of this case being appealed if I plead guilty to this offense.
     **Lamone Johnson**                              **744047**
     Inmate's Name                                   Number

     PLEA:  1.  Guilty _____  Inmate's Initials   2.  Not Guilty ✓  Inmate's Initials **LJ**

     Confidential Statements:  I have independently reviewed the reliability statement and have found that it sufficiently supports the reliability of the confidential witness statement(s).

     Disciplinary Coordinator's Signature _____

III. Finding

     1.  Guilty ✓   2.  Not Guilty _____

     Evidence relied on for finding of Guilt: (include a brief description of the offending behavior)
     _Based on I/m Taylor statement that I/m Johnson stated repeatedly that he will file a preia on her and she needed to lawyer up after being informed he will remain level 1 due to poor behavior_

---

IV.  Discipline Imposed:
     | Sanction | Code | Suspension |
     |---|---|---|
     | Canteen 120 | AE3 | — for — days |
     | | | for ____ days |
     | | | for ____ days |
     | | | for ____ days |

     Basis for discipline imposed:  _To deter future rule violations_

     Disciplinary Coordinator Printed Name and Signature  **S% Key S%K**

---

V.   As a result of conviction for subsequent offense prior to expiration of the suspended punishment, the previous suspended punishment is hereby revoked: to run consecutive to the new punishment.
     Previous Violation:
     Previous Punishment: 1. _____  2. _____  3. _____
     Date of Imposition: ____/____/____

---

     Facility Head Review **X** Affirm _____ Dismissed _____ Modified _____ Remanded
     Date **9/17/19** Signature _____

---

VI.  I have received a copy of the disposition.   Date ____/____/____

     Inmate's Signature and Number _____

     Inmates pleading not guilty may appeal to the facility head/district supervisor within 15 days.

ORIGINAL:  Commitment Document Folder
FIRST COPY:  Field File
SECOND COPY:  Inmate
THIRD COPY:  Records

Exhibit 26-3

RECEIVED

**Must Be Submitted Through the Law Library or Designee**

SEP 15 2019

Inmate/Offender Grievance Process

**REQUEST TO STAFF**

BY: _____

TO: Chief of Security    FACILITY/UNIT: DoCoF    DATE: 9-13-19

(NAME AND TITLE OF STAFF MEMBER)

I have _____ have not ✓ already submitted a "Request to Staff" or grievance on this same issue.

If yes, what date: _____ facility: _____ grievance # _____

I affirm that I do _____ do not _____ have a grievance pending on this issue.

I affirm that I do _____ do not _____ have a lawsuit of any type pending that relates in any way to this issue.

If a lawsuit is pending, indicate case number and court: _____

This request _____ does _____ does not relate to a pending misconduct report. If it does, this request may only be answered by the disciplinary coordinator assigned to the misconduct.

SUBJECT:    State completely, but briefly, the problem on which you desire assistance. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this being returned unanswered.

On 9-13-19 I was discriminated against and retaliated against Shanna Taylor. Case Manager whom forbid the C/o Hobbs to allow me to contact my Attorney and/or mother which →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

ACTION REQUESTED: State exactly how you believe your request may be handled; that is, what exactly should be done and how.

Please Inform Ms. Shanna Taylor with a memorandum placed on my door that I am allowed to call my Attorneys and to stop retaliating against me for filing Grievances.

NAME: Lamone Johnson    DOC NUMBER: 744047    UNIT & CELL NUMBER: FB-84-311

(PRINT)

SIGNATURE: _____    WORK ASSIGNMENT: _____

PB-311

---

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:

You can get with Warden Secretary about Attorney calls. Staff can not give you an attorney call.

gC. Brown                                    10-21-19

STAFF MEMBER                    DATE    **RECEIVED**

NOV 20 2019

Date response sent to inmate/offender: _____ OCT 28 2019    **GRIEVANCE** (R 4/19)

1. Original to file
2. Copy to inmate/offender

Exhibit 26-3

O.D.O.C. Policy States "Level 1 offenders
are entitled to Attorney Calls"
see; OP-060107, see also OP-030119,
This is Violating my first amendment
rights of the U.s constitution, by
Retaliating against me for Redress
of Grievances, access to courts.

RECEIVED
NOV 2 0 2019
GRIEVANCE

399

Exhibit 26-4

## INMATE/OFFENDER GRIEVANCE

Grievance no. 2019-1001-00395 G

Grievance code: 3

Response due: 12/3/19

---

**DO NOT WRITE ABOVE THIS LINE**

Date 11-5-19                           Facility or Unit DoCoF

Name Lamone Johnson                    Facility Housing Unit FB-211

DOC Number 744047 (Print)              Date "Request to Staff" response received: 10-28-19

Have you previously submitted a grievance on this same issue? NO   If yes, what date N/A , facility N/A , grievance # N/A . You must submit this completed original within 15 days of the receipt of the response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident. Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may quote from or make reference to statutes, operations, field, or administrative memoranda, department publications (time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any error(s) made in submitting your grievance.

1.  The nature of your complaint. This statement must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One issue or incident per grievance. Use backside of this page only, if necessary. On 9-13-19, I was discriminated against And retaliated against Shanna Taylor, CMII, Whom forbid the CIO holdes to allow me to Contact my Attorney and/or matters which OBoOoC Policy →

2.  Informal action taken (including dates) to resolve the complaint, as well as the names of those employees from whom you sought an answer to your grievance.
    RTS to CoOSo Kevin Braun @-13-19

    **RECEIVED**
    NOV 14 2019
    **GRIEVANCE**

3.  The action you believe the reviewing authority may lawfully take.
    Please Inform Ms. Shanna Taylor with a memorandum Placed on my door that I am allowed to Call my Attorney. And to Stop retaliating against filing me for Greivances

Grievance report sent to: (warden/facility head/deputy director//correctional health services administrator):
James Yates

Name                                   Title Warden

Signature of Grievant Lamone Johnson   Date Sent to Reviewing Authority 11-5-19

DOC 090124A (R 4/19)

1. Original to file
2. Copy to inmate/offender

Exhibit CC-4 (Backside)

States "Level 1 offenders are entitled to
Attorney." See OP-060107, See OP-060125
Attachment "For purpose of OP-060125,
telephone restriction means that an
offender is not permitted to make or
receive phone calls except calls from and
to the offenders attorney and clergy."
(4th Footnote) See also OP-030119.
This is violating my first Amendment
Right of the U.S. constitution, by
retaliating against me for redress of
Grievances, access to courts.





RECEIVED
NOV 14 2019
GRIEVANCE

EXHIBIT CC-5

## GRIEVANCE RETURNED UNANSWERED

Received:

_____

**Inmate signature**

11-26-19

**Date**

| | |
|---|---|
| **DATE:** | **November 25, 2019** |
| **TO:** | **Johnson, Lamone, #744047** |
| **FROM:** | **James Yates, Warden** |
| **Received:** | **November 14, 2019** |
| **RE:** | Return of Grievance # 2019-1001-00395-G |

*YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:*

☐ You have not filed your grievance within the specified time frame. *(CANNOT RESUBMIT)*

   ☐ The "Request to Staff" must be submitted **within seven (7) days of the incident.**

   ☐ The inmate/offender grievance must be submitted by the inmate/offender 15 days from the
    **date of the receipt of the response to the "Request to Staff."**

☒ An **ANSWERED** Request to Staff form addressed to the **correct staff member** must be attached.

☐ The **Request to Staff** issue is not consistent with the issue requested on the **Grievance.**

☐ **Inmate Request forms are not utilized in the Grievance Process.**

☐ You have not completed the **Grievance form correctly, in its entirety, or on the correct form.**

☐ Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil,
highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making
comments, in the margins of the pages is permitted.

☐ The **Grievance and Request to staff** must be specific as to the **Complaint, Dates, Places,
Personnel Involved and How the Inmate was Affected.**

☐ Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐ If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of
submission, the inmate may file a grievance to the reviewing authority with **a copy of the "Request
to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.)
The grievance form may only be filed about the lack of response to the "Request to Staff."**

☒ Only **ONE ISSUE OR INCIDENT** is allowed per **Grievance** and **Request to Staff.**

☐ You are on **Grievance Restriction**, proper documentation was not included.

☐ It has been determined that the grievance is not of an **Emergency or Sensitive** nature. The grievance
is being returned and you must comply with the standard grievance process.

**Page 2 of 2**

Exhibit 26-5

☐ **Section-09 Programs Page: 4 OP-090124 Effective Date: 04/11/2019**
**B. Non-grievable Issues**
1. Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Inmate/Offender Disciplinary Procedures."

☐ 2. Grievances shall not be submitted:

☐ (a) about matters that are in the course of litigation;

☐ (b) about matters that include requests for disciplinary action against staff;

☐ (c) requesting monetary compensation; or

☐ (d) For property issues at privately contracted facilities. These are to be resolved by the privately contracted facility and are not grievable or appealable to ARA.

☐ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☐ **Section-09 Programs Page: 18 OP-090124 Effective Date: 04/11/2019**
A. Determining Abuse of the Grievance Process
1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
☐ a. Grievances intended to harass another;
☐ b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
☐ c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
☐ d. Grievances about de minimis (small, trifling, no available remedy) issues;
☐ e. Repetitive grievances by multiple inmates/offenders about the same issue;
☐ f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
☐ g. Continued procedural defects, such as submitting additional pages, after having been previously warned.
☐ **Because of continued abuse of the grievance process this serves as an official warning.**

☒ You will be afforded the opportunity to properly re-submit a grievance form within **10 days** of receipt of this notice **WITH THE NOTED CORRECTIONS COMPLETED.** The grievance form must be proper, complete, and submitted to the proper reviewing authority. The failure of such waives/forfeits the right to proceed in the grievance process.

☐ Due to your continued failure to submit a properly filed grievance, you are now **OUT OF TIME.**

☒ Other:  *Need answered RTS, only one issue per grievance.*

Exhibit 26-6

## INMATE/OFFENDER GRIEVANCE

**RECEIVED**

**NOV 20 2019**

**GRIEVANCE**

Grievance no. 2019-1001-00397-6

Grievance code: 3

Response due: 12/9/19

---

### DO NOT WRITE ABOVE THIS LINE

Date 11-15-19 (resubmitted 2nd time)     Facility or Unit DoCoFo

Name Camoe Johnson     Facility Housing Unit FB#211
(Print)

DOC Number 744047     Date "Request to Staff" response received: Oct 9th 19

Have you previously submitted a grievance on this same issue? NO If yes, what date N/A, facility
N/A, grievance # N/A. You must submit this completed original within 15 days of the receipt of the
response to the "Request to Staff". The "Request to Staff" must have been submitted within 7 days of the incident.
Do not include/attach anything to this grievance except the "Request to Staff" including the response. You may
quote from or make reference to statutes, operations, field, or administrative memoranda, department publications
(time sheets, inventory forms, assessments, etc.). You will be permitted only one opportunity to correct any
error(s) made in submitting your grievance.

