No. 23-7031

---

# United States Court of Appeals
## FOR THE TENTH CIRCUIT

---

**LAMONE M. JOHNSON,**
Plaintiff-Appellant,

**v.**

**DR. SANDERS; RAY LARIMER; ERNESTO MARTINEZ;
SHANNA TAYLOR; SGT. MORRISON,**
Defendants-Appellees.

---

Appeal from the United States District Court
for the Eastern District of Oklahoma
The Hon. Judge John F. Heil III
No. 6:19-cv-269-JFH, JAR

---

## SUPPLEMENTAL OPENING BRIEF OF APPELLANT

---

### ORAL ARGUMENT REQUESTED

---

Steven J. Alagna
*Counsel of Record*
*Supervising Attorney*

Nicholas Blum
Jacob Cogdill
Madeline Wingert
*Student Advocates*

WASHINGTON UNIVERSITY SCHOOL OF LAW
Appellate Clinic
One Brookings Drive, MSC 1120-250-102
St. Louis, MO 63130
(314) 935-7238
salagna@wustl.edu

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................ii

GLOSSARY ........................................................................................... 1

STATEMENT OF RELATED CASES ..................................................... 1

STATEMENT OF JURISDICTION.......................................................... 1

STATEMENT OF THE ISSUES............................................................... 1

STATEMENT OF THE CASE .................................................................. 3

I.     Appellant was diagnosed with gender dysphoria and prescribed hormone replacement therapy ("HRT"). ........................................ 3

II.    Defendants discontinued Ms. Green's prescribed HRT. ................. 5

III.  Ms. Green repeatedly requested reinstatement of her HRT and other gender-affirming care. ........................................................ 13

IV.  The district court entered summary judgment against Ms. Green's deliberative-indifference claim. ..................................................... 15

SUMMARY OF THE ARGUMENT ....................................................... 16

STANDARD OF REVIEW...................................................................... 18

ARGUMENT ......................................................................................... 19

I.     A reasonable jury could find that Defendants were deliberately indifferent based on their intentional interference with Ms. Green's prescribed HRT. ............................................................. 23

II.    A reasonable jury could conclude Defendants were deliberately indifferent in failing to provide Ms. Green with any gender-affirming care. ......................................................................... 29

III.  A reasonable jury could find that Defendants were deliberately indifferent in recklessly failing to refer Ms. Green to medical personnel capable of providing necessary care............................. 34

CONCLUSION ...................................................................................... 39

STATEMENT REGARDING ORAL ARGUMENT ................................ 41

CERTIFICATE OF COMPLIANCE........................................................ 42

CERTIFICATE OF SERVICE................................................................. 42

District Court's Opinion and Order (Apr. 8, 2022) .............. Attachment 1

District Court's Judgment (Apr. 8, 2022) ............................ Attachment 2

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................... 18

*Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995) ....................6, 25, 29

*Casanova v. Ulibarri*, 622 F. App'x 724 (10th Cir. 2015)......21, 23, 24

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ......................... 4

*Estelle v. Gamble*, 429 U.S. 97 (1976) ........................................19, 23

*Farmer v. Brennan*, 511 U.S. 825 (1970) ........................ 19, 21, 36, 38

*Halliwell v. Allbauch*, No. CIV-18-1152-D, 2019 WL 1128761
    (W.D. Okla. Mar. 12, 2019)........................................................ 37

*Hardeman v. Smash*,
    No. 21-7018, 2022 WL 470741 (10th Cir. Feb. 16, 2022) .......19, 38

*Hardeman v. Smith*, 764 F. App'x 658 (10th Cir. 2019)..........6, 31, 32

*Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994) ....................24, 27

*Lamb v. Norwood*, 899 F.3d 1159 (10th Cir. 2018) ...........6, 19, 30, 32

*Lucas v. Turn Key Health Clinics, LLC*,
    58 F.4th 1127 (10th Cir. 2023) ................. 21, 22, 29, 34–36, 38, 39

*Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402
    (10th Cir. 1990) ....................................................................21, 24

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005).............. 18, 20, 21, 34, 36

*Paugh v. Uintah Cnty.*, 47 F.4th 1139 (10th Cir. 2022) ........23–25, 38

*Phillips v. Mich. Dep't of Corrections*,
    731 F. Supp. 792 (W.D. Mich. 1990)........................................... 25

*Phillips v. Mich. Dep't of Corrections*,
    932 F.2d 969 (6th Cir. 1991) ....................................... 26

*Porter v. Crow*, No. 18-CV-0472-JED-FHM,
    2020 WL 620284 (N.D. Okla. Feb. 10, 2020) .............................. 37

*Sanchez v. Oliver*, 995 F.3d 461 (5th Cir. 2021) ............................... 36

*South v. Gomez*, 211 F.3d 1275 (9th Cir. 2000) ................................ 26

*Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986) .............................. 29

## Statutes and Rules

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1331 .................................................................. 1

42 U.S.C. § 1983 .............................................................. 1, 15

Fed. R. Civ. P. 56(a) ........................................................... 18

Fed. R. Civ. P. 59(e) ........................................................... 16

## Miscellaneous

*Undertake*, *Oxford English Dictionary* (3d ed. 1973) ....................... 27

# GLOSSARY

DCF ......................................................... Davis Correctional Facility

HRT .................................................... Hormone replacement therapy

ODOC ......................................Oklahoma Department of Corrections

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is a timely appeal from a final order of the U.S. District Court for the Eastern District of Oklahoma disposing of all claims. ROA, Vol. II, at 438–52. Federal courts have subject-matter jurisdiction under 28 U.S.C. § 1331 because this case involves an Eighth Amendment deliberate-indifference claim under 42 U.S.C. § 1983.

## STATEMENT OF THE ISSUES

I.   Intentional interference with prescribed medical treatment can constitute deliberate indifference. Defendants admitted that they intentionally cut Ms. Green off from her physician-prescribed hormone replacement therapy and knew that discontinuing the therapy would— and did—cause unwanted side effects. Did the district court err in finding

that no reasonable factfinder could determine that Defendants were deliberately indifferent to Ms. Green's serious medical need?

II.    When a prison official knows about and fails to treat an ongoing serious medical need, they are deliberately indifferent. Ms. Green notified Defendants of her serious medical need for gender-affirming care through multiple grievances and other requests, but Defendants did not provide her any gender-affirming care. Was summary judgment for Defendants in error?