1.  The nature of your complaint. This statement must be specific as to the complaint, dates, places,
    personnel involved, and how you were affected. One issue or incident per grievance. Use backside of
    this page only, if necessary. On 9-13-19, I was discriminated
    against and retaliated against Shanna Taylor case manager
    when forbid the CIO Hobbs to allow me to contact
    my Attorney and/or mothers which O.D.O.C. policy states →

2.  Informal action taken (including dates) to resolve the complaint, as well as the names of those employees
    from whom you sought an answer to your grievance.
    RTS to C.O.'S Kevin Brown on 9-13-19
    Verbal conversation with G. Robinson Disciplinary
    Coordinator 10-28-19

3.  The action you believe the reviewing authority may lawfully take.
    Please inform Mrs. Shanna Taylor with a memorandum
    placed on my door that I am allowed to call my attorney
    And to stop retaliation against me for filling Grievances

Grievance report sent to (warden/facility head/deputy director//correctional health services administrator):
James Yates     Warden

Name

Signature of Grievant     Date Sent to Reviewing Authority 11-15-19 (for the second time)

DOC 090124A (R 4/19)

1. Original to file
2. Copy to inmate/offender

Exhibit C6-6 (Back side)

"Level 1 offenders are entitled to Attorney Calls". See: OP-060107, See also OP-030119 as well as, " for purposes of OP-060125, telephone restriction means that an offender is not permitted to make or receive Phone Calls except calls to or from the offenders attorney and clergy" OP-060125, Attachments, (footnote 4.) This is Violating MY first amendment rights of the U.S. constitution, by retaliating against me for redress of Grievances, access to Courts.



RECEIVED
NOV 20 2019
GRIEVANCE

Exhibit C6-1

## GRIEVANCE RETURNED UNANSWERED

Received:

_____
**Inmate signature**

11-26-19

**Date**

| | |
|---|---|
| **DATE:** | November 25, 2019 |
| **TO:** | Johnson, Lamone, #744047 |
| **FROM:** | James Yates, Warden |
| **Received:** | November 18, 2019 |
| **RE:** | Return of Grievance # 2019-1001-00397-G |

*YOUR GRIEVANCE IS BEING RETURNED UNANSWERED BECAUSE OF THE FOLLOIWNG:*

☐   You have not filed your grievance within the specified time frame.  *(CANNOT RESUBMIT)*

    ☐ The "Request to Staff" must be submitted **within seven (7) days of the incident.**

    ☐The inmate/offender grievance must be submitted by the inmate/offender 15 days from the
       **date of the receipt of the response to the "Request to Staff."**

☐   An **ANSWERED** Request to Staff form addressed to the **correct staff member** must be attached.

☐   The **Request to Staff** issue is not consistent with the issue requested on the **Grievance.**

☐   **Inmate Request forms are not utilized in the Grievance Process.**

☐   You have not completed the **Grievance form correctly, in its entirety, or on the correct form.**

☐   Grievances submitted must be **legibly written or typed, in blue or black ink. No pencil,
    highlighter, or other color of ink is allowed.** No drawing, decorating, doodling, or making
    comments, in the margins of the pages is permitted.

☐   The **Grievance and Request to staff** must be specific as to the **Complaint, Dates, Places,
    Personnel Involved and How the Inmate was Affected**.

☐   Classification Movement requests to transfer to another facility, are not grievable to DOC.

☐   If there has not been response to your Request to Staff in 30 days, but no later than 60 days, of
    submission, the inmate may file a grievance to the reviewing authority with **a copy of the "Request
    to Staff" attached to the grievance form. (Ask the law library supervisor for a copy of the RTS.)
    The grievance form may only be filed about the lack of response to the "Request to Staff."**

☐   Only **ONE ISSUE OR INCIDENT** is allowed per **Grievance** and **Request to Staff.**

☐   You are on **Grievance Restriction**, proper documentation was not included.

☐   It has been determined that the grievance is not of an **Emergency or Sensitive** nature. The grievance
    is being returned and you must comply with the standard grievance process.

Exhibit 26-7

**Page 2 of 2**

☐ **Section-09 Programs Page: 4 OP-090124 Effective Date: 04/11/2019**
   **B. Non-grievable Issues**
   1. Misconduct reports received through the agency disciplinary procedures may not be appealed through the grievance process. Misconduct reports may only be appealed through the disciplinary appeal process as referenced in OP-060125 entitled "Inmate/Offender Disciplinary Procedures."

☐ 2. Grievances shall not be submitted:

   ☐ (a) about matters that are in the course of litigation;

   ☐ (b) about matters that include requests for disciplinary action against staff;

   ☐ (c) requesting monetary compensation; or

   ☐ (d) For property issues at privately contracted facilities. These are to be resolved by the privately contracted facility and are not grievable or appealable to ARA.

☐ Property issues may be addressed by utilizing the requirements of CCA Policy 14-6: Inmate Resident Property (Property Claim 14-6D and Appeal 14-6E).

☐ **Section-09 Programs Page: 18 OP-090124 Effective Date: 04/11/2019**
   A. Determining Abuse of the Grievance Process
   1. The appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's/offender's ability to submit a grievance. Types of abuse, include, but are not limited to: (PREA 115.52(g))
☐ a. Grievances intended to harass another;
☐ b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);
☐ c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;
☐ d. Grievances about de minimis (small, trifling, no available remedy) issues;
☐ e. Repetitive grievances by multiple inmates/offenders about the same issue;
☐ f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;
☐ g. Continued procedural defects, such as submitting additional pages, after having been previously warned.
☐ **Because of continued abuse of the grievance process this serves as an official warning.**

☐ You will be afforded the opportunity to properly re-submit a grievance form within **10 days** of receipt of this notice **WITH THE NOTED CORRECTIONS COMPLETED.** The grievance form must be proper, complete, and submitted to the proper reviewing authority. The failure of such waives/forfeits the right to proceed in the grievance process.

☐ Due to your continued failure to submit a properly filed grievance, you are now **OUT OF TIME**.

☒ Other:  *This is a DUPLICATE OF GRIEVANCE 2019-1001-00395.*

EASTERN DISTRICT OF OKLAHOMA

**FILED**

MAR 1 8 2020

Lamone M. Johnson
Plaintiff(s)

v.

Dr. Sanders et al.,
Defendants,

OBJECTION
TO MAGISTRATE
JUDGE STEVEN
P. Shreder

CIV-19-269-RAW SPS

PLEASE RETURN COPY
STAMPED AND FILED

## OBJECTIONS

Plaintiff Johnson's OBJECTIONS
TO MAGISTRATE JUDGE STEVEN
P. Shreder Order denying Plaintiff's request
for Photocopies are the following:

(1.) Plaintiff is a Pro se Prisoner whom
is not Licensed, nor Certified in law
Practice, see: Hall v. Bellman, 935 F.2d
1106, 1110 Cloth Cir. 1991) ("A Pro se
litigant's Pleadings are to be construed
liberally and held to a less Stringent
Standard than formal Pleadings draft by
lawllers. We believe that this rule means
that if the Court Can reasonably read the
Pleadings to State a valid Claim on which
the Plaintiff Could Prevail, it should do
So despite the Plaintiff's failure to cite
Proper legal authority, his confusion of various

408

Pg. 2

legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.") Plaintiff has made motion's for Appointment of counsel but the court denied Plaintiff's motion (see Document 37) Plaintiff has limited access to law library, Plaintiff is limited to the knowledge within civil law and law in general. Plaintiff proceeded informa Pauperis and does not have the funds to hire a Attorney, Plaintiff has written legal organization's and Attorney's and the Oklahoma Bar Association, with no such luck, Plaintiff is stressing when it comes to writing legal Pleadings, she does not have A adequate Law library to know the legal local rules, everything Plaintiff knows is from one Book's Jailhouse lawlers mannal,

(2.) The Defendant's Answer was one "motion". So the defendant's asked for multiple relief's but their motion/Answer was not denied. (see Document 32, Pg 4,5) This is violation of the equal protection Clause of the 14th Amendmant to the U.S. Constitution. Roman v. Evans, 517 U.S. 620, 116 S. Ct. 1620, 134 L.Ed. 2d 855 (1996) ; Lawrence v. Texas 539 U.S. 558, 542 (2003)

409

Page 3

; United States v. Windsor, 133 S. Ct. 2675 (2013) ; Village Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) Plaintiff is entitled to the same relief as other Pro Se litigants. Roper v. Simmons, 543 U.S. 551, 560 (2005)

Wherefore Plaintiff respectfully dissent with the Magistrate Judge Steven P. Shreder's order denying Plaintiff's request for photocopies, asks this court to reconsider Plaintiff's motion and relief.

Respectfully submitted
this 13th day of March 2020,
*[signature]*

Certificate-of-Mailing

Plaintiff placed this foregoing document in the Prison mail room March 13th 2020, to the following address:

· Clerk of the United States Eastern District of Oklahoma, P.O. Box 607, Muskogee, OK 74402
*[signature]*
Dated: 3-13-20

FILED

DEC - 7 2020

PATRICK KEANEY
Clerk, U.S. District Court

Deputy Clerk

IN THE UNITED STATES
DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

Lamone M. Johnson
Plaintiff's,

V.

Dr. Sanders, et. al.
Defendants,

MOTION FOR
AN ORDER
COMPELLING
DISCOVERY

CIV-19-269-JFH-SPS

Plaintiff's moves this court for an order
Pursuant to Fed. R. Civ. P. Rule 37(a),(3)
COMpelling Defendant Ernesto Martinez
to answer fully interrogatories Numbers
4, 5, 7, 9, 13, 14. the answers given
were "Evasive, incomplete disclosures"
Which pursuant to Fed. R. Civ. P. Rule 37(3)
"is to be treated as a failure to disclose,
answer, or respond." the defendant repeatedly
"Objected" On the grounds of relevances,
Plaintiff is entitled to NON-Privilged
information That is "reasonably Calculated
to lead to the discovery of admissible
evidence." See Fed. R. Civ. P. Rule 26(b)(1).
The defendant Martinez Claims in his
answer (Doc# 32) that Plaintiff was
Not in any "real danger's" That however is
False, because the defendant "Claims"
that, the Plaintiff has a right to anything
Which is anyway "relevant" to any Party/s   Pg:1

411

Claim or defense. Other inmates in the kitchen working could've heard these threats being made, to testify or swear on a sworn Affidavit that Plaintiff was in fact in danger. Furthermore Defendant Martinez Constantly contradicts himself, in his Answer (See Doc #32) he states Plaintiff was "not in any real danger", but in his interrogatory response #8 he states" During Segregation reviews, a determination is made to return the inmate to general Population or Conduct a Protective measures investigation" On 3-5-2019 Plaintiff attended a Segregation review and Protective measures were found Substantial and issued to Protect her from harm. Which the defendant attended. (See the defendants response to interrogatory #5) So to Say Plaintiff was "not in any real danger" Concludes that his So called "23 Years of experience" is really no experience at all. With all due respect the defendant's are blowing Smoke and Smoking leads to Cancer. Yes, even second hand Smoke. This objection Should be over Ruled. Again Plaintiff is entitled to "relevant" information (See Fed. R. Civ. P. 26 (b)(1).) Plaintiff wishes to despose Staff members and Subpoena as well to testify as witnesses any "relevant" information

On the Claims that the defendant Martinez "alleges" happend.