III.    A prison official in a "gatekeeping" role must provide access to medical personnel capable of evaluating an inmate's serious medical need. Defendants read Patricia Jones's report, which contained conclusions that, on their face, did not follow from the report's analysis, as well as non-medical comments that call into question Jones's impartiality, but Defendants failed to afford access to any other evaluator. Was summary judgment for Defendants in error?

**STATEMENT OF THE CASE**

## I.  Appellant was diagnosed with gender dysphoria and prescribed hormone replacement therapy ("HRT").

Appellant Marylin Green[1] is a transgender woman. ROA, Vol. II, at 141–43. Consistent with medical literature, at a very young age, she began questioning her gender characteristics and desiring to live as a woman. ROA, Vol. I, at 127; ROA, Vol. III, at 49. At twelve years of age, Ms. Green began taking androgen-suppressant medication, which blocks the effects of testosterone, thereby reducing "male" physical traits and causing "feminizing" effects. ROA, Vol. II, at 208; ROA, Vol. I, at 124–25; ROA, Vol. III, at 46–47.

For years, Ms. Green has consistently presented as a woman, including through her dress and use of cosmetics and she/her pronouns. ROA, Vol. I, at 127–28; ROA, Vol. III, at 49–50. Ms. Green has experienced "strong discomfort with her genitalia" and attempted self-castration three times throughout her childhood and adolescence. ROA, Vol. II, at 353; ROA, Vol. III, at 117. The World Professional Association

---

[1] Appellant's opening brief attached a document noting that she has legally changed her name. Appellant's Opening Br. at 28. Accordingly, this brief refers to her by the name Marylin Green.

for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "WPATH standards") (ROA, Vol. II, at 235) note that the "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth" is referred to as "gender dysphoria." ROA, Vol. II, at 241.[2]

In 2016, Ms. Green was evaluated and diagnosed with gender dysphoria and began receiving gender-affirming HRT in the form of prescription Estradiol and Spironolactone. ROA, Vol. II, at 42–44, 190. HRT alters features typically associated with sex and gender such as fat distribution, muscle mass, and hair growth by changing the levels of sex steroids in the body. ROA, Vol. II, at 206. Male-to-female HRT often involves an estrogen (which promotes typically "female" traits), a testosterone blocker (which suppresses the development of typically "male" traits), or a combination of the two. ROA, Vol. II, at 207–08. Ms.

---

[2] The DSM-5 "replace[d] the term *gender identity disorder* with *gender dysphoria*." *See* ROA, Vol. II, at 306. Ms. Green was diagnosed with "Gender Identity Disorder" under the DSM-4, ROA, Vol. II, at 190, but this brief uses the updated term "gender dysphoria" to avoid confusion. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 n.4 (9th Cir. 2019) ("Until recently, the medical community commonly referred to gender dysphoria as 'gender identity disorder.'").

Green's HRT prescription included both estrogen in the form of Estradiol and the testosterone blocker Spironolactone. ROA, Vol. II, at 43.

The benefits of HRT recede if the medication is halted, and withdrawal of HRT creates "a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality." ROA, Vol. II, at 305; *see also* ROA, Vol. II, at 43 (Dr. Sanders testified he "knew that a withdrawal from Estradiol and Spironolactone could have unwanted side effects.").

Ms. Green's prescribed HRT continued uninterrupted for nearly two years, through transfers between four different correctional facilities. ROA, Vol. II, at 190.

## II.    Defendants discontinued Ms. Green's prescribed HRT.

Before she was transferred to Defendants' facility, Ms. Green was first transferred to the Dick Conner Correctional Center. ROA, Vol. II, at 190. When she arrived, she requested an adjustment to her HRT. *Id*. She was advised that she had to be evaluated by an Oklahoma Department of Corrections ("ODOC") provider before she could receive an increased dosage, and was scheduled for an appointment with Patricia Jones, Psy.D., who was the ODOC's "Qualified Mental Health Provider"

("QMHP"). ROA, Vol. I, at 118; ROA, Vol. II, at 57. Jones evaluated Ms. Green and wrote a report to "document the presence or absence of the diagnostic criteria for [g]ender [d]ysphoria per the DSM-5." ROA, Vol. I, at 127; ROA, Vol. III, at 189.

Notably, Jones's report failed to refer to Ms. Green by her requested pronouns, referring to her as "him" throughout the report.[3] The report also contained statements that appeared to be unrelated to medical considerations, such as that Ms. Green "use[d] . . . [her] sexuality via social media, on stage adult entertainment, and prostitution," and that "[t]he current political climate provided, and continues to provide, a socially defensible position for calling out anyone who declines to applaud inmate Johnson's presentations as 'haters.'" ROA, Vol. I, at 128–29; ROA, Vol. III, at 190–91.

---

[3] The WPATH standards highlight that competent health-care providers should have "familiarity with basic sensitivity protocols such as the use of preferred gender pronoun and name" for transgender patients. ROA, Vol. I at 183. This Court has long followed that same practice. *See, e.g.*, *Brown v. Zaravas*, 63 F.3d 967, 968 n.1 (10th Cir. 1995) ("As is our practice, we refer to litigants as the record suggests they prefer to be addressed."); *Hardeman v. Smith*, 764 F. App'x 658, 659 n.1 (10th Cir. 2019) ("Appellant identifies as female, so we use female pronouns here."); *see also Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) (noting the appellant was transgender and "identified as a female" and using she/her pronouns throughout).

Jones administered a standardized questionnaire to measure gender dysphoria, and Ms. Green's score strongly indicated an affirmative diagnosis. ROA, Vol. I, at 126; ROA, Vol. III, at 188. Under that questionnaire, "lower scores show[] increased levels of gender dysphoria." *Id.* The average score of people experiencing gender dysphoria was 2.49, while that of people not experiencing gender dysphoria was 4.85. ROA, Vol. I, at 127; ROA, Vol. III, at 189. Ms. Green scored 1.4, which Jones found to be "extremely low." *Id.*

Jones's report then turned to the DSM-5's two criteria for gender dysphoria. The first criterion, incongruence between a person's gender identity and their sex assigned at birth, involves six factors: when at least two are satisfied, the criterion indicates gender dysphoria. ROA, Vol. I, at 127; ROA, Vol. III, at 189.