WHEREFORE, asks this honorable Court to Compel the defendant with an order Pursuant to Fed. R. Civ. P. 37(a)(3), and award fees for the cost of this motion Pursuant to Fed. R. Civ. P. Rule 37(a)(4) requiring the aforesaid Defendant to Pay the Sum of $100.00 as reasonable expenses in obtaining this order, on the ground that the defendants refusal to answer the interrogatories had no substantial justification. For this releif Plaintiff does Pray,

Dated: 11-24-20

Signed: Lamone

Lamone M. Johnson
J.H.C.C / M1-107
P.O. Box: 548
Lexington, OK 73051

I hereby certify that a Copy was Placed on the inmate Prison mail on 11 24 20 to: Darrell L. Moore
P.O. Box 3368
Pryor, OK 74362

Lamone

Pg 3

Document 1-E                    RECEIVED

MAY 2 0 2020

In The United States District Court
The Eastern District Of Oklahoma.    Deputy Clerk

Lamone M. Johnson,          PLAINTIFF'S FIRST
            Plaintiff,      SET OF INTERROGATORIES
                            TO DEFENDANTS
v.

Dr. Sanders, et. al.,       Case no's CIV-19-269-JHP-RAW
        Defendants

In accordance with Rule 33 of the Federal Rules of
Civil Procedure. Plaintiff's request that Defendant
Ernesto Martinez answer the following interrogatories
under oath, and that the answers be signed by the
person making them and be served on Plaintiff's
within 30 days of Service of these interrogatories.

If You cannot answer the following interrogatories in full,
after exercising due diligence to secure the information
to do so, so state and answer to the extent possible,
specifying Your inability to answer the remainder and
stating whatever information or knowledge You have
concerning the unanswered portions.

These interrogatories shall be deemed continuing,
so as to require supplemental answers as
new and different information materializes.

1) Please identify all positions and titles,
with corresponding dates of employment, that You
have held as an employee at Davis Correctional
facility in the year 2019. Describe Your job responsibility's
for each position and titles.

                                    pg 1

414

Document 1-2

2. Please describe in as much detail as possible every Policy, Procedure and Practice that governs the Care of LGBTQIP (Lesbian, Gay, Bi-sexual, Transgender Queen, Intersex, Pansexual) Inmates and the Disciplinary Process.

3. Please identify the inmates that arrived on may 16, 2018 between 6:45AM to 6:45Pm.

4. Please identify Inmates schedulers in the Kitchen for the months of June, July 2019 (include Inmates names, And I.D. Photo's)

5. Please identify all Staff members whom was present in the segregation review and the listed Inmates' whom attended the segregation review and the Out come of each inmate's Situation on the date of march 5th, 2019.

6. Please identify all Prison Staff members (by name, Rank and title at the relevant time and last Known home and work address) who were On duty on fox delta between 6:45 Am and 5:45Pm, from march 6th to march 14, 2019.

7. Please identify all Prison Staff members (by name, Rank and title at the relevant time and last Known home and work address) who were On duty on fox delta between 6:45 Pm to 5:45 Am from march 6th to march 14th, 2019.

Pg 2 2

Document 1-2

8) Please identify the Procedure for "inmates who refuse cell mates" and the Procedure for "investigating a physical altercation between two inmates that who horseplay." And the steps the investigator takes to determine the incident as "horseplay" or a "Fight."

9) Please identify and attach a copy of your whereabouts on march 6th, 2019, between 10:30 Am — 4:59 pm.

10) Please identify where you were at on the facilities Fox unit on march 6th, 2019, between 10:30 Am — 4:59 pm.

11) Please identify in as much detail as possible what you saw occur on march 6th 2019, on fox delta, cell 210.

12) Please identify the incident reports and a copy, and their location of the events that transpired on march 6th 2019? on fox delta, cell 210?

13) Please identify and attach copies of all 51-C's filed by inmate Lamone Johnson, inmate Marquis Porter and their location's.

14) Please identify all officials responsible for formulating, implementing and monitoring compliance with the policies, procedures and protocols and practices described in your response to interrogatory #2 and interrogatory #8

Pg. 3

Document 1-2

(15) Please Identify each document, as the term is
defined in Federal Rules of Civil Procedure 34(a)(1)
that evidence, mentions or refers to any facts
Stated in Your response to Interrogatory #11,
Interrogatory #12 and Interrogatory #13.

(16) Please identify each Person who has made to
You Sworn or unsworn Statements or Provided
information for affidavits or statements that
relate to the allegations made in Plaintiffs Complaint
and state the information Provided.

(17) State the name and address or otherwise
identify and locate any Person who, to You or Your
Attorney's Knowledge, Claims to Know of facts relevant
to the Conduct described in these interrogatories.

Date: 5-14th-2020
Signature: Lemuel Pruitt
LAMONE JOHNSON #744047
J.H.C.C./MHU-1-167
P.O.Box: 544
Lexington, OK 73051

Certificate-of-mailing
I, the Plaintiff Placed this foregoing document
in the Prisons mailroom on May____, 14th, 2020
to the following addresses:

o Darrell L. Moore, OBA 6332, P.O.Box: 368,
Pryor OK 74362
Bof

417

Document 1-2

On May _____ 14th _____, 2020

Ramirez

Pg. 5.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

LAMONE JOHNSON,

           **Plaintiff,**

vs.

                                **Case No. CIV-19-269-RAW-SPS**

DR. SANDERS, et al.,

           **Defendants.**

---

**DEFENDANTS' RESPONSES TO PLAINTIFF'S
DISCOVERY REQUESTS.**

---

      COMES NOW Defendant Martinez, by and through his attorney of record, Darrell L. Moore, OBA #6332, responding to Plaintiff's Discovery Requests, as follows:

**INTERROGATORIES TO DEFENDANT MARTINEZ**

**REQUEST NO. 1:** Please identify all positions and titles with corresponding dates of employment that you have held as an employee at Davis Correctional Facility in the year 2019, describe your job responsibilities for each position and titles.

**RESPONSE TO REQUEST NO. 1:** Unit Manager, Davis Correctional Facility. I exercised Unit Manager responsibilities over the Fox inmate housing units during 2019.

**REQUEST NO. 2:** Please describe in as much detail as possible every policy, procedure and practice that governs that care of LGBTQIP (Gay, Bi-sexual, Transgender, Queer, Intersex, Pansexual) Inmates and the disciplinary process.

**RESPONSE TO REQUEST NO. 2:** For the Fox housing unit at Davis Correctional Facility, Oklahoma DOC OP-040204 Segregation Measures is the policy that governs the care of inmates. It is applied to all inmates. Oklahoma DOC OP-060125 Disciplinary Procedures is the policy that outlines the disciplinary process. It is applied to all inmates. OP-060125 Attachment A sets out the acts constituting rule violations. Oklahoma DOC OP-030102 pertains to inmate housing. Oklahoma DOC OP-140147 pertains to determination and management of inmates with gender dysphoria. And, Oklahoma DOC OP-030601 and 030601-APS pertain to the Oklahoma Prison Rape Elimination Act.

**REQUEST NO. 3:** Please identify the inmates that arrived on May 16, 2018 between 6:45 am to 6:45 pm.

1

**RESPONSE TO REQUEST NO. 3:** Lamone Johnson; Michael Gaddis; Roddrick Ward; Mickel McCray; Austin Eiland; Sonny Taylor; Thomas McNeil.

**REQUEST NO. 4:** Please identify inmates schedules in the kitchen for months of June, July 2019 (include inmates names and ID Photos). *& Plaintiff needs, This will lead to evidence that is in admissible*

**RESPONSE TO REQUEST NO. 4:** Objection, relevance. Facility records indicate you worked in food service 5/24/2018 - 7/05/2018 and 10/04/18 - 10/09/18. *A lie, Plaintiff was placed in Seg*

**REQUEST NO. 5:** Please identify all staff members whom was present in the segregation review and the listed inmates whom attended the segregation review and the outcome of each inmate situation on the date of March 5, 2019. *& Plaintiff is Suing Defendant Martinez in his official Capacity*

**RESPONSE TO REQUEST NO. 5:** Objection, relevance. Objection, safety, security, and privacy concerns restrict release of the requested information regarding other inmates. Without waiving these objections, Plaintiff attended a segregation review on or about March 5, 2019. Staff whom may have been present were Assistant Warden Gentry, Assistant Warden Perez, Chief of Security Brown, Unit Manager Berry, Unit Manager Martinez, and Clerk Polkinghorn.

**REQUEST NO. 6:** Please identify all prison staff members (by name, rank and title at the relevant time and last known home and work address) who were on duty on Fox Delta between 6:45 am and 5:45 pm, from March 6, 2019 to March 14, 2019.

**RESPONSE TO REQUEST NO. 6:** A review of shift rosters for the subject dates indicates the following Officers were assigned to the day shift on Fox Delta from March 6, 2019 to March 14, 2019: David Dellinger, Jacob Reed, Dayne Chaplin, Zachary Powell, Vance Shaw.

**REQUEST NO. 7:** Please identify all prison staff members (by name, rank and title at the relevant time and last known home and work address) who were on duty on Fox Delta between 6:45 pm to 5:45 am from March 6 to March 14, 2019.

**RESPONSE TO REQUEST NO. 7:** Objection, relevance. Objection, safety and security of staff members. Plaintiff is an inmate in a correctional facility and will not be provided address information of staff members. Without waiving these objections, a review of shift rosters for the subject dates indicates the following Officers were assigned to the day shift on Fox Delta from March 6, 2019 to March 14, 2019: David Dellinger, Jacob Reed, Dayne Chaplin, Zachary Powell, Vance Shaw.

**REQUEST NO. 8:** Please identify the procedure for "inmates who refused cellmates" and the procedure for "investigating or physical altercation between two inmates who horseplay." And the steps the investigator takes to determine the incident as "horseplay" or "fight."