Jones's report shows that Ms. Green satisfied at least four of the six factors. ROA, Vol. I, at 127–28; ROA, Vol. III, at 189–90. The report acknowledged that Ms. Green has "always" been "acutely aware of [her] desire to live as/be a female," she has "a strong desire to be rid of her primary . . . sex characteristics," "a strong desire for . . . sex

characteristics of the other gender," and "a desire to be the other gender." *Id*.

Jones suggested that Ms. Green might not meet the other two factors ("a strong desire to be treated as the other gender" and "a strong conviction that one has the typical feelings and reactions of the other gender") because in the interview, Ms. Green said she "desires to be seen as a woman, but spent no time detailing or discussing what it would mean to be treated as a woman," and "only expressed interest in specific traditional female roles when describing [her] employment history." ROA, Vol. I, at 128; ROA, Vol. III, at 190. Jones did not explain why Ms. Green's "desire to be treated as the other gender," and interest in traditionally feminine gender roles, were not enough to satisfy the factors. In any event, Jones's report showed that Ms. Green satisfied four factors when only two were necessary to meet the first diagnostic criterion. ROA, Vol. I, at 127–28; ROA, Vol. III, at 189–90.

As to the second criterion, which "relates to the association of the condition with clinically significant distress," Jones had noted that Ms. Green reported "severe to moderate levels of depression and anxiety, extreme somatic complaints, as well as rare thoughts of suicide and self-

harm." ROA, Vol. I, at 126; ROA, Vol. III, at 188. But Jones then stated that Ms. Green "does not appear to be experiencing clinical levels of anxiety and/or depression related to Gender Dysphoria" because, she concluded, any distress was due to a "Personality Disorder." ROA, Vol. I, at 128; ROA, Vol. III, at 190. Jones did not explain how she came to understand that the distress was attributable only to a personality disorder, and not to gender dysphoria.

Ms. Green's medical records do not indicate that she had ever been diagnosed with a personality disorder prior to Jones's evaluation. ROA, Vol. I, at 96–98. Ms. Green did, however, have a documented history of a gender-dysphoria diagnosis. ROA, Vol. II, at 190.

Jones's report concluded that Ms. Green "does not meet the criteria for Gender Dysphoria" and "the distress fueled by a documented personality disorder is the primary factor fueling [her] dysphoric mood." ROA, Vol. I, at 121; ROA, Vol. III, at 183. The report did not account for the discrepancy between this conclusion and Ms. Green's score on the standardized questionnaire, the fact that she satisfied four of the six diagnostic factors when only two would have sufficed, and the fact that

she reported severe to moderate depression in connection with her gender identity.

Jones recommended "mental health programming" and noted that medical staff will "determine[] if continuation, advancement, or discontinuation of the Hormone Treatment is in the best interest of Inmate Johnson." ROA, Vol. I, at 129; ROA, Vol. III, at 191. Jones's report was dated May 11, 2018. ROA, Vol. I, at 121; ROA, Vol. III, at 183.

On May 16, 2018, Ms. Green was then transferred to Defendants' facility, the Davis Correctional Facility ("DCF").[4] ROA, Vol. II, at 55. Upon arrival, officers disposed of her cosmetics, stating they were "*Female only*," ROA, Vol. II, at 69, and she was denied access to female undergarments. ROA, Vol. II, at 103.

A week after that, Ms. Green agreed to waive mental-health treatment because her HRT "made the continued prescribing of Remeron [an antidepressant] unnecessary." ROA, Vol. II, at 50. Medical records indicate that when Ms. Green waived mental-health treatment, she made clear "[M]y hormones cover my depression, so I don't need anything now.

---

[4] DCF is a prison facility "housing male inmates in the custody of Oklahoma Department of Corrections," owned and operated by a private contractor with the ODOC. ROA, Vol. II, at 68.

I'm doing ok." ROA, Vol. III, at 180. At that time, Ms. Green was unaware of Jones's conclusions and that Defendants were planning on discontinuing her HRT. ROA, Vol. II, at 50–51.

Meanwhile, Defendant Dr. Sanders, Doctor of Osteopathic Medicine at DCF, read Jones's report, including that Jones had declined to diagnose Ms. Green with gender dysphoria. ROA, Vol. II, at 43. Although Jones's report indicated that Dr. Sanders would have to make the final call about Ms. Green's HRT, Dr. Sanders came to the "opinion that in order for us to remain consistent with [ODOC] policy . . . the prescription of these two medications, Estradiol and Spironolactone, . . . would need to be discontinued." *Id.* He acknowledged that Ms. Green arrived at DCF having already been prescribed Estradiol and Spironolactone. ROA, Vol. II, at 42.

Dr. Sanders's reference to "policy" was to ODOC policy OP-140147, titled "Management of Gender Nonconforming Inmates," which provides:

> 1. Hormonal treatment of Inmates with Gender Dysphoria may be undertaken only after all the following occurs;
>
> > a. Diagnosis of Gender Dysphoria has been confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders.*

> b. A 'Female to Male Hormonal Therapy Risk and Information Form' or 'Male to Female Hormonal Therapy Risk and Information Form' is read, signed by the inmate and scanned into the inmate's electronic health record.

ROA, Vol. II, at 63 (cleaned up). As its text indicates, this policy provides for when HRT may be "undertaken," and does not expressly address procedures for discontinuing past-prescribed medication.

On May 23, 2018, after Ms. Green had waived mental-health services expressly because her prescribed HRT kept her from being depressed, Defendant Ray Larimer, R.N., and another medical staffer told Ms. Green that her HRT would be reduced and then discontinued entirely. ROA, Vol. II, at 51. They explained that Dr. Sanders and the facility's mental-health provider made the decision. ROA, Vol. II, at 58.

For Ms. Green's remaining time at DCF, she did not receive any mental-health treatment aside from "weekly rounds through the segregated housing units," and being "periodically seen by the facility psychiatrist;" and she was progressively cut off from her prescribed HRT. ROA, Vol. II, at 51–52.

## III. Ms. Green repeatedly requested reinstatement of her HRT and other gender-affirming care.

After Defendants discontinued Ms. Green's prescribed HRT, she began to experience pain and swelling in her breast, back pain, vomiting, migraines, depression, and anxiety. ROA, Vol. I, at 352; ROA, Vol. II, at 361, 470. Ms. Green informed Defendants and other prison officials of these medical needs through a series of grievances, sick-call requests, and requests to staff. *See, e.g.*, ROA, Vol. II, at 368; ROA, Vol. III, at 146 ("I am severely depressed without my HRT."); ROA, Vol. II, at 360–61 ("I have been experiencing pain and swelling in my breast as well as my back"); ROA, Vol. II, at 371 ("I am in pain, my back, breast, [and] neck [are] hurting.").