**RESPONSE TO REQUEST NO. 8:** If an inmate refuses cell mates, he is issued a misconduct and his level is dropped. Furthermore, based on the circumstances of the refusal, the inmate may be placed in Segregation pending investigation into the refusal. During segregation reviews, a determination is made to return the inmate to general population or conduct a protective

2

measures investigation.  If an inmate shows signs of injury, an investigation is conducted to determine the source of the injury and to ensure the safety of the inmate. The investigation includes reviewing staff reports, photographs, and inmate medical evaluations and may include interviewing the victim, the suspect, and any witnesses.  In my 23 years' experience as a corrections professional, when inmates incur injuries as a result of horseplay, they readily admit it. When inmates maintain different stories and are evasive when questioned, it generally means that something occurred that they don't want staff to know about. In this incident, both inmates reported that inmate Johnson fell off the top bunk. However, both inmates had injuries that were inconsistent with falling off the top bunk and were consistent with fighting.

**REQUEST NO. 9:**  Please identify and attach a copy of your whereabouts on March 6, 2019 on Fox Delta Cell 210.

**RESPONSE TO REQUEST NO. 9:**  Objection, your request is vague and unclear insofar as you have asked Defendant Martinez for a *copy of your whereabouts.* Without waiving this objection, I, Unit Manager Martinez, was on the facility on March 6, 2019 as verified by my digital signature on the 5-1 incident report. My office was on the Fox Alpha Pod and I likely would have been on FD at some point during the day.

**REQUEST NO. 10:**  Please identify where you were at on the facilities Fox Unit on March 6, 2019 between 10:30 am – 4:50 pm.

**RESPONSE TO REQUEST NO. 10:**  I, Unit Manager Martinez, was on the facility on March 6, 2019 as verified by my digital signature on the 5-1 incident report. My office was on the Fox Alpha Pod and I likely would have been on FD at some point during the day..

**REQUEST NO. 11:** Please identify in as much detail as possible what you saw occur on March 6, 2019 on Fox Delta cell 210.

**RESPONSE TO REQUEST NO. 11:** On March 6, 2019, I was advised by Correctional Officer Cody Prince that inmate Johnson had blood on his nose and right eyebrow. Correctional Officer Prince advised me that he believed inmate Johnson and inmate Porter were involved in a fight because there was a lot of tension in the cell. I reviewed the staff reports, medical evaluation forms, and photographs. Based on the information provided, I was able to conclude that a fight occurred.

**REQUEST NO. 12:**  Please identify the incident reports and a copy, and their location of the events that transpired on March 6, 2019, on Fox Delta, cell 210.

**RESPONSE TO REQUEST NO. 12:**  A copy of the incident report for March 6, 2019 will be BATES numbered and produced to Plaintiff by separate correspondence. A copy of an Offense Report dated March 12, 2019 and related disciplinary records will be BATES numbered and produced to Plaintiff by separate correspondence.

**REQUEST NO. 13:**  Please identify and attach copies of all 5-1cs filed by inmate Lamone Johnson, inmate Marquis Porter and their locations.

3



**RESPONSE TO REQUEST NO. 13:**  Objection, safety and security.  Plaintiff is an inmate in a correctional facility and should not be provided information submitted by other offenders. Objection, relevance.  Objection, vague, unclear, and unduly burdensome. Plaintiff's request for "all" 5-1c he may have submitted while he was confined at Davis Correctional Facility is not relevant to his claims brought forward to this Court. Without waiving these objections, no 5-1c Incident Statements completed by Plaintiff have been located. Requests to Staff submitted by Plaintiff dated March 22, 2019 and March 28, 2019 will be BATES numbered and produced to Plaintiff by separate correspondence.

**REQUEST NO. 14:**  Please identify all officers responsible for formulating, implementing and monitoring compliance with the policies, procedures and protocols and practices described in your response to Interrogatory #2 and Interrogatory #8.



**RESPONSE TO REQUEST NO. 14:**  Objection, vague and unclear in that Plaintiff requests that we identify "all" responsible officers.  Without waiving this objection, as the Unit Manager for the Fox housing unit during 2019, I was responsible for the operation of that inmate housing unit.

**REQUEST NO. 15:**  Please identify each document as the term is defined in Federal Rules of Civil Procedure 34 (a)(1) that evidence mentions or refers to any facts stated in your response to Interrogatory #11, Interrogatory #12 and Interrogatory #13.



**RESPONSE TO REQUEST NO. 15:**  Objection, Plaintiff's request is unclear and is not understood.  Without waiving this objection, please see the produced materials responsive to Plaintiff's requests #12 and #13.

**REQUEST NO. 16:**  Please identify each person who has made to or sworn to or unsworn statements or provided information for affidavits or statements that relate to the allegations made in Plaintiff's complaint and state the information provided.



**RESPONSE TO REQUEST NO. 16:**  Objection, Plaintiff's request is unclear and is not understood.  Without waiving that objection, any affidavits that have been made were attached to the *Special Report*. Staff responding to the incident of March 6, 2019 are identified in the produced incident report. Staff involved in the disciplinary process are identified in the produced materials.

**REQUEST NO. 17:**  State the name and address or otherwise identify and locate any person who to your or your attorneys knowledge claims to know of facts relevant to the conduct described in these interrogatories.

**RESPONSE TO REQUEST NO. 17:**  Objection, Plaintiff's request is unclear and is not understood.  Without waiving that objection, any affidavits that have been made were attached to the *Special Report*. Additionally, for additional staff statements and materials, please see the materials submitted in response to Plaintiff's discovery requests.

Defendant Martinez,

_____
DARRELL L. MOORE, OBA #6332
P.O. BOX 368
PRYOR, OK  74362
(918) 825-0332
(918) 825-7730 fax
Attorney for Defendants

### Certificate of Service

☑  I hereby certify that on the 16th day of October 2020, I served the attached document by regular US Mail on the following:

Lamone Johnson, DOC# 744047
Joseph Harp Correctional Center
PO Box 548
Lexington, OK 73051-0548

_____
DARRELL L. MOORE

5

5-1A

## INCIDENT REPORT

| Facility: | Davis Correctional | | Incident Number: | 2019-1001-097-III |
|---|---|---|---|---|

| Incident Date/Time (HRS): | 03/06/2019 13:04 hours |
|---|---|

| Facility Damage: | None |
|---|---|

| Incident Location: | Facility Property \ Section: F \ Block: FD \ Cell: 210 |
|---|---|

## INCIDENT PRIORITY LIST:

| Priority | Priority Description |
|---|---|
| III | Fight WITHOUT Weapon NOT Resulting in Immediate Outside Medical Treatment-Inmate on Inmate |

| Other Priority Description: | |
|---|---|

## DESCRIPTION OF INCIDENT:

Davis Correctional Facility in Holdenville, Oklahoma

On Wednesday, March 6, 2019 at approximately 1304 hours, Correctional Officer ███ Prince was conducting a security check in the Fox Delta Pod. As Correctional Officer Prince passed by Fox Delta Cell #210, which houses inmate Porter, Marquis #786756 (Date of Birth: ███████████) and inmate Johnson, Lamone #744047 (Date of Birth: ███████████) he observed inmate Johnson at the window with injuries consistent with being involved in a physical alteration. Correctional Officer Prince called for assistance from other staff in the area so that he could take inmate Johnson to Satellite Medical for further evaluation.

Correctional Officer ███ Reynolds, Correctional Officer ███ Ryan, and Correctional Officer ███ York responded in less than one minute.

Correctional Officer Prince and Correctional Officer Reynolds escorted inmate Johnson to Satellite medical for evaluation. Licensed Practical Nurse ███ Turner conducted the medical evaluation of inmate Johnson with the following noted on the facility emergency anatomical form: swollen area to nose and bite mark to left side of neck. After the evaluation, inmate Johnson was escorted and placed back in Fox Delta Cell #219.

Correctional Officer York and Correctional Officer Ryan escorted inmate Porter to Satellite Medical for evaluation. Licensed Practical Nurse ███ Goodwin conducted the medical evaluation of inmate Porter, with the following noted on the facility emergency anatomical form: abrasions/ scratch to right elbow, left forehead, right wrist, left wrist, right forearm, and right shoulder. Bruise/ discoloration to left forehead, right wrist, left wrist, right forearm, and right shoulder. After the evaluation, inmate Porter was escorted and placed in segregation.

Inmate Johnson stated that the fight occurred as a result of him not wanting to go out to recreation and his cell partner got upset about it.

Inmate Porter stated that his cell partner fell off the bunk and no fight occurred.

SUSPECTS:
Inmate Porter, Marquis #786756 (Date of Birth: ██████████████).

Inmate Johnson, Lamone #744047 (Date of Birth: ██████████████).

VICTIMS:
Not applicable.

ESCORTS:
Correctional Officer Prince and Correctional Officer Reynolds escorted inmate Johnson to Satellite medical for evaluation. After

   Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   10/03/13

5-1A

## INCIDENT REPORT

the evaluation, inmate Johnson was escorted and placed back in Fox Delta Cell #219.

Correctional Officer York and Correctional Officer Ryan escorted inmate Porter to Satellite Medical for evaluation. After the evaluation, inmate Porter was escorted and placed in segregation.

**RESPONSE TIME:**
Less than one minute.

**MEDICAL REPORTS/INJURIES TO STAFF:**
Not applicable.

**MEDICAL REPORTS/INJURIES TO INMATES:**
Licensed Practical Nurse ▮▮▮▮▮Turner conducted the medical evaluation of inmate Johnson with the following noted on the facility emergency anatomical form:  swollen area to nose and bite mark to left side of neck.

Licensed Practical Nurse ▮▮▮▮▮Goodwin conducted the medical evaluation of inmate Porter, with the following noted on the facility emergency anatomical form: abrasions/ scratch to right elbow, left forehead, right wrist, left wrist, right forearm, and right shoulder. Bruise/ discoloration to left forehead, right wrist, left wrist, right forearm, and right shoulder.

**CRIME SCENE/EVIDENCE:**
Photographs, offense reports, and incident statements were submitted with the incident packet. The contraband placed in the Central Control Evidence Safe. Camera ▮▮▮▮▮was utilized.

**USE OF FORCE:**
No force was utilized.

**CONCLUSION:**
Inmate Porter received an offense report for Acts Constituting Rule Violation, "A-2" (Fighting).

Inmate Johnson received an offense report for Acts Constituting Rule Violation, "A-2" (Fighting).