She requested to speak with Jones about her diagnosis, to which Jones responded that she needs to "discuss [her] diagnosis with [her] primary QMHP" because "all medication decisions are made by medical." ROA, Vol. II, at 354; ROA, Vol. III, at 118. Ms. Green also requested a copy of Jones's report on two separate occasions. ROA, Vol. II, at 292, 372. She was referred to medical records. *Id.*; ROA, Vol. III, at 73.

After she received the report, Ms. Green also submitted multiple requests to be reevaluated with the correct criteria for gender dysphoria

or referred to a gender-dysphoria specialist. ROA, Vol. II, at 352; ROA, Vol. III, at 116. The first request expressly alerted Nurse Larimer to the potential symptoms of stopping HRT. ROA, Vol. II, at 352–53; ROA, Vol. III, at 116–17 ("discontinuing my [HRT] which I [have] been on for over 2 years would cause me significant harm [such as] vomiting, abdominal pain, breast dysfunction, cancer, depression, and could possibly lead to [self-harm]"). When Ms. Green again asked to be reevaluated on July 24, 2019, ROA, Vol. II, at 370, she was told that "HSA will look in to [it]." *Id.* But the DCF medical records Defendants produced in this lawsuit do not indicate that she was ever reevaluated. ROA, Vol. II, at 369; ROA, Vol. III, at 143.

Ms. Green filed at least five grievances over the span of just over a year regarding her need for gender-affirming care. ROA, Vol. II, at 357 ("I need to speak with Dr. Sanders pertaining to my [HRT]"); ROA, Vol. II, at 374; ROA, Vol. III, at 75 ("I am requesting to 'meet' with Dr. Sanders to discuss treatment options"); ROA, Vol. II, at 471; ROA, Vol. III, at 150 ("I filed a request to health services requesting that I meet with [Dr. Sanders]"); ROA, Vol. II, at 473; ROA, Vol. III, at 148 ("requesting that I meet with Dr. Sanders"). Each time, Ms. Green was always told either

that he would not meet with her because she did not meet HRT qualifications or that he would be notified she wants to meet with him. But Dr. Sanders never met with Ms. Green. ROA, Vol. II, at 177, 182.

Ms. Green appealed the denial of one of her requests to meet with Dr. Sanders. ROA, Vol. II, at 367. In that appeal, she alerted medical staff that Jones is an "inexperienced psychologist" and that "inexperienced psychologists often misdiagnose gender dysphoria for a psychiatric disorder." ROA, Vol. II, at 368; ROA, Vol. III, at 145. Her appeal was denied. ROA, Vol. II, at 369; ROA, Vol. III, at 143.

Ultimately, Defendants never restored Ms. Green's access to her prescribed HRT, nor did they provide any other gender-affirming care.

## IV. The district court entered summary judgment against Ms. Green's deliberative-indifference claim.

Ms. Green brought this action under 42 U.S.C. § 1983, alleging that Defendants Sanders and Larimer were deliberately indifferent to her serious medical need for gender-affirming care, in violation of the Eighth Amendment, and requesting monetary and injunctive relief.[5]

---

[5] Ms. Green now seeks only monetary damages because she is no longer in ODOC custody. Ms. Green also raised other constitutional claims, but the district court found that they were not exhausted under the Prison Litigation Reform Act, and entered summary judgment

The district court granted Defendants' motion for summary judgment, finding that no reasonable finder of fact could determine that Defendants were deliberately indifferent. ROA, Vol. II, at 442–49. The court concluded that neither Defendant could have had the requisite mindset for deliberate indifference because they were simply following the DOC's policy on HRT. *Id.*

Ms. Green moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). ROA, Vol. II, at 454–62. The district court denied the motion, ROA, Vol. II, at 485, and Ms. Green timely appealed, ROA, Vol. II, at 486. Ms. Green has litigated this case, including this appeal, pro se until this Court appointed the undersigned counsel. *See* Order (Jan. 31, 2024).

## SUMMARY OF THE ARGUMENT

Summary judgment was improper for at least three independent reasons. First, Ms. Green arrived at DCF with an HRT prescription to treat her diagnosed gender dysphoria. A reasonable jury could conclude Defendants were deliberately indifferent to her serious medical needs

---

against them. ROA, Vol. II, at 17–37. Ms. Green appeals only the entry of summary judgment against her deliberate-indifference claim.

when they intentionally interfered with that prescribed treatment despite Ms. Green's obvious medical need. The record supports a finding that Defendants' intentional interference was not based on a difference of medical opinion; rather, Dr. Sanders confirmed he knew Ms. Green had previously been diagnosed with gender dysphoria and that withdrawing her prescription could cause harm, but he nevertheless cut off the HRT based on his interpretation of DOC policy. But viewed most favorably to Ms. Green, a factfinder could determine that the policy allowed Defendants to leave Ms. Green's HRT prescription undisturbed, and their failure to do so was deliberately indifferent to Ms. Green's serious medical need for gender-affirming care.

Second, a reasonable jury could conclude that Ms. Green experienced the functional denial of *any* gender-affirming care. The closest thing Ms. Green received at DCF that could approximate gender-affirming "treatment" were sporadic mental-health rounds and psychiatrist visits. As this Court has recognized in analogous contexts, this is an open, material, factual question at the heart of Ms. Green's deliberate-indifference claim. On top of this, Ms. Green continued to make Defendants aware of her unaddressed medical needs after being

cut off from her prescribed HRT. On this record, a reasonable factfinder could easily determine that Defendants were deliberately indifferent.

Finally, a reasonable jury could also conclude that Defendants failed to discharge their "gatekeeping" obligations by not referring or affording access to medical personnel capable of impartially evaluating Ms. Green. Both Dr. Sanders and Nurse Larimer were confronted with obvious reasons to doubt that Jones was capable of evaluating Ms. Green for gender dysphoria. As a result, both had subjective knowledge of a substantial risk that Ms. Green never received proper treatment for her asserted condition, and their gatekeeping failure amounts to deliberate indifference.