**NOTIFICATIONS:**
Chief of Security Brown was notified on March 6, 2019 at approximately 1400 hours by Unit Manager Martinez.

| Inmates/Residents Involved? | Yes |
|---|---|

**INVOLVED PEOPLE:**

| Inmate/Resident Name(s) & Number | | | Jurisdiction | Witness or Participant | 5-1C Attached or Refused? | Injuries |
|---|---|---|---|---|---|---|
| MARQUIS PORTER (786756) | | | OK DOC | Participant | Refused | Yes |
| Hospital Admission: | No | Nature of Injury: | Fighting | | | |
| LAMONE JOHNSON (744047) | | | OK DOC | Participant | Refused | Yes |
| Hospital Admission: | No | Nature of Injury: | swollen area to nose and bite mark to left side of neck | | | |

| Employee Name(s) & Number | Employee Title | Witness or Participant | 5-1C Attached? | Injuries |
|---|---|---|---|---|
| ▮▮Prince▮▮▮▮▮ | CORRECTIONAL OFFICER | Participant | Yes | No |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

10/03/13

Johnson - CIV-19-269          10/10/2020          000002

5-1A

## INCIDENT REPORT

| | | | | |
|---|---|---|---|---|
| ███ Reynolds (40149601) | CORRECTIONAL OFFICER | Participant | Yes | No |
| ███ York (22960539) | CORRECTIONAL OFFICER | Participant | Yes | No |
| ███ Ryan (40782511) | CORRECTIONAL OFFICER | Participant | Yes | No |

| **Medical Evaluation Completed?** | Yes |
|---|---|

**HEALTH SERVICES PERSONNEL CONDUCTING EXAMINATIONS:**

| Name | Title |
|---|---|
| Turner, ███ | Licensed Practical Nurse |
| Goodwin, ███ | Licensed Practical Nurse |

| **Weapons Discovered?** | N/A | **How Many?** | |
|---|---|---|---|

| **Weapon Description** | | **Weapon Location** | |
|---|---|---|---|

| **Cell Phones Discovered?** | N/A | **How Many?** | |
|---|---|---|---|

| **Inmate/Resident Disciplinary Charges Filed?** | Yes |
|---|---|

| Inmate/Resident Name(s) & Number | Segregation and/or PHD | Property Inventory Completed |
|---|---|---|
| MARQUIS PORTER (786756) | Yes | Yes |
| LAMONE JOHNSON (744047) | Yes | Yes |

| **Incident Videotaped?** | N/A | | |
|---|---|---|---|
| **Name/Title of Camera Operator:** | | | |
| **If Not Recorded, Explain:** | | | |
| **Photos of injuries, contraband, or property?** | Yes | **How Many?** | 14 |
| **If No Photos, Explain:** | | | |
| **Name/Title of Photo Taker:** | CO Prince | | |

**EVIDENCE INFORMATION:**

| **Evidence recovered during incident?** | N/A |
|---|---|
| **Chain of Custody Maintained:** | No |
| **Evidence Description:** | N/A |
| **Evidence Current Location:** | N/A |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

10/03/13

5-1A

## INCIDENT REPORT

| Name/Title of Person Discovering Evidence: | N/A |
|---|---|
| Criminal Charges: | No |

**Notifications:**

**Facility Notifications:**

| Person Notified | Date/Time Notified | Notified By | ADO? |
|---|---|---|---|
| K. Brown | 3/6/2019@1400 hrs | E. Martinez | Yes |

**FSC Notifications:**

| Person Notified | Date/Time Notified | Notified By |
|---|---|---|
| L. Blair | | Via Email |
| L. Dixon | | Via Email |
| FSC QADA | | Via Email |

**Contracting Agency Notifications:**

| Person Notified | Date/Time Notified | Notified By |
|---|---|---|
| JC Colbert | | Via EMail |

**Outside Agency Notifications:**

| Person Notified | Date/Time Notified | Notified By |
|---|---|---|

| Referred for Investigation by Warden/Administrator or ADO? | Yes |
|---|---|

| Prepared By: | E. Martinez | Title: | Unit Manager |
|---|---|---|---|

| Completed Date/Time: | 03/06/2019 17:00hours |
|---|---|

| Name | Job Title | Date and Time Signed |
|---|---|---|
| Ernesto Vi Martinez | UNIT MANAGER | 03/06/2019 16:20 hrs. |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

10/03/13

Johnson - CIV-19-269          10/10/2020          000004

5-1C

# INCIDENT STATEMENT

| Facility | Davis Correctional Facility | | Incident Number | 2019-1001-097-III |
|---|---|---|---|---|

| Incident Date | 3/6/2019 | | Incident Time (HRS) | 1304 hours |
|---|---|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| Prince, ▇ | 39532282 | Employee | Participant |

| Housing Location (For Inmates/Residents Only) | |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

On Wednesday, March 6, 2019 at approximately 1304 hours, I was conducting a security check in the Fox Delta Pod. As I passed by Fox Delta Cell #210, which houses inmate Porter, Marquis #786756 (Date of Birth ▇▇▇ and inmate Johnson, Lamone #744047 (Date of Birth: ▇▇▇, I observed inmate Johnson at the window with injuries consistent with being involved in a physical alteration. I called for assistance from other staff in the area so that I could take inmate Johnson to Satellite Medical for further evaluation.

Correctional Officer ▇ Reynolds, Correctional Officer ▇ Ryan, and Correctional Officer ▇ York responded in less than one minute.

Correctional Officer Reynolds and I escorted inmate Johnson to Satellite medical for evaluation. Licensed Practical Nurse ▇ Turner conducted the medical evaluation of inmate Johnson with the following noted on the facility emergency anatomical form: swollen area to nose and bite mark to left side of neck. After the evaluation, inmate Johnson was escorted and placed back in Fox Delta Cell #219.

| Did you receive any injuries? YES or NO (If YES, Explain Below) | No |
|---|---|

| Were you evaluated by medical? YES or NO | No |
|---|---|

| Printed Name: ▇ Prince | | |
|---|---|---|
| Signature: | Date: | 3/6/19 |
| Typed By: | Date: | |

**This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.**

Place an "X" in the appropriate box:

| | Inmate/Resident refused to complete this 5-1C |
|---|---|
| | Civilian/Other refused to complete this 5-1C |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

Page 1 of 2 ⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯ 9/2/08

Proprietary Information -- Not For Distribution -- Copyrighted ⋯⋯⋯⋯ Property of Corrections Corporation of America

5-1C

# INCIDENT STATEMENT

| Facility | Davis Correctional Facility | | Incident Number | 2019-1001-097-III |
|---|---|---|---|---|

| Incident Date | 3/6/2019 | Incident Time (HRS) | 1304 hours |
|---|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| Reynolds, Roger | 40149601 | Employee | Participant |

| Housing Location (For Inmates/Residents Only) | |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

On Wednesday, March 6, 2019 at approximately 1304 hours, I responded to Fox Delta Pod along with Correctional Officer ███ Ryan, and Correctional Officer ███ York.

Correctional Officer Prince and I escorted inmate Johnson to Satellite medical for evaluation. Licensed Practical Nurse ███ Turner conducted the medical evaluation of inmate Johnson. After the evaluation, inmate Johnson was escorted and placed back in Fox Delta Cell #219.

| Did you receive any injuries? YES or NO  (If YES, Explain Below) | No |
|---|---|

| Were you evaluated by medical? YES or NO | No |
|---|---|

| Printed Name: ███ Reynolds | | |
|---|---|---|
| Signature: | Date: | 3/6/19 |
| Typed By: | Date: | |

This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.

Place an "X" in the appropriate box:

| | Inmate/Resident refused to complete this 5-1C |
|---|---|
| | Civilian/Other refused to complete this 5-1C |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

9/2/08

Proprietary Information – Not For Distribution – Copyrighted
Property of Corrections Corporation of America

| Facility | Davis Correctional Facility Holdenville, OK | | Incident Number | 2019-1001-057-5U |
|---|---|---|---|---|

| Incident Date | 3/6/19 | | Incident Time (HRS) | 1304 |
|---|---|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| 96 Ryan | E 907825 11 | employee | participant |

| Housing Location (For Inmates/Residents Only) | |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

*I Sergeant _____ assisted in escorting inmate M. Parley from FDIG to isolate medical to be seen. Inmate flushed out for scratches following an incident in his cell. C his cell mate. He was cleared to re-escorted him back to fox house and placed him in a cage.*

| Did you receive any injuries? YES or NO  (If YES, Explain Below) | N |
|---|---|

| Were you evaluated by medical? YES or NO | No |
|---|---|

| Printed Name: | S Ryan | | |
|---|---|---|---|
| Signature: | 96 Ryan | Date: | 3/6/19 |
| Typed By: | | Date: | |

This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.

Place an "X" in the appropriate box:

| Inmate/Resident refused to complete this 5-1C | |
|---|---|
| Civilian/Other refused to complete this 5-1C | |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

2 of 2

10/3/13

Proprietary Information – Not For Distribution – Copyrighted – Property of CCA

| Facility | Davis Correctional Facility Holdenville, OK | | Incident Number | 7E 2-19-1001-057-57 |
|---|---|---|---|---|

| Incident Date 3-6-19 | | Incident Time (HRS) 1304 |
|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| Yonk | | CO | Participating |

| Housing Location (For Inmates/Residents Only) | |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

I correctional officer Yonk basically duck
inmate Porter Marcus #286756 from ED
010 to sat lite medical
He was cleared from sate medical,
He was placed in ED cage

| Did you receive any injuries? YES or NO (If YES, Explain Below) | N/A |
|---|---|

| Were you evaluated by medical? YES or NO | N/A |
|---|---|

| Printed Name: | Yonk | | |
|---|---|---|---|
| Signature: | Yonk | Date: | 3-6-19 |
| Typed By: | | Date: | |

**This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.**

Place an "X" in the appropriate box:

| | Inmate/Resident refused to complete this 5-1C |
|---|---|
| | Civilian/Other refused to complete this 5-1C |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | | Date: | |
|---|---|---|---|
| Employee/Witness Signature | | | |

2 of 2

10/3/13

Proprietary Information – Not For Distribution – Copyrighted - Property of CCA

5-1C

# INCIDENT STATEMENT

| Facility | Davis Correctional Facility | | Incident Number | 2019-1001-097-III |
|---|---|---|---|---|

| Incident Date | 3/6/2019 | | Incident Time (HRS) | 1304 hours |
|---|---|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| Johnson, Lamone | 744047 | Inmate | Participant |

| Housing Location (For Inmates/Residents Only) | FD 21 |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

| Did you receive any injuries?  YES or NO  (If YES, Explain Below) | Yes |
|---|---|
| swollen area to nose and bite mark to left side of neck | |

| Were you evaluated by medical?  YES or NO | Yes |
|---|---|

| Printed Name: | | | |
|---|---|---|---|
| Signature: | | Date: | |
| Typed By: | | Date: | |