## STANDARD OF REVIEW

This Court reviews a district court's entry of summary judgment de novo. *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). Summary judgment is inappropriate unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the nonmovant, Ms. Green's account of the evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

The district court improperly resolved disputed facts against Ms. Green. This Court should therefore vacate summary judgment and remand so that a jury can determine the factual question of Defendants' deliberate indifference.

"[D]eliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs . . . or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Deliberate-indifference claims have both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834–36 (1970).

This Court typically (and correctly) assumes that the medical need for gender-affirming care is "sufficiently serious" to satisfy the objective component. *See, e.g.*, *Hardeman v. Smash*, No. 21-7018, 2022 WL 470741 (10th Cir. Feb. 16, 2022) (unpublished) ("We assume, without deciding, that gender dysphoria satisfies the objective component."); *see also Lamb v. Norwood*, 899 F.3d 1159, 1161–62 (10th Cir. 2018) ("The seriousness

of [the inmate's gender-dysphoria-related] medical need is uncontested for purposes of summary judgment."). The district court did the same, below. ROA, Vol. II, at 443.

In any event, the symptoms and other medical needs Ms. Green experienced after being cut off from HRT squarely satisfy the objective requirement. *See* ROA, Vol. II, at 360–61 ("I have been experiencing pain and swelling in my breast as well as my back . . . my facial hair, acne, [and] testicles are all experiencing puberty [because] you are interfering with my body's chemical balance."); ROA, Vol. II, at 368 ("I am experiencing mental and physical pain . . . I am severely depressed without my HRT."); *cf., e.g., Mata,* 427 F.3d at 751 (holding that considerable pain satisfies the objective component). Defendants have not argued otherwise, and the district court did not question that the harm Defendants caused Ms. Green was (objectively) sufficiently serious. ROA, Vol. II, at 442–49; Appellees' Resp. Br. 6–10.

Accordingly, this case turns on the subjective component. The requirement "that the official 'knows of and disregards an excessive risk to inmate health or safety,'" is satisfied where the prison official is "aware of the facts from which the inference of a substantial risk of serious harm

could be drawn and also draw[s] that inference." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (citing *Farmer*, 511 U.S. at 837). Defendants do not need to have "acted or failed to act believing that harm [would] actually befall an inmate." *Id.* (cleaned up). Rather, if they "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist," the subjective component is satisfied. *Mata*, 427 F.3d at 752.

Here, three lines of this Court's precedent independently show that the district court erred in finding Mr. Green could not satisfy the subjective component of her deliberate-indifference claim.

First, "intentionally interfering with . . . treatment once prescribed" shows deliberate indifference. *Casanova v. Ulibarri*, 622 F. App'x 724, 728–29 (10th Cir. 2015) (citing *Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990)). Defendants admit that Ms. Green was prescribed HRT and that they intentionally discontinued it, in the face of Ms. Green's protests and complaints that losing access to her HRT caused her medical harm.

Second, under the "failure to properly treat theory," if nominal treatment is so lacking that it amounts to a functional denial of care, that can qualify as deliberate indifference. *Lucas*, 58 F.4th at 1138 (collecting cases). Here, a rational factfinder could conclude that Defendants functionally deprived Ms. Green of any indicated gender-affirming care for the medical needs they knew she was experiencing.

Finally, when a defendant acts "as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment," that amounts to deliberate indifference. *Id.* at 1137. This "gatekeeper theory" focuses on whether the defendant failed to fulfill a duty to connect an inmate to capable, necessary care. *Id.* at 1139. Here, a reasonable factfinder could determine that Defendants were confronted with considerable evidence that Jones could not capably evaluate Ms. Green, but they failed to refer her elsewhere or take any reasonable corrective measures.

Summary judgment was therefore inappropriate, multiple times over.

**I.    A reasonable jury could find that Defendants were deliberately indifferent based on their intentional interference with Ms. Green's prescribed HRT.**

The record supports a finding that Defendants were deliberately indifferent to Ms. Green's serious medical needs when they intentionally interfered with her access to her physician-prescribed HRT. *Cf. Casanova*, 622 F. App'x at 729 ("[P]ersonally refusing to allow [an inmate] to keep" necessary treatment "is sufficient to satisfy the subjective prong of the deliberate indifference test.").

This is because the Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" can be "manifested by . . . intentionally interfering with the [inmate's] treatment once prescribed." *Estelle*, 429 U.S. at 104–05; *see also Casanova*, 622 F. App'x at 728–29 ("[I]t is of particular significance in this case that deliberate indifference is shown not only by failure to provide prompt attention to the medical needs of a [prisoner], but also by intentionally interfering with the treatment once prescribed.").

Accordingly, this Court has consistently found triable fact questions when defendants knowingly cut off a plaintiff from prescribed treatment or otherwise disregard medical orders. *See, e.g.*, *Paugh v. Uintah Cnty.*,

47 F.4th 1139, 1162–63 (10th Cir. 2022) (affirming denial of summary judgment when defendant failed to give the plaintiff prescription medication and knew about the plaintiff's need for it); *Casanova*, 622 F. App'x at 728–29 (reversing summary judgment because, "[v]iewing the evidence in the light most favorable to Plaintiff, Defendant intentionally interfered with the treatments prescribed for an ill geriatric patient by personally refusing to allow him to keep" a prescribed CPAP machine, glasses, and other medical equipment); *Martin*, 909 F.2d at 406 (affirming denial of summary judgment because of "factual questions whether defendants deliberately disregarded the medical information and warnings" about defying a physician's instructions in physically moving the plaintiff who had been injured in a serious accident); *Howard v. Dickerson*, 34 F.3d 978, 979–81 (10th Cir. 1994) (same, when defendants handcuffed a neck-braced defendant from behind despite a known medical need and warnings that it would cause further injury).

*Paugh* is particularly instructive. There, a pretrial detainee entered jail with a physician's prescription to treat his chronic alcoholism. *Paugh*, 47 F.4th at 1148. The officers in charge of the detainee's care were aware of the prescribed medication and the doctor's instructions, and the fact

that the detainee's condition might deteriorate without care. *Id.* at 1149. When the officers failed to provide the prescribed medication and follow the doctor's instructions, the detainee's condition worsened until he eventually died from alcohol withdrawal. *Id.* at 1149–52. Recognizing that the detainee's prescription and treatment plan made his need for care "obvious," this Court affirmed the denial of the officers' motion for summary judgment and held that a reasonable jury could find the officers were deliberately indifferent. *Id.* at 1157–58.