**This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.**

Place an "X" in the appropriate box:

| X | Inmate/Resident refused to complete this 5-1C |
|---|---|
| | Civilian/Other refused to complete this 5-1C |

| Employee/Witness Printed Name | E. Marshen | Date: | 3/6/19 |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | A. Berry | Date: | 3/6/19 |
|---|---|---|---|
| Employee/Witness Signature | | | |

Proprietary Information – Not For Distribution – Copyrighted                    Property of Corrections Corporation of America

Johnson - CIV-19-269                    10/10/2020                    000009

5-1C

# INCIDENT STATEMENT

| Facility | Davis Correctional Facility | | Incident Number | 2019-1001-097-III |
|---|---|---|---|---|

| Incident Date | 3/6/2019 | | Incident Time (HRS) | 1304 hours |
|---|---|---|---|---|

| Person Name | ID Number (Employee #/Inmate #/Civilian ID) | Person Type (Employee/Inmate/Civilian) | Person Role (Witness or Participant) |
|---|---|---|---|
| Porter, Marquis | 786756 | Inmate | Participant |

| Housing Location (For Inmates/Residents Only) | FD219 |
|---|---|

**Based on your own knowledge, what did you see, hear, and do?**

**Did you receive any injuries?  YES or NO  (If YES, Explain Below)** | Yes
abrasions/ scratch to right elbow, left forehead, right wrist, left wrist, right forearm, and right shoulder. Bruise/ discoloration to left forehead, right wrist, left wrist, right forearm, and right shoulder

**Were you evaluated by medical?  YES or NO** | Yes

| Printed Name: | | | |
|---|---|---|---|
| Signature: | | Date: | |
| Typed By: | | Date: | |

**This section to be completed by CCA staff if the civilian/other or inmate/resident refused to complete the 5-1C.**

Place an "X" in the appropriate box:

| X | Inmate/Resident refused to complete this 5-1C |
|---|---|
| | Civilian/Other refused to complete this 5-1C |

| Employee/Witness Printed Name | E. Navarher | Date: | 3/6/19 |
|---|---|---|---|
| Employee/Witness Signature | | | |

| Employee/Witness Printed Name | A. Berry | Date: | 3/6/19 |
|---|---|---|---|
| Employee/Witness Signature | | | |

9/2/08

Proprietary Information – Not For Distribution – Copyrighted

Property of Corrections Corporation of America

2019-1001-097-III Photos



Johnson



Johnso





000012

10/10/2020

Johnson - CIV-19-269

2019-1501-097-III Photos



Johnson



Porter

2019 - 1001 - 097 - III Photos



Porter



Porter

2019-1001-097-III Photos



Porter



Porter

2019-1021-097-III Photos



Poster



Poster

2019-1001-097-*III* Photos



Porter



Porter

13-34A2

## Facility Emergency Anatomical Form



Wt- 162
BP- 129/79
P-73
R-16
O2-96

Inmate/Resident ☐ Employee
Facility Name: __DCF__      Date: __3-6-19__   Time: __1310__

Name: (Last, First) __Johnson, Lamone__    Agency # / Employee#: __744047__

Age: __21__   Race: __B__   Sex: ☒ male ☐ female   Time Notified: __1310__    Time Seen: __1310__

Place of Occurrence: __FD 210__    Date/Time of Occurrence: __3-6-19__   @ about 1255 @ 1304

Reason for Report: ☒ Injury ☐ on the job injury ☐ use of force ☐ pre-seg admission ☐ other: _____

Mode of Arrival? ☐ wheelchair ☒ ambulatory ☐ on-site ☒ escorted by __Security__

Injuries Found? ☒ Yes ☐ No - If yes, use the appropriate code number on the figures above

| Abrasions/Scratch | 1 | Fresh Tattoo | 7 | Reddened Area | 13 | Other, list below | |
|---|---|---|---|---|---|---|---|
| Active Bleeding | 2 | Cut/Laceration/Slash | 8 | Skin Flap | 14 | Bite Mark | 17 |
| Bruise/Discoloration | 3 | Chemical Spray Area | 9 | Swollen Area | 15 | | 18 |
| Burn | 4 | Pain | 10 | Open Fracture | 16 | | 19 |
| Deformity | 5 | Protrusion | 11 | | | | |
| Dried Blood | 6 | Puncture | 12 | | | | |

RN Notified: _____
Time: _____
LIP Notified: _____
Time: _____
Form Completed By/Title D Turner LPN
Print/Sign D Turner, LPN

Chemical Spray Exposure? ☐ Yes ☒ No   Decontaminated? ☐ Yes ☒ No   Self-decontamination instructions given? ☐ Yes ☒ No
Refused Decontamination? ☐ Yes ☒ No   Placed on every 15 minute respiratory checks? ☐ Yes ☒ No
Brief Statement in subject's words of the circumstances of the occurrence: "__I fell off of top bunk__"

Comments: __During evaluation I/M reports his celley got upset with him because he was being loud and wanted to go to rec.__
Disposition: __housing__   Time: _____

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CCA

13-34A2

## Facility Emergency Anatomical Form



98.1
P55
R18
153/79
0.2.98% 10

☒ Inmate/Resident   ☐ Employee
Facility Name: _____ NE _____   Date: 3-6-19   Time: 1316

Name: (Last, First) Porter  Marquis   Agency # / Employee#: 786756

Age: 25   Race: B   Sex: ☐ male ☐ female   Time Notified: 1816   Time Seen: 1816

Place of Occurrence: FD  210   Date/Time of Occurrence: 3-6-19 @ 1314

Reason for Report: ☒ injury ☐ on the job injury ☐ use of force ☐ pre-seg admission ☐ other: _____

Mode of Arrival? ☐ wheelchair ☐ ambulatory ☐ on-site ☐ escorted by _____

Injuries Found? ☒ Yes ☐ No - If yes, use the appropriate code number on the figures above

| | | | | | | | RN Notified: |
|---|---|---|---|---|---|---|---|
| Abrasions/Scratch | 1 | Fresh Tattoo | 7 | Reddened Area | 13 | Other, list below | Time: N/A |
| Active Bleeding | 2 | Cut/Laceration/Slash | 8 | Skin Flap | 14 | | 17 | LIP Notified: |
| Bruise/Discoloration | 3 | Chemical Spray Area | 9 | Swollen Area | 15 | | 18 | Time: |
| Burn | 4 | Pain | 10 | Open Fracture | 16 | | 19 | Form Completed By/Title: |
| Deformity | 5 | Protrusion | 11 | | | | | |
| Dried Blood | 6 | Puncture | 12 | | | | Print/Sign _____ |

Chemical Spray Exposure? ☐ Yes ☐ No   Decontaminated? ☐ Yes ☐ No   Self-decontamination instructions given? ☐ Yes ☐ No
Refused Decontamination? ☐ Yes ☐ No   Placed on every 15 minute respiratory checks? ☐ Yes ☐ No
Brief Statement in subject's words of the circumstances of the occurrence:  My collie  fell off bank
I didn't fight with

Comments: _____
Disposition: Calm   Time: 1359

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CCA

## DEPARTMENT OF CORRECTIONS OFFENSE REPORT

Name of Facility _OCF_                                       Facility Computer Code _7C_

### Section I.

Inmate Name: _Lenore, Johnson_   DOC#: _744047_   Date of Offense: _3/12/19_   Time: _1636_

Place of Offense: _PD219_                          Housing Assignment: _PD219_

Offense: (4-4233, b# 1, 2) _fighting_                 Offense Computer Code:

Class of Offense: _A_                                 _A-L_

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)
_On the above date and approximate time, Unit Manager Martin_
_concluded an investigation which revealed that a fight occurred_
_between inmate Lenore and inmate Porter._

Staff or Inmate Witness (if any) (4-4233, b#4) _N/A_

Disposition of Physical Evidence (if any) (4-4233, b#5) _N/A_

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6) _N/A_

Printed Name and Title of Reporting Employee (4-4233, b#7)       Signature of Reporting Employee
Name _E. Martin_

Title _UM_                          Date _3/12/19_   Time _1636_

### Section II

> To be referred within 24 hours from the time the violation is reported.
>
> ____ Informal Resolution
> ____ Dismissed
> ____ Referred for investigation
> Name _____
> Title _____
> Date _3/12/19_   Time: _1840_

### Section III. Inmate should initial appropriate response

____ I have received a copy of the written charge against me. I realize that I have a right to remain silent.
____ I plead guilty and waive my right to an appeal.
____ I plead not guilty.
____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____ DOC # _____ Date ___/___/___ Time _____

____ Inmate chose not to sign for a copy of the Offense Report at this time.

Offense Report Delivered to above inmate by (Print and Sign)   Date Delivered   Time Delivered
(4-4236, 4-4238)

ORIGINAL:   Commitment Document Folder
FIRST COPY:   Field File
SECOND COPY: Inmate

DOC 060125A (R 4/17)

## DEPARTMENT OF CORRECTIONS OFFENSE REPORT

Name of Facility  DCF                                                    Facility Computer Code  7E

**Section I**

| Inmate Name: | DOC#: | Date of Offense: | Time: |
|---|---|---|---|
| Porter, Marquis | 786756 | 3/12/19 | 1636 |

Place of Offense:  FD219                                       Housing Assignment:  FD219

Offense: (4-4233, b# 1, 2)   Fighting                          Offense Computer Code:

Class of Offense:  A                                           A-2

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)
On the above date and approximate time, Unit Manager
Mershen conducted an investigation which revealed that a
fight occurred between inmt Porter and inmt Lance.

Staff or Inmate Witness (if any) (4-4233, b#4)  N/A

Disposition of Physical Evidence (if any) (4-4233, b#5)  N/A

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6)  N/A

Printed Name and Title of Reporting Employee (4-4233, b#7)      Signature of Reporting Employee

Name  E. Mershen

Title  um                             Date 3/12/19  Time 1636

**Section II**

> To be referred within 24 hours from the time the violation is reported.
> ____ Informal Resolution
> ____ Dismissed
> ✓ Referred for investigation
> Name ____
> Title  um
> Date 3/12/19  Time: 1640

**Section III  Inmate should initial appropriate response**

____ I have received a copy of the written charge against me. I realize that I have a right to remain silent.
____ I plead guilty and waive my right to an appeal.
____ I plead not guilty.
____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____ DOC # _____ Date ___/___/___ Time _____

____ Inmate chose not to sign for a copy of the Offense Report at this time.

Offense Report Delivered to above inmate by (Print and Sign)      Date Delivered          Time Delivered
(4-4236, 4-4238)

ORIGINAL:  Commitment Document Folder
FIRST COPY:  Field File
SECOND COPY: Inmate

DOC 060125A (R 4/17)

Tracking #: 19-0888D                                        FD 210

## DISCIPLINARY DISPOSITION REPORT
### (CLASS A & B OFFENSES AND CLASS X GUILTY PLEAS)

I.  Name of Facility  DCF                Facility Code  7E   Date of Violation  3/12/19
    Name of Inmate  Johnson              Lamone
                    Last Name            First Name
    Violation  Fight                     Violation Code  2    Class of Offense  A
                                                             M.I.
    Disposition Date  3/15/19  DOC #  744647  Time  1205  Place  FD 210

II. I understand that I waive the opportunity of this case being appealed if I plead guilty to this offense.
    X  Lamone Johnson                           744047
    Inmate's Name                               Number

    PLEA: 1. Guilty  ✓  Inmate's Initials  LJ  2. Not Guilty _____ Inmate's Initials _____

    Confidential Statements: I have independently reviewed the reliability statement and have found that it
    sufficiently supports the reliability of the confidential witness statement(s).