As this Court has noted, other courts have applied the same principle in the specific context of gender-affirming care, recognizing that interference with a transgender inmate's previously prescribed HRT can constitute deliberate indifference. *See, e.g.*, *Brown v. Zavaras*, 63 F.3d 967, 970 n.2 (10th Cir. 1995) (citing *Phillips v. Mich. Dep't of Corrections*, 731 F. Supp. 792, 800 (W.D. Mich. 1990) (granting a transgender inmate's motion for a preliminary injunction to continue her previously prescribed HRT because "[i]t is one thing to fail to provide an inmate with care that would improve his or her medical state, such as refusing to provide sex reassignment surgery . . . . Taking measures which actually reverse the effects of years of healing medical treatment . . . is measurably worse"),

*aff'd* 932 F.2d 969 (6th Cir. 1991)); *South v. Gomez,* 211 F.3d 1275 (9th Cir. 2000) (denying qualified immunity to prison officials because "[t]he critical element [was] that plaintiff *was already receiving female hormones* when she was transferred from [one prison to a second prison].").

So too here. Ms. Green took prescribed HRT for years before Defendants terminated that care. ROA, Vol. I, at 95. Dr. Sanders specifically admitted he knew Ms. Green was prescribed HRT to treat her gender dysphoria and that without it she would likely suffer serious medical consequences. ROA, Vol. II, at 43. Despite this, the district court curiously concluded that there was "no objective evidence in the medical records that hormonal treatment had been initiated prior to [Ms. Green's] incarceration." ROA, Vol. II, at 446. But in fact the record contains an abundance of evidence that Ms. Green had a previous and longstanding HRT prescription. *See, e.g.*, ROA, Vol. II, at 43 ("The Estradiol and another medication, Spironolactone had both been previously prescribed to [Ms. Green] based upon a mental health diagnosis of transgender/gender dysphoria."); ROA, Vol. I, at 86–87 (medical records indicating Ms. Green has been on Estradiol and Spironolactone for

years); ROA, Vol. II, at 197 (Ms. Green's declaration stating she was on HRT prior to incarceration). The district court's unsupported conclusion to the contrary betrays that it was improperly resolving a disputed fact.

From Dr. Sanders's own testimony, a reasonable jury could conclude that Defendants satisfied the subjective component of deliberate indifference when they admittedly terminated Ms. Green's prescribed HRT while understanding the medical consequences that would ensue.

Invoking the ODOC policy does not absolve Defendants of their deliberate indifference to Ms. Green's serious medical needs. As an initial matter, following policy does not foreclose deliberate indifference. *See, e.g.*, *Howard*, 34 F.3d at 979 (affirming denial of summary judgment when officers defied medical warnings, even though they acted "in accordance with general police procedure").

And in any event, a reasonable jury could find that the ODOC policy Defendants purported to rely upon did not compel them to discontinue Ms. Green's HRT. The policy's plain text required a gender-dysphoria diagnosis only to "undertake[]" new hormonal treatment. ROA, Vol. II, at 42. But the question before Defendants wasn't whether Ms. Green could "undertake" HRT—she was already on it. *See Undertake*, *Oxford English*

*Dictionary* (3d ed. 1973) ("to enter upon, begin"). Defendants affirmatively discontinued an ongoing course of prescribed treatment that Ms. Green had already, and long ago, "undertaken."

And even if that were not the case, a reasonable factfinder could conclude that under the policy, Dr. Sanders could have relied on the preexisting gender-dysphoria diagnosis on Ms. Green's chart to leave undisturbed her prescribed access to HRT. ROA, Vol. II, at 63.

Nor does Jones's report support Dr. Sanders's assertion that the policy compelled him to discontinue Ms. Green's HRT. To the contrary, the report acknowledged that Ms. Green was "currently receiving [HRT] for Gender Dysphoria" and that the "continuation, advancement, or discontinuation of the [HRT]" prescription was ultimately up to Defendants. ROA, Vol. I, at 129; ROA, Vol. III, at 191.

In sum, Defendants admit they knew Ms. Green was prescribed HRT after being diagnosed with gender dysphoria, and that they intentionally interrupted her treatment, knowing that it could cause medical complications. And in fact, Ms. Green notified the Defendants that being cut off from HRT *did* create and exacerbate severe pain, depression, and other serious medical needs. Viewing the record in the

light most favorable to Ms. Green, a reasonable jury could easily find that Defendants were deliberately indifferent. This Court should therefore vacate and remand.

## II. A reasonable jury could conclude Defendants were deliberately indifferent in failing to provide Ms. Green with any gender-affirming care.

Not only could a reasonable factfinder find deliberate indifference in Defendants' intentional interference with Ms. Green's prescribed HRT, but there is also a genuine dispute of material fact as to whether Ms. Green received *any* constitutionally adequate treatment for her medical needs. Such a failure to treat known medical needs satisfies the subjective prong of deliberate indifference. *See Lucas*, 58 F.4th at 1138–39 ("[P]roviding only *some* modicum of treatment is not sufficient to absolve [defendants] from liability for potential deliberate indifference . . . ." (cleaned up)).

This Court was "one of the first" to recognize a prison's constitutional obligation to provide some form of gender-affirming care to transgender inmates. *Brown*, 63 F.3d at 970 ("[P]rison officials must provide treatment to address the medical needs of [transgender] prisoners . . . ."); *see also Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.

1986) (holding that, at the very least, "some form of therapy [is] necessary" for an inmate complaining of gender dysphoria).

And more recently, this Court delineated four acceptable methods of providing gender-affirming care: changes in gender expression or role, hormone therapy, surgery, and psychotherapy. *Lamb*, 899 F.3d at 1161–62. Here, a reasonable jury could conclude that Ms. Green did not receive any of them.

It is clear from the record that Ms. Green did not receive any of the first three acceptable categories of care: She was not permitted to conform her gender expression to her gender identity—to the contrary, she was consistently misgendered at DCF. *See, e.g.*, ROA, Vol. II, at 103 (noting that she was "not approved" for female undergarments and cosmetics); ROA, Vol. I, at 397 (prison officials referring to her as [he] in prison records). She did not receive surgery (though she did not contend it was medically necessary at the time). ROA, Vol. I, at 128; ROA, Vol. III, at 190.[6] And, of course, Defendants terminated her HRT. ROA, Vol. II, at 43.