    Disciplinary Coordinator's Signature

                                                                          25
III. Finding

    1. Guilty  ✓     2. Not Guilty _____

    Evidence relied on for finding of Guilt: (include a brief description of the offending behavior)
    Accepted Inmates guilty plea

IV. Discipline Imposed:    Sanction              Code              Suspension
                          Phone 60               AD1               ___ for ___ days
                                                                   ___ for ___ days
                                                                   ___ for ___ days
                                                                   ___ for ___ days
    Basis for discipline imposed:  To deter future rule violations

    Disciplinary Coordinator Printed Name and Signature  Key Ky

V.  As a result of conviction for subsequent offense prior to expiration of the suspended punishment, the previous
    suspended punishment is hereby revoked: to run consecutive to the new punishment.
    Previous Violation:
    Previous Punishment: 1. _____  2. _____  3. _____
    Date of Imposition: __/__/__

    Facility Head Review  ✓  Affirm _____ Dismissed _____ Modified _____ Remanded
    Date  3/18/19  Signature  [signature]

VI. I have received a copy of the disposition.  Date __/__/__
    Inmate's Signature and Number  Lamone Jn     4/1/9

    Inmates pleading not guilty may appeal to the facility head/district supervisor within 15 days.

ORIGINAL: Commitment Document Folder
FIRST COPY: Field File
SECOND COPY: Inmate
THIRD COPY: Records

DOC 060125C-1 (R 4/17)

RECEIVED
MAR 13 2019

**DEPARTMENT OF CORRECTIONS OFFENSE REPORT**

*19-0888-1*

FD210

| Name of Facility | OCF | | Facility Computer Code | 7E |
|---|---|---|---|---|

**Section I**

| Inmate Name: | DOC#: | Date of Offense: | Time: |
|---|---|---|---|
| Lamone Johnson | 744047 | 3/12/19 | 1636 |

| Place of Offense: FD219 | Housing Assignment: FD219 |
|---|---|

| Offense: (4-4233, b# 1, 2)   Fighting | Offense Computer Code: |
|---|---|

| Class of Offense: A | A-2 |
|---|---|

Description of Incident (to include any unusual inmate behavior): (4-4233, b#3)
On the above date and approximate time, Unit Manager Matthews concluded on investigation which revealed that a fight occurred between inmate Lamone and inmate Porter.

Staff or Inmate Witness (if any) (4-4233, b#4)   N/A

Disposition of Physical Evidence (if any) (4-4233, b#5)   N/A

Immediate Action Taken (to include the use of force and prehearing detention) (4-4233, b#6)   N/A

Printed Name and Title of Reporting Employee (4-4233, b#7)        Signature of Reporting Employee

Name   E. Matthews

Title   UM                                    Date  3/12/19  Time 1636

**Section II**

To be referred within 24 hours from the time the violation is reported.

_____ Informal Resolution
_____ Dismissed
___✓_ Referred for investigation
Name _____
Title _____
Date  3/12/19  Time: 1640

**Section III** Inmate should initial appropriate response

_LJ_ I have received a copy of the written charge against me. I realize that I have a right to remain silent.
_____ I plead guilty and waive my right to an appeal.
_LJ_ I plead not guilty.
_____ I plead not guilty and waive my right to 24 hours preparation time.

Inmate's Signature _____   DOC # 744047   Date 3/14/19   Time 0829

_____ Inmate chose not to sign for a copy of the Offense Report at this time.

Offense Report Delivered to above inmate by (Print and Sign)        Date Delivered 3-14-19        Time Delivered 0829
(4-4236, 4-4238)

ORIGINAL:  Commitment Document Folder
FIRST COPY:  Field File
SECOND COPY: Inmate

DOC 060125A (R 4/17)

Record of Delivery of Copies of Evidence To Inmate

Copies of the following items were delivered to _____Johnson_____ DOC# 744047

Offense Code _____A2_____ Date of Offense 3/12/19

1. Record of Delivery
2. Offense Report
3. Cordinators Report
4. Witness Statement - I'm Porter
5. _____
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____

Inmate's Signature          Disciplinary Coordinator's Signature          3 / 14 / 19 / 0832
                                                                          Date          Time

Distribution
Original:  Commitment Document Folder with Offense Report
First Copy: Field File with Offense Report
Second Copy: Inmate with Offense Report

DOC 060125H (R 4/17)

DISCIPLINARY COORDINATOR'S REPORT

Investigating Officer (Print) _Key_ Date referred for investigation: _3-12-19_

Inmate Name and Number: _Johnson   744047_ Date investigation completed: _3-14-19_

Offense: _Fight_ Offense Code: _A2_ Date of Offense: _3-12-19_

Statement of inmate regarding offense: _Me  and  My  celly  did not fight
I fell off the table  trying  to  take  off  my  light  cover
so that i  could  take  a shower._

☒ Inmate wishes to call witness/es   ☐ Inmate does not wish to present witness

Name: _I/M Porter_ Can testify to: _incident_

Name: _____ Can testify to: _____

|   | YES | NO | (One box should be checked for each statement) |
|---|-----|----|-----|
| 1. | ☐ | ☒ | Inmate provided documentary evidence to investigator. If yes, state evidence. |
| 2. | ☐ | ☒ | Statement(s) provided by witness/es attached (or document refusal to provide information). |
| 3. | ☒ | ☐ | Discretionary action taken regarding witness testimony. Documentation/ justification attached. |
| 4. | ☒ | ☐ | Inmate has received photocopy/description of all evidence. |
| 5. | ☐ | ☒ | Written confidential witness testimony/evidence taken (not provided to inmate). |
| 6. | ☐ | ☒ | A staff representative will ONLY be appointed if inmate meets criteria specified in OP-060125 Section III. item A.   Assignment of a staff representative is warranted. If so, assigned representative is:_____ |
| 7. | ☐ | ☒ | Inmate requested documentary evidence. If yes, state evidence;_____ _____. If denied, state reason for denial:_____ |
| 8. | ☐N/A☐ | | CRC attached (front and back side) – not provided to the inmate |

Additional facts discovered by investigator not in incident reports, evidence, and/or witness statements: _None_

Disciplinary hearings will normally be scheduled on a docket which will commence within seven days from the date the disciplinary hearing officer receives the "Offense Report" from the disciplinary coordinator. Disciplinary dispositions for Class A & B offenses will be completed within seven days.

_3/15/19_                    _0825 / FD210_

Date of                    Time and Location of                    Signature of Disciplinary
Hearing/Disposition        Hearing/Disposition                    Coordinator

I acknowledge receipt of this report, all attachments, and the contents therein. (4-4238)

_Jamee Johnson  744047_ _____ Date _3/14/19_
Inmate's Signature

Original:      Commitment Document Folder
First Copy:    Field File
Second Copy:  Inmate

DOC 060125B (R 4/17)

## Witness Discretionary Action Record

Investigating Officer (print) _Kell_

The following action has been taken with regards to witness testimony:

1. _____ I have elected to take a written statement from _Tim Porter_ (Print)(witness) in lieu of allowing live testimony at the disciplinary hearing. Reasons: _Scheduling Conflicts between disposition & Witness_

2. _____ I have disqualified as a witness(Print) _____
   because the testimony is not ___relevant/material, _____ is repetitive/duplicative, _____ the witness did not witness the incident and has no direct knowledge of the facts. Reasons given for this determination: _____.

3. _____ I have disallowed the reporting staff member as a witness, because he/she has completed a written report documenting the incident/requested information.

4. _____ Witness/es refused to make a statement.

5. _____ Other _____

6. Statement
   _My Celly Lamone Johnson Fell trying to take the light cover off so we could take a shower._

Witness' Signature _____   Disciplinary Coordinator's Signature _____   Date _3/14/18_   Time _0837_

Distribution
Original: Commitment Document Folder with Offense Report
First Copy: Field File
Second Copy: Inmate with Offense Report

DOC 060125I (R 4/17)

## Mental Health Recommendations
## Regarding Offender Discipline

Date: 3/13/2019                                    Date/Time of Offense: 3/12/2019

Offender Name: JOHNSON, LAMONE           DOC# 744047

Offense: Fight                                          Offense Code: A-2

Mental Health Level at Time of Offense: ☒ B,      ☐ C1,      ☐ C2,      ☐ D

Recommendations Concerning Acceptance of the Misconduct:

☒   Accept offense report for formal disciplinary process. Offender is capable of assisting with his/her defense.

☐   Accept offense report for formal disciplinary process. Offender requires a staff representative familiar with issues related to serious mental illness or cognitive impairment.

☐   Disciplinary hearing should be postponed until the mental health authority (MHA) notifies the appropriate staff person that the offender is capable of assisting with his/her defense.  Normally, if the offender has not been assessed as capable of assisting with his/her defense within a six month period, consultation between the designated staff person and MHA will occur to determine the feasibility of additional postponement of the offense report.  The MHA and designated staff member may jointly elect to take no further action on the offense report.

☐   Informally handle the offense by referring the issue to the MHA who will hold the offender accountable for his/her behavior. The MHA will modify the offender's treatment plan to address the problem behavior. This offender's mental health issues and/or level of functioning would be best addressed using the following strategy: *

    Recommended strategy: _____
    _____
    _____
    _____

*Behavior(s) that threaten the life or health of others or security of the facility must be handled via the formal disciplinary process.

_Vicki Shepherd_                              _T. Underwood_ 3/13/2019
_____              _____
            MEd, LPC, LADC 3/13/2019
Signature of MHA (designee) Date           Signature of Warden (designee)  Date

Original:  Designated Supervisor to be placed in disciplinary report.
Copy:    Offender's Medical File                       DOC 060125R (R 04/17)

Johnson - CIV-19-269                10/10/2020                    000027

Page 1 of 2





Must Be Submitted Through the Law Library or Designee **RECEIVED**
Inmate/Offender Grievance Process
**REQUEST TO STAFF**

APR 01 2019

TO: Mr. Martinez Fox unit LM FACILITY/DIST/UNIT: Docs F DATE: 3-26-19
(NAME AND TITLE OF STAFF MEMBER)            Fox Unit Manager

I have ____ have not ✓ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do ___ do not ✓ have a grievance pending on this issue.
I affirm that I do ___ do not ___ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request _____ does _____ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:**    State completely, but briefly, the problem on which you desire assistance. This statement
must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One
issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this
being returned unanswered.