---

[6] According to the WPATH Standards, surgery "is often the last and most considered step in the treatment for gender dysphoria. While many [individuals] find comfort in their gender identity, role, and expression

This leaves only gender-affirming psychotherapy, and the record tees up a factual dispute whether Ms. Green ever received such care. Ms. Green frequently filed grievances asking for further care, including mental-health services, once she was cut off from her prescribed HRT. *See, e.g.*, ROA, Vol. II, at 359 (requesting to speak with facility psychologist); ROA, Vol. II, at 373 (requesting to speak with the QMHP).

The district court found (accepting Defendants' assertion) that Ms. Green's treatment at DCF consisted of "weekly rounds through the segregated housing units" by mental-health staff and periodic visits from the facility psychiatrist. ROA, Vol. II, at 52. But given the record of Ms. Green's repeated requests for mental-health and other care, that was an improper resolution of a disputed fact against Ms. Green.

Even assuming such mental-health meetings occurred, this Court's reasoning in *Hardeman v. Smith*, 764 F. App'x 658 (10th Cir. 2019) shows that that is insufficient to support summary judgment. There, this Court noted that the same district-court judge who entered summary judgment below inaccurately characterized the record in suggesting that short,

without surgery, for many others surgery is essential." ROA, Vol. II, at 291. Because surgery is not indicated for every individual, the availability of HRT is all the more important.

infrequent mental-health rounds must have amounted to medical treatment for the plaintiff's gender dysphoria. *Id.* at 663–64. This Court explained that a reasonable jury could conclude that "a [psychologist] merely conduct[ing] mental health rounds" was not enough to qualify as gender-affirming care under *Lamb*, especially when the record demonstrated plaintiff's "frustration at the lack of response" to her repeated requests for gender-affirming care. *Id.* at 662–63.

Here, the same district court made the same mistake. It mischaracterized the record to state that Ms. Green's claim was merely that she received treatment that was "different from what she wanted." ROA, Vol. II, at 448. But Ms. Green does not assert a mere disagreement with Defendants' treatment plan—to the contrary, the record supports a finding that Ms. Green did not receive *any* adequate gender-affirming treatment at all. *Compare Lamb*, 899 F.3d at 1164 (holding that there was no deliberate indifference where inmate was receiving a combination of psychological and hormone treatment), *with Smith*, 764 F. App'x at 663–64 (stating that the district court was overly ambitious in finding inmate was "merely asserting a difference of opinion" where there was

evidence she was not receiving "any treatment at all," even though she had access to periodic mental-health rounds).

Ms. Green's so-called "waiver" of mental-health services cannot justify summary judgment, either. The district court repeatedly relied on the notion that Ms. Green "refused and waived all mental health services and medications." ROA, Vol. II, at 446. But the district court did not engage with the fact that this purported waiver happened only because Ms. Green was receiving her prescribed HRT, when she did not know Defendants were about to cut her off. ROA, Vol. II, at 50 ("[the] hormones being provided made the continued prescribing of Remeron unnecessary"); ROA, Vol. III, at 180 ("[M]y hormones cover my depression, so I don't need anything now. I'm doing ok."). And in fact, as explained above, once she learned Defendants were terminating her HRT, she submitted multiple requests for gender-affirming care, including mental-health treatment, which the record does not indicate she ever received.

On top of that, the record also shows that Defendants failed to treat Ms. Green for the physical symptoms she experienced after having her HRT cut off. *See, e.g.*, *See* ROA, Vol. II, at 360–61 ("I have been

experiencing pain and swelling in my breast as well as my back"); ROA, Vol. II, at 371 ("I am in pain, my back, breast, [and] neck [are] hurting"); ROA, Vol. II, at 374; ROA, Vol. III, at 75 (requesting to meet with Dr. Sanders to discuss treatment options); ROA, Vol. I, at 356; ROA, Vol. III, at 148 (I am "requesting that I meet with Dr. Sanders pertaining to him stopping my HRT"). Despite Ms. Green's repeated requests, Dr. Sanders never met with Ms. Green. ROA, Vol. II, at 182. *See Lucas*, 58 F.4th at 1139 (citing *Mata*, 427 F.3d at 758) (noting that "doing nothing in the face of serious medical needs" demonstrates deliberate indifference).

In sum, a reasonable jury could conclude that Defendants failed to provide any constitutionally adequate treatment Ms. Green was entitled to, satisfying the subjective component of deliberate indifference. Summary judgment was therefore improper.

## III. A reasonable jury could find that Defendants were deliberately indifferent in recklessly failing to refer Ms. Green to medical personnel capable of providing necessary care.

Alternatively, a reasonable factfinder could determine that Defendants were deliberately indifferent on the grounds that they flunked their "gatekeeping" duties to connect Ms. Green to "medical personnel capable of treating the condition." *Mata*, 427 F.3d at 751

(cleaned up). This is because they were confronted with considerable evidence that Jones could not capably evaluate Ms. Green, yet they failed to refer her elsewhere or take any reasonable corrective measures.

A reasonable factfinder could determine that Dr. Sanders was a *de facto* gatekeeper between Ms. Green and gender-affirming care. *See* ROA, Vol. II, at 42–43 (noting Dr. Sanders's opinion that under ODOC's policy, Jones's reversal of the diagnosis required him to cut off HRT); ROA, Vol. II, at 57 (noting Larimer's understanding that "Jones was <u>the</u> qualified mental health professional for Oklahoma DOC regarding Gender Dysphoria"). Similarly, the record demonstrates a factual question whether Larimer is a gatekeeper because, as the correctional health-services administrator, he oversees the scheduling of visits between inmates and facility doctors and other health-care professionals. ROA, Vol. II, at 54–55.

Accordingly, Defendants discharge their gatekeeping obligations only by "refer[ing] or otherwise afford[ing] access to medical personnel *capable* of evaluating [Ms. Green's] treatment needs." *See Lucas*, 58 F.4th at 1139 (emphasis added).

For multiple reasons, a reasonable jury could find that they failed to do so because they knew of a substantial risk that Jones was not a capable provider for the gender-affirming care Ms. Green needed. *See Mata*, 427 F.3d at 752 (circumstantial evidence can establish that a prison official knew of a substantial risk) (citing *Farmer*, 511 U.S. at 842)).