On 3-14-19, You discriminated against me and my celly
Marquis Porter #766-756, we both told you we did not have
a fight. We were piak-weathing to see who was the
strongest. I was winning but my celly bit me to get the off.
(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly
should be done and how.
Place my old celly Marquis Porter #756-756 back in
Fox-delta 210 and pay nominal damages for violating
my U.s constitutional rights. $4500 or $1000 in nominal
damages. Tele LGBTQTP Inmates can sath views seriously

NAME: Willie Johnson DOC NUMBER: 744647 UNIT & CELL NUMBER: FD-216
      (PRINT)

SIGNATURE: Romore Johns  WORK ASSIGNMENT: _____

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:
What you described is a Physical Altercation. Futhermore,
you pled guilty to fighting. Due to the fight, Sepr were
filed and you will not be housed together. Request Denied.

                                                    4/9/15

STAFF MEMBER                    DATE

Date response sent to inmate: _____ APR 12 AM 9
1. Original to file
2. Copy to inmate/offender                      DOC 090124D (R 9/16)

Off him. I wasn't expecting that so i smacked back
and my face hit the bed, that's how my nose started
to bleed, the bite was also because p smached back.
There was no fight. my nose was bleeding alot
So we "both" banged on the door. C/O Prince
took me to medical and told the Nurse I was
in a fight. I Insisted that It wasn't a
fight but C/o Prince wouldn't isten, C/o Prince
wasn't even there when the incident arose. No-
body was there. That's why we banged on the
door. Then you threatened me and told me you
were going to have some guards or Inmates
beat me up If i didn't Plead guilty. I told
you I have PTI and You still said "I don't
protect fags; This is Prison You better learn
how to fight." My cally said "I'm not Pleading
guilty. So You Moved him. Putting him also
In harm's way. You have violated our
4th Amendment and First Amendment rights
of the united states Constitution
for cruel and unusal Punishment,
and retaliation as well as Our fourteenth
Amendment of the united states constitution
Equal Protection Clause. You have
Proved the deliberate indefference "claim
See: farmer v. Brennan, 511, U.S.o; 825, 842.
(1995); Holmes v. Anivz, 1995 WL 639995
(S. D. N.Y. 1995) See: Greene v. Bowles
361 F.3d 290 (6th Cir, 2004)
I do not want to be around you
i fear that You will Cause Irretable
harm to me. I want my old cally
back in my cell. he is the only one
I Trusto I feel Safe and Comfortable
around Marquis Porter #786756
See: 28 C.F.R. § 115. 42(6) " A Transgender
or Intersex inmate's own views with
respect to his or her own safety shall
be given serious consideration"

See:
Recomans
Romer v.
Evans, 517
U.S. 620,
116 S. Ct. 1620
134 L. Ed. 2d.
855 (1996).
See: Howard v. Cherish
575 F. Supp. 34, 36
1983 U.S. Dist.
LEXIS 16265 at
* 9-10 (S.D. N.Y. 1983)

RECEIVED

Must Be Submitted Through the Law Library or Designee

APR 01 2019

Inmate/Offender Grievance Process

**REQUEST TO STAFF**

TO: _Cheif Dirmun_____ FACILITY/DIST/UNIT: _D.C.F_ BY:_____ DATE:_3-25-19_

(NAME AND TITLE OF STAFF MEMBER)

I have ____ have not _✓_ already submitted a "Request to Staff" or grievance on this same issue.
If yes, what date: _____ facility: _____ grievance #: _____
I affirm that I do __ do not _✓_ have a grievance pending on this issue: ____
I affirm that I do ___ do not _✓_ have a lawsuit of any type pending that relates in any way to this issue.
If a lawsuit is pending, indicate case number and court: _____
This request _____ does _____✓_ does not relate to a pending misconduct report. If it does, this
request may only be answered by the disciplinary coordinator assigned to the misconduct.

**SUBJECT:** State completely, but briefly, the problem on which you desire assistance. This statement
must be specific as to the complaint, dates, places, personnel involved, and how you were affected. One
issue or incident per "Request to Staff." Your failure to specifically state your problem may result in this
being returned unanswered.

On 3-25-19 @ appx 8:50- 9:00 am I spoke to you
at my cell door For delta 210. I informed You that I had
a PMI (Protective Measures Investagation) that I could only
live with one Person whom i feel safe around See: 2B →

(USE OTHER SIDE IF MORE SPACE IS NEEDED. DO NOT ATTACH ADDITIONAL PAGES.)

**ACTION REQUESTED:** State exactly how you believe your request may be handled; that is, what exactly
should be done and how.

Place Marquis Porter 746756 back Into my cell FD-
210. I feel safe around him, he has NEVER Made any
Sexual advances towards Me.

NAME: _Lawrence (Monie) Johnson_ DOC NUMBER: _744047_ UNIT & CELL NUMBER:_FD-210_
        (PRINT)

SIGNATURE: _Lawrence Johnson_ WORK ASSIGNMENT: _____

**DO NOT WRITE BELOW THIS LINE**

DISPOSITION:
Mr. Johnson this is a dead issue.
You will not house w/ Mr. Porter, ever again.
Not this yard or any DOC yard.

_Warman_                                    4-5-19

**STAFF MEMBER**                        **DATE**

APR 0 8 ANS'D

Date response sent to inmate: _____
1. Original to file                                    DOC 090124D (R 9/16)
2. Copy to inmate/offender

See: 28 C.F.R. § 115.42.(c) "A Transgender
or intersex inmates own views with respect to
his or her own safety shall be given serious
consideration." That person is Marquis
L. Porter, 746756, whom also has a PMTI
which we are "threated" by the same group
of People. Id. § 115.41,43, On 3-28-19, around
4800-6800 Pm Mr. Martinez sent C/O STamey to
house a Inmate with me. I refused due to
me 1. Being a (MTF) Pre-operative Transgender
I am at risk of Sexual Assault. See: Farmer
V. Brennan, 511 U.S. 825 (1994) & See: Lojan
V. Crumbsie, 12 CV. 0320 LAP, 2013 WL
411356 at 4* (S.D.N.V. Feb. 1, 2013 "Mere
knowledge that Plaintiff was transgender
was sufficient to put Prison Officals on
Notice that she was susceptible
to PhNYsiciall attack." 2. That I have
PMTI's and Previous P.R.E.A Incidents
reported were I was the victim. So my
own Safety veiws should be tooking into
Serious consideration with respect. Not
doing so is a P.R.E.A Violation.
See 28 C.F.R. § 115.41,42(e)
You told me that You don't have
to listen to my Veiws. I told you
I can only live with Marquis Porter.
You told me I could live with
Anyone. Leaving me in my cell for a
long period of time Alone also violates my
Rights. See: 28 C.F.R. § 115.43 (a)(b), (c)
See also: Medina-Tejada V. Sacramento
County, No. CV-5-04-138 FDC/DAD Feb 22, 2006)

See:
OP-030601
VII. Screening
/Assessment
at Reception
Centers B.(1)(2)
B.(d)
See also:
OP-140147
Managment of
(Gender Non-
conforming)
offenders

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

**LAMONE MORLEE JOHNSON,**

                 **Plaintiff,**

**vs.**                               **Case No. CIV-19-269-JHP-SPS**

**DR. SANDERS, et al.,**

                 **Defendants.**

---

## DEFENDANT CORECIVIC'S RESPONSE
## TO COURT'S ORDER

---

COME NOW Defendants Sanders, Larimer, Martinez, Morrison, and Taylor, (Hereinafter "CoreCivic Defendants") by and through their counsel of record, Darrell L. Moore, OBA 6332, responding to the Court's Minute Order [Doc. # 77] directing Defendants to show cause as to why they did not respond to Plaintiff's pleadings [Doc. #s 45 and 49].  In response, Defendants respectfully state as follows:

1.     Plaintiff Johnson was housed at Davis Correctional Facility, Holdenville, Oklahoma pursuant to a contract between CoreCivic, Inc., (formerly CCA) and the Oklahoma Department of Corrections.  *See* Special Report [Doc# 31].

2.     On March 18, 2020 Plaintiff Johnson requested that this Court enter an Order directing prison officials to allow Plaintiff to receive and send affidavits and written depositions to another inmate, Marquis Porter, DOC# 786756, who is housed by the Oklahoma Department of Corrections at Lawton Correctional Facility in Lawton, Oklahoma. [Doc. #45].  On June 7, 2020 Plaintiff Johnson requested leave of the Court to depose Marquis Porter. [Doc. #49].

1

3.　　Plaintiff Johnson was transferred by the Oklahoma Department of Corrections from Davis Correctional Facility to the Oklahoma State Penitentiary during December 2019. [*See* Notice of Change of Address, Doc# 26].

4.　　Both Plaintiff and the inmate with whom he seeks to communicate and/or depose are in the custody of the Oklahoma Department of Corrections. These two inmates are confined at prison facilities not owned or operated by CoreCivic. Defendants, employees of CoreCivic, Inc., at the Davis Correctional Facility in Holdenville, Oklahoma have no authority or control to effect the relief Plaintiff seeks from this Honorable Court by way of his filings at Doc. # 45 and 49.

5.　　In his filings at Doc. #45 and 49 Plaintiff Johnson does not represent to the Court that he has made requests of his custodian, Oklahoma Department of Corrections, or the Warden of his current facility (Oklahoma State Penitentiary) or of the Warden at inmate Porter's current facility to be provided such assistance or relief.

WHEREFORE, premises considered, Defendants respectfully respond as directed by this Court and show cause that they have no ability or authority to effect or assist in the accomplishment of the relief Plaintiff seeks from this Honorable Court.

Respectfully submitted,
CoreCivic Defendants


BY:_____
Darrell L. Moore, OBA #6332.
J. RALPH MOORE, PC
P.O. Box 368
Pryor, OK  74362
Tele: (918) 825-0332
Fax: (918) 825-7730
darrellmoore@jralphmoorepc.com
Attorney for CoreCivic Defendants

*Certificate of Service*

☐ I hereby certify that on February 18, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:


☑  I hereby certify that on February 18, 2021, I served the attached document by regular US Mail on the following, who are not registered participants of the ECF System:


Lamone Johnson, DOC #744047
Oklahoma State Penitentiary
P.O. Box 97
McAlester, OK 74502-0097


_____
DARRELL L. MOORE