First, it should have been obvious to Defendants that Jones's reversal of Ms. Green's gender-dysphoria diagnosis was unsupported by the conclusions and analysis on the face of her own report. Defendants read Jones's report. ROA, Vol. II, at 43; ROA, Vol. II, at 58. As explained above, that report curiously withheld a diagnosis of gender dysphoria even though the analysis leading up to that conclusion strongly indicated such a diagnosis. Defendants' "refus[al] to verify underlying facts that [they] strongly suspect[] to be true," or their failure "to confirm inferences of risk that [they] strongly suspect to exist," constitute deliberate indifference. *Lucas*, 58 F.4th at 1137 (citing *Farmer*, 511 U.S. at 843 n.8); *see also Mata*, 427 F.3d at 755–59; *Sanchez v. Oliver*, 995 F.3d 461, 474 (5th Cir. 2021) (determining that medical professional was deliberately

indifferent when there was evidence of their awareness of an incorrect diagnosis).

Second, Jones's report should have prompted Defendants to question her partiality—and therefore capability. As noted above, Jones's report repeatedly misgendered Ms. Green. ROA, Vol. I, at 121–29; ROA, Vol. III, at 183–91. And Jones's ad hominem statements about Ms. Green's activity on "social media," "on stage adult entertainment, and prostitution," combined with her musings on the "current political climate," call-out culture, and the ability to label "anyone who declines to applaud inmate Johnson's presentations as 'haters'" seriously call into question Jones's ability to care for Ms. Green's serious medical needs. ROA, Vol. I, at 128–29; ROA, Vol. III, at 190–91.[7] In the meantime,

_____

[7] Unfortunately, this is not the first time Jones has taken such potshots at transgender inmates she has examined. *See, e.g., Porter v. Crow*, No. 18-CV-0472-JED-FHM, 2020 WL 620284, at *3 (N.D. Okla. Feb. 10, 2020) (unpublished) (holding that transgender inmate stated claim for deliberate indifference when Jones's report suggested the inmate was "masquerading as a woman," demeaned the inmate by "continually" using the wrong pronouns, and relied on gendered stereotypes about professions on the way to withholding a gender-dysphoria diagnosis). And Jones appears to have a penchant for reversing inmates' previous gender-dysphoria diagnoses. *See, e.g., Halliwell v. Allbauch*, No. CIV-18-1152-D, 2019 WL 1128761, at *2 (W.D. Okla. Mar. 12, 2019) (unpublished) (stating that Jones told an ODOC physician who diagnosed the inmate with gender dysphoria to "change plaintiff's

Defendants saw Ms. Green's physical and mental condition deteriorate. ROA, Vol. II, at 361, 371.

A jury could find that a reasonable person in Dr. Sanders's (a board-certified physician practicing medicine for 30 years) or Larimer's position would, at a minimum, "strongly suspect" that Jones's biases prevented her from capably evaluating inmates for gender dysphoria. *Lucas*, 58 F.4th at 1137; *see also Paugh*, 47 F.4th at 1158; ROA, Vol. II, at 39.

This is not a mere disagreement about a diagnosis or course of treatment. Rather, this is about prison officials failing to take reasonable measures to ensure that an inmate under their purview received adequate medical care after learning about another provider's care that was obviously deficient. *See Farmer*, 511 U.S. at 832–33 (the Eighth Amendment "imposes duties on [prison] officials" to "ensure that inmates receive adequate . . . medical care"). Given the obvious deficiencies on the face of Jones's report, and the fact that Defendants were on notice of Ms. Green's ongoing medical needs, Defendants cannot avoid liability based

---

diagnosis (of Gender Dysphoria) and not treat her for [gender dysphoria]"); *Smash,* 2022 WL 470741, at *1 (stating that after an ODOC psychologist diagnosed Hardeman with gender identity disorder, Jones conducted a separate evaluation and changed the diagnosis to histrionic personality disorder).

merely on their initial referral of Ms. Green to Jones. *See Lucas*, 58 F.4th at 1139 ("[M]erely doing *something* . . . does not insulate one from liability . . . a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances.").

Defendants could have abated the risk by exercising their own medical judgment, allowing Ms. Green to see a specialist, or arranging an assessment from another QMPH. Instead, they did nothing. A reasonable jury could find that their inaction in light of a known, substantial risk of harm was insufficient to discharge their gatekeeping obligations. *See Lucas*, 58 F.4th at 1139.

## CONCLUSION

For these reasons, this Court should vacate the decision below and remand for further proceedings.

Respectfully submitted,

/s/ Steven J. Alagna
Steven J. Alagna
*Counsel of Record*
*Supervising Attorney*

Nicholas Blum
Jacob Cogdill
Madeline Wingert
*Student Advocates*
WASHINGTON UNIVERSITY SCHOOL OF LAW
Appellate Clinic
One Brookings Drive
MSC 1120-250-102
St. Louis, MO 63130
(314) 935-7238
salagna@wustl.edu

*Counsel for Appellant*

Dated: April 8, 2024

## STATEMENT REGARDING ORAL ARGUMENT

This Court's Order appointing the undersigned counsel indicates that the Court will hear oral argument in this matter. *See* Order at 3 (Jan. 31, 2024). Ms. Green respectfully submits that oral argument is indeed warranted because this case involves important questions, including whether prison officials can be deliberately indifferent when they intentionally interfere with prescribed hormone replacement therapy while knowing that medical complications would—and did—result, among other, related issues. These questions have significant implications for transgender inmates and prison officials throughout this Circuit—especially given the frequency of disputes before this Court arising from evaluations by Patricia Jones, Psy.D.—and oral argument would assist the Court in addressing them.

# CERTIFICATE OF COMPLIANCE

This brief complies with word-count limitations of Federal Rule of Appellate Procedure 32(a) because it contains 7,681 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It complies with Federal Rule of Appellate Procedure 32(a)'s typeface and type-style requirements because it was typed in size-14 Century Schoolbook, a proportionally spaced typeface, in Microsoft Word for Microsoft 365.

/s/ Steven J. Alagna

# CERTIFICATE OF SERVICE

I certify that on April 8, 2024, I electronically filed the foregoing Supplemental Opening Brief of Appellant Lamone M. Johnson via this Court's CM/ECF system, which will send notice of such filing to counsel of record in the above-captioned case.

/s/ Steven J. Alagna